## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

THE FORTUNE SOCIETY, INC.
29-76 Northern Blvd
Long Island City, NY 11101

        Plaintiff,

   v.

SANDCASTLE TOWERS HOUSING
DEVELOPMENT FUND CORP.
1465A Flatbush Ave.
Brooklyn, NY 11210

SARASOTA GOLD LLC
1407 48th Street
Brooklyn, NY 11219

     and

WEISSMAN REALTY GROUP LLC
45 Broadway, 12th Floor
New York, NY 10006

       Defendants.

Civil Action No. 1:14-cv-6410

**COMPLAINT**

**JURY DEMAND**

## NATURE OF THE ACTION

1.    The Fortune Society ("Fortune") brings this suit pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq*., for injunctive, monetary and declarative relief against Defendants Sandcastle Towers Housing Development Fund Corporation ("HDFC"), Sarasota Gold LLC ("Sarasota Gold"), and Weissman Realty Group LLC ("Weissman") for engaging in a pattern or practice of illegal discrimination on the basis of race and color at The Sand Castle, a multi-building apartment complex they own and manage in Queens, New York.

Specifically, Defendants maintain and enforce a policy of automatically excluding any person with a record of a criminal conviction from renting or living in an apartment at The Sand Castle. Defendants explicitly confirmed this policy to Fortune twice in the summer of 2013.  The policy excludes all such people regardless of the nature of the conviction, the amount of time that has lapsed since the conviction, evidence of rehabilitation, or any other factor related to whether a specific person poses any threat to safety.  Pursuant to this stated policy, Defendants repeatedly refused to permit Fortune to rent apartments at The Sand Castle on behalf of its clients because those clients have criminal histories.[1]  Defendants' policy has the purpose and effect of discriminating against African Americans and Latinos, including Fortune's clients, in violation of the Fair Housing Act and New York State and City law.

2. Fortune is a not-for-profit organization that for nearly fifty years has been dedicated to the successful reentry and reintegration of formerly incarcerated individuals in New York City ("the City").  It is one of the leading organizations in the country addressing and helping individuals overcome reentry issues.  Fortune has been lauded nationally and internationally for the innovation, quality, and effectiveness of its programs.  Just this summer Fortune's Senior Vice President of Programs, himself a formerly incarcerated African-American man, was named a "Champion of Change" by the White House for his work at Fortune.

3. Fortune serves approximately 5,000 clients a year.  Approximately 95% of its clients are African-American or Latino.  Fortune provides comprehensive services to these clients by operating housing, education, employment, health, and case management programs, among others.

---

[1] For purposes of this Complaint, "criminal history" and "criminal record" refer to a prior criminal conviction.

4. One of Fortune's principal tasks is to secure housing for its clients and their families. Fortune provides temporary and permanent housing for hundreds of formerly incarcerated individuals each year. It does so by running "scattered-site" programs that place clients in private rental housing throughout the City and by operating two housing facilities itself in West Harlem. The two facilities are The Fortune Academy and Castle Gardens.

5. Many of Fortune's housing programs work as a pipeline, with individuals moving from emergency to "phased permanent" to permanent housing as part of their successful reintegration. Being able to move people to the end of the pipeline opens up more space at the beginning and allows Fortune to serve more clients.

6. In some of Fortune's scattered-site programs, Fortune leases apartments and pays the rent itself. Its clients provide some reimbursement, which encourages a sense of personal investment and responsibility. Some of Fortune's scattered-site programs serve specific segments of the formerly-incarcerated population, such as people who are HIV-positive, or certain regions of the City. Fortune has developed relationships with over 100 landlords to facilitate its scattered-site housing and regularly seeks out new locations for these programs.

7. The Fortune Academy includes an 18-bed emergency housing unit and a "phased-permanent" unit that serves 41 people who transfer from the emergency unit when Fortune staff determine they are ready to live independently, subject to the availability of space. Individuals stay in the phased-permanent housing until they are ready to transition to permanent housing elsewhere. Such permanent housing is often located through Fortune's scattered-site programs. At Castle Gardens, Fortune provides affordable permanent housing that integrates formerly-incarcerated people with other low-income families. The demand for space at Fortune Academy and Castle Gardens substantially exceeds the space that is available.

3

8.      In the summer of 2013 and again in early 2014, Fortune tried to rent apartments for its clients at The Sand Castle under one of its scattered-site programs that required that apartments be located in Queens.  The Sand Castle is a four-building apartment complex with over 900 rental units in Far Rockaway, Queens.  It is owned and managed by Defendants. Fortune wanted to rent units at The Sand Castle because the complex is an ideal fit for its clients: among other things, The Sand Castle suits Fortune's clients well because it is located in a safe and racially diverse community that is readily accessible to public transportation, which its clients rely on heavily.  In addition, units at The Sand Castle fit the budget for the scattered-site program.

9.      When Defendants learned that Fortune serves formerly incarcerated individuals who would live in the apartments Fortune wanted to rent, they refused to rent apartments to Fortune.  This refusal, they told Fortune, was because they maintain and enforce a policy prohibiting anyone with a criminal record from renting an apartment or living at The Sand Castle.  This type of "blanket ban" policy has become increasingly common in housing due to the increased accessibility of inexpensive background checks via the Internet.  As a direct result of Defendants' repeated application of their blanket ban policy against Fortune, some of Fortune's clients have been forced to remain homeless or in substandard or unsafe housing substantially longer than they otherwise would have while Fortune searched for alternative housing.  In several cases, clients found eligible for scattered-site housing in the Queens program were residing in The Fortune Academy and had to remain there longer than necessary, thus occupying beds that could have been utilized to house other homeless individuals.

10.      Defendants' actions have directly and significantly diminished and frustrated Fortune's ability to provide safe and stable housing for its clients, which is a central part of its

mission of assisting formerly-incarcerated individuals with reentry and reintegration.  In addition to frustrating Fortune's ability to provide housing to its clients, these actions have caused Fortune to expend substantial additional resources to identify alternative housing options for its clients and to increase advocacy efforts, and forced Fortune to divert resources from other programmatic activities to counteract Defendants' conduct.

11.     Locally and nationally, blanket bans like the one maintained and enforced by Defendants against Fortune are discriminatory and have a clear and unlawful disparate impact on African Americans and Latinos.  The disproportionate rates of conviction and incarceration of African Americans and Latinos, as compared to whites, are well-documented.[2]  This disproportionality is clear in New York City, New York State, and the United States as a whole. African Americans and Latinos are likewise significantly overrepresented compared to whites among individuals released from prison each year, *i.e.*, Fortune's clients.  Banning people from safe and affordable housing based solely on a criminal conviction thereby has a predictable and large adverse impact on African Americans and Latinos.  In the analogous context of employment bans, this is exactly what the United States Equal Employment Opportunity Commission ("EEOC") has found by analyzing national criminal records data.[3]

12.     Analysis of criminal records and other data likewise shows that the blanket ban maintained by Defendants at The Sand Castle has a severe disparate impact on the basis of race and color.  African-American men who live in New York City and satisfy Defendants' other residency requirements for The Sand Castle are at least three times as likely as whites to be excluded by Defendants' prohibition against people with records, and Latino men are almost four

---

[2] "White" is used herein to refer to non-Hispanic Caucasians.

[3] *See generally* U.S. Equal Emp't Opportunity Comm'n, *EEOC Enforcement Guidance, Number 915.002* (Apr. 25, 2012), http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm.

and one-half times as likely as whites to be excluded.  The disparities may actually be much greater because these figures are based on a conservative statistical analysis.

13.     Under the Fair Housing Act and New York law, a policy that has a disparate impact may be permissible if it is necessary to achieve a legitimate business purpose that cannot be satisfied with a less discriminatory alternative.  That is not the case here.  A clear and obviously less discriminatory alternative for dealing with any potential concerns raised by applicants with criminal records is available to Defendants – one that is already established in the area of employment discrimination law and regulation.

