# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

THE FORTUNE SOCIETY, INC.
29-76 Northern Blvd
Long Island City, NY 11101

        Plaintiff,

    v.

SANDCASTLE TOWERS HOUSING
DEVELOPMENT FUND CORP.
1465A Flatbush Ave.
Brooklyn, NY 11210

SARASOTA GOLD LLC
1407 48th Street
Brooklyn, NY 11219

E & M ASSOCIATES LLC
1465A Flatbush Ave.
Brooklyn, NY 11210

and

WEISSMAN REALTY GROUP LLC
45 Broadway, 12th Floor
New York, NY 10006

        Defendants.

Civil Action No. 1:14-cv-6410

Magistrate Judge Vera M. Scanlon

Oral Argument Requested

**REVISED BRIEF IN SUPPORT OF PLAINTIFF THE FORTUNE SOCIETY, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS SARASOTA GOLD, LLC, SANDCASTLE TOWERS HOUSING DEVELOPMENT FUND CORPORATION, AND E & M ASSOCIATES, LLC AND TO EXCLUDE <u>REBUTTAL EXPERT REPORTS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 4

I.       The Fortune Society ................................................................................... 4

II.      The Sand Castle's Background and Application Process ........................... 5

         A.       The Sand Castle's Background ...................................................... 5

         B.       Defendants' General Application Process ..................................... 6

         C.       Personnel Involved in Application Decisions ................................ 6

III.     Fortune's Attempts to Obtain Housing At The Sand Castle ....................... 8

IV.      Defendants' Application and Enforcement of The Sand Castle's
         Applicant Criteria ...................................................................................... 9

         A.       Defendants Enforce a Blanket Criminal Records Ban .................. 9

                  1.       Defendants Advertise and Otherwise Communicate a
                           Categorical Ban to the Public ........................................... 10

                  2.       Review of the Available Applicant Files Indicates
                           Enforcement of a Ban ....................................................... 11

                  3.       Defendants Openly Concede a Categorical
                           Felony Ban ......................................................................... 12

         B.       Defendants Do Not Enforce Other Stated Tenant
                  Selection Criteria ......................................................................... 13

V.       The Effect of  Defendants' Criminal Records Practices ........................... 14

         A.       Disparities in the Criminal Justice System .................................. 14

         B.       Disparate Impact Analysis in the FHA Context ........................... 15

         C.       The Disproportionate Effect of The Sand Castle's
                  Blanket Ban on the Potential Applicant Pool .............................. 18

                  1.       Dr. Parnell's Determination of the Qualified
                           Applicant Pool .................................................................. 18

2.      Dr. Wildeman's Criminal Record Analysis ...............................................20

3.      Application of Criminal Records Analysis to The Sand
        Castle Applicant Pool .................................................................................21

4.      Dr. Parnell's and Dr. Wildeman's Analysis Showed
        Consistent Results Regardless of Variations in Income
        Thresholds and Geographic Areas Considered..........................................21

LEGAL STANDARD..................................................................................................22

SUMMARY OF ARGUMENT ....................................................................................23

ARGUMENT ................................................................................................................24

I.      Disparate Impact Liability Under the FHA Extends to
        Criminal Records Bans .............................................................................................24

II.     Defendants' Practices Violate the FHA Based on Racial
        Disparate Impact .......................................................................................................25

        A.      Step 1: The Evidence Establishes a Disproportionate
                Adverse Effect .................................................................................................27

        B.      Step 2:  Defendants' Blanket Criminal Records Ban Is Not
                Necessary to Achieve Any Legitimate Interest ...................................................29

        C.      Step 3:  Even If Defendants' Practices Serve Legitimate
                Interests, They Can Be Achieved by the Less Discriminatory
                Alternative of Individualized Consideration..........................................................32

III.    Defendants' Practices Violate  § 3604(a), (b) and (c) of
        the Fair Housing Act ................................................................................................34

        42 U.S.C. § 3604(a) and (b)......................................................................................34

        42. U.S.C. § 3604(c). ...............................................................................................34

CONCLUSION..............................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277 (5th Cir. 1994) ...................................16

*Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984)......................................................15

*Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140
(2d Cir. 1991).................................................................................................................17, 18

*Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148
(S.D.N.Y. 1989)..........................................................................................................................28

*Cales v. New Castle Hill Realty*, AB, 2011 WL 335599
(S.D.N.Y. Jan. 31, 2011)..........................................................................................................35

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...............................................26, 27

*Dothard v. Rawlinson*, 433 U.S. 321 (1977)...............................................................................16

*EEOC v. Joint Apprenticeship Comm.*, 186 F. 3d 110 (1998)...............................................16, 17

*El v. SEPTA*, 479 F.3d 232 (3d Cir. 2007).................................................................................31

*Field v. Orkin Extermination Co.*, 2002 WL 32345739
(E.D. Pa. Feb. 21, 2002) ..........................................................................................................31

*Goenaga v. Mar. of Dimes Birth Defects Found*, 51 F.3d 14
(2d Cir. 1995)............................................................................................................................23

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*,
2011 WL 4915524 (E.D. La. Oct. 17, 2011) ...........................................................................29

*Green v. Missouri Pac. R.R. Co.*, 523 F.2d 1290 (8th Cir. 1975).......................................... *passim*

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) .......................................................................16

*Guerrero v. California Dep't of Corr.*, 119 F. Supp. 3d 1065
(N.D. Cal. 2015)........................................................................................................................32

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)....................................................9

*Hack v. Pres. & Fellows of Yale Coll.*, 237 F.3d 81 (2d Cir. 2000) ..............................................17

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,

844 F.2d 926 (2d Cir. 1988)...........................................................................................23, 24

*In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d 1305
(11th Cir. 1999)..............................................................................................................16

*Int'l Broth. of Teamsters v. United States*, 431 U.S. 324 (1977) ...............................35

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988) .......................................................18, 29

*LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551 (S.D.N.Y. July 16, 2002)................27

*Malave v. Potter*, 320 F.3d 321, (2d Cir. 2003)................................................16, 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..................23

*McCain v. United States*, 2015 WL 1221257 (D. Vt. Mar. 17, 2015) ........................33

*Melani v. Bd. of Higher Educ. of City of New York*, 561 F. Supp. 769
(S.D.N.Y. 1983) ..............................................................................................................18

*Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016)....................... *passim*

*Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251 (D. Mass. 2008) .................29

*MLB Properties., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008)..........................26

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
658 F.3d 375 (3d Cir. 2011).....................................................................................17, 28

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ..........................................27

*Ragin v. N.Y. Times Co.*, 923 F.2d 995 (2d Cir. 1991) ...............................................35

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997).......................................................26

*Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133
(E.D.N.Y. 2011)..............................................................................................17, 28, 29

*Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31 (2d Cir. 2015) ..............................35

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
135 S. Ct. 2507 (2015)......................................................................................2, 23, 24, 30

*Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003) .................24, 25, 28

*United States v. Alvarado*, 923 F.2d 253 (2d Cir. 1991) .............................................23

iv

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ...................................................25

*United States v. Mulder,* 273 F.3d 91 (2d Cir. 2001)..................................................27

*United States v. New York State Dep't of Motor Vehicles*,
82 F. Supp. 2d 42 (E.D.N.Y. 2000) ............................................................................35

*Waldon v. Cincinnati Public Schools*, 941 F. Supp. 2d 884
(S.D. Ohio 2013)..........................................................................................................31

*Wards Cove Packing Co. v. Antonio*, 490 U.S. 642 (1989)..........................................15

## **Statutes and Rules**                                                                **Page(s)**

24 C.F.R. § 100.500 ................................................................................................23, 24

42 U.S.C. § 3601 *et seq.*...........................................................................................1, 34

Fed. R. Evid. 201 ...........................................................................................................23

Fed. R. Evid. 401 ...........................................................................................................26

## **Other Authorities**                                                                 **Page(s)**

EEOC, *Consideration of Arrest and Conviction Records in Employment
Decisions Under Title VII of the Civil Rights Act of 1964*,
2012 WL 1499883 (Apr. 25, 2012) ..................................................................................3

Paetzwold & Willborn, The Statistics of Discrimination § 5:4-5:5 (2015) ....................15

Robert G. Schwemm, Housing Discrimination:
Law and Litigation § 10:6 (2015) ..................................................................................15

# INTRODUCTION

Defendants Sarasota Gold, LLC, Sandcastle Towers Housing Development Fund Corporation, and E & M Associates, LLC ("Defendants"[1]) own and operate a large apartment complex in Queens called The Sand Castle. Summary judgment should be granted against Defendants because they refuse to consider applicants on a nondiscriminatory basis as required by the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") and the New York State and City Human Rights Laws ("HRL"). Plaintiff The Fortune Society ("Fortune"), a New York City organization that helps formerly incarcerated individuals find housing, has been denied housing by Defendants three times because of Defendants' unlawful and discriminatory policies.

The undisputed evidence establishes that Defendants maintain and enforce a policy or practice that automatically and categorically excludes applicants and prospective applicants who have a criminal record.[2] Defendants have openly and repeatedly advertised their exclusionary policy online. On more than 40 occasions, The Sand Castle's rental manager made express written statements to brokers and members of the public that applicants with criminal records would not be considered or accepted. Defendants state that the "no criminal background" language in their public pronouncements "correctly state the criteria" for applications. SOF ¶ 107.[3]  That Defendants enforce their stated policy is evident from a review of the available tenant

---

[1] "Defendants" is used herein to refer to these three entities. Fortune moves for summary judgment against these three Defendants on its race discrimination claims (Counts I-III) based on disparate impact. Fortune's alternative ground for liability on Counts I to III – intentional discrimination – is not at issue in this motion and is not necessary to establish Defendants' liability. Evidence of intentional racial discrimination will remain for trial, as will Fortune's source of income discrimination claim (Count IV).  Fortune does not move for summary judgment as to the fourth Defendant, Weissman Realty Group LLC ("Weissman Realty").

[2] "Criminal record" refers to record of conviction for a felony or a misdemeanor only. Plaintiff acknowledges that applicants with only traffic-related misdemeanors or violations may not be subject to Defendants' policy.

[3] Plaintiff's Statement Of Material Facts As to Which There Is No Genuine Issue To Be Tried, submitted herewith pursuant to Local Civil Rule 56.1(a) (referred to herein as "SOF").

files (there are over 1200). Even with Defendants' acknowledgement of errors in applying their screening process, these files show that 99.6% of applicants accepted over the last decade have no criminal record (excluding traffic-related misdemeanors). Moreover, Defendants openly acknowledge that applicants with felony convictions are automatically rejected without regard to the recency or severity of the crime.

Defendants' unlawful actions cause a large and statistically significant disparate impact because African Americans and Latinos in the qualified applicant pool are at least twice as likely as whites to have a criminal record. Further, any public safety concerns based on past criminal conduct can be satisfied with the less discriminatory alternative of individualized review of applicants who have criminal records. Defendants are therefore liable for discrimination. This conclusion is compelled by (1) Supreme Court and Circuit law on disparate impact; (2) guidance from the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Equal Employment Opportunity Commission ("EEOC") stating that blanket bans against people with criminal records in housing and employment, respectively, cause an unlawful disparate impact; and (3) case law holding that blanket bans in employment cause an unlawful disparate impact.

Under the FHA, facially neutral policies or practices that disproportionately and adversely affect members of a protected class are unlawful unless the defendant can prove that the practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016); *see also Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc. ("ICP")*, 135 S. Ct. 2507, 2514-15 (2015). Even if the defendant can meet that burden, a plaintiff will prevail by demonstrating that the same legitimate interests could be served through a less discriminatory alternative. *Mhany Mgmt.*, 819 F.3d at 618.

Guidance recently issued by HUD confirms what Fortune has alleged since the start of this case: that blanket bans like Defendants' can be expected to have a disproportionate adverse effect on African Americans and Hispanics because of disparities in the criminal justice system, and that blanket bans are *never* necessary to achieve the legitimate interest of promoting safety. *See* Ex. A (HUD, *Office of Gen. Counsel Guidance on Application of FHA Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions*) (Apr. 4, 2016) ("HUD Guidance") at 2, 6, 10. HUD even cites *this case* in explaining why a safety interest is insufficient as a matter of law to support a blanket ban. *See id.* at 4 n.23. The HUD Guidance further holds that individualized consideration – based on factors such as the "nature, severity, and recency of criminal conduct" and "evidence of rehabilitation" – is effectively required because it provides a less discriminatory alternative to categorical policies. *Id.* at 6-7.

The HUD Guidance mirrors the courts' and the EEOC's consistent rejection of blanket bans in the employment context. As in housing, the law under Title VII is clear that blanket bans disproportionately and adversely affect African Americans and Hispanics and cannot be justified by safety concerns, and that individualized consideration of applicants is mandatory.  *See, e.g.*, *Green v. Missouri Pac. R.R. Co.*, 523 F.2d 1290, 1293 (8th Cir. 1975); EEOC, *Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*) ("EEOC Guidance"), 2012 WL 1499883 (Apr. 25, 2012) (first issued in 1987). Moreover, the State of New York will soon issue "[n]ew guidance forbidding discrimination based on a conviction alone, and require" those receiving state housing funds "to make an individualized assessment of applicants."[4]

---

[4] *See* Ex. B, which is *https://www.governor.ny.gov/news/governor-cuomo-announces-executive-actions-reduce-barriers-new-yorkers-criminal-convictions* (last checked on July 14, 2016).