14.      Instead of applying a blanket ban, Defendants could assess potential residents with criminal records individually by considering factors directly relevant to appropriate qualifications for tenancy.  This could include the nature of the conviction or(?) conduct, how long ago it occurred, the age of the person at the time of the conviction, post-conviction and post-release conduct, evidence of rehabilitation, evidence of any current threat to safety, letters of recommendation, the individual's history as a tenant and as a whole, and other factors.  The EEOC applies a presumption in the employment context that, because of the racially disparate impact of blanket bans, precisely such an individualized assessment is required by law and sufficient to protect legitimate interests such as safety.[4]  The EEOC's sound rationale applies with equal force to housing.

15.     Through an individualized assessment, Defendants would maintain the ability to review carefully all Sand Castle applicants while permitting prospective tenants who have criminal records, but pose no realistic threat to the community, to obtain housing.  This more tailored approach would protect public safety equally well, yet it would be less discriminatory

---

[4] *Id.*

and exclusionary because it would reduce the number of African Americans and Latinos prevented from securing housing at The Sand Castle.

16.     Using individualized assessments to reduce the impact of blanket bans, including Defendants' blanket ban at The Sand Castle, is crucial both for individuals who were formerly incarcerated and for the health of our communities.  Recidivism rates are much higher for reentrants who do not find safe and permanent housing, and recidivism impacts the whole surrounding community.  For Fortune's clients and other reentrants, successful reintegration greatly depends on having a suitable home.  Quite properly, housing has been called the "lynchpin that holds the reintegration process together."[5]

17.     The importance to individuals and communities of promoting successful reintegration by meeting the housing needs of the formerly incarcerated has grown alongside the rapid growth in the number of people imprisoned in the United States.  In 1980, 300,000 people in the United States were imprisoned.  Today over 2.3 million are imprisoned, many for non-violent crimes.  Nearly everyone who is currently imprisoned will be released and will need to find housing.  Moreover, the pace of people being released will increase in the near term because the United States Sentencing Commission voted unanimously to reduce sentencing ranges for certain drug offenses and to apply the changes retroactively where justified by individualized consideration, and because of a large-scale initiative by the United States to expedite consideration of clemency for the many non-violent, low-level federal offenders who have already served substantial time in prison.[6]

---

[5] Jeremy Travis, *But They All Come Back: Facing Challenges of Prisoner Reentry* 219 (2005).

[6] *See generally* U.S. Sentencing Comm'n, Office of Research and Data, *Summary of Key Data Regarding Retroactive Application of the 2014 Drug Guidelines Amendment* (July 25, 2014), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/retroactivity-analyses/drug-guidelines-

18.     Blanket bans maintained by Defendants and other landlords, however, present
formidable and often insurmountable obstacles for formerly incarcerated individuals like
Fortune's clients.  By blocking the path to safe, permanent, and affordable housing, these bans
also block the path to social and economic stability for many otherwise qualified and deserving
people without regard to the nature of their past crime or how far they have since come.  Blanket
bans also create a chilling effect, discouraging potential tenants from even applying for tenancy
in the first place.  Eliminating such unnecessary obstacles from their paths is both sound policy
and required by the Fair Housing Act.

19.     Defendants' blanket ban is based on racially discriminatory stereotypes about
those with criminal records.  Indeed, the discriminatory impact of Defendants' policy is so large,
and the less discriminatory alternative so obvious, that unlawful racially discriminatory intent
can be inferred.  Fortune contends that Defendants knew that people with criminal records,
including Fortune's clients, are disproportionately African-American and Latino.  Defendants
understood the adverse impact their policy has on the racial make-up of its property, and
deliberately and purposefully pursued that outcome.

20.     Defendants' deliberate and purposeful conduct is consistent with their other
efforts to remake the image of The Sand Castle after Defendant Sarasota Gold purchased it in
2006.  Defendants employed measures to attract wealthier white tenants and gentrify the
building, including advertisements emphasizing white models.  These efforts are consistent with
engaging in intentional discrimination in order to limit the number of minority tenants in the
building.

---

amendment/20140725-Drug-Retro-Analysis.pdf.  *See also* Dep't of Justice, Office of Public Affairs, *Announcing New Clemency Initiative, Deputy Attorney General James M. Cole Details Broad New Criteria for Applicants* (April 23, 2014), http://www.justice.gov/opa/pr/announcing-new-clemency-initiative-deputy-attorney-general-james-m-cole-details-broad-new.

21.     Fortune brings this action to address Defendants' discriminatory and unlawful conduct at The Sand Castle and to redress the harm it has suffered and will continue to suffer as a direct result of that conduct absent relief.

## PARTIES

22.     Plaintiff The Fortune Society, Inc. is a not-for-profit corporation organized under the laws of New York State with headquarters in Long Island City and offices throughout New York City.  Fortune is dedicated to assisting formerly incarcerated individuals and their families through advocacy and the provision of reentry services, including housing, employment assistance, substance abuse counseling, and other services.  Fortune serves approximately 5,000 people annually.

23.     Defendant Sarasota Gold LLC ("Sarasota Gold") is a New York limited liability company headquartered in Brooklyn, NY.  Its address for service of process on file with the New York State Department of State is 1407 48th Street, Brooklyn, NY 11219.  Sarasota Gold was formed on September 1, 2006, and since September 2006, it has owned or held all beneficial and equitable interest in the complex known as "The Sand Castle" located at 711 Seagirt Avenue in Far Rockaway, Queens.

24.     Defendant Sandcastle Towers Housing Development Fund Corporation ("HDFC") is a not-for-profit corporation established pursuant to Article XI of the New York State Private Housing Finance Law in June 2013 and headquartered in Brooklyn, NY.  HDFC, as the nominee for Sarasota Gold, has held legal or record title to the fee interest in The Sand Castle since June 27, 2013.  HDFC was formed on June 11, 2013 and its address for service of process is 1465A Flatbush Avenue, Brooklyn, NY 11210.

25.     The same person (Aryeh Ginzberg) serves as the President of Defendant HDFC and the Manager of the company that serves as Defendant Sarasota Gold's Sole Member.

26.     Defendant Weissman is a management company employed by Defendants Sarasota Gold and HDFC to operate and manage The Sand Castle on their behalf.  Weissman is headquartered in Lawrence, NY and was formed on April 18, 2005.  Its address for service of process is 45 Broadway, 12th floor, New York, NY 10006.  On one or more occasions when attempting to lease apartments at The Sand Castle, the people Fortune staff members spoke with were, upon information and belief, employees and/or agents of Weissman.

27.     Weissman is, and upon information and belief has been at all relevant times, the employee and/or agent of Defendants Sarasota Gold and HDFC such that Defendants Sarasota Gold and HDFC are liable for its acts alleged herein.

28.     In acting or omitting to act as alleged herein, each Defendant was acting through its employees and/or agents, and is liable on the basis of the acts and omissions of its employees and/or agents.

29.     In acting or omitting to act as alleged herein, each employee or officer of each Defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by each Defendant as principal.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613.  This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.  This Court has supplemental jurisdiction over the New

York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") claims pursuant to 28 U.S.C. § 1367.

31. Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants conduct business in and are residents of the district and a substantial part of the events and omissions giving rise to the claims occurred in the district.

## FACTUAL BACKGROUND

### I. THE FORTUNE SOCIETY AND ITS ATTEMPTS TO RENT APARTMENTS FOR ITS CLIENTS AT THE SAND CASTLE

#### A. Fortune's Mission and Programs

32. Founded in 1967, The Fortune Society's mission is to help incarcerated and formerly incarcerated individuals become contributing members of society and to offer alternatives to incarceration. Fortune offers a holistic array of programs for formerly incarcerated, low-income persons in New York City through a "one-stop shop" model of services that includes housing, case management, counseling, education, employment services, substance abuse treatment, family services, health services, and mental health services, among others. Fortune routinely engages in education and advocacy to promote the creation of a fair, humane, and truly rehabilitative correctional system.