3

Here, Fortune meets its initial burden by showing, through expert analysis, that otherwise eligible African Americans and Latinos in the New York area housing market are significantly and disproportionately harmed by Defendants' exclusionary criminal records policies. This is because, nationwide and locally, African Americans and Hispanics have far higher rates of criminal conviction as compared to whites (i.e., non-Hispanic whites). This significant disparity persists regardless of how the applicant pool for The Sand Castle is geographically defined or at which income levels potential applicants are considered eligible for tenancy. Defendants' expert raises no issue of material fact with regard to these conclusions and does not dispute them.

Although it is their burden to do so, Defendants have proffered no evidence that their practices further any legitimate interest. Defendants provide no empirical justification for the categorical criminal records practices they use, only the type of vague, "speculative" assertions about safety that case law and the HUD Guidance explicitly reject. *See, e.g.*, HUD Guidance at 4. By contrast and consistent with the Guidance, Fortune presents expert criminological analysis establishing that age, the number of past crimes, and the time since the last offense are variables that must be jointly considered to determine if an individual is likely to pose a threat to the community. Further, Fortune presents evidence that individualized consideration is a less discriminatory alternative that will not compromise any legitimate safety concerns.

Because the undisputed evidence shows that Defendants' practices cause a substantial adverse impact that cannot be justified by a legitimate interest, and because Fortune has put forward a less discriminatory alternative, Fortune is entitled to summary judgment that Defendants are liable for violating the FHA, as well as parallel State and New York City laws.

## **FACTUAL BACKGROUND**

### I.    **The Fortune Society**

Fortune is a not-for-profit organization dedicated to the successful reentry and

reintegration of formerly incarcerated individuals in New York City. Serving 6,000 clients a year, it is one of the leading national organizations addressing reentry issues. Fortune provides services to these clients by operating housing and employment programs, among others. Fortune's client population is overwhelmingly African American and Latino. SOF ¶¶ 1-6.

Fortune also places clients in private rental housing in the City through its grant-funded "scattered-site" programs. In 2013, Fortune received a housing assistance grant from New York State providing funding for 25 residential units to be specifically located in Queens. In the course of attempting to place clients using this funding, Fortune reached out to The Sand Castle, a four-building apartment complex located at 711 Seagirt Avenue in Far Rockaway. After Defendants discovered Fortune's mission and purpose, Fortune's request was rejected. SOF ¶¶ 7-8, 278-99.

## II.      The Sand Castle's Background and Application Process

### A.  The Sand Castle's Background

The Sand Castle has been owned by Defendants Sarasota Gold, LLC and/or Sandcastle Towers Housing Development Fund Corporation and managed by Defendant E & M Associates, LLC since 2006. The majority (56%) of the complex's 917 units are studios, which rent for as little as $950 per month. SOF ¶¶ 11-12, 17, 23-24, 289, 310. Formerly senior housing, The Sand Castle is a doorman building equipped with medical facilities, a grocery store, beach access, and even a Jewish community center. SOF ¶ 288. A plurality of the beachfront complex's residents are white. The complex is 42.6% white, 37.6% African American, and 14.9% Latino, meaning that the building is nearly twice as white as the zip code in which it is located. SOF ¶¶ 245-47.

Shortly after acquiring the complex, Defendants made a multi-million dollar effort to upgrade it—hiring a marketing firm, renovating the lobby, and installing amenities, such as a new gym and media room. Defendants sought to attract a younger, more professional, and higher

income element.  After that effort largely failed, Defendants began accepting applicants with subsidies, including victims of Hurricane Sandy with FEMA-funding. In June 2013, Defendants Sarasota Gold and Sandcastle Towers entered into an affordable housing agreement with the New York City Housing Development Corporation ("HDC"). SOF ¶¶ 14-17.

### B. Defendants' General Application Process

Defendants state that they apply the following criteria to evaluate which applicants are qualified to become tenants at The Sand Castle: income, creditworthiness, criminal background, and landlord-tenant litigation history. To become a tenant at The Sand Castle, an applicant must submit to criminal background, credit, and landlord-tenant litigation checks run by Sand Castle staff using Weimark Credit Information Services. SOF ¶¶ 79-82.

The Weimark criminal background check is the dispositive source of criminal records information for applicants to The Sand Castle. The criminal background check provides information on the nature of the crime, whether it was a misdemeanor or felony, and the class of the misdemeanor or felony. Applicants are also interviewed in the process. SOF ¶¶ 83-84, 86.

Once an applicant has been approved by Sand Castle staff, Defendants' affordable housing agreement with the City requires confirmation that the applicant meets HDC's maximum income restrictions. The restrictions require that 90% of Sand Castle residents earn no more than 125% of the Area Median Income ("AMI") and that 10% earn no more than 135% of AMI. As a practical matter, this restriction means that an applicant can typically earn no more than approximately $70,000 annually. HDC does not apply any other criteria. SOF ¶¶ 89-93.

### C. Personnel Involved in Application Decisions

During the period in which they have owned, controlled, and managed The Sand Castle (*i.e.*, since 2006), Defendants have primarily entrusted two individuals with the authority and

6

responsibility for reviewing, screening, and rejecting tenant applications: employees Brontie Silvera and Rose Campbell. Campbell, The Sand Castle's rental manager, oversees all aspects of the tenant selection process. Campbell fields inquiries from potential applicants and is the primary contact for brokers seeking to place tenants. SOF ¶¶ 34-43, 47-67.

Since her tenure began in 2013, Campbell has also been "100 percent" responsible for handling tenant applications as they come in. SOF ¶ 40. Both Aryeh Ginzberg—the majority shareholder of Sarasota Gold, president of Sandcastle Towers, and senior employee of E & M— and Sruly Tress, the building manager who acts under the direction of Sarasota Gold and E & M, testified that Defendants have delegated near-total control over the application process to Campbell and that she is subject to minimal oversight in her tenant selection duties. Campbell rejects applicants without oversight: if an applicant's background check indicates a criminal record, Campbell can make the decision to reject on her own. She does not consult with anyone before making that decision. SOF ¶¶ 13, 18, 25, 39-40, 47-54, 66-67, 119.[5]

Prior to Campbell's employment at The Sand Castle, her current role and function were performed by Brontie Silvera. SOF ¶ 56. Due to the fact that Silvera worked at The Sand Castle prior to Sarasota Gold's acquisition of the complex in 2006, Defendants deferred to Silvera as to what applicant criteria to apply and how to apply them. Silvera was entrusted with "similar authority" as Campbell to screen and reject applications based on the applicant criteria. SOF ¶¶ 57-61, 66. The process Silvera used to review tenant applications was the same as Campbell's current process. In fact, Campbell learned what the application criteria were directly from Silvera

---

[5] Although Tress nominally supervises Campbell, he is minimally involved in the day-to-day operations and is not consulted when Campbell rejects an applicant. Moreover, as it was Campbell who taught Tress about the applicant criteria, Campbell's understanding of the selection criteria governs the decision making process. SOF ¶¶ 45-55.

during their brief overlap at The Sand Castle. Although E & M employees Meyer Brecher and Phil Goldstein assisted in the building's management during Silvera's tenure, Silvera, like Campbell after her, did not seek the approval of any manager before rejecting an applicant and was largely unsupervised in the performance of her duties.[6] SOF ¶¶ 62-65, 68-70.

In sum, Defendants have allowed Silvera and Campbell to reject applicants who, in their view, do not meet building criteria, without supervision or approval. Defendants have not exercised meaningful oversight over the process used by Silvera and Campbell. SOF ¶¶ 66-67.

## III.   Fortune's Attempts to Obtain Housing At The Sand Castle

Fortune made three attempts to rent apartments at The Sand Castle that were denied—two in the summer of 2013 and the other in March 2014. First, in or around June 2013, Fortune employee Camille Morrison called to inquire about housing for Fortune's clients. She was told that the complex does not accept people with criminal records. SOF ¶¶ 286, 290-300.

Second, in July 2013, Fortune's housing specialist, Kevin Carter, inquired of Sand Castle personnel whether apartments were available. After Carter explained Fortune's mission to assist formerly incarcerated individuals find housing, Defendants' representative informed him that The Sand Castle does not allow "ex-offenders" to rent apartments. SOF ¶ 292-94.

Third, on March 24, 2014, Carter and Fortune's President and CEO, JoAnne Page, called The Sand Castle's front office to inquire about renting apartments. Carter and Page spoke to Tress, the complex manager. Page explained Fortune's mission and that Fortune serves people who are formerly incarcerated. Tress responded that "criminal history . . . does scare us," and that it is a "red flag." Tress later called Carter and told him that The Sand Castle could not rent to

---

[6] Real estate brokers Heidi Herschkowitz and Melissa Gursky, employed by Weissman Realty but acting as agents of Defendants, also worked on-site to assist with applicant recruitment. SOF ¶¶ 26-29, 72-77.

Fortune because the complex "was not dealing with that many vacancies" and that renting to Fortune was "not something that we'd be interested in right now." In actuality, The Sand Castle had more than 70 vacancies at the time and was actively seeking to fill them. SOF ¶¶ 295-310.

Ultimately, Sand Castle's refusal to accept Fortune clients required the organization to expend substantial additional time and money to secure alternative housing, resources that otherwise would have been spent pursuing other organizational objectives. The additional out-of-pocket expenses alone amount to tens of thousands of dollars. SOF ¶ 312-15.[7]

## IV. Defendants' Application and Enforcement of The Sand Castle's Applicant Criteria

### A. Defendants Enforce a Blanket Criminal Records Ban

The Sand Castle's refusals to rent to The Fortune Society because Fortune's clients have criminal records reflect and are the direct result of Defendants' practices. Defendants, primarily through Campbell and Silvera before her, maintain and enforce a policy or practice that automatically and categorically excludes applicants and prospective applicants who have a criminal record. First, Defendants advertise and otherwise publicly pronounce that such applicants are not considered and will be rejected. SOF ¶¶ 95-115. Second, as a review of the available tenant files indicates, Defendants rigorously enforce a "no criminal background" policy with regard to both felonies and non-traffic-related misdemeanors. SOF ¶¶ 116-47. Third, rental manager Campbell testified in her deposition that applicants with felony backgrounds are not welcome at The Sand Castle. SOF ¶¶ 124-28, 137. Defendants maintain that their practice is justified, asserting that "convicted criminals have no basis for complaining that landlords choose not to rent to them." SOF ¶ 115.

---

[7] These injuries make clear that Fortune has standing to bring its claims. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). Defendants have never contended otherwise.

1.   <u>Defendants Advertise and Otherwise Communicate a Categorical Ban to the Public</u>

Defendants have posted public advertisements explicitly stating that individuals with

criminal records will not be accepted. In January 2014, Tress caused such an ad to be posted on

Craigslist. The ad, written by Tress, included as one of the applicant criteria that applicants have

"no criminal history." This unqualified prohibition made no distinctions based on the type of

crime, whether it was a felony or misdemeanor, or when it occurred. SOF ¶¶ 96-100.

The identical ad was posted repeatedly, over a period of several months, to ensure high

viewership. Tress regarded the ads as conveying the "standard," basic information that potential

applicants needed to know about the selection criteria. Lead Sarasota Gold partner Aryeh

Ginzberg was aware of the initial ad's stated criminal records prohibition before it was posted

and did not suggest any changes. SOF ¶¶ 97, 101-02. Collectively, the ads generated so much

interest from the public that Campbell, charged with responding to inquiries from prospective

applicants, "started to get very overwhelmed with all the applications" and The Sand Castle's

vacancy rate began to decrease as she filled units with interested callers. SOF ¶¶ 78, 103-04.

In addition to the ads themselves, on at least 39 separate occasions from at least March

2014 to October 2014, Defendants, through rental manager Campbell, made express written

statements to members of the public that The Sand Castle would not consider or accept

applicants with criminal records. During this period, Campbell responded to several dozen email

inquiries with a standard, uniform message stating that those applying for tenancy must have "no

criminal background."  SOF ¶¶ 105-06. Tress testified that Campbell's response stating "no

criminal background"  "correctly state[d] the criteria" for rental applications. Indeed, had Tress

reviewed Campbell's emails, each stating "no criminal background" as one of the criteria, he

would have approved that language. Campbell also told prospective applicants over the phone

"[t]he same thing that she said in the e-mail" concerning the applicant criteria. SOF ¶¶ 107-08.

Real estate brokers working with The Sand Castle were also advised that applicants with criminal records would not be considered and should not be referred. One broker testified that management instructed her that the building "does not want people with criminal backgrounds" as tenants. SOF ¶ 114. In an April 24, 2014 email to two real estate brokers who routinely refer applicants to The Sand Castle, Campbell stated: "For the future, applicant cannot have a . . . criminal background." In another email to the same brokers six months later, Campbell restated the requirement that referred applicants not have a criminal background. SOF ¶¶ 110-12. Herschkowitz, one of the on-site Weissman brokers and later a Sand Castle employee, acknowledged in a January 27, 2014 email to Tress that applicants with a criminal history "can absolutely not live in the sandcastle [sic]" and explained that she would convey that message to a particular applicant. Tress did not take issue with Herschkowitz's statement. SOF ¶ 113.

Accordingly, countless members of the public have been advised of The Sand Castle's "no criminal background" policy through either public advertisements, word-of-mouth, interactions with Campbell or other staff, and independent brokers aware of the policy.

2. <u>Review of the Available Applicant Files Indicates Enforcement of a Ban</u>

The Sand Castle's enforcement of its "no criminal background" policy has been remarkably effective. In discovery, Defendants made available 1145 files of applicants accepted by The Sand Castle from 2006 to June 2015. Of that 1145, only *two* accepted applicants had background checks definitively indicating a past felony conviction. Thus, with respect to felonies, Defendants' practices produced the desired result 99.83% of the time. SOF ¶ 136.