33. Fortune serves approximately 5,000 individuals annually. African Americans and Latinos comprise over 95% of Fortune's clients.

34. Fortune is widely regarded as one of the leading organizations in the country confronting the myriad reentry issues faced by formerly incarcerated individuals. Fortune's programs are recognized nationally and internationally for their innovation, quality, and effectiveness, including in reducing rates of recidivism. Just this summer the White House named Fortune's Senior Vice-President of Programs a "Champion of Change" for his

11

effectiveness in helping formerly incarcerated men and women achieve and maintain employment. Also this summer, Governor Cuomo appointed Fortune's CEO to the new statewide Council on Community Re-Entry and Reintegration. Fortune's housing has been funded as a Special Project of National Significance by the United States Health Resources and Services Administration and the United States Department of Housing and Urban Development ("HUD") and Fortune has received accolades from numerous organizations as a provider of model reentry programs.

35.     Because of the vital importance of safe and stable housing to successful reentry, one of Fortune's principal tasks is to secure housing for its clients and their families. This is central to Fortune's mission. Each year Fortune provides temporary or permanent housing for more than 300 formerly incarcerated people.

36.     Many of Fortune's housing programs, described immediately below, work together as a pipeline. Clients move from emergency to phased-permanent units at the Fortune Academy, and then to permanent housing. Moving clients from temporary to permanent housing is of critical importance to this process. By helping clients who are ready to live independently move from Fortune's temporary housing to permanent housing, Fortune creates additional space in its temporary housing programs. Without this additional space, Fortune cannot serve new clients in need of emergency or phased-permanent housing. Fortune always faces a backlog of people who need its help in securing such housing.

### 1.     Emergency and Phased-Permanent Housing: Fortune Academy

37.     The Fortune Academy is a housing facility in West Harlem that is owned and operated by The Fortune Society. The Fortune Academy offers both emergency and phased-permanent housing for approximately 60 formerly incarcerated individuals who are homeless.

12

38.     In addition to providing housing, The Fortune Academy works with participants to develop needed tools for social reintegration, employment, independence, sobriety, and the transition to the private mainstream housing market.  Through these extensive reentry services and programs, Fortune Academy residents learn how to address the issues that led to their incarceration and homelessness.  This comprehensive approach is instrumental to the success of Fortune's housing clients in achieving and maintaining positive, self-sufficient, and crime-free lives.

39.     The Fortune Academy's emergency housing unit includes 18 beds plus some overflow capacity.  Rooms in the emergency unit house three to seven people at a time and do not include cooking facilities.

40.     Demand for emergency beds at The Fortune Academy is always high because many people are released every week from jail and prison into local communities and have no viable housing options.  The emergency unit is consistently filled to capacity, and Fortune is constantly forced to turn people away.

41.     The emergency unit's waiting list is frequently several months long.  Making as many beds available as possible is critical to Fortune's mission.

42.     Fortune's model is to move individuals housed in the emergency unit to transitional or permanent housing within 45 days, but individuals often stay for as many as eight or nine months, in part because there are so few affordable housing options available to the formerly incarcerated in New York City.  This is due in significant part to blanket bans on people with criminal records imposed by private landlords.

43.     Fortune clients who have been in emergency housing and are assessed by Fortune Academy staff as ready to live independently are eligible for placement in the Academy's phased-permanent unit if space is available.

44.     The phased-permanent unit houses 41 people.  Rooms in the phased-permanent program are apartment-style singles or doubles that include amenities such as cooking equipment.

45.     When a vacancy opens in the phased-permanent unit, Academy staff select an individual from the emergency unit who has demonstrated his or her readiness to live more independently with the help of continued supportive services from Fortune.

46.     Fortune clients housed in the phased-permanent unit typically remain there until they can make the transition to permanent housing.  The process of finding and moving into permanent housing often takes a year or more, again in significant part because of blanket bans that exclude individuals with criminal histories from living in rental housing.

**2.      Permanent Housing: Scattered-Site Programs and Castle Gardens**

47.     Fortune also operates programs to provide safe and stable permanent housing for its clients, including several scattered-site programs.

48.     Fortune's scattered-site programs are initiatives through which Fortune places clients in private rental housing throughout New York City.  Through these programs, Fortune has developed relationships with New York City landlords and management companies to identify safe and affordable apartments for clients who Fortune determines are ready to live independently.

49.     Fortune places its scattered-site clients through a variety of methods.  Some clients are placed in private housing owned or managed by landlords or management companies

with which Fortune already has an established relationship.  Other clients are placed in private

housing with the assistance of a licensed real-estate broker retained by Fortune for that specific

purpose.  Housing specialists on Fortune's staff also actively seek out new private landlords who

are willing to house its clients.

50.     Fortune itself often enters into residential leases with participating landlords.  In

these circumstances, Fortune is responsible for making all rental payments to the landlord.

Scattered-site program participants then enter into an occupancy agreement with Fortune and

partially reimburse Fortune for a share of the rent each month by paying 30% of their income to

Fortune.  Partial reimbursement facilitates a sense of personal investment and responsibility

while maintaining affordability for Fortune's clients.

51.     The scattered-site programs are funded from a variety of public and private

grants.  The grants Fortune receives often have geographical or programmatic restrictions.  This

means that Fortune may only be able to use a grant to house clients in a particular area of the

City or to assist only a specific subset of its client population, such as people who are HIV-

positive.  Potential participants in Fortune's scattered-site programs are carefully evaluated by

Fortune's staff to assess their readiness for independent living and their fit for specific programs.

If Fortune staff determine that an individual is an appropriate candidate for a program, Fortune's

housing specialists begin the process of helping that person find an apartment in the private

rental market.  Fortune's own Castle Gardens is one option for clients who are ready for

permanent housing, but it is a very limited one.  Castle Gardens is a 114-unit residential building

in West Harlem that Fortune opened in 2010.  It provides homes and on-site social services for

formerly-incarcerated people as well as other low-income families.  Openings are infrequent and

unpredictable, however.  Like any other typical apartment building in New York City, once an

15

individual becomes a Castle Gardens resident, he or she may remain there indefinitely.  As a result, Fortune typically cannot look to Castle Gardens to solve its need to locate housing for clients who are prepared to succeed in permanent housing.

**B.    Fortune's Inability to Rent Apartments for Clients at The Sand Castle Because of Defendants' Blanket Criminal Record Ban**

52.    Due to the perpetual need to expand housing options for its prospective and current clients, Fortune's staff is constantly searching for more private landlords willing to house Fortune clients through its scattered-site programs.  As part of this search, Fortune attempted to place clients at The Sand Castle, a large apartment complex in Far Rockaway, Queens, which is owned by Defendants Sarasota Gold and HDFC and managed on the owners' behalf by Defendant Weissman.

53.    Defendant Sarasota Gold bought The Sand Castle in or around 2006 for $98 million.  While the building had been largely occupied by seniors, the new owners planned an image makeover and raised their rents.  Posters were placed in the lobby encouraging potential tenants to "Live the Life You've Always Dreamed."  Advertisements for the complex and The Sand Castle website featured smiling young, white, blond models.  Unit floor plans were labeled with British-sounding references like "Ardsley," "Dover," and "Stanton."  Defendants' goal was to present a more "upscale," gentrified image, one that deemphasized the presence of minority neighbors.

54.    Fortune became aware of The Sand Castle after receiving a housing assistance grant from New York State in 2013 that provides funding for exactly 25 residential units in Queens.