Further, the two applicants with background checks indicating felony records who became tenants were plainly admitted to the building in error. One tenant was convicted of

felony larceny; the other of felony assault on a police officer. In her deposition, Campbell, the rental manager, confirmed that Sand Castle's explicit practice is to "automatically" reject applicants convicted of these very offenses. SOF ¶¶ 136-37. That these two tenants were accepted reflects the fact—acknowledged in depositions by top officials of Defendants—that mistakes are sometimes made in the tenant selection process and the landlord's criteria are not always correctly applied. SOF ¶¶ 138-40. Even with these occasional errors, based on the available information from a ten-year period, just 0.17% of accepted applicants had a felony conviction. SOF ¶ 136. Accordingly, the evidence suggests that even this small percentage represents an aberration rather than a purposeful exception.

The Sand Castle's available accepted applicant files also confirm that individuals with misdemeanor convictions other than traffic offenses are, as a rule, not accepted. Based on the 1145 accepted applicant files, only three individuals with background checks clearly indicating non-traffic misdemeanor convictions ever became tenants. SOF ¶¶ 136 n.6, 144-45. Of these three, only one was a tenant prior to the start of this litigation. SOF ¶ 144. Even including all three accepted over a ten-year period, these figures show that just 0.2% of accepted applicants with information available had a past non-traffic misdemeanor conviction. SOF ¶¶ 143-44.

In sum, review of the 1145 accepted applicant files reveals that 99.6% of applicants accepted over the last decade have no criminal record (excluding traffic-related misdemeanors). Given the proportion of New York City residents with criminal records, this fact indicates that Defendants' policies are highly effective at keeping people with criminal records out.

3. Defendants Openly Concede a Categorical Felony Ban

Campbell, the Sand Castle employee with nearly exclusive authority over tenant applications as a practical matter, admitted in sworn testimony that she rejects any and every

applicant whose background check reveals a past felony conviction. Campbell testified that it is "the landlord's criteria" to deny an applicant "if it's a felony" in the applicant's background, and Campbell unequivocally applies that criterion. Accordingly, if an applicant's Weimark report indicates a past felony conviction, Campbell "will tell them that they will be denied" and it results in "automatic denial." SOF ¶¶ 124-26. Campbell acknowledged that applicants with felony convictions are rejected regardless of the nature of the felony; how long ago the felony occurred; and any other mitigating factors. In fact, agents and employees Defendants do not even know how to determine the date of the underlying crime or conviction. SOF ¶¶ 120-23, 127. On-site broker Gursky's deposition testimony further confirms Sand Castle's felony screening. She stated that, based on her understanding of the building criteria, she did not in the past, and would not today, knowingly refer a person with a felony in their background. SOF ¶ 131. At the very least, then, Defendants categorically exclude all persons with felony convictions.

**B.   Defendants Do Not Enforce Other Stated Tenant Selection Criteria**

In addition to its criminal records criterion, Defendants purport to apply a minimum income of $30,000; a credit score minimum of 600 or 620; and a landlord-tenant litigation history criteria to applicants for tenancy. Unlike the criminal records criterion, however, each of these is flexibly and unevenly implemented, and often not applied at all. SOF ¶¶ 148-77. For example, the building routinely accepts applicants who have no income, no credit score, or a below-600 credit score if they have a voucher that partially or fully covers the rent. Significantly, about half of The Sand Castle's current tenants receive subsidies of some kind. But the income and credit score thresholds are not "set in stone" even for those who do not have subsidies. SOF ¶¶ 149-71. Indeed, there is "never a score . . . too low" to be considered. SOF ¶ 167. The Sand Castle's landlord-tenant litigation history criterion is also flexibly applied, particularly if the

eviction occurred five years ago or more, or the applicant presents a reasonable explanation for the housing issue. SOF ¶¶ 172-78.

Thus, the evidence suggests that while Defendants purport to maintain minimum income, credit score, and landlord-tenant litigation history criteria, in fact, these are not barriers to entry.

## V.  The Effect of  Defendants' Criminal Records Practices

### A. Disparities in the Criminal Justice System

African Americans and Latinos, at 58% of the nation's more than 2.3 million prisoners, are overrepresented in the criminal justice system. SOF ¶ 180. In 2014, African Americans made up approximately 36% of the total prison population but only 12% of the general U.S. population. HUD Guidance at 3. That is, African Americans were incarcerated at a rate of almost three times their representation in the population. *Id*. Latinos are similarly affected—comprising 22% of the prison population but only 17% of the general population. By contrast, whites comprised 62% of the general population but only about 34% of the prison population.  *Id*. at 3-4.

Over 95% of current inmates will be released at some point, and each year, 700,000 inmates are released back into their home communities. Given the incarceration statistics discussed above, these releasees are inevitably disproportionately African-American and Latino. Racial disparities are even starker in New York State, where more than 50% of inmates released in 2009 were African-American and over 25% were Latino. These proportions are notably stable over time: over half of the inmates released by the State's Department of Correction from 1985 to 2009 were African-American and nearly one-third were Latino. Most of those released— nearly two-thirds since 1985—go to New York City to live. Correspondingly, whites are incarcerated, and therefore released from jails and prisons, at rates significantly lower than their representation in the national, New York State, and New York City populations. SOF ¶¶ 182-87.

14

Given the persistence of these racial disparities, it is unsurprising that in New York City and State, African Americans and Latinos are far more likely than whites to have a criminal record, meaning that blanket bans more heavily impact members of these groups. SOF ¶¶ 188-91.

**B.**   **Disparate Impact Analysis in the FHA Context**

The threshold factual question in a disparate impact analysis "is whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class." Robert G. Schwemm, Housing Discrimination: Law and Litigation § 10:6 (2015).  Generally, this means that there must be "statistical evidence showing that the defendant's policy or practice has a greater impact on protected class members than on others." *Id*.  To assess such an impact, a proper analysis must (1) identify the relevant population affected by the neutral policy or practice; (2) conduct a race-based comparison of groups of qualified applicants within the relevant population; and (3) determine whether any differences between the groups compared are statistically significant. *Id.*; Paetzwold & Willborn, The Statistics of Discrimination § 5:4-5:5 (2015). Plaintiff's expert, Dr. Allan Parnell, set forth this well-established framework in his submissions. SOF ¶¶ 225-28.

First, the analysis must "identify those individuals who would be subject to the neutral [] practice being challenged." Statistics of Discrimination § 5:4; *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 651 (1989); SOF ¶¶ 227-28. This determination depends upon the nature of the policy or practice under scrutiny. In an eviction case, for example, "the affected group would be the current tenants in the defendant's building, whereas in an admissions case, the affected group might be the entire local housing market." Schwemm at 1; *see also Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 988 (4th Cir. 1984). The reason for the difference is simple: A policy affecting only those living in the building affects only current tenants, while restrictions

15

on who can rent a unit affect any person who applies or might have applied absent the policy.

A proper assessment of a rental restriction must consider the "whole pool of the potential renters who could apply," not just actual applicants. SOF ¶ 227 (quoting Parnell Dep.). Indeed, in such circumstances, "studies based on general population data and potential applicant pool data" are preferable to an analysis of actual applicants. *Malave*, 320 F.3d 321, 327n.4 (2d Cir. 2003) ("[E]ven if the data were available, the applicant pool would not have been the most appropriate underlying labor pool."). This is because, under such circumstances, "the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory." *EEOC v. Joint Apprenticeship Comm.*, 186 F. 3d 110, 119 (1998); *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1305 (5th Cir. 1994) ("[P]ractices which deter qualified minorities from applying for jobs impermissibly taints any analysis which employs the use of actual applicant-flow data").[8] Accordingly, examining actual applicants to assess the impact of a known rental restriction is typically inadequate.

Assessment of the entire potential applicant pool necessitates an examination of the local housing market, which must be geographically determined. SOF ¶¶ 225-28, 230; HUD Guidance at 3. Further, in determining the pool of potential applicants affected by the challenged policy, "the focus . . . is on defining the *qualified* applicant pool." *In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1312 (11th Cir. 1999) (emphasis added). "[T]here must be evidence identifying the basic qualifications . . . and a determination, based upon these qualifications, of the relevant statistical pool with which to make the appropriate comparisons."

---

[8] Supreme Court precedent has also endorsed this approach. *See Dothard v. Rawlinson,* 433 U.S. 321, 329–30 (1977); *Griggs v. Duke Power Co.,* 401 U.S. 424, 430 (1971).

*Id.*; *see also* Statistics of Discrimination § 4:3. Thus, to the extent possible, the analysis should center on those who are otherwise eligible for the housing at issue. *Malave*, 320 F.3d at 326.

The second stage of the analysis "involves a comparison between two groups" of qualified potential applicants within the relevant population—specifically, "those affected and those unaffected by the facially neutral policy." *Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 142-43 (E.D.N.Y. 2011) (citing *Hack v. Pres. & Fellows of Yale Coll.*, 237 F.3d 81, 90 (2d Cir. 2000)). "This comparison must reveal that although neutral, the policy in question imposes a 'significantly adverse or disproportionate impact' on a protected group of individuals." *Id.* at 143. That is, if members of a protected class are affected by the policy or practice at a substantially higher rate than those outside the class, the first element in the disparate impact analysis is established. *Joint Apprenticeship,* 186 F.3d at 117. While "no single test controls in measuring disparate impact," one established method is to compare the proportion of all members of the protected class who are adversely affected against the proportion of nonmembers of the protected class who are adversely affected. *E.g.*, *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 381-83 (3d Cir. 2011) (disparate impact established by Census data showing that 22.54% of African American and 32.31% of Hispanic households would be affected by the challenged housing demolition, compared to only 2.73% of white households); SOF ¶¶ 238-42.

The final stage of the analysis considers whether, as compared to the group of qualified applicants outside the protected class, qualified applicants within the protected class are disproportionately disadvantaged by the challenged policy in a manner that is legally meaningful, *i.e.* statistically significant. *Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140, 1147 (2d Cir. 1991). "Statisticians generally regard a measured differential as being

17

statistically significant when the P value is .05 or less." *Melani v. Bd. of Higher Educ. of City of New York*, 561 F. Supp. 769, 774 (S.D.N.Y. 1983). That is, if qualified minorities are not disadvantaged by the challenged policy, the "given pattern can be expected to occur" less than five times out of 100. *Bridgeport Guardians,* 933 F.2d at 1147. In addition to statistical significance, courts may also consider the magnitude of the disparity in determining whether there is a cognizable impact. *E.g.*, *Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir. 1988).

**C.** **The Disproportionate Effect of The Sand Castle's Blanket Ban on the Potential Applicant Pool**

Through its experts Dr. Allan Parnell and Dr. Christopher Wildeman, Fortune has established that due to racial differences among those with a criminal record, African Americans and Latinos in The Sand Castle's pool of potential qualified applicants are and predictably will be disproportionately disadvantaged relative to whites by Defendants' exclusionary criminal records practices.  Both experts relied upon standard recognized methodologies.

1. Dr. Parnell's Determination of the Qualified Applicant Pool

Defendants' criminal records policy excludes and affirmatively discourages all potential applicants with criminal records.  Because it functions as a restriction on admission affecting all potential renters, Dr. Parnell examined the policy's full effect on the entire potential applicant pool.[9]  To assess the impact, Dr. Parnell—whose areas of expertise include demographic analysis and the effects of discrimination on housing markets—first determined the geography of the

---

[9] Defendants' regular public statements, as recounted in Section IV, *supra*, actively discouraged applications from people with criminal records. Due to the chilling effect these actions had on the applicant pool, Dr. Parnell's analysis was the most appropriate. Notably, it is also the only type of statistical analysis that could have been conducted with the data available. As Defendants retained only a handful of rejected applications during the relevant time period, it is not possible to assess the effect of their criminal records policies using actual applicant information. SOF ¶¶ 134, 220-28. That is, no meaningful analysis can be conducted to ascertain how frequently applicants' criminal record were a basis for rejection; the race of those rejected for any reason; or even to know how many applicants were rejected during the relevant period. SOF ¶¶ 224, 228.

potential applicant pool. Specifically, Dr. Parnell determined that, based on its location and his review of zip codes extracted from applications, The Sand Castle draws applicants primarily from Nassau County and the New York HUD Metro Fair Market Area, which includes all of New York City (hereinafter, collectively, the "New York-Nassau Market Area"). Over the past decade, 92.4% of applicants with available zip code information originated from communities within these combined areas, thus confirming that the entire region comprises the potential applicant pool.[10] SOF ¶¶ 230-36. There are 3,578,042 households in the area rental market—1,861,248 white, 840,810 African American, and 875,984 Latino. SOF ¶ 240.

Dr. Parnell also assessed the economic qualifications of the potential applicant pool. Other than criminal background, the only dispositive criterion for applicants to The Sand Castle is the maximum income restriction imposed by HDC, which has been construed by Sand Castle staff as a $70,000 income cap. SOF ¶ 91. Dr. Parnell accounted for this restriction by analyzing the effect of various income restrictions on the potential applicant pool. Examining available census data, Dr. Parnell observed that in the New York-Nassau Market Area, 2,023,737 households in the rental market earn $0-70,000 per year in income—811,738 white households, 576,013 African-American households, and 635,986 Latino households. Applying Sand Castle's purported $30,000 minimum and a $70,000 cap, Dr. Parnell observed that there were 439,620 white households, 272,777 African-American households, and 281,429 Latino households. As the $70,000 cap is a rule of thumb rather than a hard-and-fast standard, Dr. Parnell also assessed the same housing market at various other income levels in order to capture all income-qualified potential Sand Castle renters. The pool is highly diverse at any income threshold. SOF ¶ 238-40.