55.    Through its research, Fortune determined that The Sand Castle would be an ideal site to house program participants.  Specifically, The Sand Castle is located in a relatively safe

and racially diverse area within the grant's geographical limitation, and in a neighborhood in which there are already Fortune clients. Having a number of clients located in the same geographical area allows Fortune to more effectively utilize its case management staff by reducing travel time, reducing costs, and supporting greater intensity of services.

56. The waterfront property features numerous amenities, including a fitness center, supermarket, on-site medical facilities, and a doorman. The Jewish Association Serving the Aging has facilities located in the building. The Sand Castle is also convenient to public transportation relied upon by Fortune's clients.

57. Additionally, and of critical importance to Fortune, The Sand Castle's rents are affordable and fit well within Fortune's grant budget. Studio apartments are available for as little as approximately $1,000 per month and one-bedroom apartments start at approximately $1,300 per month.

58. The Sand Castle has over 900 apartments and, upon information and belief, has had sufficient availability at all times relevant to this Complaint to provide units to Fortune and/or its clients.

59. In or around May 2013, in a transaction handled by Fortune's then real-estate agent, Fortune entered into leases with Defendant Sarasota Gold for four apartments at The Sand Castle. Fortune is listed as the tenant for each apartment and is solely responsible for all rental payments pursuant to the terms of the lease agreements.

60. At the time that Defendants entered into these lease agreements with Fortune, The Sand Castle's management knew that Fortune intended to use the units for its housing program and that it intended to sub-lease the apartments to program clients. The Sand Castle's management did not know, however, the nature of the Fortune program or that Fortune served

individuals with criminal records.  Moreover, Defendants had no specific knowledge that Fortune's sub-lessees had criminal records.  The Sand Castle did not request any financial or other background information from Fortune about potential sub-lessees.

61.     In or around July 2013, a Fortune housing specialist visited The Sand Castle's leasing office to pick up keys for the apartments that had been leased to Fortune.  While there, the housing specialist asked a Sand Castle employee about the possibility of Fortune leasing more apartments in the building for its clients.  The employee responded that Fortune would need to contact building management.  Fortune subsequently contacted The Sand Castle's management on several occasions to explore the possibility of leasing additional apartments to house more Fortune clients.  The individuals with whom Fortune staff members spoke on these occasions were, upon information and belief, employees or agents of Defendant Weissman.

62.     During Fortune's encounters with Weissman, Weissman learned that Fortune serves clients who have criminal records.  Upon learning that Fortune's clients have criminal records, Weissman immediately denied Fortune's request to lease any more apartments at The Sand Castle.  In doing so, Weissman explicitly and unequivocally told Fortune's staff that The Sand Castle's apartments are not available to people with criminal records.

63.     The first of these discussions with Weissman took place in the summer of 2013 when a Fortune staff member spoke with Melissa Gursky, who was working in a Sand Castle management capacity.  Fortune explained the organization's mission and programs.  In response, Ms. Gursky articulated The Sand Castle's blanket ban policy, explicitly telling the Fortune staff member that The Sand Castle "does not house ex-offenders" (or similar words to that effect).

64.     Also in the summer of 2013, a different Fortune staff member called Defendant Weissman.  The Fortune employee explained that he worked for Fortune, that Fortune helps

formerly incarcerated people find housing, and that Fortune was interested in leasing additional apartments at The Sand Castle.  In response, Weissman stated that, "we don't allow ex-offenders on the property and we do not rent to programs" (or similar words to that effect).  The assertion that The Sand Castle does not rent to programs was demonstrably false because Defendants had leased apartments to Fortune in the spring knowing that it was a "program" (but not knowing the nature of the program).

65.     In this same conversation, Fortune explained that the stated ban on the formerly incarcerated "appears to be discriminatory" (or similar words to that effect).  Weissman responded by repeating that The Sand Castle does not accept formerly incarcerated individuals as residents.  Fortune asked when the exclusionary policy was adopted, but Weissman refused to answer.

66.     Although Defendant Weissman made clear that The Sand Castle does not permit residents with criminal records, Defendants agreed to honor the leases that Defendant Sarasota Gold had entered into with Fortune when it was unaware that Fortune's clients were formerly incarcerated individuals.

67.     Fortune again contacted The Sand Castle in early 2014 to determine whether Defendants had rescinded their blanket ban against people with criminal records and whether Fortune could lease additional apartments for its clients.  Fortune's employee spoke with Defendants' agent or employee, Sruly Tress.

68.     Fortune first confirmed that The Sand Castle had vacant apartments available for rent.  Fortune told Mr. Tress that its clients have criminal backgrounds and reminded Mr. Tress that Fortune had clients who had been living in the building without incident.  Mr. Tress explicitly acknowledged that The Sand Castle had not experienced any problems with those

residents. Fortune made clear that it was willing to provide Defendants with any information they reasonably required regarding the backgrounds of individual tenants who would occupy the apartments that Fortune wanted to rent.

69.     Mr. Tress responded by telling Fortune that tenants with criminal histories "scare" management and that criminal records are a "red flag." He did, however, state that he would check with Defendants' upper-level management about whether Fortune would be permitted to rent additional units.

70.     Mr. Tress contacted Fortune shortly thereafter and told Fortune it would not be allowed to lease additional units in The Sand Castle. Mr. Tress told Fortune that The Sand Castle did not wish to conduct any further business with Fortune.

## II.     DEFENDANTS' REJECTION OF FORTUNE ON THE BASIS OF THEIR BLANKET BAN AGAINST RESIDENTS WITH CRIMINAL RECORDS CONSTITUTES UNLAWFUL DISCRIMINATION

71.     Facially neutral housing practices that have a disparate impact on the basis of race or color are prohibited by the Fair Housing Act unless they are necessary to achieve a legitimate business purpose that cannot be satisfied through a less discriminatory alternative practice. Blanket bans that automatically deny housing to people with criminal records, including the blanket ban maintained and enforced by Defendants at The Sand Castle, are unlawful under this standard. Such bans have a severe disparate impact on African Americans and Latinos, and any legitimate safety concerns can be satisfied through the less discriminatory alternative of giving individualized consideration to each potential resident's circumstances and desirability as a tenant.

72.     Moreover, the disparate impact of a facially neutral housing practice may be so stark and foreseeable that it demonstrates an unlawful intent to discriminate. That is also the

case here.  Because of well-known racial disparities regarding people with criminal records, Defendants' blanket ban operates to disqualify otherwise qualified African Americans and Latinos from living at The Sand Castle at a rate at least three to four and one-half times the rate at which whites are disqualified.  By implementing and maintaining their blanket ban at The Sand Castle, Defendants have been and continue to be engaged in intentional discrimination. Defendants' ban is consistent with a policy of limiting the number of new minority tenants in the building.

73.     Defendants have also made concerted efforts to change The Sand Castle's image and to present it as more "upscale," including through its print and online advertising, which prominently feature young, white men and women.  These efforts are consistent with a policy of purposefully attracting white tenants and dissuading others from applying.

### A.   Blanket Bans in General Disproportionately and Severely Impact African Americans and Latinos at the National, State, and City Levels

74.     Seven-hundred thousand inmates are released from confinement each year and become new targets of blanket bans.[7]  They are disproportionately African-American and Latino because the inmate population as a whole is disproportionately African-American and Latino, and 95% of inmates are eventually released.[8]

75.     In New York State, more than 50% of the 25,060 inmates released in 2009 were African-American and over 25% were Latino.[9]  Yet the State's general population is only 15.9%

---

[7] Ann E. Carson, and William J. Sobel, U.S. Dept. of Justice, *Prisoners in 2011*, BJS Bulletin 1 (Dec. 2012), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCMQFjAA&url=http%3A%2F%2Fwww.bjs.gov%2Fcontent%2Fpub%2Fpdf%2Fp11.pdf&ei=uUNRVOy7GpHisATtwYHQAg&usg=AFQjCNF1I0Yzt_-U9B6qCTGgbdSaYZKWvQ&sig2=RBCZAeieGV1zf4VvBijxnQ&bvm=bv.78597519,d.cWc.