---

[10] As confirmation, Campbell also testified that most applicants come from New York City. SOF ¶ 237.

2.  <u>Dr. Wildeman's Criminal Record Analysis</u>

To complete his assessment of the impact of Defendants' criminal records practices on the qualified applicant pool, Dr. Parnell relied upon the analysis conducted by Dr. Christopher Wildeman. Dr. Wildeman, whose areas of expertise include demographic analysis and the effects of mass incarceration, performed an analysis estimating the lifetime risk of criminal conviction by race. SOF ¶¶ 192-98. Dr. Wildeman found that, nationwide, Latinos are 2.51 times more likely than whites, and African Americans 4.40 times more likely than whites, to have a criminal record. SOF ¶ 199. This finding is consistent with studies conducted by others. SOF ¶¶ 180-90.

Using New York-specific data, Dr. Wildeman found that racial disproportionalities in rates of criminal conviction are even greater in New York State and City than nationally. With no income threshold applied, Dr. Wildeman demonstrated that, depending on the age category, Latinos living in New York are at least 5.13 times more likely than whites living in New York to have criminal records, and that African-American New Yorkers are at least 7.07 times more likely than whites to have criminal records. SOF ¶ 206. Dr. Wildeman found that these disparities persist nationwide and in New York at several different income thresholds, including those assessed by Dr. Parnell. For those earning $0-70,000 the cumulative risk of having a criminal record is 3.01% for whites, 7.46% for Latinos, and 11.38% for African Americans. For those earning $30,000-70,000, the cumulative risk of having a criminal record is 1.37% for whites, 3% for Latinos, and 4.76% for African Americans. SOF ¶¶ 201-02. Dr. Wildeman concluded that significant racial disparities persist in the risk of having a criminal record regardless of income level, age, or the nature of the offense, and that the rate of racial disparity for misdemeanors and felonies is essentially the same. SOF ¶¶ 196, 200-12.

3.   Application of Criminal Records Analysis to The Sand Castle Applicant Pool

Dr. Parnell specifically applied Dr. Wildeman's proportional risk findings at the $0-70,000 and $30,000-70,000 thresholds to the New York-Nassau Market Area, i.e., the qualified potential applicant pool for The Sand Castle. He determined that the differences in proportions between whites and minorities in this market are statistically significant. SOF ¶¶ 229, 241-43.

To test statistical significance, Dr. Parnell performs a series of "Z-tests" using the proportion of each racial group with criminal records and the numerical size of the housing market under each income scenario. Relying on Dr. Wildeman's analysis, Dr. Parnell concluded that, in the $0-70,000 segment of the housing market, the cumulative risk of having a criminal record is 3.01% for whites, 7.46% for Latinos, and 11.38% for African Americans. This means that African Americans in the New York-Nassau Market Area at this income threshold are 3.78 times more likely, and Latinos 2.48 times more likely, to be excluded by a criminal records ban as compared to similarly-situated whites. Dr. Parnell finds that these differences have P-values of less than 0.01, meaning that they are statistically significant at a 99% confidence level. Highly similar results occur for the $30,000-70,000 and the $0-90,000 income bands, with the same level of statistical significance for the differences in proportion. SOF ¶¶ 201, 229, 241-43.

The limited rejected applicant information maintained by Defendants supports Dr. Parnell's conclusions regarding adverse impact. Through discovery, Fortune obtained 116 rejected applicant files, an admittedly far from complete sample. Of those 116, 29 were clearly rejected because of their criminal background. Of the 27 of these with reliable race information available, at least 22 were either African American or Latino. SOF ¶¶ 134-35, 146-47.

4.   Dr. Parnell's and Dr. Wildeman's Analysis Showed Consistent Results Regardless of Variations in Income Thresholds and Geographic Areas Considered

For the sake of comprehensiveness, Dr. Parnell not only examined the New York-Nassau

Market Area, but also independently examined geographical subsets of that market. In total, Dr. Parnell considered four alternative ways to define the applicant pool geographically: Queens alone, New York City alone, the New York HUD Fair Market Rental Area alone, and the New York-Nassau Market Area. Dr. Parnell then considered each of these four alternative geographies under seven different income scenarios: any income; $30,000 and up; $40,000 and up; $0 to $70,000; $30,000 to $70,000; $40,000 to $70,000; and $0-90,000. The markets for all four nested geographic housing markets are similarly racially diverse at all income levels, with substantial white and minority populations. SOF ¶¶ 232, 238-40.

Similarly, Dr. Wildeman considered the proportional risk of having a criminal record for each of these seven incomes. He ultimately concluded that Latinos and African Americans are far more likely than whites to have a criminal record regardless of whether national or New York data are used and whether income thresholds are or are not applied. SOF ¶¶ 200-04, 210.

Dr. Parnell overlaid these risk calculations on each market, at every income level. Ultimately, Dr. Parnell conducted Z-tests—a total of 56—to assess whether differences in the likelihood of having a criminal conviction were statistically significant under all geographic and income scenarios. The results were <u>always</u> statistically significant, with P-values less than 0.01. Dr. Parnell thus concluded that no matter how the applicant pool is defined geographically or economically, minority renters are and will be disproportionately affected by Defendants' exclusionary criminal-records policy as compared to whites, at a substantial rate. SOF ¶¶ 241-43.

## <u>LEGAL STANDARD</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the moving party has made a properly supported showing sufficient to

suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. Mar. of Dimes Birth Defects Found*, 51 F.3d 14, 18 (2d Cir. 1995). The non-movant cannot "simply show that there is some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).[11]

## SUMMARY OF ARGUMENT

The Second Circuit has long held, and the Supreme Court last year confirmed, that housing practices that disproportionately and adversely affect racial minorities without legitimate justification violate the FHA. *ICP*, 135 S. Ct. 2507, 2525 (2015); *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir. 1988). The undisputed evidence establishes that Fortune is entitled to summary judgment under the three-step analysis that applies to FHA disparate impact claims. *Mhany Mgmt,* 2016 WL 1128424, at *30-31; 24 C.F.R. § 100.500(c).

First, the evidence establishes that Defendants' criminal records policies disproportionately bar otherwise-qualified African Americans and Latinos from obtaining housing at The Sand Castle. Second, there is no evidence from which reasonable jurors could find that Defendants' criminal records policy is necessary to achieve public safety, the legitimate interest claimed here. Third, even if Defendants could make such a showing, the evidence establishes that the public safety objective could be achieved through the less discriminatory alternative of giving individualized consideration to applicants with criminal records.

This conclusion is further compelled by HUD's recently-issued guidance stating that blanket bans in rental housing have a disparate impact and therefore violate the FHA, and by the

---

[11] In applying this standard, the Court may take judicial notice of the record from related cases, and any other facts, such as Census data that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir. 1991).

longstanding recognition that blanket bans against employing people with criminal records violate Title VII for the same reason.

## ARGUMENT

## I.   Disparate Impact Liability Under the FHA Extends to Criminal Records Bans

Sections 3604(a), (b), and (c) of the FHA prohibit, *inter alia*, landlords from employing rental practices that "cause or predictably will cause a discriminatory effect" based on race or national origin, regardless of whether there is evidence of discriminatory intent. *ICP*, 135 S. Ct. at 2525; 24 C.F.R. § 100.500(a). The Second Circuit follows HUD's three-step burden-shifting analysis for disparate impact claims under the FHA. *Mhany Mgmt.*, 819 F.3d at 617.  First, the plaintiff must demonstrate a *prima facie* case by showing "1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts practices." *Id.*; *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 577 (2d Cir. 2003). That is, the plaintiff must demonstrate that a facially neutral rule "actually or predictably results in racial discrimination." *Huntington Branch*, 844 F.2d at 934.

Second, the defendant "may rebut the prima facie case by proving that the 'challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.'" *Mhany Mgmt.*, 819 F.3d at 617. And third, if that burden is met, the plaintiff can still prevail by showing that the same objective could be achieved through the use of a less discriminatory alternative. *Id.*

The recently-issued HUD Guidance makes clear that categorical criminal records bans can be expected to have a disproportionate adverse effect on African Americans and Hispanics

because of racial disparities in the criminal justice system. HUD Guidance at 2.[12] The Guidance further clarifies that housing providers must actually *prove* that their policy advances a legitimate interest and that a categorical criminal records ban that has such an effect cannot, as a matter of law, ever be justified. *Id.* at 6. Moreover, HUD's interpretation confirms that individualized consideration is the appropriate less discriminatory alternative for even those policies that, while not categorical and serving a legitimate interest, nevertheless cause a disparate impact. *Id.* at 7. HUD's pronouncement is fully consistent with the EEOC's Guidelines on the same issue, and with the line of cases holding that blanket criminal records bans violate Title VII because they disproportionately exclude African Americans and Latinos from employment and are not necessary to attain any legitimate objective. *See, e.g.*, *Green*, 523 F.2d at 1296 (holding that "a sweeping disqualification" based "solely on past behavior" violates Title VII where that practice "has a disproportionate racial impact and rests upon a tenuous or insubstantial basis"); EEOC Guidance at 13.[13] These cases also emphasize that individualized consideration of people with criminal records is the appropriate less discriminatory alternative. *See Green*, 523 F.2d at 1297.

## II.      Defendants' Practices Violate the FHA Based on Racial Disparate Impact

The instant facts easily fit the traditional disparate impact paradigm and align with the recent HUD guidance on criminal records. As discussed above, the evidence shows that Defendants' maintain a facially neutral policy that categorically discourages and/or excludes any applicant to The Sand Castle with a past criminal conviction. Specifically, Defendants advertise

---

[12] The HUD Guidance is entitled to deference. *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001).

[13] The extensive Title VII precedent on this question is particularly relevant given that the FHA's "prohibition on discrimination [in housing] is generally interpreted in accordance with Title VII's prohibition on discrimination in employment." *Davis v. City of New York*, 902 F. Supp. 2d 405, 437 (S.D.N.Y. 2012). Thus, "[w]hen examining disparate impact claims" under the FHA, this Court should "use Title VII as a starting point." *Tsombanidis*, 352 F.3d at 575; *accord Lax v. 29 Woodmere Blvd. Owners, Inc.*, 812 F. Supp. 2d 228, 235 n.4 (E.D.N.Y. 2011).

a blanket ban; their records confirm that they rigorously enforce it; and they openly admit, at the very least, a felony ban. SOF ¶¶ 96-147. The Sand Castle's blanket criminal records ban is a "neutral" policy or practice that, as Fortune's experts show, disproportionately excludes African-American and Latino applicants in the relevant housing market. Moreover, Defendants cannot show that their ban has a legitimate basis; nor can they counter Fortune's evidence that any legitimate safety aim could be addressed through the less discriminatory alternative of individualized consideration.

Significantly, reports from Defendants' expert, Donald Welsch, do not create any genuine dispute over the material facts herein because they are irrelevant, unhelpful, and unreliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (expert report "not a talisman against summary judgment"). A core question in this case—and the question addressed by Plaintiff's experts—is whether The Sand Castle's alleged policy of excluding individuals with criminal records disproportionately and unjustifiably affects minorities in the applicant pool. Welsch offered no analysis of that issue, making his conclusions irrelevant to "any fact of consequence." Fed. R. Evid. 401. By his own admission, Welsch does not dispute the findings, methods or analyses of Plaintiffs' three experts. Instead, Welsch's opinions are conclusory statements that the expert report in question contains "no evidence" of a particular, and often irrelevant, point. SOF ¶¶ 213-15, 249-51, 268-69. These conclusions are no different than those rejected in *MLB Properties., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (rejecting as "conclusory" an expert's conclusion that party's argument was "unsupported by the facts as I understand them and ought to be dismissed").

On their face, Welsch's reports are irrelevant and non-responsive to Dr. Wildeman's core conclusion that minorities nationwide and in New York, regardless of income, have a

26

substantially higher risk of conviction than whites, and to Dr. Kazemian's core conclusion that

blanket bans are unnecessary for public safety. Indeed, Welsch devotes only *two conclusory*

*sentences* to his opinions on *both reports*. SOF ¶¶ 213-15, 269. Welsch also does not dispute Dr.

Parnell's core findings that the New York-Nassau Market is the appropriate applicant pool; that

minorities in any of the markets assessed have criminal records at significantly higher rates than

whites; nor that a policy excluding applicants because of criminal record harms minorities

disproportionately. SOF ¶ 249-51. Instead, Welsch offers opinions, unsupported by analysis,

which any casual observer could make; thus, his "no evidence" conclusions "do[] no more than

[Defendants] will do in argument, i.e., propound a particular interpretation" of the record.

*LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002). As Welsch's

opinions do not dispute Plaintiffs' expert's key findings, they are simply not helpful to the trier

of fact and immaterial. *See United States v. Mulder,* 273 F.3d 91, 104 (2d Cir. 2001).

Moreover, Welsch admits that he is unqualified to offer opinions in the relevant topic

areas and that his statements are not based on any data or methodology, much less reliable

ones. For example, he stated that he "[does not] have a professional understanding of

incarceration, of recidivism, [or] racial disproportionality"; was "not qualified" to assess those

issues; and conducted no analyses of his own. SOF ¶¶ 216-18, 252-58, 270; *Nimely v. City of*

*New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). Whether looked at as a Rule 401 relevance issue

or a Rule 702/*Daubert* issue, Welsch's reports are inadmissible; they should be excluded.