[8] Devah Pager, *The Mark of a Criminal Record*, 108.5 Am. J. of Sociology 937, 957-960 (2003).

[9] *See* State of New York Dept. of Correction and Comm. Supervision, *2009 Inmate Releases: Three Year Post Follow-up* 17 (2013), http://www.doccs.ny.gov/Research/Reports/2013/2009_releases_3yr_out.pdf.

African-American and 17.6% Latino.  Of the nearly 600,000 inmates released by the New York

State Department of Correction from 1985 to 2009, over half were African-American and nearly

one-third were Latino.[10]

76.     Most of those released from New York State prisons – nearly two-thirds since

1985 – go to New York City to live.[11]  In 2011, New York City's own Department of Correction

released 88,000 people from its disproportionately African-American and Latino inmate

population.[12]  The reentering population in New York City is therefore very large as well as

disproportionately minority.

77.     Unlike African Americans and Latinos, whites are incarcerated, and therefore

released from jails and prisons, at rates significantly lower than their representation in the

general population at the national, New York State, and New York City levels.

78.     In addition to the large number of prisoners already being released, more than

46,000 additional federal prisoners are expected to become eligible for early release over the

next several years.  In April 2014, the United States Sentencing Commission voted unanimously

to retroactively apply lower sentencing ranges for certain drug offenses.  This will permit

prisoners currently serving under these offenses to apply for early release.  Approximately 75%

of the prisoners eligible to apply are African-American or Latino.[13]

---

[10] *Id.*

[11] *Id.*

[12] New York City Dept. of Correction, *2nd Quarter Fiscal Year 2012, Oct.-Dec. Report* 2 (2012),
http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCAQFjAA&url=http%3A%2F%
2Fwww.nyc.gov%2Fhtml%2Fdoc%2Fdownloads%2Fpdf%2Fdoc_at_a_glance.pdf&ei=_TRRVLsxp9qwBMnjgjg&
usg=AFQjCNH34hX9wdSCxjAlRM1pqa72P6EWRg&sig2=cDD3q9NfHnhJ9kjSgD-
8rg&bvm=bv.78597519,d.cWc.

[13] *See* supra note 6.

79.     The sheer number of people released from prison every year has skyrocketed largely because the incarcerated population in the United States has grown from 300,000 in 1980 to more than 2.3 million today.  Approximately 10 million misdemeanor cases are filed every year.[14]  An additional 12 million people across the country have at least one felony conviction.[15] At the same time, it has become much easier and common for housing providers to identify and ban people with criminal records because of the growth of companies that provide inexpensive background checks via the Internet.

80.     The dramatic increase in the number of incarcerated people over these years is due largely to the widespread policy of pursuing non-violent drug offenders.  Non-violent drug offenses alone account for two-thirds of the rise in the federal inmate population and more than half of the rise in state prisoners between 1985 and 2000.

81.     The national prison population is now comprised overwhelmingly of individuals convicted of non-violent crimes.  As of 2010, less than 10% of the federal prison population had been convicted of a violent crime.[16]

82.     The massive increase in incarceration and in the number of people with criminal convictions has hit African Americans and Latinos especially hard.  They are incarcerated at rates significantly disproportionate to their numbers in the United States general population.

---

[14] Alexandra Natapoff, *Misdemeanors*, 85 S. CAL. L. REV. 1313 (2012).

[15] *See* supra note 8 at 938.

[16] Paul Guerino, Paige M. Harrison, and William J. Sabol, U.S. Dept. of Justice, *Prisoners in 2010*, BJS Bulletin 1 (Dec. 2011), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCMQFjAA&url=http%3A%2F%2Fwww.bjs.gov%2Fcontent%2Fpub%2Fpdf%2Fp10.pdf&ei=sjZRVPOEK-_8sASRg4GACA&usg=AFQjCNEPKwaNRy9ORMlSwxCPr3ax_dIvGA&sig2=NCZDIUCD69T-y-2raD44NA&bvm=bv.78597519,d.cWc

Together, African Americans and Latinos comprise approximately 58% of all prisoners.[17]
However, they only make up 30% of the U.S. population.[18]

83.     Men overwhelmingly comprise the nation's inmate population and the disparities
by race are especially stark among the male population.  African Americans represent 13% of the
United States male population but over 40% of the more than two million men currently
incarcerated.  Based on national incarceration data, the U.S. Department of Justice estimates that
1 in 3 African-American men will go to prison at some point in their lifetime.  For Latino men,
the rate of expected incarceration is 1 in 6.  For white men, the figure is only 1 in 17.[19]  That is,
African-American men are six times more likely to be incarcerated than white men, and Latino
men are almost three times more likely to be incarcerated than white men.[20]

84.     The above-referenced disparities persist across categories of crime, such as drug
possession.

85.     New York State and New York City race and incarceration statistics mirror the
national data.  Of the 54,235 inmates under State custody on January 1, 2013, 49.5% were

---

[17] *See generally* NAACP, *Criminal Justice Factsheet* (2009), http://www.naacp.org/pages/criminal-justice-fact-sheet.

[18] *See* U.S. Census Bureau, *Statistical Abstract of the United States: 2012*, Table 6 (2012), http://www.census.gov/compendia/statab/2012edition.html.

[19] The Sentencing Project, *Report of the Sentencing Project to the United Nations Human Rights Committee*: *Regarding Racial Disparities in the United States Criminal Justice System* 1 (Aug. 2013), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCMQFjAA&url=http%3A%2F%2Fsentencingproject.org%2Fdoc%2Fpublications%2Frd_ICCPR%2520Race%2520and%2520Justice%2520Shadow%2520Report.pdf&ei=3zdRVLmII-nasATY64AI&v6u=https%3A%2F%2Fs-v6exp1-ds.metric.gstatic.com%2Fgen_204%3Fip%3D50.242.218.113%26ts%3D1414608864553895%26auth%3Dfg6dk3vitleto2x3z4zvhqfeu6bstw25%26rndm%3D0.46951305062984383&v6s=2&v6t=2831&usg=AFQjCNH3mh3wqJlc32hwhRKt75FxmCBWrg&sig2=X1vmoYBfe_jMR-AbtEozqA&bvm=bv.78597519,d.cWc

[20] *Id*.

African-American and 24% were Latino.[21]   Yet the State's general population is just 15.9%

African-American and 17.6% Latino.

86.      Of the 12,386 City inmates in custody on December 31, 2012, 57% were African-

American and 33% were Latino.[22]   The City's general population, however, is only 25.5%

African-American and 28.6% Latino.

87.      Much of the disparity in New York is due to the fact that African Americans are

significantly more likely than whites to be arrested for drug-possession.[23]   For example, African

Americans are four times as likely as whites to be arrested for marijuana possession despite

research showing equivalent marijuana use; such arrests increased substantially in recent years in

New York City due to stop and frisk police tactics.

88.      The bottom line is clear: more people have criminal records than ever before, and

those people are disproportionately African-American and Latino.  In New York City, New York

State, and the country as a whole, African Americans and Latinos are far more likely than whites

to have a criminal record.

89.      This means both that African Americans and Latinos are much likelier than

whites to be barred from housing by automatic exclusions of people with records and that the

absolute number of African Americans and Latinos affected is very large.

---

[21] State of New York Dept. of Correction and Comm. Supervision, *Under Custody Report: Profile of Inmate Population Under Custody on January 1, 2013* ii (Jan. 2013), http://www.doccs.ny.gov/Research/ Reports/2013/UnderCustody_Report_2013.pdf.

[22] *See* supra note 12.

[23] Ryan S. King, The Sentencing Project, *Disparity By Geography: The War on Drugs in America's Cities* 15 (May 2008), http://www.sentencingproject.org/doc/publications/dp_drugarrestreport.pdf.