### A.  Step 1: The Evidence Establishes a Disproportionate Adverse Effect

Defendants' "outwardly neutral practice" of excluding and discouraging applicants with

criminal records other than traffic offenses causes or predictably will cause a disproportionate,

harmful effect on African Americans and Latinos. The starting point for measuring a housing

policy's disproportionate effect "involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Rivera*, 784 F. Supp. 2d at 142-43. Here, the groups subject to comparison are African Americans, Latinos, and whites in the qualified potential applicant pool. Plaintiff's experts used demographic information to compare the relative rates of criminal record-based exclusion for those groups. That is, Plaintiff's experts assessed the likelihood that a criminal records ban would impact qualified minorities as compared to its impact on qualified whites in the appropriate geographical area. SOF ¶¶ 231-41.

This method of comparison is analogous to the disparate impact methodologies applied in similar cases. SOF ¶¶ 201-03, 242-43, 248. Courts examine the relative effect of the challenged policy on the groups affected. In *Tsombanidis*, the court observed that plaintiffs should have provided "statistical evidence (1) that *x%* of all of the recoverings in West Haven need (or have good reason) to live in the 'group settings' prohibited by the facially neutral fire regulations at issue, (2) that *y%* of all of the non-recoverings in West Haven need (or have good reason) to live in such group settings prohibited by the fire regulations, and, crucially, (3) that *x* is significantly greater than *y*." 352 F.3d at 577. In *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 154 (S.D.N.Y. 1989), the court credited an odds ratio analysis, similar to the analysis here, observing that, based on census and other data, "[a]pplication of Crestwood's policy of rejecting holders of Section 8 vouchers, alone, would have the effect of disqualifying from tenancies 6.06% of the minority households in the applicant pool, but only 0.25% of non-minority households in the pool."  This same mode of analysis was applied by the Third Circuit in the recent *Mt. Holly* case. *Mt. Holly*, 658 F.3d at 381-83.[14]

---

[14] *See also, e.g., Green*, 523 F.2d at 1293 ("disproportionate racial impact may be established statistically" by showing that "blacks . . . in a specified geographical area . . . are excluded . . . at a substantially higher rate than

Dr. Parnell's undisputed analysis demonstrates that the potential applicant pool for The Sand Castle is the New York-Nassau Market Area. Incorporating Dr. Wildeman's analysis of racial disproportionality in criminal records, Dr. Parnell compared whites to African Americans and Latinos in the potential applicant pool, and determined the relative effect of Defendants' criminal records practices on each group. In each of the four geographically-nested rental housing markets contributing to the pool of potential applicants, and at all seven income levels tested, African Americans and Latinos are and will be excluded at statistically significant and "substantially higher" rates than whites by practices that bar or discourage individuals with criminal records. *Green*, 523 F.2d at 1293; SOF ¶¶ 200-12, 234-43. Notably, at the $0-70,000 threshold, nearly 1 in 8 African Americans and 1 in 13 Latinos in the New York-Nassau Market Area market are excluded, as compared to 1 in 33 whites. Thus, African Americans and Latinos in the market are 3.78 and 2.48 times more likely than whites to be affected, respectively. SOF ¶ 201. These disparities are statistically significant and more than substantial enough for a disparate impact claim. *Keith*, 858 F.2d at 484 (challenged action "had twice the adverse impact on minorities as it had on whites"); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 2011 WL 4915524, at *7 (E.D. La. Oct. 17, 2011) (same); *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 258-59 (D. Mass. 2008) (same); SOF ¶¶ 201-09, 241.

The evidence therefore establishes, beyond any genuine dispute, that Defendants automatically and categorically exclude individuals with criminal records from living at The Sand Castle; that Defendants publically state that they do so; and that these practices result in an adverse, disproportionate impact on African Americans and Latinos.

---

whites"); *Rivera*, 784 F. Supp. 2d at 143 ("[T]he 'appropriate comparison' is between Hispanic Farmingdale citizens who are impacted . . . and non-Hispanic Farmingdale citizens who are impacted"); *accord* HUD Guidance at 3 (statistics proving impact should be "based on a housing provider's market area").

**B.** **Step 2:  Defendants' Blanket Criminal Records Ban Is Not Necessary to Achieve Any Legitimate Interest**

As the facts here establish a statistically-significant disproportionate effect, the burden shifts to Defendants to affirmatively "prove" that their blanket criminal records ban is "necessary to achieve a valid interest." *ICP*, 135 S. Ct. at 2524; *Mhany Mgmt*., 819 F.3d at 617.  Fortune does not challenge the ability of a landlord to consider an applicant's criminal record as part of its screening process. But as HUD has concluded, a *blanket* ban can *never* be shown to be *necessary* to satisfy any legitimate interest. HUD Guidance at 6 ("[A] blanket prohibition on any person with any conviction record – no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then – will be unable to meet this burden."). Moreover, as the HUD Guidance and case law make clear, "a policy or practice that fails to consider the nature, severity, and recency of criminal conduct is unlikely to be proven necessary" and, thereby, lawful. *Id*. at 7; *see Green*, 523 F.2d at 1298, 1299 n.14 (rejecting policy that disqualified applicants convicted of crimes other than traffic offenses).

The HUD Guidance proscribes even a criminal records policy that limits blanket exclusion to felony convictions. The Guidance states that a "housing provider with a more tailored policy or practice that excludes individuals with only certain types of convictions *must still prove* that its policy is necessary to serve a substantial, legitimate, nondiscriminatory interest." HUD Guidance at 6 (emphasis added). A policy categorically banning as broad a classification of convictions as "felonies"—which in New York can include anything from a violent sexual assault to the unauthorized operation of a recording device in a theater (N.Y. Penal Law § 275.34 )—cannot possibly satisfy Defendants' burden of proof. Such a policy does not even attempt to "accurately distinguish[] between criminal conduct that indicates a demonstrable risk to resident safety and/or property and criminal conduct that does not," as is required. *Id*.

30

As relates to felony bans, the relevant case law dictates the same result. *Field v. Orkin Extermination Co.*, 2002 WL 32345739, at *1 (E.D. Pa. Feb. 21, 2002) (employer failed to show that termination of employees with felony convictions was related to job qualifications and that company's categorical ban was "*per se* unlawful"); *Waldon v. Cincinnati Public Schools*, 941 F. Supp. 2d 884, 886 (S.D. Ohio 2013) (termination because of felony ban not justified "when [the] offenses were remote in time" and "those affected posed no obvious risk due to their past convictions"); *cf. El v. SEPTA*, 479 F.3d 232, 245-46 (3d Cir. 2007) (policy must "accurately distinguish between applicants that pose an unacceptable level or risk and those that do not").

Consistent with this precedent, Plaintiff's expert Dr. Lila Kazemian's undisputed report in this case establishes that public safety concerns do not justify the blanket exclusion of individuals with criminal records from housing. Specifically, Dr. Kazemian highlights the empirical evidence that old criminal records are not predictive of future offending; that there is a negative association between the number of future offenses and the time lag since the last offense; and that the risk of a new crime declines significantly as the amount of time since the last offense increases. She further observes that "most offenders eventually resemble nonoffenders in terms of conviction risk" and sets forth empirical studies showing that after as short a period as seven years, the future risk of offending for individuals who remain arrest-free within that period is virtually "indistinguishable from that of nonoffenders." SOF ¶ 263. All this makes clear that there is no reasonable or empirical basis for a blanket ban. SOF ¶¶ 264-68.

Defendants offer *nothing* to support their blanket exclusion of people with criminal records, nor even to justify the felony ban they openly acknowledge maintaining. Instead, Defendants make the legally unsupportable claim that "convicted criminals have no basis for complaining that landlords choose not to rent to them." SOF ¶ 115. Thus, regardless of whether

the record here evidences an overall criminal records ban or only a felony ban, a straightforward

reading of both the HUD Guidance and the case law demonstrates Defendants' liability.

**C.  Step 3:  Even If Defendants' Practices Serve Legitimate Interests, They Can Be Achieved by the Less Discriminatory Alternative of Individualized Consideration**

The principal reason that Defendants could never demonstrate the necessity of a blanket

ban is that a process of individualized consideration is both less discriminatory and effectively

serves any legitimate public safety interest in screening out dangerous individuals. *Mhany*

*Mgmt.*, 2016 WL 1128424, at *30819 F.3d at 617; HUD Guidance at 7 (noting that

"individualized assessment of relevant mitigating information . . . is likely to have a less

discriminatory effect than categorical exclusions"). Fortune has introduced undisputed evidence

that individualized review is both less discriminatory and serves any legitimate safety interest.

First, as discussed above, the burden of criminal convictions falls disproportionately upon

African Americans and Latinos. Simply by virtue of the fact that an individualized review

process will allow *some* people with criminal records to become tenants, as opposed to none or

virtually none under a blanket policy, individualized review has less a discriminatory impact.

Moreover, given that rental manager Campbell already conducts applicant interviews,

individualized review would be easy for The Sand Castle to implement. SOF ¶¶ 87-88.

Second, individualized review still allows landlords to exclude potentially dangerous

individuals. Courts and government agencies have provided guidance about the proper screening

of applicants. The *Green* Court first articulated appropriate factors for a case-by-case approach in

this context: (1) "[t]he time elapsing since the conviction" (2) "the degree of the felon's

rehabilitation, and" (3) "the circumstances under which the crime was committed." *Id.* at 1297.

These are now standard considerations required by courts and federal agencies when considering

criminal convictions. *See, e.g.*, HUD Guidance at 7; EEOC Guidance at *14-*18; *Guerrero v.*

*California Dep't of Corr.*, 119 F. Supp. 3d 1065, 1078-79 (N.D. Cal. 2015); *McCain v. United States*, 2015 WL 1221257, at *17 (D. Vt. Mar. 17, 2015). Increasingly more jurisdictions, including New York State, treat "individualized review as a best practice." SOF ¶ 277. Indeed, Governor Cuomo's recently announced prohibition on blanket bans in State-funded housing *requires* individualized review. *See* Exhibit B.

Through the application of such factors, Defendants could exclude applicants who may pose an actual threat while admitting individuals committed to successful reentry. Page testified that she is personally aware of hundreds of current and former Fortune employees with criminal records —almost entirely African American and Latino—who, based on their post-incarceration efforts at self-improvement, have located rental housing in New York City and survived individualized landlord review but would have certainly been denied had they applied to The Sand Castle. She also testified about the hundreds of Fortune clients successfully placed in rental housing without incident, and that many such clients have survived a fair individualized review. SOF ¶¶ 272-76. This evidence merely confirms the obvious: many people with criminal records are decent tenants who do not pose a safety risk.

                    *               *               *

In the face of HUD Guidance, legal precedent, and empirical evidence indicating that blanket bans are unnecessary and *per se* unlawful—and despite the fact that it is their burden to do so—Defendants have failed to provide *any* evidence showing that their blanket ban is needed to achieve a valid interest or that individualized consideration is not effective. Defendants cannot present any expert reports, studies, or actual tenant data concerning the relationship of public safety and people with criminal records, much less any demonstrating a need to automatically exclude applicants with criminal convictions. Vague expressions of a need to find "good" tenants

33

and amorphous concerns about public safety (SOF ¶ 259) are no more than "[b]ald assertions

based on generalizations or stereotypes." HUD Guidance at 5 ("A housing provider must,

however, be able to prove through reliable evidence that its policy . . .  actually assists in

protecting resident safety."). Indeed, HUD has indicated that the safety-based assertions made

specifically by Defendants *in this very case* will not—alone—meet the landlord's burden. *Id*. at 4

n.23. Unfailingly, such policies are deemed illegitimate. Accordingly, no reasonable juror could

find that Defendants have raised a valid defense that their blanket ban is "'necessary to achieve

one or more substantial, legitimate, nondiscriminatory interests'" or that individualized

consideration is not an effective, less discriminatory alternative. *Mhany Mgmt*, 819 F.3d at 617.

**III.   <u>Defendants' Practices Violate  § 3604(a), (b) and (c) of the Fair Housing Act</u>**

<u>**42 U.S.C. § 3604(a) and (b).**</u>  Defendants' blanket criminal records ban

disproportionately affects minorities in the applicant pool and cannot be justified. They therefore

"make unavailable or deny" housing to individuals "on the basis of race" and national origin in

violation of § 3604(a). In addition, Defendants' practices also discriminate "in the terms,

conditions, or privileges" of rental in violation of § 3604(b). Obtaining tenancy at The Sand

Castle is conditioned upon not having a criminal record. Due to criminal records disparities,

minority applicants are disproportionately and unjustifiably excluded because of this condition.

<u>**42 U.S.C. § 3604(c).**</u>  Defendants have affirmatively discouraged applications from

people with criminal records through their repeated statements of "no criminal history" or "no

criminal background" in their advertising for The Sand Castle and in their communications to

potential applicants. Even if Defendants did not make these statements with the intent of limiting

the number of minority applicants, Plaintiff's expert reports firmly establish the discriminatory

effect such statements have on the applicant pool. Under § 3604(c), it is the effect of the

statement on the reader or hearer, rather than "the speaker's subjective belief," that is the critical

consideration. *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 53 (2d Cir. 2015).

These exclusionary statements are unlawful because the statements "would discourage an

ordinary reader" with a criminal record, a disproportionate number of whom are members of

protected classes, from applying for an apartment. *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 999-

1000 (2d Cir. 1991). Any "ordinary reader" receiving an email from Defendants' rental manager,

Rose Campbell, stating "no criminal background," or who reviewed The Sand Castle's ad on

Craigslist stating the same, would clearly be discouraged from submitting an application or even

calling the front office to inquire further. The ultimate result of this practice is a "chilling effect"

on those, predominately African American and Latino potential applicants, who have a criminal

record. *United States v. New York State Dep't of Motor Vehicles*, 82 F. Supp. 2d 42, 55

(E.D.N.Y. 2000) (noting that when a person's desire for housing "is not translated into a formal

application solely because of his unwillingness to engage in a futile gesture he is as much a

victim of discrimination as is he who goes through the motions of submitting an application."