90.     The EEOC's analysis of the impact of blanket bans in the employment context further confirms the disparate impact described here.  The EEOC has concluded from analyzing national criminal records data that blanket bans have a disparate impact on the basis of race, and sets forth such a presumption in its Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964 ("Enforcement Guidance").[24]

91.     The EEOC's conclusion applies to the disparate impact analysis here because blanket bans operate the same way in housing as they do in employment.  In both contexts, applicants are uniformly and permanently excluded, whether from housing opportunities or employment.  They are excluded based solely on the fact of a prior conviction, regardless of whether they pose a current risk.

**B.      Defendants' Blanket Ban at The Sand Castle Disproportionately and Severely Impacts African Americans and Latinos in New York City**

92.     Just like blanket bans generally, Defendants' specific blanket ban at The Sand Castle has a clear disparate impact on the basis of race.  In fact, the disparate impact is even greater than a blanket ban would have at a national or statewide level because at the local level (*i.e.*, New York City) incarceration rates for whites and minorities are even more disproportionate.  Upon information and belief, The Sand Castle attracts potential tenants from all over New York City.

93.     In addition to prohibiting residents with criminal records, The Sand Castle purports to require that potential tenants earn a minimum of $30,000 per year.  But a stark disparate impact persists even when this purported requirement is taken into account.

---

[24] *See* supra note 3.  The prior version from 1990 reached the same conclusion and set forth the same presumption.

94.     Using data from the United States Census Bureau, Bureau of Justice Statistics, and Bureau of Labor Statistics, the likely racial composition of City residents who have criminal records and annual incomes near or above $30,000 can be and has been ascertained through an independent analysis.

95.     The analysis shows that 12.2% of African-American men who live in New York City, and 18% of Latino men who live in the City, satisfy The Sand Castle's income threshold but are nonetheless disqualified from living at The Sand Castle because of Defendants' blanket ban.

96.     The analysis further shows that only 4.1% of white men who live in the City satisfy the income threshold but are disqualified by the blanket ban.

97.     This means that otherwise qualified African-American men are three times as likely as white men to be disqualified by Defendants' blanket ban, and that Latino men are nearly four and one-half times as likely to be disqualified.

98.     These figures, if anything, understate the disparities.  Alternative statistical models indicate that the disparate impact caused by Defendants' blanket ban may be significantly greater.

99.     Defendants also purport to require potential tenants to have a credit score above 600.  Because African-American and Latino City residents with incomes near or above $30,000 also typically have FICO scores over 600, credit score is not independently important for this analysis.[25]

100.    The racially disparate impact on African Americans and Latinos of Defendants' blanket refusal to provide housing to people with criminal records is clear from these findings.

_____

[25] Benjamin Levinger, Marques Benton, Stephan Meier, *The Cost of Not Knowing the Score: Self-Estimated Credit Scores and Financial Outcomes*, 32 J. Fam. Econ. 566, 569 (2011).

101.    Moreover, even if Defendants' actions were viewed more narrowly as applying a blanket ban only against Fortune and its clients – notwithstanding Defendants' explicit statement that the policy applies to everyone – that would still clearly have a racially disparate impact. Because Fortune's clients are over 95% African-American and Latino and any income and credit score requirements are irrelevant since Fortune would be the actual renter, the disparate impact would be even greater than on the general population.

### C.    Giving Individualized Consideration to Applicants' Circumstances Is a Less Discriminatory Alternative That Would Satisfy Any Concern About Safety at The Sand Castle

102.    Defendants' blanket ban is not necessary to achieve a legitimate nondiscriminatory business purpose. While public safety may be Defendants' rationale for automatically excluding Fortune's clients and all others with criminal records from housing, blanket bans are not necessary to satisfy that concern. Giving individualized consideration to each potential Sand Castle resident's circumstances is a less discriminatory alternative to Defendants' blanket ban and would serve public safety equally well.

103.    Specifically, public safety at The Sand Castle can be protected through the use of individual assessments that consider the nature of an individual's conviction, the amount of time since the conviction or release, and evidence of rehabilitation, among other factors. An individualized assessment allows people who have a criminal record, but who pose no realistic current or future threat to the community, to obtain housing. This more targeted and narrower approach both protects public safety and is less discriminatory and exclusionary because it reduces the number of minority applicants who are banned from The Sand Castle.

104.    In the analogous employment context, the EEOC recognizes that individualized assessments are almost always required by law because they provide a less discriminatory

alternative to blanket bans and are sufficient to protect legitimate interests like safety.  The agency's Enforcement Guidance advocates the use of  "a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job," "notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity."[26]

105.   The EEOC's sound rationale applies equally to housing, including housing at The Sand Castle.

106.   A federal court of appeals has also recognized that blanket bans violate anti-discrimination laws (specifically, in the context of employment) because their disparate impact cannot be justified by a business necessity such as safety.  *See Green v. Missouri Pacific Railroad,* 523 F.2d 1290, 1293 (8th Cir. 1975).  *Green* held that a company policy automatically rejecting all applicants with a conviction for an offense other than a minor traffic infraction caused a disparate impact based on race and could not be justified by business necessity.  The Eighth Circuit noted that it "could not conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed."  *Id*. at 1298.

107.   Recent correspondence from HUD suggests it agrees that blanket bans in housing are not necessary to achieve a legitimate interest and constitute unlawful discrimination on the basis of race.

---

[26] *See* supra note 3.

108.    In a 2011 letter to public housing authorities across the country, the HUD

Secretary and the Assistant Secretary for Public and Indian Housing emphasized the importance

of "helping ex-offenders gain access to one of the most fundamental building blocks of a stable

life—a place to live."  The letter makes clear that beyond the very limited, categorical exclusion

of individuals who were convicted of manufacturing methamphetamine on the premises of

federally assisted housing and sex offenders who are subject to a lifetime registration

requirement, public housing authorities enjoy "broad discretion" to "consider all relevant

information, including factors which indicate a reasonable probability of favorable future

conduct."  Further, the letter provides that public housing authorities "should take into

consideration," for example, evidence of rehabilitation and participation in counseling programs.

109.    In making 46,000 drug offenders eligible to apply for early release from prison,

the United States Sentencing Commission unanimously concluded that individual assessments of

each prisoner will suffice to protect public safety.  Specifically, judges will consider a range of

factors when evaluating each early-release application, including the nature and circumstances of

the offense, the offender's characteristics, deterrence, and the offender's potential threat to

society.[27]  The Commission emphasized that this "measured approach" will "protect public

safety by enabling appropriate consideration of individual petitions by judges."[28]  The

Commission thus has endorsed individualized assessments, rather than blanket judgments about

those with criminal records, as sufficient for the protection of public safety.

---

[27] U.S. Sentencing Comm., *Frequently Asked Questions: Retroactive Application of the 2014 Drug Guidelines Amendment* 2, http://www.ussc.gov/sites/default/files/pdf/amendment-process/materials-on-2014-drug-guidelines-amendment/20140724_FAQ.pdf.

[28] U.S. Sentencing Comm., *News Release: United States Sentencing Commission, U.S. Sentencing Commission Unanimously Votes to Allow Delayed Retroactive Reduction in Drug Trafficking Sentences* (July 18, 2014), http://www.ussc.gov/news/press-releases-and-news-advisories/press-releases-and-news-advisories-archives.

110.    That several Fortune clients have lived at The Sand Castle successfully and without incident further undermines any suggestion that Defendants' policy is necessary to serve public safety.  Yet those clients would have been excluded from living at The Sand Castle had Fortune tried to lease units for them in or after the summer of 2013 when Defendants were aware that Fortune's clients have criminal histories.