(quoting *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)). Anyone who

received one of Campbell's emails, saw the Craigslist ad, or spoke to a Sand Castle employee,

and did not apply because of the "no criminal history" statement, was unlawfully affected.[15]

## CONCLUSION

For the reasons set forth above, Plaintiff The Fortune Society, Inc. respectfully submits

that summary judgment should be granted in its favor as to liability based on its disparate impact

claims under the FHA, NYSHRL, and NYCHRL against Defendants.

---

[15] To the extent that Fortune has made out FHA violations FHA, it has also established violations of the NYCHRL and NYHRL. *See Cales v. New Castle Hill Realty*, AB, 2011 WL 335599, at *4 (S.D.N.Y. Jan. 31, 2011).

Dated: August 12, 2016

Respectfully submitted,

/s/ Ryan C. Downer
Ryan C. Downer (RD3249)
Margaret Burgess, admitted *pro hac vice*
John P. Relman, admitted *pro hac vice*
Glenn Schlactus, admitted *pro hac vice*
Jia Cobb, admitted *pro hac vice*
RELMAN, DANE & COLFAX, PLLC
1225 19th St., NW, Suite 600
Washington, D.C. 20036-2456
Tel: 202-728-1888
Fax: 202-728-0848
E-mail: rdowner@relmanlaw.com
mburgess@relmanlaw.com
jrelman@relmanlaw.com
gschlactus@relmanlaw.com
jcobb@relmanlaw.com

*Attorneys for Plaintiff*

# EXHIBIT

# A



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-0500

April 4, 2016

**Office of General Counsel Guidance on**
**Application of Fair Housing Act Standards to the Use of Criminal Records by**
**Providers of Housing and Real Estate-Related Transactions**

### I.      Introduction

The Fair Housing Act (or Act) prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status or national origin.[1]  HUD's Office of General Counsel issues this guidance concerning how the Fair Housing Act applies to the use of criminal history by providers or operators of housing and real-estate related transactions.  Specifically, this guidance addresses how the discriminatory effects and disparate treatment methods of proof apply in Fair Housing Act cases in which a housing provider justifies an adverse housing action – such as a refusal to rent or renew a lease – based on an individual's criminal history.

### II.      Background

As many as 100 million U.S. adults – or nearly one-third of the population – have a criminal record of some sort.[2]  The United States prison population of 2.2 million adults is by far the largest in the world.[3]  As of 2012, the United States accounted for only about five percent of the world's population, yet almost one quarter of the world's prisoners were held in American prisons.[4]  Since 2004, an average of over 650,000 individuals have been released annually from federal and state prisons,[5] and over 95 percent of current inmates will be released at some point.[6]  When individuals are released from prisons and jails, their ability to access safe, secure and affordable housing is critical to their successful reentry to society.[7]  Yet many formerly incarcerated individuals, as well as individuals who were convicted but not incarcerated, encounter significant barriers to securing housing, including public and other federally-subsidized housing,

---

[1] 42 U.S.C. § 3601 *et seq.*

[2] Bureau of Justice Statistics, U.S. Dep't of Justice, *Survey of State Criminal History Information Systems, 2012*, 3 (Jan. 2014), *available at* https://www.ncjrs.gov/pdffiles1/bjs/grants/244563.pdf.

[3] Nat'l Acad. Sci., Nat'l Res. Couns., *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 2 (Jeremy Travis, et al. eds., 2014), *available at:* http://www.nap.edu/catalog/18613/the-growth-of-incarceration-in-the-united-states-exploring-causes.

[4] *Id.*

[5] E. Ann Carson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2014* (Sept. 2015) at 29, appendix tbls. 1 and 2, *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387.

[6] Bureau of Justice Statistics, U.S. Dep't of Justice, *Reentry Trends in the United States*, *available at* http://www.bjs.gov/content/pub/pdf/reentry.pdf.

[7] *See, e.g.*, S. Metraux, et al. "Incarceration and Homelessness," in *Toward Understanding Homelessness: The 2007 National Symposium on Homelessness Research, #9* (D. Dennis, et al. eds., 2007), *available at:* https://www.huduser.gov/portal//publications/pdf/p9.pdf (explaining "how the increasing numbers of people leaving carceral institutions face an increased risk for homelessness and, conversely, how persons experiencing homelessness are vulnerable to incarceration.").

because of their criminal history.  In some cases, even individuals who were arrested but not convicted face difficulty in securing housing based on their prior arrest.

Across the United States, African Americans and Hispanics are arrested, convicted and incarcerated at rates disproportionate to their share of the general population.[8]  Consequently, criminal records-based barriers to housing are likely to have a disproportionate impact on minority home seekers.  While having a criminal record is not a protected characteristic under the Fair Housing Act, criminal history-based restrictions on housing opportunities violate the Act if, without justification, their burden falls more often on renters or other housing market participants of one race or national origin over another (i.e., discriminatory effects liability).[9]  Additionally, intentional discrimination in violation of the Act occurs if a housing provider treats individuals with comparable criminal history differently because of their race, national origin or other protected characteristic (i.e., disparate treatment liability).

## III.   Discriminatory Effects Liability and Use of Criminal History to Make Housing Decisions

A housing provider violates the Fair Housing Act when the provider's policy or practice has an unjustified discriminatory effect, even when the provider had no intent to discriminate.[10]  Under this standard, a facially-neutral policy or practice that has a discriminatory effect violates the Act if it is not supported by a legally sufficient justification.  Thus, where a policy or practice that restricts access to housing on the basis of criminal history has a disparate impact on individuals of a particular race, national origin, or other protected class, such policy or practice is unlawful under the Fair Housing Act if it is not necessary to serve a substantial, legitimate, nondiscriminatory interest of the housing provider, or if such interest could be served by another practice that has a less discriminatory effect.[11]  Discriminatory effects liability is assessed under a three-step burden-shifting standard requiring a fact-specific analysis.[12]

The following sections discuss the three steps used to analyze claims that a housing provider's use of criminal history to deny housing opportunities results in a discriminatory effect in violation of the Act.  As explained in Section IV, below, a different analytical framework is used to evaluate claims of intentional discrimination.

---

[8] *See infra* nn. 16-20 and accompanying text.

[9] The Fair Housing Act prohibits discrimination based on race, color, religion, sex, disability, familial status, and national origin.  This memorandum focuses on race and national origin discrimination, although criminal history policies may result in discrimination against other protected classes.

[10] 24 C.F.R. § 100.500; *accord Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, *Inc.*, ___ U.S. ___, 135 S. Ct. 2507 (2015).

[11] 24 C.F.R. § 100.500; *see also Inclusive Cmtys. Project*, 135 S. Ct. at 2514-15 (summarizing HUD's Discriminatory Effects Standard in 24 C.F.R. § 100.500); *id.* at 2523 (explaining that housing providers may maintain a policy that causes a disparate impact "if they can prove [the policy] is necessary to achieve a valid interest.").

[12] *See* 24 C.F.R. § 100.500.

A.  Evaluating Whether the Criminal History Policy or Practice Has a Discriminatory Effect

In the first step of the analysis, a plaintiff (or HUD in an administrative adjudication) must prove that the criminal history policy has a discriminatory effect, that is, that the policy results in a disparate impact on a group of persons because of their race or national origin.[13]  This burden is satisfied by presenting evidence proving that the challenged practice actually or predictably results in a disparate impact.

Whether national or local statistical evidence should be used to evaluate a discriminatory effects claim at the first step of the analysis depends on the nature of the claim alleged and the facts of that case.  While state or local statistics should be presented where available and appropriate based on a housing provider's market area or other facts particular to a given case, national statistics on racial and ethnic disparities in the criminal justice system may be used where, for example, state or local statistics are not readily available and there is no reason to believe they would differ markedly from the national statistics.[14]

National statistics provide grounds for HUD to investigate complaints challenging criminal history policies.[15]  Nationally, racial and ethnic minorities face disproportionately high rates of arrest and incarceration.  For example, in 2013, African Americans were arrested at a rate more than double their proportion of the general population.[16]  Moreover, in 2014, African Americans comprised approximately 36 percent of the total prison population in the United States, but only about 12 percent of the country's total population.[17]  In other words, African Americans were incarcerated at a rate nearly three times their proportion of the general population.  Hispanics were similarly incarcerated at a rate disproportionate to their share of the

---

[13] 24 C.F.R. § 100.500(c)(1); *accord Inclusive Cmtys. Project*, 135 S. Ct. at 2522-23.  A discriminatory effect can also be proven with evidence that the policy or practice creates, increases, reinforces, or perpetuates segregated housing patterns.  *See* 24 C.F.R. § 100.500(a).  This guidance addresses only the method for analyzing disparate impact claims, which in HUD's experience are more commonly asserted in this context.

[14] *Compare Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) ("[R]eliance on general population demographic data was not misplaced where there was no reason to suppose that physical height and weight characteristics of Alabama men and women differ markedly from those of the national population.") *with Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.,* 56 F.3d 1243, 1253 (10th Cir. 1995) ("In some cases national statistics may be the appropriate comparable population.  However, those cases are the rare exception and this case is not such an exception.") (citation omitted).

[15] *Cf. El v. SEPTA*, 418 F. Supp. 2d 659, 668-69 (E.D. Pa. 2005) (finding that plaintiff proved prima facie case of disparate impact under Title VII based on national data from the U.S. Bureau of Justice Statistics and the Statistical Abstract of the U.S., which showed that non-Whites were substantially more likely than Whites to have a conviction), *aff'd on other grounds,* 479 F.2d 232 (3d Cir. 2007).

[16] *See* FBI Criminal Justice Information Services Division, *Crime in the United States, 2013*, tbl.43A, *available at* https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-43 (Fall 2014) (reporting that African Americans comprised 28.3% of all arrestees in 2013); U.S. Census Bureau, Monthly Postcensal Resident Population by Single Year of Age, Sex, Race and Hispanic Origin: July 1, 2013 to December 1, 2013, *available at* http://www.census.gov/popest/data/national/asrh/2014/2014-nat-res.html (reporting data showing that individuals identifying as African American or Black alone made up only 12.4% of the total U.S. population at 2013 year-end).

[17] *See* E. Ann Carson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2014* (Sept. 2015) at tbl. 10, *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387; and U.S. Census Bureau, Monthly Postcensal Resident Population by Single Year of Age, Sex, Race and Hispanic Origin: July 1, 2014 to December 1, 2014, *available at* http://www.census.gov/popest/data/national/asrh/2014/2014-nat-res.html.

general population, with Hispanic individuals comprising approximately 22 percent of the prison population, but only about 17 percent of the total U.S. population.[18]  In contrast, non-Hispanic Whites comprised approximately 62 percent of the total U.S. population but only about 34 percent of the prison population in 2014.[19]  Across all age groups, the imprisonment rates for African American males is almost six times greater than for White males, and for Hispanic males, it is over twice that for non-Hispanic White males.[20]

Additional evidence, such as applicant data, tenant files, census demographic data and localized criminal justice data, may be relevant in determining whether local statistics are consistent with national statistics and whether there is reasonable cause to believe that the challenged policy or practice causes a disparate impact.  Whether in the context of an investigation or administrative enforcement action by HUD or private litigation, a housing provider may offer evidence to refute the claim that its policy or practice causes a disparate impact on one or more protected classes.

Regardless of the data used, determining whether a policy or practice results in a disparate impact is ultimately a fact-specific and case-specific inquiry.

B.  Evaluating Whether the Challenged Policy or Practice is Necessary to Achieve a Substantial, Legitimate, Nondiscriminatory Interest

In the second step of the discriminatory effects analysis, the burden shifts to the housing provider to prove that the challenged policy or practice is justified – that is, that it is necessary to achieve a substantial, legitimate, nondiscriminatory interest of the provider.[21]  The interest proffered by the housing provider may not be hypothetical or speculative, meaning the housing provider must be able to provide evidence proving both that the housing provider has a substantial, legitimate, nondiscriminatory interest supporting the challenged policy and that the challenged policy actually achieves that interest.[22]

Although the specific interest(s) that underlie a criminal history policy or practice will no doubt vary from case to case, some landlords and property managers have asserted the protection of other residents and their property as the reason for such policies or practices.[23]  Ensuring

---

[18] *See id.*
[19] *See id.*
[20] E. Ann Carson, Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2014* (Sept. 2015) at table 10, *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387.
[21] 24 C.F.R. § 100.500(c)(2); *see also Inclusive Cmtys. Project*, 135 S. Ct. at 2523.
[22] *See* 24 C.F.R. § 100.500(b)(2); *see also* 78 Fed. Reg. 11460, 11471 (Feb. 15, 2013).
[23] *See, e.g.*, Answer to Amended Complaint at 58, *The Fortune Society, Inc. v. Sandcastle Towers Hsg. Dev. Fund Corp.*, No. 1:14-CV-6410 (E.D.N.Y. May 21, 2015), ECF No. 37 ("The use of criminal records searches as part of the overall tenant screening process used at Sand Castle serves valid business and security functions of protecting tenants and the property from former convicted criminals."); *Evans v. UDR, Inc.*, 644 F.Supp.2d 675, 683 (E.D.N.C. 2009) (noting, based on affidavit of property owner, that "[t]he policy [against renting to individuals with criminal histories is] based primarily on the concern that individuals with criminal histories are more likely than others to commit crimes on the property than those without such backgrounds … [and] is thus based [on] concerns for the safety of other residents of the apartment complex and their property."); *see also* J. Helfgott, *Ex-Offender Needs Versus Community Opportunity in Seattle*, Washington, 61 Fed. Probation 12, 20 (1997) (finding in a survey of 196

resident safety and protecting property are often considered to be among the fundamental responsibilities of a housing provider, and courts may consider such interests to be both substantial and legitimate, assuming they are the actual reasons for the policy or practice.[24]  A housing provider must, however, be able to prove through reliable evidence that its policy or practice of making housing decisions based on criminal history actually assists in protecting resident safety and/or property.  Bald assertions based on generalizations or stereotypes that any individual with an arrest or conviction record poses a greater risk than any individual without such a record are not sufficient to satisfy this burden.