111.    Indeed, under Defendants' current policy, even formerly incarcerated individuals with exemplary post-incarceration achievements are excluded.  For example, former Fortune client Stanley Richards, released from prison more than 20 years ago, is Fortune's Senior Vice President.  Hired as a counselor at Fortune in 1991, Mr. Richards steadily worked his way up, becoming manager of career development and deputy executive director.  He currently oversees all of Fortune's housing programs and has developed a wide range of skills and experience in implementing supportive reentry programs for people released from prison.  Mr. Richards' work and achievements have been recognized by the White House and the Department of Labor. Another former Fortune client, The Honorable Walter Strauss, became a Manhattan Housing Court judge after serving two prison sentences for non-violent crimes.  Prior to taking the bench, Judge Strauss obtained his GED through a prison education program, attended the City University of New York at night for his bachelor's degree, and attended Rutgers University Law School.  Both Mr. Richards and Judge Strauss are examples of individuals who changed their lives for the better after incarceration, establishing careers and collecting professional accolades. Like many other Fortune clients who have led successful, crime-free lives post incarceration, neither pose any threat whatsoever to public safety.  Even so, neither Mr. Richards nor Judge Strauss would be welcome at The Sand Castle.

112.    It would not compromise any legitimate concern Defendants may have to give individualized consideration to Fortune's clients' particular circumstances and allow those who do not threaten public safety to live at The Sand Castle.  Defendants' blanket criminal record ban at The Sand Castle nonetheless prevents any individualized consideration.  Defendants' policy of automatically excluding people with criminal records, including people like Fortune's clients who are successfully and commendably reintegrating into society, is not necessary to achieve a legitimate business purpose.

113.    Because Defendants' blanket ban has a large discriminatory impact on the basis of race and is not necessary to achieve a legitimate business purpose, it is unlawfully discriminatory.

114.    Had Defendants enforced any lawful and appropriate nondiscriminatory policy regarding the consideration of criminal records, including performing in good faith an individualized assessment, they would have had no valid basis to deny housing at The Sand Castle to most of Fortune's clients.  Moreover, if Defendants implement a lawful policy, they will have no valid basis to deny housing at The Sand Castle to most of Fortune's clients in the future.

115.    The discriminatory disparate impact of Defendants' blanket ban is so large and foreseeable – and its overbreadth so unnecessary – that Defendants' intent to discriminate against African Americans and Latinos can be inferred.  Fortune contends that Defendants fully understand the unnecessary disparate impact that the blanket ban has on African-American and Latino applicants as well as the effect that such a policy has on the racial make-up of The Sand Castle.  Defendants nonetheless intentionally implemented and continue to pursue that policy for

32

the express purpose of decreasing or at least limiting the number of persons of color at the property.

### III.   DEFENDANTS' BLANKET BAN AND OTHERS LIKE IT PREVENT FORMERLY INCARCERATED INDIVIDUALS FROM OBTAINING CRITICALLY IMPORTANT SAFE AND STABLE HOUSING

116.    The harm inflicted by discriminatory blanket bans is great not only in terms of the sheer number of people affected, as shown above, but also in terms of the devastating consequences for each affected individual trying to reenter society.  Preventing this harm, or at the very least minimizing it, is central to Fortune's mission.

117.    Individuals reentering society after time in prison confront an array of challenges. These include finding employment, securing government benefits, and reestablishing community ties.  But their most immediate need is to secure safe and affordable housing.  Especially in a place like New York City, where housing is extremely expensive, that is very difficult.

118.    Research shows that success in finding adequate housing, though difficult, is critically important to meeting the other challenges faced by reentrants.  Housing has been characterized, properly, as the "lynchpin that holds the reintegration process together."[29]

119.    A 2004 New York City study demonstrated that more than 30% of single adults entering shelters under the Department of Homeless Services have recently been released from city and state correctional institutions.  Without stable housing, many continually cycle between incarceration and shelters.[30]

---

[29] *See* supra note 5.

[30] NYC Department of Homeless Services, *Summary of DOC/DHS Data Match* (Jan. 22, 2004) (draft analysis submitted for review as part of the New York City Dept. of Correction and Dept. of Homeless Services Discharge Planning Initiative).

120.    Other research has shown that reentrants who do not find stable housing in the community are more likely to recidivate than those who are able to secure permanent housing.

121.    An Urban Institute study likewise found a causal connection between the inability to find permanent housing and recidivism.  According to the study, reentrants often did not succeed in the community if they could not find a safe and stable place to live.[31]

122.    The Vera Institute of Justice found that parolees released from incarceration who entered New York City homeless shelters were seven times more likely to abscond from post-release supervision than those with more stable housing.  It also found that reentrants in temporary shelter housing had more difficulty resisting drugs and finding work.[32]

123.    This and other evidence makes plain that adequate housing is crucial to success in the reintegration process.  Yet blanket bans directly prevent reentrants from obtaining such housing.  By design, blanket bans do so thoughtlessly, without giving any consideration to the particular circumstances of a person trying to find a place to live.  This complete disregard for individual circumstances cannot be justified under the law, and needlessly inflicts great harm on the formerly incarcerated, their communities, and organizations like Fortune seeking to help them become productive members of society.

## INJURY TO THE FORTUNE SOCIETY

124.    Fortune has been directly and substantially harmed by the blanket ban against providing housing to formerly incarcerated individuals and others with criminal records that Defendants have maintained since at least the summer of 2013.  Defendants' policy has diminished Fortune's ability to perform its work, forced it to divert resources, and frustrated its

---

[31] Jeremy Travis and Caterina G. Roman, Urban Inst., *Taking Stock: Housing, Homelessness, and Prisoner Reentry* 7-10 (2004), http://www.urban.org/publications/411096.html.

[32] *Id.* at 8.

34

mission of ensuring that formerly incarcerated people can successfully reenter society and obtain safe and stable housing.

125.    Defendants' policy placed Fortune at significant risk of losing grant funding and caused unnecessary costs and delay related to the grant process.  As described in paragraph 54 above, Fortune received a grant from the State of New York to obtain 25 rental units in Queens for reentrants.  Defendants' denial of housing delayed Fortune's ability to meet the terms of the grant and thereby put Fortune at risk of losing the grant altogether.  Ultimately, in order to fulfill its obligation, Fortune had to hire an additional staff member to search for and secure appropriate units in other Queens apartment buildings.  After Defendants' discriminatory conduct, it took Fortune additional months to obtain the 25 units necessary to satisfy the grant's terms.

126.    Further, Fortune devoted substantial time and other resources to identify The Sand Castle as appropriate housing for its clients.  Defendants' discriminatory criminal records policy, however, prevented Fortune from placing clients there.  As a result, Fortune has been forced to expend scarce and substantial additional resources to find adequate alternative housing options for clients who otherwise would have been placed at The Sand Castle.  In addition to additional staff time, Fortune has spent a significant amount of money in broker fees because it has had to employ brokers and agents to assist it with finding housing for its clients in Queens.

127.    Defendants' actions also impeded Fortune's programs in another way.  When Fortune is able to place multiple clients in one geographic area, it reduces travel time and costs for Fortune's caseworkers.  This is because rather than spending time traveling to several different buildings in different neighborhoods for just a few meetings, in the same time period, a caseworker can visit with multiple clients living at the same site.  Defendants' refusal to allow Fortune clients as tenants, and Fortune's corresponding need to place clients at multiple sites

spread throughout Queens, has increased both the temporal and financial cost of individual caseworker visits.

128.    Defendants' discriminatory conduct has also directly impeded Fortune's ability to operate its housing programs and frustrated its mission by disrupting its housing pipeline. As described above, many of Fortune's clients progress from temporary to phased-permanent to permanent housing. By impeding Fortune's ability to place its clients at The Sand Castle, Defendants have reduced the effectiveness of this model. Specifically, Defendants' discriminatory refusal caused Fortune clients otherwise eligible to live in The Sand Castle to remain in the Fortune Academy's temporary housing. Because these clients remained at the Academy, fewer beds were available to other individuals newly released from prison and in need of immediate assistance. But for Defendants' discriminatory actions, Fortune staff would have been able to devote more time to locating housing for clients currently in its emergency and phased-permanent housing and Fortune would have been able to meet the needs of more clients.