### 1.  Exclusions Because of Prior Arrest

A housing provider with a policy or practice of excluding individuals because of one or more prior arrests (without any conviction) cannot satisfy its burden of showing that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest.[25]  As the Supreme Court has recognized, "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct.  An arrest shows nothing more than that someone probably suspected the person apprehended of an offense."[26]  Because arrest records do not constitute proof of past unlawful conduct and are often incomplete (*e.g.,* by failing to indicate whether the individual was prosecuted, convicted, or acquitted),[27] the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular individual.  For that reason, a housing provider who denies housing to persons on the basis of arrests not resulting in conviction cannot prove that the exclusion actually assists in protecting resident safety and/or property.

---

landlords in Seattle that of the 43% of landlords that said they were inclined to reject applicants with a criminal history, the primary reason for their inclination was protection and safety of community).

[24] As explained in HUD's 2013 Discriminatory Effects Final Rule, a "substantial" interest is a core interest of the organization that has a direct relationship to the function of that organization.  The requirement that an interest be "legitimate" means that a housing provider's justification must be genuine and not false or fabricated.  *See* 78 Fed. Reg. at 11470; *see also Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 742 (8th Cir. 2005) (recognizing that, "in the abstract, a reduction in the concentration of low income housing is a legitimate goal," but concluding "that the Housing Authority had not shown a need for deconcentration in this instance, and in fact, had falsely represented the density [of low income housing] at the location in question in an attempt to do so").

[25] HUD recently clarified that arrest records may not be the basis for denying admission, terminating assistance, or evicting tenants from public and other federally-assisted housing.  *See* Guidance for Public Housing Agencies (PHAs) and Owners of Federally-Assisted Housing on Excluding the Use of Arrest Records in Housing Decisions, HUD PIH Notice 2015-19, (November 2, 2015), available at: http://portal.hud.gov/hudportal/documents/huddoc?id=PIH2015-19.pdf.

[26] *Schware v. Bd of Bar Examiners*, 353 U.S. 232, 241 (1957); *see also United States v. Berry*, 553 F.3d 273, 282 (3d Cir. 2009) ("[A] bare arrest record – without more – does not justify an assumption that a defendant has committed other crimes and it therefore cannot support increasing his/her sentence in the absence of adequate proof of criminal activity."); *United States v. Zapete-Garcia*, 447 F.3d 57, 60 (1st Cir. 2006) ("[A] mere arrest, especially a lone arrest, is not evidence that the person arrested actually committed any criminal conduct.").

[27] *See, e.g.,* U.S. Dep't of Justice, *The Attorney General's Report on Criminal History Background Checks* at 3, 17 (June 2006), *available at* http://www.bjs.gov/content/pub/pdf/ag_bgchecks_report.pdf (reporting that the FBI's Interstate Identification Index system, which is the national system designed to provide automated criminal history record information and "the most comprehensive single source of criminal history information in the United States," is "still missing final disposition information for approximately 50 percent of its records").

Analogously, in the employment context, the Equal Employment Opportunity Commission has explained that barring applicants from employment on the basis of arrests not resulting in conviction is not consistent with business necessity under Title VII because the fact of an arrest does not establish that criminal conduct occurred.[28]

### 2. *Exclusions Because of Prior Conviction*

In most instances, a record of conviction (as opposed to an arrest) will serve as sufficient evidence to prove that an individual engaged in criminal conduct.[29]  But housing providers that apply a policy or practice that excludes persons with prior convictions must still be able to prove that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest.  A housing provider that imposes a blanket prohibition on any person with any conviction record – no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then – will be unable to meet this burden.  One federal court of appeals held that such a blanket ban violated Title VII, stating that it "could not conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed."[30]  Although the defendant-employer in that case had proffered a number of theft and safety-related justifications for the policy, the court rejected such justifications as "not empirically validated."[31]

A housing provider with a more tailored policy or practice that excludes individuals with only certain types of convictions must still prove that its policy is necessary to serve a "substantial, legitimate, nondiscriminatory interest."  To do this, a housing provider must show that its policy accurately distinguishes between criminal conduct that indicates a demonstrable risk to resident safety and/or property and criminal conduct that does not.[32]

---

[28] *See* U.S. Equal Emp't Opportunity Comm'n, *EEOC Enforcement Guidance*, *Number 915.002,* 12 (Apr. 25, 2012), *available at* http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm*; see also Gregory v. Litton Systems, Inc.*, 316 F. Supp. 401, 403 (C.D. Cal. 1970) (holding that defendant employer's policy of excluding from employment persons with arrests without convictions unlawfully discriminated against African American applicants in violation of Title VII because there "was no evidence to support a claim that persons who have suffered no criminal convictions but have been arrested on a number of occasions can be expected, when employed, to perform less efficiently or less honestly than other employees," such that "information concerning a … record of arrests without conviction, is irrelevant to [an applicant's] suitability or qualification for employment"), *aff'd*, 472 F.2d 631 (9th Cir. 1972).

[29] There may, however, be evidence of an error in the record, an outdated record, or another reason for not relying on the evidence of a conviction.  For example, a database may continue to report a conviction that was later expunged, or may continue to report as a felony an offense that was subsequently downgraded to a misdemeanor. *See generally* SEARCH, *Report of the National Task Force on the Commercial Sale of Criminal Justice Record Information* (2005), *available at* http://www.search.org/files/pdf/RNTFCSCJRI.pdf.

[30] *Green v. Missouri Pacific R.R.*, 523 F.2d 1290, 1298 (8th Cir. 1975).

[31] *Id.*

[32] *Cf. El*, 479 F.3d at 245-46 (stating that "Title VII … require[s] that the [criminal conviction] policy under review accurately distinguish[es] between applicants that pose an unacceptable level or risk and those that do not").

6

A policy or practice that fails to take into account the nature and severity of an individual's conviction is unlikely to satisfy this standard.[33]  Similarly, a policy or practice that does not consider the amount of time that has passed since the criminal conduct occurred is unlikely to satisfy this standard, especially in light of criminological research showing that, over time, the likelihood that a person with a prior criminal record will engage in additional criminal conduct decreases until it approximates the likelihood that a person with no criminal history will commit an offense. [34]

Accordingly, a policy or practice that fails to consider the nature, severity, and recency of criminal conduct is unlikely to be proven necessary to serve a "substantial, legitimate, nondiscriminatory interest" of the provider.  The determination of whether any particular criminal history-based restriction on housing satisfies step two of the discriminatory effects standard must be made on a case-by-case basis.[35]

## C.  Evaluating Whether There Is a Less Discriminatory Alternative

The third step of the discriminatory effects analysis is applicable only if a housing provider successfully proves that its criminal history policy or practice is necessary to achieve its substantial, legitimate, nondiscriminatory interest.  In the third step, the burden shifts back to the plaintiff or HUD to prove that such interest could be served by another practice that has a less discriminatory effect.[36]

Although the identification of a less discriminatory alternative will depend on the particulars of the criminal history policy or practice under challenge, individualized assessment of relevant mitigating information beyond that contained in an individual's criminal record is likely to have a less discriminatory effect than categorical exclusions that do not take such additional information into account.  Relevant individualized evidence might include: the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts.  By delaying consideration of criminal history until after an individual's financial and other qualifications are verified, a housing provider may be able to minimize any additional costs that such individualized assessment might add to the applicant screening process.

---

[33] *Cf. Green*, 523 F.2d at 1298 (holding that racially disproportionate denial of employment opportunities based on criminal conduct that "does not significantly bear upon the particular job requirements is an unnecessarily harsh and unjust burden" and violated Title VII).

[34] *Cf. El*, 479 F.3d at 247 (noting that plaintiff's Title VII disparate impact claim might have survived summary judgment had plaintiff presented evidence that "there is a time at which a former criminal is no longer any more likely to recidivate than the average person…."); *see also Green*, 523 F.2d at 1298 (permanent exclusion from employment based on any and all offenses violated Title VII); *see* Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology and Pub. Pol'y 483 (2006) (reporting that after six or seven years without reoffending, the risk of new offenses by persons with a prior criminal history begins to approximate the risk of new offenses among persons with no criminal record).

[35] The liability standards and principles discussed throughout this guidance would apply to HUD-assisted housing providers just as they would to any other housing provider covered by the Fair Housing Act.  *See* HUD PIH Notice 2015-19 *supra* n. 25.  Section 6 of that Notice addresses civil rights requirements.

[36] 24 C.F.R. § 100.500(c)(3); *accord Inclusive Cmtys. Project*, 135 S. Ct. 2507.

D.  Statutory Exemption from Fair Housing Act Liability for Exclusion Because of Illegal Manufacture or Distribution of a Controlled Substance

Section 807(b)(4) of the Fair Housing Act provides that the Act does not prohibit "conduct against a person because such person has been convicted … of the illegal manufacture or distribution of a controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)."[37]  Accordingly, a housing provider will not be liable under the Act for excluding individuals because they have been convicted of one or more of the specified drug crimes, regardless of any discriminatory effect that may result from such a policy.

*Limitation*.  Section 807(b)(4) only applies to disparate impact claims based on the denial of housing due to the person's *conviction* for drug manufacturing or distribution; it does not provide a defense to disparate impact claims alleging that a policy or practice denies housing because of the person's *arrest* for such offenses.  Similarly, the exemption is limited to disparate impact claims based on drug *manufacturing or distribution* convictions, and does not provide a defense to disparate impact claims based on other drug-related convictions, such as the denial of housing due to a person's conviction for drug *possession*.

## IV.  Intentional Discrimination and Use of Criminal History

A housing provider may also violate the Fair Housing Act if the housing provider intentionally discriminates in using criminal history information.  This occurs when the provider treats an applicant or renter differently because of race, national origin or another protected characteristic.  In these cases, the housing provider's use of criminal records or other criminal history information as a pretext for unequal treatment of individuals because of race, national origin or other protected characteristics is no different from the discriminatory application of any other rental or purchase criteria.

For example, intentional discrimination in violation of the Act may be proven based on evidence that a housing provider rejected an Hispanic applicant based on his criminal record, but admitted a non-Hispanic White applicant with a comparable criminal record.  Similarly, if a housing provider has a policy of not renting to persons with certain convictions, but makes exceptions to it for Whites but not African Americans, intentional discrimination exists.[38]  A disparate treatment violation may also be proven based on evidence that a leasing agent assisted a White applicant seeking to secure approval of his rental application despite his potentially disqualifying criminal record under the housing provider's screening policy, but did not provide such assistance to an African American applicant.[39]

---

[37] 42 U.S.C. § 3607(b)(4).

[38] *Cf. Sherman Ave. Tenants' Assn. v. District of Columbia*, 444 F.3d 673, 683-84 (D.C. Cir. 2006) (upholding plaintiff's disparate treatment claim based on evidence that defendant had not enforced its housing code as aggressively against comparable non-Hispanic neighborhoods as it did in plaintiff's disproportionately Hispanic neighborhood).

[39] *See, e.g., Muriello*, 217 F. 3d at 522 (holding that Plaintiff's allegations that his application for federal housing assistance and the alleged existence of a potentially disqualifying prior criminal record was handled differently than those of two similarly situated white applicants presented a prima facie case that he was discriminated against because of race, in violation of the Fair Housing Act).

Discrimination may also occur before an individual applies for housing.  For example, intentional discrimination may be proven based on evidence that, when responding to inquiries from prospective applicants, a property manager told an African American individual that her criminal record would disqualify her from renting an apartment, but did not similarly discourage a White individual with a comparable criminal record from applying.

If overt, direct evidence of discrimination does not exist, the traditional burden-shifting method of establishing intentional discrimination applies to complaints alleging discriminatory intent in the use of criminal history information.[40]  First, the evidence must establish a prima facie case of disparate treatment.  This may be shown in a refusal to rent case, for example, by evidence that: (1) the plaintiff (or complainant in an administrative enforcement action) is a member of a protected class; (2) the plaintiff or complainant applied for a dwelling from the housing provider; (3) the housing provider rejected the plaintiff or complainant because of his or her criminal history; and (4) the housing provider offered housing to a similarly-situated applicant not of the plaintiff or complainant's protected class, but with a comparable criminal record.  It is then the housing provider's burden to offer "evidence of a legitimate, nondiscriminatory reason for the adverse housing decision."[41]  A housing provider's nondiscriminatory reason for the challenged decision must be clear, reasonably specific, and supported by admissible evidence.[42]  Purely subjective or arbitrary reasons will not be sufficient to demonstrate a legitimate, nondiscriminatory basis for differential treatment.[43]

While a criminal record can constitute a legitimate, nondiscriminatory reason for a refusal to rent or other adverse action by a housing provider, a plaintiff or HUD may still prevail by showing that the criminal record was not the true reason for the adverse housing decision, and was instead a mere pretext for unlawful discrimination.  For example, the fact that a housing provider acted upon comparable criminal history information differently for one or more individuals of a different protected class than the plaintiff or complainant is strong evidence that a housing provider was not considering criminal history information uniformly or did not in fact have a criminal history policy.  Or pretext may be shown where a housing provider did not actually know of an applicant's criminal record at the time of the alleged discrimination.  Additionally, shifting or inconsistent explanations offered by a housing provider for the denial of an application may also provide evidence of pretext.  Ultimately, the evidence that may be offered to show that the plaintiff or complainant's criminal history was merely a pretextual

---

[40] *See, generally, McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (articulating the concept of a "prima facie case" of intentional discrimination under Title VII); s*ee, e.g., Allen v. Muriello*, 217 F. 3rd 517, 520-22 (7th Cir. 2000) (applying prima facie case analysis to claim under the Fair Housing Act alleging disparate treatment because of race in housing provider's use of criminal records to deny housing).