129.    Moreover, as a direct result of Defendants' discriminatory conduct, Fortune has had to divert resources to engage in advocacy, community education, and outreach about the need to increase the availability of housing for formerly incarcerated individuals. Fortune has been forced to allocate limited staff time and resources to both investigate and counteract Defendants' discriminatory conduct. As a result, Fortune has had to forgo other programmatic activities it would have engaged in.

130.    Unless enjoined, Defendants will continue to engage in the unlawful practices described herein and the extent of Fortune's injuries will increase.

131.    Defendants' unlawful actions described herein were, and are, intentional, willful, and malicious, and/or have been, and are, implemented with callous and reckless disregard for federally protected rights.

132.    Within 10 days of the commencement of this action, Plaintiffs will provide notice of this action to the New York City Commission on Human Rights and Corporation counsel, pursuant to the New York City Administrative Code § 8-502(c).

## CAUSES OF ACTION

### Count I (Race Discrimination—42 U.S.C. § 3604)

133.    Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 132 above.

134.    Defendants' acts, policies, and practices have an adverse and disproportionate impact on African Americans and Latinos in New York City as compared to similarly situated whites.  This adverse and disproportionate impact is the direct result of Defendants' blanket policy of automatically refusing housing to all people with criminal records with no consideration of their individual characteristics and circumstances.  This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice – providing individualized consideration – that would have a less discriminatory effect.

135.    Defendants' acts, policies, and practices have been carried out with the intention of discriminating on the basis of race and color.  Defendants have adopted and maintained an exclusionary policy regarding the use of criminal records with the intent and expectation that the policy disproportionately prevents African Americans and Latinos from obtaining housing at The Sand Castle.

136.    Defendants' acts, policies, and practices constitute discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604, and its implementing regulations, in that:

a.    Defendants' acts, policies, and practices have made and continue to make housing unavailable because of race and/or color, in violation of 42 U.S.C. § 3604(a); and

b.    Defendants' acts, as described above, provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b); and

c.    Defendants' notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race and/or color, in violation of 42 U.S.C. § 3604(c).

**Count II (Race Discrimination—N.Y. Exec. Law § 296 (5)(a))**

137.    Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 132 above.

138.    Defendants' acts, policies, and practices have an adverse and disproportionate impact on African Americans and Latinos in New York City as compared to similarly situated whites.  This adverse and disproportionate impact is the direct result of Defendants' blanket policy of automatically refusing housing to all people with criminal records with no consideration of their individual characteristics and circumstances.  This policy is not necessary to serve any substantial, legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice – providing individualized consideration – that would have a less discriminatory effect.

139.     Defendants' acts, policies, and practices have been carried out with the intention of discriminating on the basis of race and color.  Defendants have adopted and maintained an exclusionary policy regarding the use of criminal records with the intent and expectation that the policy disproportionately prevents African Americans and Latinos from obtaining housing at The Sand Castle.

140.     Defendants' acts, policies, and practices constitute discrimination and violate the New York State Human Rights Act, NY Executive Code § 296(5), in that:

a.     Defendants' acts, policies, and practices have made and continue to make housing unavailable because of race and/or color, in violation of NY Executive Code § 296(5)(a)(1); and

b.     Defendants' acts, as described above, provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of NY Executive Code § 296(5)(a)(2); and

c.     Defendants' notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race and/or color, in violation of NY Executive Code § 296(5)(a)(3).

**Count III (Race Discrimination—Admin. Code of City of NY § 8-107(5))**

141.     Plaintiff repeats and incorporates by reference all allegations set forth in Paragraphs 1 through 132 above.

142.     Defendants' acts, policies, and practices have an adverse and disproportionate impact on African Americans and Latinos in New York City as compared to similarly situated whites.  This adverse and disproportionate impact is the direct result of Defendants' blanket

policy of automatically refusing housing to all people with criminal records with no consideration of their individual characteristics and circumstances. This policy is not necessary to serve any substantial, legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice – providing individualized consideration – that would have a less discriminatory effect.

143.    Defendants' acts, policies, and practices have been carried out with the intention of discriminating on the basis of race and color. Defendants have adopted and maintained an exclusionary policy regarding the use of criminal records with the intent and expectation that the policy disproportionately prevents African Americans and Latinos from obtaining housing at The Sand Castle.

144.    Defendants' acts, policies, and practices constitute discrimination and violate the New York City Human Rights Act, Administrative Code of City of NY § 8-107(5)), in that:

a.    Defendants' acts, policies, and practices have made and continue to make housing unavailable because of race and/or color, in violation of Administrative Code of City of NY § 8-107(5)(a)(1); and

b.    Defendants' acts, as described above, provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of Administrative Code of City of NY § 8-107(5)(a)(2); and

c.    Defendants' notices and statements have expressed and/or continue to express a preference, limitation, and discrimination based on race and/or color, in violation of Administrative Code of City of NY § 8-107(5)(a)(3).

**Count IV (Source of Income Discrimination—Admin. Code of City of NY §
8-107(5))**

145.    Plaintiff repeats and incorporates by reference all allegations set forth in
Paragraphs 1 through 132 above.

146.    Defendants' acts, policies, and practices, by refusing to rent apartments to
Plaintiff, discriminated because of source of income.  Specifically, Defendants refused to house
individuals whose rent was subsidized by Fortune's housing programs, and made a clear
statement that The Sand Castle does not allow residents whose rent is subsidized by programs.

147.    Defendants' acts, policies, and practices constitute discrimination and violate the
New York City Human Rights Act, Administrative Code of City of NY § 8-107(5)), in that:

      a.    Defendants' acts, policies, and practices have made and continue to make
housing unavailable because of source of income, in violation of Administrative
Code of City of NY § 8-107(5)(a)(1); and

      b.    Defendants' acts, as described above, provide different terms, conditions,
and privileges of rental housing, as well as different services and facilities in
connection therewith, on the basis of source of income, in violation of
Administrative Code of City of NY § 8-107(5)(a)(2); and

      c.    Defendants' notices and statements have expressed and/or continue to
express a preference based on source of income, in violation of Administrative
Code of City of NY § 8-107(5)(a)(3).

**DEMAND FOR JURY TRIAL**

148.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues
triable as of right.

41

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

(1)      Enter a declaratory judgment finding that the foregoing actions of Defendants violate 42 U.S.C. § 3604, New York Executive Law § 296(5), and Administrative Code of City of NY § 8-107(5);

(2)      Enter an injunction enjoining Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein and directing Defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3)      Award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its injuries caused by the conduct of Defendants alleged herein;

(4)      Award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for the willful, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5)      Award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2), NY Executive Code § 297(10), and Administrative Code of City of NY § 8-502(g);

(6)      Award prejudgment interest to Plaintiff; and

(7)      Order such other relief as this Court deems just and equitable.

October 30, 2014                      Respectfully submitted,

                                     /s/ Ryan Downer

                                       Ryan C. Downer (RD3249)
                                       John P. Relman*
                                       Glenn Schlactus*
                                       Jia Cobb*
                                       RELMAN, DANE & COLFAX, PLLC
                                       1225 19th St., NW, Suite 600
                                       Washington, D.C. 20036-2456
                                       Tel: 202-728-1888
                                       Fax: 202-728-0848
                                       E-mail: jrelman@relmanlaw.com
                                             rdowner@relmanlaw.com
                                             gschlactus@relmanlaw.com
                                             jcobb@relmanlaw.com

                                       *application for admission pro hac vice to be filed