[41] *Lindsay v. Yates*, 578 F.3d 407, 415 (6th Cir. 2009) (quotations and citations omitted).

[42] *See, e.g., Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1039-40 (2d Cir. 1979) ("A prima facie case having been established, a Fair Housing Act claim cannot be defeated by a defendant which relies on merely hypothetical reasons for the plaintiff's rejection.").

[43] *See, e.g., Muriello*, 217 F.3d at 522 (noting that housing provider's "rather dubious explanation for the differing treatment" of African American and White applicants' criminal records "puts the issue of pretext in the lap of a trier of fact"); *Soules v. U.S. Dep't of Hous. and Urban Dev.*, 967 F.2d 817, 822 (2d Cir. 1992) ("In examining the defendant's reason, we view skeptically subjective rationales concerning why he denied housing to members or protected groups [because] 'clever men may easily conceal their [discriminatory] motivations.'" (quoting *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1185 (8th Cir. 1974)).

9

justification for intentional discrimination by the housing provider will depend on the facts of a particular case.

The section 807(b)(4) exemption discussed in Section III.D., above, does not apply to claims of intentional discrimination because by definition, the challenged conduct in intentional discrimination cases is taken because of race, national origin, or another protected characteristic, and not because of the drug conviction.  For example, the section 807(b)(4) exemption would not provide a defense to a claim of intentional discrimination where the evidence shows that a housing provider rejects only African American applicants with convictions for distribution of a controlled substance, while admitting White applicants with such convictions.

## V.      Conclusion

The Fair Housing Act prohibits both intentional housing discrimination and housing practices that have an unjustified discriminatory effect because of race, national origin or other protected characteristics.  Because of widespread racial and ethnic disparities in the U.S. criminal justice system, criminal history-based restrictions on access to housing are likely disproportionately to burden African Americans and Hispanics.  While the Act does not prohibit housing providers from appropriately considering criminal history information when making housing decisions, arbitrary and overbroad criminal history-related bans are likely to lack a legally sufficient justification.  Thus, a discriminatory effect resulting from a policy or practice that denies housing to anyone with a prior arrest or any kind of criminal conviction cannot be justified, and therefore such a practice would violate the Fair Housing Act.

Policies that exclude persons based on criminal history must be tailored to serve the housing provider's substantial, legitimate, nondiscriminatory interest and take into consideration such factors as the type of the crime and the length of the time since conviction.  Where a policy or practice excludes individuals with only certain types of convictions, a housing provider will still bear the burden of proving that any discriminatory effect caused by such policy or practice is justified.  Such a determination must be made on a case-by-case basis.

Selective use of criminal history as a pretext for unequal treatment of individuals based on race, national origin, or other protected characteristics violates the Act.

Helen R. Kanovsky, General Counsel

# EXHIBIT

# B

Case 1:14-cv-00410-VMC Document 94-1 Filed 05/02/17 Page 55 of 61 PageID #: 1719



**SEPTEMBER 21, 2015** Albany, NY

# Governor Cuomo Announces Executive Actions to Reduce Barriers For New Yorkers With Criminal Convictions

## Governor Accepts and Adopts Recommendations from Council on Community Re-Entry That Improve Access to Employment, Housing, and Health Care for New Yorkers with Criminal Histories

## Recommendations Tailored to Support Successful Reintegration, Reduce Reliance on Public Assistance and Reduce Rates of Recidivism, Saving Taxpayers Thousands of Dollars and Helping New Yorkers Get Back on their Feet

Governor Cuomo announced that 12 recommendations made by the Council on Community Re-Entry and Reintegration, which remove barriers faced by New Yorkers with criminal convictions when attempting to re-enter their communities, will be fully implemented by his administration. The recommendations address issues ranging from employment to housing to health care, and make New York State a leader in the nationwide movement to successfully transition individuals who have served their time back into society, which saves taxpayers dollars and supports public safety.

"New York is a state of opportunity, where individuals from all backgrounds and circumstances are given a fair chance to pursue their goals," **Governor Cuomo said.** "The work of this Council increases the ability of our fellow citizens with criminal convictions to contribute positively to their families and communities, which creates a fairer and safer New York."

Case 1:14-cv-06410-vMS   Document 54-1   Filed 05/02/17   Page 56 of 61 PageID #: 1116

Governor Cuomo created the Council on Community Re-Entry and Reintegration in July 2014 and tasked them with identifying barriers formerly incarcerated people face and making recommendations for change. On average, New York State releases more than 25,000 people from prison each year and research shows that without successful re-entry policies, that there is a higher rate of re-convictions. On average, New York spends $60,000 to house an incarcerated individual per year.

Today, Governor Cuomo has accepted all twelve recommendations of the Council and committed to full compliance, implementation and enforcement by the State. New Yorkers with criminal convictions and representatives from the public safety and advocacy communities are greeting the Council's recommendations and Governor's actions with enthusiasm.

### 1. Adopt New Anti-Discrimination Guidance for New York-financed Housing

New guidance will forbid discrimination based on a conviction alone, and require operators to make an individualized assessment of applicants based on factors such as the seriousness of the offense, the time since the offense, the age of the applicant at the time of the crime and evidence of an applicant's rehabilitation. The Division of Homes and Community Renewal will work with local agencies to ensure full compliance.

Prior to this reform, individuals could be turned away from housing based solely on their conviction, with no consideration of rehabilitation or whether they are an actual danger to their neighbors.

The guidance will cover state-funded public housing, federal Section 8 rental assistance administered by state agencies, and affordable housing financed by the Housing Finance Agency.

### 2. Set uniform guidelines that evaluate qualified applicants for state occupational licenses.

New guidelines will apply to applications for licenses, including those for barbers, paramedics and real estate brokers, among others, with a presumption towards granting a license, unless an individualized consideration of an applicant's criminal record under New York's anti-discrimination statute governing licensing and employment weighs against it. Before these guidelines, there was an uneven approach to reviewing applications for occupational licenses

Case 1:14-cv-06616-VMS   Document 34-1   Filed 05/02/17   Page 57 of 61 PageID #: 1717

for several different occupational licenses.

### 3. Adopt "fair chance hiring" for New York State agencies.

Applicants for competitive positions with New York State agencies will not be required to discuss or disclose information about prior convictions until and unless the agency has interviewed the candidate and is interested in hiring him or her. This is because employers unfortunately often do not look further at an applicant once they learn that the individual has a criminal conviction. As a consequence, many qualified New Yorkers are denied the opportunity to contribute in the job market, including in state service.

### 4. Amend 10 New York State licensing and employment regulations.

New regulations will reduce barriers for people with criminal convictions to serve in licensed occupations. Changes have been advanced in the Departments of Health, State, and Environmental Conservation. Previous regulations created stricter barriers for people with convictions than required by statute. With these changes, formerly incarcerated men and women can obtain licenses subject to the existing rigorous statutory scheme, and by not face absolute bans not set in law.

### 5. Include the formerly incarcerated as a target population for supportive housing.

Homeless individuals leaving incarceration will now be one of the targeted populations that can be served by supportive housing projects funded by New York State. Many people with special needs leaving prison or jail now are in need of housing with services on site after release. Housing these individuals and providing services should lead to fewer arrests and reduced use of the shelter system.

### 6. Streamline the application process for documents creating a presumption of rehabilitation.

Certificates of Relief from Disabilities and Certificates of Good Conduct are helpful documents that create a presumption of rehabilitation for eligible people. New, more accessible processes to obtain these documents will be implemented. The process of applying for these certificates has historically been burdensome and slow.

### 7. Provide a path to Obtaining Department of Motor Vehicles-issued ID for people exiting state prison.

Individuals exiting state facilities will be allowed to obtain forms of identification including driver's licenses and learner's permits, where eligible, if they have a state prison-issued ID, release papers, original birth certificates and social security cards. This change addresses the present reality that everyone needs state-issued ID. Prior data showed only 29 percent of people released from state facilities had such ID six months from release. Early reports from this new process indicate that 45 percent of people now have this ID in the same time frame; a 50 percent increase.

## 8. Launch a job search effort aided by new technology donated by Apploi Corp.

This new kiosk-based system will allow job-seekers with criminal convictions to overcome negative pre-conceptions by marketing themselves on video to potential employers.Without these innovations, job seekers can struggle to make a case for what they can contribute, slowed by formal applications and layers of bureaucracy.

## 9. Give individuals in State prison the ability to save more money to use after release.

New guidelines are being introduced and implemented that will divert less of the money sent to individuals from outside sources towards paying fees other than restitution. Before this reform, 100 percent of the money coming to incarcerated individuals from families and other outside sources went to paying fines, leaving nothing for individuals to save for release. Even with these new guidelines, though, restitution remains the first and principal obligation of all convicted individuals and restitution will be paid in full.

## 10. Create new housing and treatment capacity for mentally ill people leaving state prison.

Capacity will be increased througha Department of Mental Health solicitation for supported housing units for seriously mentally ill individuals returning to New York City. This supportive housing will help keep seriously mentally ill people in treatment and off the streets.

## 11. Increase the number of individuals leaving prison who are enrolled in health care coverage.

New Medicaid enrollment efforts will be fully rolled out, led by the Department of Health and the Department of Corrections and Community Supervision. Close to 400 people a month have been enrolled thus far. This coverage is needed because people leaving prison and jail have high medical needs, including for treatment of substance abuse disorders and chronic conditions such as diabetes and hypertension. Without medical coverage, they end up costing

all of New York more through expensive emergency room visits.

12. **Allow individuals returning home to live with spouses and partners.**
Recognizing that returning to families and loved ones is the most affordable and humane route to reduce homelessness and increase stability after release, people will now be able to live with spouses and partners as long as an individualized determination finds no indices of domestic violence involving those partners. A prior administrative policy made it unintentionally difficult for some people to live with partners with whom there was no history of abuse.

**Alphonso David, Counsel to the Governor, said,** "When people are released from incarceration or have a criminal record, they are burdened with obstacles that greatly hurt their chances at working, living with their families, and staying healthy. From its inception, this Council has worked diligently with state agencies not just to identify unnecessary barriers placed on people with convictions but to reduce them, consistent with public safety. In only one year, this Council has already taken great strides in this endeavor."

**Council Chair Rossana Rosado said,** "We accomplished our goals this year but our work is far from over. As we look to address many more of the systemic barriers encountered in re-entry, we will not lose sight of New York's role as a leader in combating the devastating impact and stigma of second class citizenship that so many of our fellow New Yorkers face, especially men of color."

The Council will continue to build on this successful first year by promoting a range of educational opportunities to improve chances of employment, addressing barriers to health care, seeking to reduce the potential for extortion from public exposure of criminal records and continuing to seek solutions to housing people with criminal convictions consistent with fairness and public safety.

*Members of the Council on Community Re-Entry and Reintegration are listed below in alphabetical order:*

**Robert Burns**, Monroe County Office of Probation, Chief Probation Officer
**Alphonso David**, Counsel to the Governor

**Soffiyah Elijah**, Correctional Association of New York, Executive Director

**Elizabeth Gaynes**, The Osborne Association, Executive Director

**Elizabeth Glazer**, New York City Office of Criminal Justice, Director

**Ann Jacobs**, Prisoner Reentry Initiative at John Jay College, Director

**Seymour James**, Legal Aid Society, Attorney-in-Charge of the Criminal Practice

**Angela Jimenez**, Special Advisor

**Rick Jones**, Neighborhood Defender Service of Harlem, Executive Director

**Max Kenner**, Bard Prison Initiative, Founder and Executive Director

**Mary Kornman**, Westchester County District Attorney's Office, Chief of the Bureau of Strategic Planning and Crime Control

**Georgia Lerner**, Women's Prison Association, Executive Director

**Glenn Martin**, Just Leadership USA, Founder and President

**George McDonald**, DOE Fund, Founder and President

**Brenda McDuffie**, Buffalo Urban League, President and CEO

**Julio Medina**, Exodus Transitional Community, Founder, Executive Director and CEO

**JoAnne Page**, The Fortune Society, President and CEO

**Chauncey Parker**, Manhattan District Attorney's Office, Executive Assistant District Attorney for Crime Prevention Strategies

**Sean Pica**, Hudson Link, Executive Director

**Rossana Rosado**, John Jay College of Criminal Justice, Board of Trustees Member (Chair)

**Jessica Roth**, Cardozo Law School, Assistant Professor and National Center for Access to Justice, Board Member

**Paul Samuels**, Legal Action Center, Director and President

**Sam Schaeffer**, Center For Employment Opportunities, CEO/Executive Director

**Joanne Schlang**, Treatment Alternatives for Safer Communities, Executive Director

**Danielle Sered**, Vera Institute of Justice, Director, Common Justice

**Anthony Thompson**, New York University School of Law, Professor

**Chris Watler**, Center for Court Innovation, Harlem Community Justice Center Project Director

**Marsha Weissman**, Center For Community Alternatives, Executive Director

# Contact the Governor's Press Office

NYC Press Office: 212.681.4640

Albany Press Office: 518.474.8418

**Contact us
by email:**    press.office@exec.ny.gov