**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

THE FORTUNE SOCIETY, INC.
29-76 Northern Blvd
Long Island City, NY 11101

        Plaintiff,

   v.

SANDCASTLE TOWERS HOUSING
DEVELOPMENT FUND CORP.
1465A Flatbush Ave.
Brooklyn, NY 11210

SARASOTA GOLD LLC
1407 48th Street
Brooklyn, NY 11219

E & M ASSOCIATES LLC
1465A Flatbush Ave.
Brooklyn, NY 11210

and

WEISSMAN REALTY GROUP LLC
45 Broadway, 12th Floor
New York, NY 10006

        Defendants.

Civil Action No. 1:14-cv-6410

Magistrate Judge Vera M. Scanlon

Oral Argument Requested

**PLAINTIFF'S REVISED STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE TO BE TRIED PURSUANT TO LOCAL RULE 56.1(b)**

## TABLE OF CONTENTS

I.     THE PARTIES.................................................................................................1

II.    THE INDIVIDUALS WHO OPERATE THE SAND CASTLE ........................................6

     A.    The Individuals Responsible for Evaluation of Tenant Applications....................6

     B.    Other Sand Castle Staff.................................................................13

III.   THE APPLICATION PROCESS ........................................................15

IV.   THE SAND CASTLE'S POLICIES REGARDING APPLICANTS
     WITH CRIMINAL RECORDS ........................................................18

     A.    Advertisements and Other Statements to the Public Expressing
         The Sand Castle's Automatic Exclusion of Applicants with
         Criminal Records ................................................................18

     B.    Additional Communications Expressing The Sand Castle's
         Automatic Criminal Records Restriction................................21

     C.    The Sand Castle's Treatment of Applicants with Criminal Records.................22

         a.    Determination of Criminal Conviction Status ............................22

         b.    Absolute Ban On Individuals With Felony Records................................23

         c.    The Sand Castle Generally Denies Applicants with
            Misdemeanor Histories .............................................26

V.    OTHER APPLICATION CRITERIA AT THE SAND CASTLE ...................................28

VI.   EXPERT ANALYSES DEMONSTRATE THAT THE SAND CASTLE'S
     CRIMINAL RECORDS POLICIES HAVE A RACIALLY
     DISPROPORTIONATE AND ADVERSE IMPACT ........................................................32

     A.    African Americans and Latinos Nationwide and in New York
         Have Criminal Records at a Disproportionately Higher
         Rate than Whites ................................................................32

     B.    The Disparities Are Substantial and Statistically Significant
         in the Housing Market From Which The Sand Castle
         Draws Its Applicants................................................................41

i

VII.    THERE IS NO LEGITIMATE BUSINESS JUSTIFICATION
        FOR THE SAND CASTLE'S CRIMINAL RECORDS POLICIES..................................49

VIII.   DEFENDANTS REFUSED TO RENT APARTMENTS TO
        THE FORTUNE SOCIETY BECAUSE OF THEIR CRIMINAL
        RECORDS POLICIES.........................................................................................................53

IX.     VACANCIES AT THE SAND CASTLE.........................................................................57

## I.    THE PARTIES

1.    **Plaintiff The Fortune Society** ("Fortune") is a not-for-profit organization that for nearly fifty years has been dedicated to the successful reentry and reintegration of formerly incarcerated individuals in New York City.  Ex. 20 (Declaration of JoAnne Page ("Page Dec.")) at ¶ 8; Ex. 28 at PL000487.

2.    It is one of the leading organizations in the country addressing and helping individuals overcome reentry issues.  Fortune has been lauded nationally and internationally for the success of its programs.  Ex. 20 (Page Dec.) at ¶ 8; Ex. 28 at PL000485-86.

3.    Fortune serves approximately 6,000 clients a year, the overwhelming majority of whom are African-American or Latino. All have criminal records.  Ex. 20 (Page Dec.) at ¶ 8.

4.    Fortune provides comprehensive services to these clients by operating housing, education, employment, health, and case management programs, among others.  Ex. 28 at PL000485-87.

5.    One of Fortune's principal tasks is to secure housing for its clients and their families.  Ex. 28 at PL000487-88; Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at ¶ 18. Fortune provides temporary and permanent housing for hundreds of formerly incarcerated individuals each year.  Ex. 20 (Page Dec.) at ¶ 9.

6.    Fortune dedicates significant staff time and resources to locating affordable housing options and placing its clients appropriately in the private housing market.  Ex. 20 (Page Dec.) at ¶ 11.

7.    Fortune's housing programs frequently work as a pipeline, with clients moving out of its emergency or transitional housing facilities and into permanent private housing.  By helping clients who are ready to live independently move from Fortune's temporary housing to

permanent housing, Fortune creates additional space in its temporary housing programs.  Ex. 20 (Page Dec.) at ¶¶ 9, 11.

8.      In Fortune's scattered-site programs, Fortune often leases apartments and pays the rent on its clients' behalf.  Its clients provide some reimbursement, which encourages a sense of personal investment and responsibility.  Ex. 20 (Page Dec.) at ¶ 10; Ex. 28 at PL000487-88.

9.      Fortune was recently awarded a scattered-site contract to fund 60 clients in private housing.  Ex. 20 (Page Dec.) at ¶ 11.

10.     Fortune is struggling to find landlords willing to accept these clients due to the fact that the clients have criminal records.  Ex. 20 (Page Dec.) at ¶ 11.

11.     The Sand Castle is a four-building, 917-unit apartment complex located at 7-11 Seagirt Avenue in Far Rockaway, Queens.  Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at ¶ 5; Ex. 3 (Deposition Transcript of Sonia Forrest ("Forrest Dep.")) at 21:1-4, 50:20-22; Ex. 10 (Deposition Transcript of Sruly Tress[1] ("Tress Dep.")) at 14:17-23, 114:22-23.

12.     Since 2006, The Sand Castle has been owned and controlled by **Defendant Sarasota Gold LLC**, a New York limited liability company headquartered in Brooklyn, NY.  Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at ¶ 10; Ex. 10 (Tress Dep.) at 19:8-13, 33:9-15; Ex. 2 (Deposition Transcript of Rose Campbell ("Campbell Dep.")) at 168:11-18; Ex. 3 (Forrest Dep.) at 93:9-17; Ex. 30 at DEF000176.  Since September 2006, Sarasota Gold has owned or held all beneficial and equitable interest in The Sand Castle.  Ex. 29 (Defs' Answer to Am.

---

[1] Tress testified in both his personal capacity and as a Rule 30(b)(6) witness for Defendants Sandcastle Towers Housing Development Fund Corporation and Sarasota Gold LLC.

Compl., Dkt. 37) at ¶ 10; Ex. 1 (Deposition Transcript of Meyer Brecher[2] ("Brecher Dep.")) at 27:15-17; Ex. 10 (Tress Dep.) at 14:14-23, 19:11-13; Ex. 30 at DEF000176-80.

13.     Sarasota Gold is, in turn, controlled by Aryeh Ginzberg, Irving Langer, and members of the Stern Family.  Ex. 4 (Deposition Transcript of Aryeh Ginzberg[3] ("Ginzberg Dep.")) at 14:23-15:6; Ex. 10 (Tress Dep.) at 22:3-10, 31:9-25; Ex. 1 (Brecher Dep.) at 25:11-22.  At 50%, Ginzberg owns the largest share of Sarasota Gold and is the managing member.  Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at ¶ 13; Ex. 4 (Ginzberg Dep.) at 15:11-16:6.

14.     Shortly after acquiring the complex, Defendant Sarasota Gold made a multi-million dollar effort to upgrade it in order to attract a younger and higher-income element.  Sarasota hired a marketing firm, renovated the lobbies, and installed amenities, such as a new gym and media room. Ex. 4 (Ginzberg Dep.) at 29:18-30:14, 31:21-32:25; 120:22-122:9.

15.     After that effort largely failed, Defendants began accepting applicants with subsidies, including victims of Hurricane Sandy with FEMA funding.  Ex. 4 (Ginzberg Dep.) at 33:2-34:16; 119:23-120:16; Ex. 10 (Tress Dep.) at 176:3-22; Ex. 3 (Forrest Dep.) at 71:1-18.

16.     In June 2013, Defendant Sarasota Gold entered into an agreement with the New York City Housing Development Corporation ("HDC") to become a provider of affordable housing.  Ex. 31 at DEF000188-208; Ex. 4 (Ginzberg Dep.) at 39:6-41:23.

17.     Solely for the purpose of facilitating this transaction, the members of Sarasota Gold created **Defendant Sandcastle Towers Housing Development Fund Corporation** ("Sandcastle Towers"), a not-for-profit corporation established pursuant to Article XI of the New York State Private Housing Finance Law in June 2013.  Ex. 29 (Defs' Answer to Am. Compl.,

---

[2] Brecher testified in both his personal capacity and as a Rule 30(b)(6) witness for Defendant E & M Associates.
[3] Ginzberg testified in both his personal capacity and as a Rule 30(b)(6) witness for Defendant E & M Associates.

Dkt. 37) at ¶ 11; Ex. 4 (Ginzberg Dep.) at 41:11-43:17, 46:21-47:11; Ex. 31 at DEF000188; Ex. 30 at DEF000176-180.  Sandcastle Towers, as the nominee for Sarasota Gold, has held legal title to the fee interest in The Sand Castle since June 27, 2013.  Ex. 30 at DEF000176-180; Ex. 10 (Tress Dep.) at 33:24-34:6, 35:21-25.

18.     Aryeh Ginzberg is the president of Sandcastle Towers.  Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at ¶ 13; Ex. 4 (Ginzberg Dep.) at 45:11-14; Ex. 31 at DEF000196.

19.     With respect to the day-to-day operation of The Sand Castle, Defendants Sarasota Gold and Sandcastle Towers are "basically one company."  Ex. 10 (Tress Dep.) at 45:18-46:1; *accord* Ex. 10 (Tress Dep.) at 33:24-34:12.  Sandcastle Towers "is an entity that has no teeth to it . . . [i]t's just an entity on a piece of paper" and is not an "operating entity" in any real sense.  Ex. 4 (Ginzberg Dep.) at 49:11-20.

20.     Sandcastle Towers does not keep any corporate records, has no employees, has no revenues or profits, and has the same address as Sarasota Gold.  Ex. 4 (Ginzberg Dep.) at 48:10-12, 49:21-50:9, 59:23-25; Ex. 30 at DEF000176-180.

21.     There is no difference between Sarasota Gold and Sandcastle Towers except that the former holds equitable title and the latter holds legal title to The Sand Castle.  Ex. 4 (Ginzberg Dep.) at 50:23-51:3; Ex. 30 at DEF000176-180.

22.     The sole function of both Sarasota Gold and Sandcastle Towers is the ownership of The Sand Castle.  Ex. 4 (Ginzberg Dep.) at 28:12-15, 50:19-22.

23.     **Defendant E & M Associates LLC** is the management company for The Sand Castle, serving as such pursuant to an agreement with Sarasota Gold.  Ex. 32 at DEF020738-45; Ex. 4 (Ginzberg Dep.) at 53:21-25, 127:12-13; Ex. 10 (Tress Dep.) at 44:11-19; Ex. 2 (Campbell

Dep.) at 169:1-9; Ex. 3 (Forrest Dep) at 25:23-26:9.  As the management company, E & M directs and controls The Sand Castle's staff.  Ex. 4 (Ginzberg Dep.) at 54:14-17, 56:16-57:6.

24.    E & M has had its current management role since 2006 or 2007.  Ex. 4 (Ginzberg Dep.) at 54:1-13; Ex. 1 (Brecher Dep.) at 103:8-104:17; Ex. 3 (Forrest Dep.) at 27:9-12.

25.    E & M Associates is owned by Irving Langer (one of the owners of Sarasota Gold).  Ex. 4 (Ginzberg Dep.) at 16:5-6, 18:8-11. Aryeh Ginzberg and Leibel Lederman are "senior employees," with Ginzberg serving as Senior Vice President.  Ex. 4 (Ginzberg Dep.) at 18:10-20.

26.    Since 2009, **Defendant Weissman Realty Group, LLC** has served as a broker for The Sand Castle, referring prospective applicants.  Ex. 11 (Rule 30(b)(6) Deposition of Mark Weissman[4] ("Weissman Dep.")) at 22:5-22, 55:18-22.

27.    From 2009 to 2013 Weissman Realty assigned employees to work on-site at The Sand Castle.  Melissa Gursky worked on-site from 2009 to 2012 and Heidi Hershkowitz worked on-site in 2013.  Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at ¶ 31; Ex. 33 (Def. Weissman Realty's Second Set of Interrogatory Responses) at ¶ 19; Ex. 11 (Weissman Dep.) at 31:13-17, 33:18-34:3.

28.    Mark Weissman is the founder and president of Weissman Realty Group, LLC. Ex. 11 (Weissman Dep.) at 9:15-20; Ex. 6 (Deposition Transcript of Melissa Gursky ("Gursky Dep.")) at 32:1-14.

---

[4] Weissman testified in both his personal capacity and as a Rule 30(b)(6) witness for Defendant Weissman Realty, LLC.

29.     Weissman employees working on-site at The Sand Castle were under the direction and control of Defendants Sarasota Gold, Sandcastle Towers, and E & M Associates.[5] Ex. 11 (Weissman Dep.) at 29:11-30:9, 33:18-34:3, 63:13-16, 67:4-11, 69:7-13.

## II.     THE INDIVIDUALS WHO OPERATE THE SAND CASTLE

### A.     The Individuals Responsible for Evaluation of Tenant Applications

30.     Ginzberg and the other members of Sarasota Gold and E & M's senior leadership have "minimal" to no involvement in The Sand Castle's day-to-day operations.  Ex. 4 (Ginzberg Dep.) at 19:17-20, 23:17-24:7, 72:6-73:23, 82:23-83:10; Ex. 10 (Tress Dep.) at 37:21-38:17, 39:6-9; Ex. 5 (Deposition Transcript of Phil Goldstein ("Goldstein Dep.")) at 46:5-8, 47:4-10.

31.     Ginzberg is the Sarasota principal and E & M employee with lead responsibility for The Sand Castle.  Ex. 4 (Ginzberg Dep.) at 19:17-24, 55:2-7; Ex. 10 (Tress Dep.) at 21:18-22:2; Ex. 1 (Brecher Dep.) at 28:17-29:8; Ex. 31 at DEF000196.

32.     But since at least 2008, Ginzberg has "not [been] involved in day to day" operations "at all" and only visits the building two or three times per year, typically just to conduct a physical inspection.  Ex. 4 (Ginzberg Dep.) at 73:13-74:16; Ex. 10 (Tress Dep.) 37:21-38:17, 39:6-9; Ex. 1 (Brecher Dep.) at 29:3-8.

33.     Since 2008, Ginzberg has had minimal interaction with the Sand Castle's staff (Ex. 4 (Ginzberg Dep.) at 74:17-19, 75:2-5), has played no supervisory role over staff (Ex. 4 (Ginzberg Dep.) at 76:24-77:8), and at present, communicates with the building manager only once every three months in a "quick conversation," (Ex. 4 (Ginzberg Dep.) at 77:14-24).

---

[5] All references to "Defendants" refer to Sarasota Gold, Sandcastle Towers, and E & M Associates unless otherwise specified.  Plaintiff does not move for summary judgment against Weissman Realty.

34.     Rather than have direct involvement in the complex's routine operations, including the rental application process, Ginzberg has delegated control to trusted employees. Ex. 4 (Ginzberg Dep.)  at 78:7-24, 80:1-81:4, 81:13-82:4, 90:16-19.

35.     Rose Campbell and Brontie Silvera are the two employees who, since 2006, have had primary responsibility for the rental application process.  Ex. 4 (Ginzberg Dep.) at 78:7-9, 78:25-79:3; Ex. 10 (Tress Dep) at 70:23-71:3, 79:19-80:6; Ex. 5 (Goldstein Dep.) at 54:18-21.

36.     During Silvera's tenure, Meyer Brecher and Phil Goldstein assisted in the management of The Sand Castle.  Ex. 4 (Ginzberg Dep.) at 75:6-9, 76:14-17, 79:4-12, 110:8-22, 112:11-113:1.

37.     During Campbell's tenure, Sruly Tress has served as the building's manager. Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 1(c); Ex. 34 (Def. Weissman Realty's Interrogatory Responses) at ¶ 1(e); Ex. 10 (Tress Dep.) at 13:13-19, 14:24-15:7.

38.     Rose Campbell has been an employee of Sarasota Gold and Sandcastle Towers since December 2013.  Ex. 4 (Ginzberg Dep.) at 57:10-12, 57:21-22, 59:14-20, 127:21-128:6; Ex. 2 (Campbell Dep.) at 14:5-7, 19:19-21.  In her capacity as a Sarasota Gold employee, Campbell is directed and controlled by E & M Associates in its capacity as the management company for The Sand Castle.  Ex. 4 (Ginzberg Dep.) at 57:16-58:19, 63:8-13.

39.     Campbell manages and has managed all aspects of the application process for prospective tenants at The Sand Castle.  Ex. 4 (Ginzberg Dep.) at 78:7-9; Ex. 10 (Tress Dep.) at 72:5-20; Ex. 5 (Goldstein Dep.) at 39:21-24; Ex. 3 (Forrest Dep.) at 17:17-18:1.  In correspondence with prospective applicants, Campbell holds herself out to the public as the "rental manager" of The Sand Castle.  Ex. 38 at SJ0001-SJ0039.

40.     Defendants "trust [Campbell] fully" with the authority to process applications for tenancy at The Sand Castle, and since her tenure began in 2013, Campbell has been "100 percent" responsible for handling tenant applications. Ex. 10 (Tress Dep.) at 70:4-71:3, 75:21-24, 79:20-80:2; Ex. 4 (Ginzberg Dep.) at 80:1-6, 80:22-24, 90:16-19.

41.     Applicants for tenancy submit their applications to Campbell and she then determines whether the application satisfies The Sand Castle's criteria.  Ex. 2 (Campbell Dep.) at 54:17-55:3; Ex. 14 (Deposition Transcript of Rose Campbell in *Marcano v. Sandcastle Towers Hous. Dev. Fund Corp.*, No. 1:14-cv-05716-MKB-VMS ("Campbell *Marcano* Dep.")) at 17:5-16; Ex. 3 (Forrest Dep.) at 85:15-22.  Campbell's authority includes the power to screen out and reject applicants without obtaining approval from anyone else at The Sand Castle.  Ex. 4 (Ginzberg Dep.) at 79:4-25; Ex. 10 (Tress Dep.) at 79:19-80:2, 135:9-20; Ex. 5 (Goldstein Dep.) at 53:6-10.

42.     Campbell fields inquiries via phone, in person, and email from members of the public seeking information about renting apartments at The Sand Castle, and when prospective applicants have questions about the application process, they are referred to Campbell.  Ex. 38 at SJ0001-39; Ex. 2 (Campbell Dep.) at 53:15-20; Ex. 3 (Forrest Dep.) at 19:5-11, 68:13-20, 77:15-21, 79:6-15; Ex. 10 (Tress Dep.) at 62:12-19, 63:5-8.

43.     Campbell is also the primary point of contact for outside brokers seeking to place tenants in the building.  Ex. 10 (Tress Dep.) at 67:13-21; Ex. 2 (Campbell Dep.) at 51:14-25; Ex. 9 (Deposition Transcript of Annette Strasser ("Strasser Dep.")) at 40:19-41:4.  To the extent brokers communicate with the building manager about a particular applicant, it is "[j]ust a way to get to Rose."  Ex. 10 (Tress Dep.) at 93:10-18; *see* paragraph 45.

44.     Campbell has the authority to explain The Sand Castle's applicant criteria to prospective applicants and does so on a regular basis.  Ex. 38 at SJ0001-39; Ex. 10 (Tress Dep.) at 143:20-144:1; Ex. 3 (Forrest Dep.) at 70:17-71:1, 71:20-72:5, 72:9-12.

45.     Campbell reports directly and exclusively to Sruly Tress, the manager of The Sand Castle since January 2014.  Ex. 10 (Tress Dep.) at 13:13-19, 14:24-15:7, 19:14-23; Ex. 1 (Brecher Dep.) at 53:23-25; Ex. 2 (Campbell Dep.) at 15:23-16:8; Ex. 3 (Forrest Dep.) at 22:25-23:5.

46.     Tress is directed and controlled by E & M Associates in its capacity as The Sand Castle's management company.  Ex. 4 (Ginzberg Dep.) at 57:4-6, 58:16-19, 60:21-24.

47.     Over the last two years and with Ginzberg's tacit approval, Tress has increasingly delegated authority to Rose Campbell to handle The Sand Castle's daily operations.  Ex. 4 (Ginzberg Dep.) at 84:13-85:1, 85:16-86:13.  Ginzberg and Tress agree that Campbell is one of the "two women who run" The Sand Castle and "do basically everything."  Ex. 16 (Deposition Transcript of Sruly Tress in *Marcano v. Sandcastle Towers Hous. Dev. Fund Corp.*, No. 1:14-cv-05716-MKB-VMS ("Tress *Marcano* Dep.")) at 38:4-21; Ex. 4 (Ginzberg Dep.) at 84:13-85:1.

48.     With the approval of his superiors, Tress is typically on site at The Sand Castle only once per week.  Ex. 10 (Tress Dep.) 15:8-12; Ex. 4 (Ginzberg Dep.) at 75:6-15; 83:18-84:4.

49.     During Tress's tenure, Tress and Campbell have been the only two agents or employees of Defendants who have had the responsibility to decide which tenant applications to accept or reject.  Ex. 39 (Defs' Supplemental Interrogatory Responses) at ¶ 13; Ex. 16 (Tress *Marcano* Dep.) at 33:15-20; Ex. 3 (Forrest Dep.) at 90:20-91:3.

50.     Tress, however, does not typically exercise his authority to oversee the tenant application process and is not typically involved in decisions concerning tenant acceptance or

rejection.  Ex. 39 (Defs' Supplemental Interrogatory Responses) at ¶ 13; Ex. 10 (Tress Dep.) at

23:25-24:15, 74:24-75:24; Ex. 2 (Campbell Dep.) at 55:20-56:5.

51.     Campbell is the person with primary responsibility for screening applications for

tenancy and makes the decision to reject applicants who do not meet The Sand Castle's criteria.

Ex. 4 (Ginzberg Dep.) at 79:23-25; Ex. 10 (Tress Dep.) at 135:9-20.  Accordingly, in a

"typical[]" situation, Campbell applies The Sand Castle's applicant criteria on her own and

decides whether to reject an applicant without seeking Tress's approval.  Ex. 10 (Tress Dep.) at

72:18-23, 73:12-15; 135:12-20; Ex. 16 (Tress *Marcano* Dep.) at 126:18-24; Ex. 14 (Campbell

*Marcano* Dep.) at 74:9-19.

52.      Tress's involvement in decisions to approve or reject tenant applications is

limited to situations where Campbell has a question about an application or the applicant wants

to challenge his or her denial.  Ex. 39 (Defs' Supplemental Interrogatory Responses) at ¶ 13; Ex.

2 (Campbell Dep.) at 105:18-106:6; Ex. 10 (Tress Dep.) at 73:19-74:6; Ex. 14 (Campbell

*Marcano* Dep.) at 75:8-14, 76:6-9.

53.     This scenario "hardly ever happens" and it is only "[o]nce in a while" that

Campbell has a question about an application that causes her to confer with Tress.  Ex. 10 (Tress

Dep.) at 74:24-75:24.

54.     The members of Sarasota Gold are fully aware of Tress's limited involvement in

rental decisions and have told Tress that it is "okay to trust Rose."  Ex. 16 (Tress *Marcano* Dep.)

at 132:12-133:1; Ex. 4 (Ginzberg Dep.) at 85:16-86:13.

55.     When Tress began his employment at The Sand Castle, he would "sit with"

Campbell and "go through" the tenant applications in her possession in order to "learn the

10

business" and "see the process." Ex. 10 (Tress Dep.) at 73:3-11. In this manner, Campbell

taught her boss, Tress, about the application process. Ex. 10 (Tress Dep.) at 72:24-73:18.

56.     Prior to Campbell's employment at The Sand Castle, Campbell's current role and

function were performed by Brontie Silvera, who worked at The Sand Castle prior to Sarasota

Gold's acquisition of the complex. Ex. 5 (Goldstein Dep.) at 39:13-17, 55:18-56:4; Ex. 2

(Campbell Dep.) at 15:3-19; Ex. 3 (Forrest Dep.) at 18:8-13, 79:16-21; Ex. 1 (Brecher Dep.) at

52:16-53:4.

57.     Silvera was an employee of Sarasota Gold from 2006, when Defendants acquired

The Sand Castle, until early 2014. Ex. 34 (Def. Weissman Realty's Interrogatory Responses) at

¶ 1(i); Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 1(f); Ex. 4 (Ginzberg Dep.) at 63:23-64:5,

64:12-22; Ex. 14 (Campbell *Marcano* Dep.) at 25:4-24. Silvera's tenure overlapped slightly with

Tress's and Campbell's. Ex. 3 (Forrest Dep.) at 28:7-18; Ex. 14 (Campbell *Marcano* Dep.) at

25:21-24.

58.     In her capacity as a Sarasota Gold employee, Silvera was directed and controlled

by E & M Associates in its capacity as the management company for The Sand Castle. Ex. 4

(Ginzberg Dep.) at 64:9-22, 127:25-128:11.

59.     Silvera's past duties were no different from Campbell's current ones, and

Campbell was later "hired to do [Silvera's] duties." Ex. 2 (Campbell Dep.) at 64:15-18; Ex. 14

(Campbell *Marcano* Dep.) at 24:13-16; Ex. 3 (Forrest Dep.) at 20:7-9.

60.     During her tenure, Silvera "was the one doing all the rentals" and, as Campbell

currently does, ran that process with little oversight. Ex. 10 (Tress Dep.) at 68:3-4; Ex. 4

(Ginzberg Dep.) at 78:25-79:3; Ex. 5 (Goldstein Dep.) at 35:13-36:12, 43:4-17. Throughout her

tenure as rental manager, Silvera was virtually "unsupervised" and was permitted to "d[o] her own thing."  Ex. 4 (Ginzberg Dep.) at 75:16-76:19, 77:6-8.

61.     Defendants deferred to Silvera as to what applicant criteria to apply and how to apply them.  Ex. 4 (Ginzberg Dep.) at 90:20-91:10, 97:3-16.  Silvera was entrusted with "similar authority" as Campbell to screen and reject applications based on the applicant criteria and had the same duties of taking and reviewing applications as Campbell.  Ex. 10 (Tress Dep.) at 62:22-63:8, 67:22-25, 80:3-12; Ex. 2 (Campbell Dep.) at 20:17-21; Ex. 3 (Forrest Dep.) at 79:16-21.

62.     Silvera did not typically seek the approval of any manager before rejecting an applicant.  Ex. 4 (Ginzberg Dep.) at 76:14-19, 77:6-8, 85:2-15; Ex. 5 (Goldstein Dep.) at 43:8-17, 44:8-12, 53:11-15, 54:18-55:2.

63.     The process Silvera used to review tenant applications was the same as Campbell's current process.  Ex. 2 (Campbell Dep.) at 58:18-59:1, 64:11-18.  When Campbell assumed Silvera's duties, Campbell adopted the same processes and practices that Brontie Silvera had applied.  Ex. 10 (Tress Dep.) at 99:15-19, 110:13-15.

64.     Campbell learned what the application criteria were directly from Silvera.  Ex. 2 (Campbell Dep.) at 74:12-14, 68:22-69:4; Ex. 14 (Campbell *Marcano* Dep.) at 73:14-74:4.  Silvera trained Campbell how to do the job through a process of "show and tell."  Ex. 14 (Campbell Dep.) at 39:17-20; Ex. 5 (Goldstein Dep.) at 41:16-21.

65.     Campbell learned her job by watching Silvera and by "doing small little things," such as "how to do the credit report" or "checking the application," under Silvera's supervision.  Ex. 2 (Campbell Dep.) at 39:17-40:5.  That was Campbell's only training.  Ex. 2 (Campbell Dep.) at 40:14-15; Ex. 14 (Campbell *Marcano* Dep.) at 23:13-16.

66.     Defendants have delegated decisions about how criminal records should be considered in the application process to Silvera and Campbell.  Ex. 4 (Ginzberg Dep.) at 103:4-20; Ex. 5 (Goldstein Dep.) at 54:18-55:10; Ex. 1 (Brecher Dep.) at 76:4-17; Ex. 10 (Tress Dep.) at 74:24-75:19.

67.     Defendants have endowed Silvera and Campbell with the authority to reject applicants without supervision or approval, and have exercised little oversight over the process.  Ex. 4 (Ginzberg Dep.) at 78:7-79:25, 114:16-115:5; Ex. 5 (Goldstein Dep.) at 35:13-36:4, 42:9-17, 53:6-15; 54:18-55:10; Ex. 10 (Tress Dep.) at 72:18:20; 135:12-20; Ex. 16 (Tress *Marcano* Dep.) at 126:18-24; Ex. 39 (Defs' Supplemental Interrogatory Responses) at ¶ 13 ("Silvera was in charge of the onsite office at Sand Castle and continued using the same policies and procedures as she had prior to the change in ownership.").

**B.     Other Sand Castle Staff**

68.     Prior to Tress's tenure as manager, Phil Goldstein assisted in the management of The Sand Castle as an employee of E & M Associates.  Ex. 4 (Ginzberg Dep.) at 75:11-13; Ex. 5 (Goldstein Dep.) at 17:10-25, 18:18-22, 19:12-22.

69.     Goldstein, however, considered himself "the boss of nothing" and did not exercise control or authority over the rental application process, has no firsthand knowledge of how applications were considered, entrusted the review of applications entirely to Silvera and Campbell, and did not supervise their work.  Ex. 5 (Goldstein Dep.) at 34:17-21, 37:15-39:6, 41:16:-42:17, 43:4-17, 44:8-18, 53:6-15; 54:18-55:17; Ex. 2 (Campbell Dep.) at 87:16-21.

70.     Prior to Goldstein's tenure, Meyer Brecher, a consultant for E & M since 1997, assisted in the management of The Sand Castle's front office.  Ex. 4 (Ginzberg Dep.) at 76:5-11; Ex. 1 (Brecher Dep.) at 21:10-15, 22:2-4, 30:7-19; Ex. 3 (Forrest Dep.) at 23:14-24, 28:19-24.

71.    Brecher is and has been listed on the E & M Associates website as the "director of property management."  Ex. 1 (Brecher Dep.) at 140:19-141:2.

72.    People have referred to Brecher as a manager of The Sand Castle.  Ex. 4 (Ginzberg Dep.) at 114:16-115:24; Ex. 1 (Brecher Dep.) at 56:18-22, 81:15-20.

73.    Brecher "put [his] name down as manager" on documents related to Sand Castle tenants.  Ex. 40 at DEF020734; Ex. 1 (Brecher Dep.) at 146:8-147:4.  Brecher's signature appears on several documents indicating his status as a "manager" of The Sand Castle.  Ex. 40 at DEF020734-35; Ex. 42 at DEF020724-26.

74.    Brecher dealt with the on-site Weissman Realty agents on a daily basis.  Ex. 11 (Weissman Dep.) at 26:24-27:1.

75.    Melissa Gursky, a broker with Weissman Realty, worked on-site at The Sand Castle and was equipped with her own phone and desk in the management office.  Ex. 11 (Weissman Dep.) at 31:13-17, 59:14-16; Ex. 6 (Gursky Dep.) at 38:1-25.  Gursky later moved off-site and worked out of Weissman Realty's offices.  Ex. 6 (Gursky Dep.) at 41:7-14.

76.    Gursky regarded Brecher as her supervisor for work related to The Sand Castle and followed his directions.  Ex. 43; Ex. 6 (Gursky Dep.) at 62:17-18, 96:12-13, 98:1-2, 127:21-23; Ex. 11 (Weissman Dep.) at 34:4-12, 63:13-16.

77.    Gursky's responsibilities, both on-site and off-site, included speaking to applicants to The Sand Castle.  Ex. 6 (Gursky Dep.) at 43:8-19, 57:8-12; Ex. 11 (Weissman Dep.) at 60:8-19.  She continues to refer applicants to the staff at The Sand Castle.  Ex. 6 (Gursky Dep.) at 45:17-21.

14

### III.   THE APPLICATION PROCESS

78.    Prospective applicants find out about available apartments through online advertisements such as on Craigslist, broker advertising, information shared by housing agencies, or simply by calling or walking into The Sand Castle's front office.  Ex. 2 (Campbell Dep.) 46:10-18, 47:20-25, 53:8-14.

79.    Defendants state that they apply a set of criteria to evaluate which applicants or prospective applicants are qualified to become tenants and reside at The Sand Castle.  Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 5.  Applications are reviewed and vacancies are filled on a "first come, first qualified, first served basis."  Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 5.

80.    The criteria by which applicants are evaluated are income, creditworthiness, criminal background, and landlord-tenant litigation history.  Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 5; Ex. 10 (Tress Dep.) at 71:13-21, 99:20-25; Ex. 2 (Campbell Dep.) at 54:17-55:3; 68:9-15.  To become a tenant at The Sand Castle, an applicant must submit to criminal background, credit, and landlord-tenant litigation history checks.  Exs. 34-37 (Defs' Interrogatory Responses) at ¶ 5; Ex. 3 (Forrest Dep.) at 87:8-16.

81.    Agents and employees of Defendants exclusively use and have always exclusively used Weimark Credit Information Services ("Weimark") to check the applicant's background.  Ex. 44 at DEF000818-22; Ex. 10 (Tress Dep.) at 123:11-17; Ex. 2 (Campbell Dep.) at 124:6-9; Ex .11 (Weissman Dep.) at 80:17-81:11; Ex. 7 (Deposition Transcript of Heidi Hershkowitz ("Hershkowitz Dep.")) at 60:11-13.

82.    The Weimark criminal background check has been part of the application process since 2006.  Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 5; Exs. 35-36 (Defs' Interrogatory Responses) at ¶ 13; Ex. 10 (Tress Dep.) at 120:9-19, 121:21-25.

83.     Defendants definitively rely upon the criminal background checks provided by Weimark to determine whether an applicant has a criminal record.  Ex. 2 (Campbell Dep.) at 123:23-124:1, 130:12-15; Ex. 45 at DEF000013.  That is, Defendants' agents regard information provided by Weimark as the "only" reliable source of criminal background information.  Ex. 2 (Campbell Dep.) at 123:14-124:1, 146:14-16; Ex. 10 (Tress Dep.) at 123:18-21, 124:1-4, 140:10-24.

84.     In the event that information included in the Weimark background check conflicts with self-reported information The Sand Castle may receive about an applicant's criminal history, the Weimark background check is dispositive.  Ex. 2 (Campbell Dep.) at 121:23-122:3, 123:14-124:1, 124:19-21; Ex. 10 (Tress Dep.) at 140:15-24.

85.     Rose Campbell typically runs the background checks on applicants to The Sand Castle.  Ex. 10 (Tress Dep.) at 124:5-7.  Silvera, Campbell's predecessor, typically ran the background checks before Campbell's employment at The Sand Castle.  Ex. 10 (Tress Dep.) at 124:8-9.

86.     The Weimark criminal background check often provides information on the nature of a crime an applicant was convicted of; whether it was a misdemeanor, felony, or other offense-type; and the class of the misdemeanor or felony.  Ex. 45 at DEF000013.

87.     Applicants are also interviewed as part of the application process.  These are typically conducted by Campbell and, before her, by Silvera.  Ex. 2 (Campbell Dep.) at 62:5-11, 63:19-22, 64:11-18.

88.     In the interviews, Campbell does not "ask too many questions," as "[t]he application speaks for itself."  Ex. 2 (Campbell Dep.) at 63:4-9.

16

89.     Because of Defendants' arrangement with the City of New York, applicants approved by The Sand Castle are forwarded to New York's Housing Development Corporation ("HDC").  Ex. 2 (Campbell Dep.) at 54:10-14, 55:20-22. HDC uses information provided by Sand Castle to confirm that the applicant's income does not exceed the City's maximum income limits for affordable housing. Ex. 2 (Campbell Dep.) at 55:4-22; Ex. 10 (Tress Dep.) at 72:14-20; Ex. 31 at DEF000190-91.

90.     HDC's restrictions require that 90% of Sand Castle residents earn no more than 125% of the Area Median Income and that 10% of residents earn no more than 135% of Area Median Income.  Ex. 31 at DEF000190-91.

91.     As applied by The Sand Castle staff, this typically means that an applicant can earn no more than approximately $70,000 annually to be considered for tenancy.  Ex. 3 (Forrest Dep.) at 72:1-5; Ex. 15 (Deposition Transcript of Heidi Hershkowitz in *Marcano v. Sandcastle Towers Hous. Dev. Fund Corp.*, No. 1:14-cv-05716-MKB-VMS ("Hershkowitz *Marcano* Dep.")) at 57:24-58:25.

92.     Campbell has full authority on her own to decide whether an applicant should be forwarded to HDC for HDC's administrative sign-off. Ex. 10 (Tress Dep.) at 72:14-20.  Only those applications that survive Campbell's initial screen are sent to HDC; applications rejected by Campbell are never forwarded to HDC.  Ex. 2 (Campbell Dep.) at 67:20-68:8.

93.     In its administrative review, HDC "solely" looks at the applicant's income information.  Ex. 2 (Campbell Dep.) at 59:12-25; Ex. 10 (Tress Dep.) at 95:9-96:1.  HDC does not make any decisions about applicants based on criminal background or any other non-income criteria.  Ex. 10 (Tress Dep.) at 96:2-5.

94.     The only reason that HDC has ever rejected an applicant approved by The Sand Castle's staff is due to the applicant being over-income.  Ex. 10 (Tress Dep.) at 96:12-21, 210:25-211:7.

95.     The Sand Castle does not maintain any written policies on the application process or criteria.  Ex. 35-36 (Defs' Interrogatory Responses) at ¶ 13; Ex. 10 (Tress Dep.) at 99:12-14.

## IV.     THE SAND CASTLE'S POLICIES REGARDING APPLICANTS WITH CRIMINAL RECORDS

### A.     Advertisements and Other Statements to the Public Expressing The Sand Castle's Automatic Exclusion of Applicants with Criminal Records

96.     On January 30, 2014, Tress wrote an email setting out the content of an online advertisement for apartments at The Sand Castle, which stated "the basic stuff about the building."  Ex. 46 at DEF013950; Ex. 10 (Tress Dep.) at 153:22-154:7, 154:20-155:1.  In the email, Tress set out "no criminal history" as one of the criteria for qualified applicants.  Ex. 46 at DEF013950; Ex. 10 (Tress Dep.) at 154:20-155:1.

97.     Tress stated in a separate January 30, 2014 email exchange with Ginzberg, Brecher, and Goldstein, that he planned to have placed on the Craigslist website an ad that would include "no criminal record" as one of the criteria.  Ex. 47 at DEF011747-49.  Tress asked if anyone had suggestions about the ad's content.  Although Ginzberg and Brecher both responded to the email, neither objected to, nor suggested modifying, the proposed "no criminal record" language.  Ex. 47 at DEF011748.

98.     Tress directed that an ad containing the same basic content as his initial January 30th email be posted on Craigslist.  Ex. 46 at DEF013950; Ex. 47 at DEF011747-49; Ex. 10 (Tress Dep.) at 154:8-19; Ex. 9 (Strasser Dep.) at 106:9-19, 109:16-19, 110:17-22, 117:13-23.

The ad, written by Tress, included the statement "no criminal history" as one of the applicant criteria. Ex. 46 at DEF013950; Ex. 10 (Tress Dep.) at 154:8-155:19, 156:14-17, 162:14-18.

99.     Tress knew to include the "no criminal history" criterion in the ad due to discussions he had with Rose Campbell and Brontie Silvera (as well as with Weismann's employee, Heidi Hershkowitz) early in his tenure as building manager. Ex. 10 (Tress Dep.) at 161:20-162:9, 162:24-163:23. The discussions Tress had with Silvera, Campbell, and Hershkowitz informed his decision as to what information the Craigslist ad should contain. Ex. 10 (Tress Dep.) at 163:20-23.

100.     The Craigslist ad stating "no criminal history" as an applicant criterion did not make any distinction between felonies and misdemeanors. Nor did it make any distinction based on the recency of an applicant's criminal record. Ex. 10 (Tress Dep.) at 156:14-24; Ex. 2 (Campbell Dep.) at 175:17-19, 175:24-176:5.

101.     From the perspective of The Sand Castle's management, including the "no criminal history" language was "standard" and "part of the general information" a prospective tenant needed before applying. Ex. 10 (Tress Dep.) at 157:4-17.

102.     Over the course of at least two to four months, Craigslist ads stating "no criminal history" as a criterion were repeatedly reposted or renewed by Rose Campbell. Ex. 2 (Campbell Dep.) at 170:12-171:9.

103.     The Craigslist ads "did well" for The Sand Castle and the complex "got a lot of calls from it." Ex. 10 (Tress Dep.) at 164:14-18. So many prospective applicants viewed the ads on Craigslist that Campbell "started to get very overwhelmed with all the applications" and The Sand Castle's vacancy rate started to decrease. Ex. 2 (Campbell Dep.) at 171:10-18.

19

104.     The Craigslist ads included Campbell's email address.  Ex. 10 (Tress Dep.) at 164:18-20.  Campbell would receive 10-15 emails per week from people responding to the Craigslist postings.  The volume of email "started to overwhelm" Campbell's inbox.  Ex. 2 (Campbell Dep.) at 171:19-172:9.

105.     From at least March 2014 to October 2014, Campbell responded via email to the inquiries she received about the availability of apartments at The Sand Castle and the complex's applicant criteria.  Ex. 38 at SJ0001-39; Ex. 2 (Campbell Dep.) at 150:7-13, 151:5-152:9.  Campbell's responses to at least 39 prospective applicants stated "no criminal background" (or in one instance, "no criminal") as one of the applicant criteria.  Ex. 38 at SJ0001-39; Ex. 2 (Campbell Dep.) at 153:25-154:7, 172:19-173:3.  This was Campbell's "standard" response that she "would send to all the applicants responding on the Craigslist ad."  Ex. 2 (Campbell Dep.) at 151:25-152:15.

106.     Campbell had the authority to send the email responses.  Ex. 10 (Tress Dep.) at 143:16-23; Ex. 38 at SJ0001-39.

107.     Tress, the building manager, testified that Campbell's standard email response featuring the "no criminal background" language "correctly state[s] the criteria" for rental applications.  Ex. 10 (Tress Dep.) at 142:8-13.  Had Tress seen Campbell's emails, each stating "no criminal background" as one of the criteria, he would have approved that language.  Ex. 10 (Tress Dep.) at 143:3-15.

108.     During the time the Craigslist ads were posted, Campbell also communicated to prospective applicants over the phone.  Ex. 10 (Tress Dep.) at 164:14-19.  Campbell told prospective applicants over the phone "[t]he same thing that she said in the e-mail."  Ex. 10 (Tress Dep.) 164:21-165:9, 165:21-166:7.

109.    The 2014 Craigslist ads stating "no criminal background" as one of the criteria are the only ads that Sand Castle's staff have posted themselves.  Ex. 10 (Tress Dep.) at 172:14-20.

**B.    Additional Communications Expressing The Sand Castle's Automatic Criminal Records Restriction**

110.    In an April 24, 2014 email to two representatives of Program Rentals, a real estate agency working with The Sand Castle, Campbell stated: "For the future, applicant cannot have a . . . criminal background."  Ex. 48 at DEF018201; Ex. 2 (Campbell Dep.) at 157:7-17.

111.    In an October 23, 2014 email to Program Rentals, Campbell restated the requirement that referred applicants should not have a criminal background.  Ex. 49.

112.    Program Rentals refers "a lot of applicants" to The Sand Castle.  Ex. 2 (Campbell Dep.) at 156:19-25.

113.    Heidi Hershkowitz, one of the on-site Weissman Realty brokers and later a Sand Castle employee (Ex. 11 (Weissman Dep.) at 70:18-71:11, 74:9-13), stated in a January 27, 2014 email to Tress that she would convey to an applicant that he "can absolutely not live in the sandcastle [sic] with a criminal history."   Ex. 50.  Tress's response to the email did not object to Hershkowitz's language regarding criminal history.  Ex. 50.

114.    Melissa Gursky testified that Brecher instructed her that The Sand Castle "does not want people with criminal backgrounds" as tenants.  Ex. 6 (Gursky Dep.) at 108:23-109:10. She further stated that Brecher did not want applicants with criminal backgrounds due to his concern about building safety.  Ex. 6 (Gursky Dep.) at 110:6-23.

115.    Defendants assert that "[a]bsent a certificate of relief from civil disabilities or an outright pardon, convicted criminals have no basis for complaining that landlords choose not to rent to them."  Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at ¶ 70.

C.      **The Sand Castle's Treatment of Applicants with Criminal Records**

    a.   **Determination of Criminal Conviction Status**

116.    In the event that past criminal activity appears in an applicant's background check, Rose Campbell—the Sand Castle agent or employee with nearly exclusive authority over tenant applications as a practical matter, *see* paragraphs 35-55—determines whether there was a conviction and the class of any conviction by examining the "charge class" and "disposition" descriptions on the Weimark background check.  Ex. 2 (Campbell Dep.) 225:25-227:21.

117.    To determine whether to exclude the applicant, Campbell looks for some indication of conviction.  Ex. 2 (Campbell Dep.) 225:25-227:12.

118.    If criminal activity is reported on the background check but there is no entry for the "charge class" and "disposition," then Campbell does not use the reported criminal activity to exclude the applicant because she "can't actually determine whether the person was actually convicted of the crime."  Ex. 2 (Campbell Dep.) at 227:4-21, 228:14-229:14, 229:25-231:5.  In such circumstances, Campbell testified that any reported criminal activity is "most likely . . . an arrest" and that the person was "not convicted of anything."  Ex. 2 (Campbell Dep.) at 229:25-230:23.

119.    When an applicant's background check indicates that the applicant has a criminal conviction, Campbell makes the decision to reject the applicant on her own, without consulting Tress or others.  Ex. 10 (Tress Dep.) at 72:14-20; 135:9-20; Ex. 4 (Ginzberg Dep.) at 79:16-25, 103:4-18.  She is not required to bring the fact that an applicant has a criminal record to upper management's attention.  Ex. 10 (Tress Dep.) at 141:9-13.

120.    Neither Campbell nor Tress can determine from the Weimark report the date on which a given crime or conviction occurred.  Ex. 2 (Campbell Dep.) at 128:15-129:5; Ex. 10

(Tress Dep.) at 126:12-15.  Campbell does not "know how to read [a background check] to determine whether [a crime or conviction] happened one year ago or five years ago" or at any other point, and never received instructions on how to do so.  Ex. 2 (Campbell Dep.) at 129:1-13.

121.    After rejecting an application, Campbell does not solicit additional information from applicants about the circumstances of their criminal record and applicants are not affirmatively offered an opportunity to appeal a rejection based on their criminal background. Ex. 2 (Campbell Dep.) at 132:13-133:24.

122.    Campbell simply conveys to the applicant that they were rejected and the reason. Ex. 2 (Campbell Dep.) at 133:10-24.

123.    Applicants who applied with the assistance of an outside broker typically learn of their rejection from the broker and do not have a chance to discuss their rejection with a decision maker at The Sand Castle.  Ex. 2 (Campbell Dep.) at 82:20-83:2.

### b.  Absolute Ban On Individuals With Felony Records

124.    In screening criminal backgrounds, Campbell focuses on whether the applicant has a past felony conviction because it is "the landlord's criteria" to categorically deny an applicant "if it's a felony" in the applicant's background.  Ex. 2 (Campbell Dep.) at 132:25-133:2; Ex. 14 (Campbell *Marcano* Dep.) at 72:24-73:5.

125.    Campbell testified in her deposition that "[w]e do take the misdemeanors if it's not a problem. Felonies, it's something different, okay?"  Ex. 2 (Campbell Dep.) at 158:8-10.

126.    If the information on the Weimark report indicates that an applicant has a past felony conviction, this results in an "automatic denial" and Campbell "will tell them that they will be denied."  Ex. 2 (Campbell Dep.) at 73:7-10; 155:1-12.  Campbell rejects any and every

applicant whose Weimark background check reveals a past felony conviction.  Ex. 2 (Campbell Dep.) at 72:23-73:10, 148:20-149:2.

127.    Applicants with a felony record are rejected regardless of the nature of the underlying crime.  Ex. 2 (Campbell Dep.) at 73:11-15.

128.    Campbell typically writes "Applicant denied for background check, felony" on the application when an applicant is rejected based on felony background.  Ex. 2 (Campbell Dep.) at 127:9-18.  Other applications denied for criminal record feature similar descriptions. Ex. 62 at SJ0040-162.

129.    Tress does not know of any specific instance in which Campbell has asked him to approve the application of an applicant with a felony conviction.  Ex. 10 (Tress Dep.) at 132:22-133:3, 133:22-134:5.

130.    Tress "[did not] know the difference" between a felony and a misdemeanor and "didn't understand what falls into what category."  Ex. 10 (Tress Dep.) at 131:23-132:10, 134:6-12.  Tress primarily became aware of the difference between a felony and a misdemeanor as a result of this litigation.  Ex. 10 (Tress Dep.) at 132:15-21, 134:6-12.

131.    Based on her understanding of building policy, Gursky did not in the past, and would not today, knowingly refer a person with a felony in their background.  Ex. 6 (Gursky Dep.) at 109:11-14, 109:25-110:9, 126:23-127:1.

132.    Fortune requested access in discovery to all of Defendants' 2006 to 2015 applicant files and Defendants' counsel represented that access to all of the available files was provided.  Ex. 74; Ex. 57 (Plaintiff's Motion to Compel Discovery, Dkt. 39); Ex. 41 (Order Granting Motion for Discovery, Dkt. 46); *see also* Ex. 2 (Campbell Dep.) 43:6-11.

133.    In total, Fortune obtained 1,277 applicant files.  Ex. 18 (Declaration of Maia Cole ("Cole Dec.")) at Ex. 1.

134.    This 1,277 does <u>not</u> reflect all applicants to the Sand Castle during this period. Application information for some accepted applicants was not available and, because Defendants do not typically retain any information about rejected applicants, only a relatively small sample of rejected applicant files were available, most of them provided by ABBA Realty, a third-party broker.  Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 7; Ex. 18 (Cole Dec.) at 3 & Ex. 1, Column L; Ex. 12 (Deposition Transcript of Donald Welsch ("Welsch Dep.")) at 109:24-110:2.

135.    Of the 1,277 files obtained, 1,145 pertain to applicants who were accepted as tenants; 116 pertain to applicants who were rejected; and 16 files pertain to applicants whose status is unknown.  Ex. 18 (Cole Dec.) at Ex. 1, Column A.

136.    Based on the 1,145 accepted applicant files from 2006 to June 2015 that were made available to Plaintiff, only two accepted applicants have background checks that clearly indicate a past felony.[6]  One of the two tenants has a conviction for felony larceny; the other tenant was convicted of felony assault on a police officer. Ex. 18 (Cole Dec.) at Ex. 1, Row 13-Column G and Row 9-Column Q; Ex. 67 at WCS000463; Ex. 75 at WCS000488.

137.    The Sand Castle's explicit practice is to automatically reject any applicant convicted of felony larceny or felony assault on a police officer.  Ex. 2 (Campbell Dep.) at 148:20-149:2.

138.    Mistakes are sometimes made in the application review process and an applicant with an unsuitable background may "slip[] through the cracks" to become a tenant.  Ex. 10

---

[6] "Clear indication" means that the "charge class" and "disposition" sections of the Weimark criminal report indicate that the person was convicted. Note that not all of the 1,145 accepted applicants had Weimark criminal background checks available for review.

(Tress Dep.) at 149:22-150:11, 152:10-25; Ex. 1 (Brecher Dep.) at 108:3-22; Ex. 4 (Ginzberg Dep.) at 89:7-90:8.  On occasion, applicants are accepted who should have been rejected based on their criminal background.  Ex. 1 (Brecher Dep.) at 85:7-9; 108:14-22.

139.    Even Level 4 sex offenders, or people with similar backgrounds, have mistakenly been accepted when they should have been denied "per policy."  Ex. 4 (Ginzberg Dep.) at 89:7-90:8.

140.    Mistakes may happen when the Sand Castle agent or employee reviewing the application "did not do their job."  Ex. 4 (Ginzberg Dep.) at 89:17-22.

141.    Steven Green, the tenant with a felony conviction for aggravated assault on a law enforcement officer, was accepted as a tenant only after this litigation commenced on October 30, 2014.  His tenancy application is dated December 2, 2014.  Ex. 75 at DEF000544, and WCS000488.

### c.  The Sand Castle Generally Denies Applicants with Misdemeanor Histories

142.    The Sand Castle "generally" does not accept applicants for tenancy who have been convicted of "financial crimes (fraud, check kiting, etc.), property crimes (burglary, vandalism, grand larceny), violent crimes (assault, homicide), drug related crimes (sale, possession with intent to sell, misdemeanor possession)."  Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 5.

143.    Based on the 1,145 accepted applicant files from 2006 to June 2015 made available to Plaintiff, eight individuals with misdemeanor convictions clearly indicated on their background reports became tenants. Ex. 18 (Cole Dec.) at Ex. 1, Row 28-Column G, Row 494-Column G, Row 497-Column G, Row 906-Column G, Row 574-Column Q; Row 106-Column G, Row 3-Column Q, Row 136-Column Q.

144.    Of those eight, five were convicted of misdemeanor traffic offenses.  Ex. 18 (Cole

Dec.) at Ex. 1, Row 28-Column G, Row 494-Column G, Row 497-Column G, Row 906-Column

G, Row 574-Column Q.  Only three tenants were admitted with non-traffic misdemeanor

convictions.  Ex. 18 (Cole Dec.) at Ex. 1, Row 106-Column G, Row 3-Column Q, Row 136-

Column Q.  Of the three who had been convicted of non-traffic-related offenses, only one was

potentially a tenant before this litigation commenced on October 30, 2014.  Ex. 73 at SJ0232-34.

145.    Ten other accepted applicants had criminal activity of some kind reported in their

criminal background checks but the "charge class" or "disposition" sections of the report did not

clearly indicate that a conviction was obtained; did not identify the charge class as either a felony

or misdemeanor; or there is some other ambiguity. Most of this activity appears to be traffic

related.  Ex. 18 (Cole Dec.) at Ex. 1, Row 6-Column G, Row 163-Column G, Row 273-Column

G, Row 424-Column G, Row 860-Column G, Row 956-Column G, Row 1083-Column G, 1152-

Column G, Row 262-Column Q, Row 606-Column Q.

146.    Through discovery, Fortune obtained 116 rejected applicant files, a far from

complete sample.  Ex. 18 (Cole Dec.) at Ex. 1, Column A; Exs. 35-37 (Defs' Interrogatory

Responses) at ¶ 7; *see* paragraph 134.  Of those 116 applicants, 29 were marked "denied for

criminal background" or some other clear indicator that the application was rejected due to

criminal background.  Ex. 62 at SJ0040-231; *see* paragraph 128.

147.    Race information was available for 27 of these 29 rejected applicants because it

appeared on the Weimark background report: 18 were African American, one was Hispanic, four

were reported as "other," and two each were reported as unknown and white.[7]  Three of those

_____

[7] White is used to refer to non-Hispanic whites and black is used to refer to non-Hispanic blacks.

marked as "other" had Hispanic surnames: Julio Velez, Enrique Soler, and Elimelech Rodriguez. Ex. 62 at SJ0040-231.

## V.  OTHER APPLICATION CRITERIA AT THE SAND CASTLE

148.    The Sand Castle states that it maintains and enforces other applicant criteria, including an income minimum, credit score cut-off, and a screen for landlord tenant litigation history. Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 5; Ex. 2 (Campbell Dep.) at 68:16-24.

149.    The stated minimum household income for studio apartments is approximately $29,000-$30,000; for one bedrooms, approximately $40,000-$45,000, and for two bedrooms, $50,000-$65,000.  Ex. 2 (Campbell Dep.) at 68:16-24, 70:16-71:18.

150.    The income criteria, however, has "flexibility" and is "not a set-in-stone" number. Ex. 10 (Tress Dep.) at 100:11-13, 101:5-6.

151.    The Sand Castle's income specifications are either modified or waived entirely for applicants with rent subsidies such as Section 8.  Ex. 2 (Campbell Dep.) at 69:7-70:3, 71:19-72:8; Ex. 10 (Tress Dep.) at 102:9-13, 212:3-213:17.

152.    For applicants with subsidies, Defendants do not "have to worry about their income" and the income thresholds do not apply.  Ex. 10 (Tress Dep.) at 102:16-103:6;  Ex. 2 (Campbell Dep.) at 71:19-72:8.

153.    If an applicant does not meet the income requirement, Campbell will ask if they receive a subsidy or rental assistance.  Ex. 2 (Campbell Dep.) at 69:7-16.  If the person has a subsidy or rental assistance, then Campbell can "leave out" or not consider the fact that the applicant is "under-income."  Ex. 2 (Campbell Dep.) at 69:12-17.

154.    In this manner, an applicant earning only $750.00 per month could be deemed "income eligible" for tenancy as long as they have a voucher or other form of agency assistance. Ex. 2 (Campbell Dep.) at 69:18-22.

155.    Similarly, an applicant earning no income at all could be deemed eligible.  Ex. 2 (Campbell Dep.) at 69:23-70:3.

156.    "Somewhere around 50 percent" of Sand Castle tenants receive a housing subsidy or program assistance of some kind that pays all or a portion of their rent.  Ex. 10 (Tress Dep.) at 103:7-14; Ex. 16 (Tress *Marcano* Dep.) at 75:24-76:4; Ex. 4 (Ginzberg Dep.) at 42:18-19, 122:10-13.   This proportion has been consistent for at least the past five years.  Ex. 10 (Tress Dep.) at 104:2-5.

157.    There have always been a lot of tenants at The Sand Castle who rely on subsidies. Ex. 10 (Tress Dep.) at 103:15-19.  Subsidy information derived from the 1,145 accepted applicant files made available to Plaintiff indicates that 597 of them received a subsidy.   Ex. 18 (Cole Dec.) at Ex. 1, Columns K and U.

158.    Even for an applicant with no voucher or subsidy, earning below $30,000 is not necessarily disqualifying.  Ex .16 (Tress Dep.) at 101:7-24.

159.    The Sand Castle states that it applies a credit score cut-off of either 600 or 620 for applicants. Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 5; Ex. 2 (Campbell Dep.) at 72:10-13.

160.    In practice, however, the credit score requirement is "flexible" and there is "no real number."  Ex. 10 (Tress Dep.) at 105:13-23; Ex. 11 (Weissman Dep.) at 81:12-82:5.

161.    The Sand Castle receives applications from "[a] lot" of applicants who "do not make the credit score" cut-off.  Ex. 2 (Campbell Dep.) at 158:21-22.  "[I]n some cases, a lot of people are coming from, maybe, shelters or other programs."  Ex. 2 (Campbell Dep.) at 159:1-3.

162.    In such cases, The Sand Castle "won't penalize them for having a [sic] poor credit."  Ex. 2 (Campbell Dep.) at 159:3-4.

163.    Campbell testified that "a majority of our people here that's applying for the apartments, a lot of them may have . . . poor credit."  Ex. 2 (Campbell Dep.) at 159:13-16.

164.    Applicants with credit scores below 600 are considered on an individual basis, not rejected automatically.  Ex. 2 (Campbell Dep.) at 199:13-16; Ex. 10 (Tress Dep.) at 105:15-17.

165.    Campbell does not "really penalize a younger person because they don't have the established credit" (Ex. 2 (Campbell Dep.) at 222:2-17) and The Sand Castle will "overlook" a poor credit score if the applicant has a "good job" and "had his last apartment for a few years," (Ex. 10 (Tress Dep.) at 104:24-105:2).

166.    If the reason the applicant has a poor credit score is a cell phone bill or "something small" then The Sand Castle will also overlook it.  Ex. 10 (Tress Dep.) at 105:10-23.

167.    For an applicant to The Sand Castle, Campbell testified that there is "never a score . . . too low" to be considered.  Ex. 2 (Campbell Dep.) at 159:20-23.

168.    There are many tenants at The Sand Castle who have no credit score at all.  Ex. 10 (Tress Dep.) at 105:13-20; Ex. 24 (Supplemental Expert Report of Allan Parnell (November 23, 2015) ("Parnell Supp. Report")) at 9.

169.    Like the income criteria, the credit score criteria is further relaxed for applicants with housing subsidies.  Ex. 2 (Campbell Dep.) at 198:12-16.  Where the applicant is supported by a subsidy, The Sand Castle staff "will consider waiving" the credit score minimum (Ex. 2

30

(Campbell Dep.) at 158:16-159:18, 198:12-16; Ex. 14 (Campbell *Marcano* Dep.) at 165:2-9, 166:7-10), and will "overlook more" as far as creditworthiness is concerned.  Ex. 10 (Tress Dep.) at 106:16-21.

170.    Of the 1,277 applicant files made available to Plaintiff, only 561 included any information about the applicant's credit score.  Based on those 561 application files, the majority of accepted applications had scores below 600 or had reports indicating that they did not have a credit score at all.[8]  Ex. 18 (Cole Dec.) at Ex. 1, Columns J and T.

171.    Among paying tenants without housing subsidies, nearly 1 out of every 5 known paying tenant had scores below 600 or had reports indicating that they did not have a credit score at all.[9]  Ex. 18 (Cole Dec.) at Ex. 1, Columns J and T.

172.    The Sand Castle states that it rejects applicants with a landlord-tenant litigation history.  Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 5.

173.    The Sand Castle's landlord-tenant litigation history criterion is "flexibl[y]" applied, however.  Ex. 9 (Strasser Dep.) at 73:13-24; Ex. 52 at Strasser 0030-31.

174.    Applicants with a landlord-tenant history are "[n]ot necessarily" rejected. Ex. 2 (Campbell Dep.) at 108:9-109:3.

175.    The Sand Castle considers how long ago the landlord-tenant incident occurred in evaluating an applicant with a landlord-tenant litigation history.  Ex. 10 (Tress Dep.) at 107:17-108:3; Ex. 14 (Campbell *Marcano* Dep.) at 166:21-167:5.  If "the eviction history is very old" then it will not prevent an applicant from being accepted as a tenant and is "happily

---

[8] This excludes the small number of files in which one applicant had a FICO score below 600 or a report showing no credit score but a co-applicant had a credit report indicating a FICO score above 600.
[9] This excludes the small number of files in which one applicant had a FICO score below 600 or a report showing no credit score but a co-applicant had a credit report indicating a FICO score above 600.

overlook[ed]." Ex. 53; Ex. 2 (Campbell Dep.) at 194:16-195:12; Ex. 10 (Tress Dep.) at 107:15-108:3.

176.    Campbell considers "very old" to be anywhere between 5-10 years ago or older. Ex. 2 (Campbell Dep.) at 108:13-19, 194:16-195:12.

177.    Applicants who can offer a reasonable explanation for their landlord tenant history are considered. Ex. 52 at Strasser 00030-00031. Applicants are automatically rejected for landlord-tenant history "only if it's mostly current and it's consecutive." Ex. 2 (Campbell Dep.) at 108:24-25; Ex. 53.

178.    Campbell is able to determine the dates of an applicant's landlord-tenant incidents from the Weimark report. Ex. 2 (Campbell Dep.) at 194:10-15.

## VI.    EXPERT ANALYSES DEMONSTRATE THAT THE SAND CASTLE'S CRIMINAL RECORDS POLICIES HAVE A RACIALLY DISPROPORTIONATE AND ADVERSE IMPACT

### A.    African Americans and Latinos Nationwide and in New York Have Criminal Records at a Disproportionately Higher Rate than Whites

179.    Plaintiff's expert Lila Kazemian, Ph.D, is a criminologist and Associate Professor of Sociology at John Jay College of Criminal Justice, City University. Dr. Kazemian's areas of expertise include life-course and criminal career research, desistance from crime, offender reentry, and comparative criminology. Ex. 22 (Expert Report of Lila Kazemian (June 30, 2015) ("Kazemian Report")) at Ex. 2. Paragraphs 180 to 191 are based on her report.

180.    African Americans and Latinos comprise approximately 58% of the 2.3 million prisoners in the United States and make up only 30% of the U.S. population. Ex. 22 (Kazemian Report) at 2 (confirming accuracy of the statistics stated in the amended complaint); Ex. 22 (Kazemian Report) at Ex. 1 ¶¶ 80, 83.

181.    Dr. Kazemian's report confirms that because African Americans and Latinos are overrepresented in the criminal justice system, there are a greater proportion of African-American and Hispanics with a criminal record as compared to whites.  Ex. 22 (Kazemian Report) at 1-3.

182.    Specifically, based on her knowledge and expertise, Dr. Kazemian's report confirms that the 700,000 inmates released from confinement each year are disproportionately African-American and Latino because the inmate population as a whole is disproportionately African-American and Latino, and that 95% of inmates are eventually released back into their communities. Ex. 22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 75.

183.    Dr. Kazemian confirms that the racial disparities at the national level are mirrored in the New York State statistics, where more than 50% of inmates released in 2009 were African-American and over 25% were Latino.  Of the nearly 600,000 inmates released by the New York State Department of Corrections from 1985 to 2009, over half were African-American and nearly one-third were Latino.  Ex. 22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 76.

184.    New York State's general population is only 15.9% African-American and 17.6% Latino.  Ex. 22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 76.

185.    Dr. Kazemian's report confirms that most of those released from New York State prisons—nearly two-thirds since 1985—go to New York City to live—and that in 2011, New York City's own Department of Corrections released 88,000 people from its disproportionately African-American and Latino inmate population.  Ex. 22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 77.

186.    The reentering population in New York City is, therefore, both large and disproportionately minority. Ex. 22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 77.

187.    Dr. Kazemian's report also confirms that whites are incarcerated, and therefore released from jails and prisons, at rates significantly lower than their representation in the general population at the national, New York State, and New York City levels.  Ex. 22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 78.

188.    Dr. Kazemian confirms that based on national incarceration data, the U.S. Department of Justice estimates that 1 in 3 African-American men will go to prison at some point in their lifetime.  For Latino men, the rate of expected incarceration is 1 in 6.  For white men, the figure is 1 in 17.  That is, African-American men are six times more likely to be incarcerated than white men, and Latino men are almost three times more likely to be incarcerated than white men.  Ex. 22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 84.

189.    The disparities referenced in paragraph 188 persist across categories of crime, such as drug possession.  Ex. 22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 85.

190.    Dr. Kazemian's report confirms that more people have criminal records than ever before, and those people are disproportionately African-American and Latino; and that in New York City, New York State, and the country as a whole, African Americans and Latinos are far more likely than whites to have a criminal record.  Ex .22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 89.

34

191.     This means both that African Americans and Latinos are more likely than whites to be barred from housing by automatic exclusions of people with records and that the absolute number of African Americans and Latinos affected is very large.  Ex .22 (Kazemian Report) at 2; Ex. 22 (Kazemian Report) at Ex. 1 ¶ 90.

192.     Christopher Wildeman, Ph.D., is an Associate Professor of Policy Analysis and Management in the College of Human Ecology at Cornell University and a Visiting Fellow at the Department of Justice's Bureau of Justice Statistics.  Dr. Wildeman's areas of expertise include demographic analysis and mass incarceration.  Ex. 27 (Expert Report of Christopher Wildeman (June 22, 2015) ("Wildeman Report")) at Ex. 1.

193.     Dr. Wildeman performed an analysis estimating the lifetime risk of being incarcerated as a proxy for the lifetime risk of criminal conviction.  He used this proxy because the highest-quality data available is on incarceration rather than conviction and it provides a sound basis for estimating conviction disparities by race.  Ex. 27 (Wildeman Report) at 1; Ex. 13 (Deposition Transcript of Christopher Wildeman ("Wildeman Dep.")) at 30:16-31:20, 48:13-19, 53:11-25.

194.     Dr. Wildeman concludes that the race-based disparities of people with criminal records are comparable to the race-based disparities in lifetime risk of incarceration.  Ex. 27 (Wildeman Report) at 12.

195.      Dr. Wildeman performed his analysis using data from the National Longitudinal Survey of Youth 1979 ("NLSY79"), the 2004 Survey of Inmates in State and Federal Correctional Facilities, the National Corrections Reporting Program, year-end prison reports, and CDC Wonder to generate three sets of estimates regarding racial disparities in the cumulative risk of experiencing incarceration.  Ex. 27 (Wildeman Report) at 1.

196.    Dr. Wildeman notes that the NLSY79 dataset is "generally considered to provide a nearly perfect measure of prison incarceration"; that, because the data provides information on both prison and jail incarceration, they provide the highest-quality data available for estimating convictions, including both felonies and misdemeanors; and that the data provide "a nearly perfect estimate of felony conviction because they measure prison incarceration so well." Ex. 27 (Wildeman Report) at 4-5; Ex. 13 (Wildeman Dep.) at 36:6-16.

197.    Dr. Wildeman specifically estimated (a) the proportion of white, Latino, and African-American 47-55 year olds that have ever been incarcerated and the racial disproportionality in incarceration; (b) adding several different income restrictions, the proportion of white, Latino, and African-American 47- to 55-year-olds that have ever been incarcerated and the racial disproportionality in incarceration; and (c) the proportion of white, Latino, and African-American adults that have ever been incarcerated in New York State. Ex. 27 (Wildeman Report) at 1-2.

198.    In each instance, Dr. Wildeman finds that Latinos and African Americans are far more likely to have ever experienced prison or jail incarceration than whites. Ex. 27 (Wildeman Report) at 3.

199.    First, Dr. Wildeman finds that, nationally, Latinos are 2.51 times as likely to have ever experienced incarceration as whites are. He also finds that African Americans are 4.40 times as likely to have ever experienced incarceration as whites. Ex. 27 (Wildeman Report) at 2, 11-12. Dr. Wildeman's findings are based on his analyses showing incarceration likelihoods of 2.39% for whites, 5.99% for Latinos, and 10.61% for African Americans. Ex. 27 (Wildeman Report) at 8.

200.     Second, Dr. Wildeman finds that significant racial disparities persist regardless of income.  Dr. Wildeman finds substantial and consistent racial disparities in incarceration risk for those earning $30,000 and over; $40,000 and over; $0 to $70,000; $0 to 90,000; $30,000 to $70,000; and $40,000 to $70,000 and all incomes in between.  Ex. 27 (Wildeman Report) at 9 and 16; Ex. 21 (Declaration of Christopher Wildeman ("Wildeman Dec.")) at ¶10.

201.     For example, Dr. Wildeman finds that among those earning $0 to $70,000, Latinos are 2.48 times more likely to have ever experienced incarceration as whites and African Americans are 3.78 times more likely to have ever experienced incarceration as whites.  Ex. 21 (Wildeman Dec.) at ¶ 11.  This is based on findings that the incarceration likelihoods for those within the income band are 3.01% for whites; 7.46% for Latinos; and 11.38% for African Americans.  Ex. 21 (Wildeman Dec.) at ¶ 11.

202.     Similarly, among those earning $30,000 to $70,000, Latinos are 2.19 times more likely to have ever experienced incarceration as whites and African Americans are 3.47 times more likely to have ever experienced incarceration as whites.  This is based on findings that the incarceration likelihoods for those within the income band are 1.37% for whites; 3.00% for Latinos; and 4.76% for African Americans. Ex. 27 (Wildeman Report) at 16.

203.     For the $0 to $90,000 income band, Latinos are 2.33 times more likely to have ever experienced incarceration as whites and African Americans are 3.93 times more likely to have ever experienced incarceration as whites.  Ex. 21 (Wildeman Dec.) at ¶ 12.  This is based on findings that the incarceration likelihoods for those within the income band are 2.82% for whites; 6.58% for Latinos; and 11.08% for African Americans.  Ex. 21 (Wildeman Dec.) at ¶ 12.

204.     Notably, Dr. Wildeman's analysis finds that African Americans above the $30,000 income threshold are still 1.88 times as likely to have ever been incarcerated as *all*

whites, including both whites earning more than $30,000 and Whites earning less than $30,000. Ex. 27 (Wildeman Report) at 9, 14.

205.    Third, Dr. Wildeman concludes "disproportionality in the risk of prior imprisonment is even greater" in New York than nationally.  Ex. 27 (Wildeman Report) at 2.  In other words, the national proportions are conservative by comparison.

206.    Specifically, Dr. Wildeman finds that, depending on the age category, Latinos living in New York are between 5.13 and 5.97 times as likely to have ever been imprisoned as whites living in New York, and that African-American New Yorkers are between 7.07 and 8.04 times as likely to have ever been imprisoned as white New Yorkers.  Ex. 27 (Wildeman Report) at 2, 10, and 15.

207.    Based on these findings, Dr. Wildeman concludes that regardless of the age, there is a high degree of racial disproportionality in history of imprisonment for individuals living in New York State.  Ex. 27 (Wildeman Report) at 2, 10, and 15.

208.    In connection with his analyses specific to New York, Dr. Wildeman further finds that just 1.47% of whites living in New York will have ever experienced imprisonment by their late 50s.  By contrast, the corresponding figures for Latinos and African Americans in New York are significantly greater: at 8.77% and 11.66%, respectively.  Ex. 27 (Wildeman Report) at 10, and 15.

209.    Further explicating the racial disproportionality in cumulative risk of incarceration, Dr. Wildeman finds that Latinos living in New York are more likely to have ever been imprisoned by age 18-24 (3.02%) than whites living in New York are to have ever experienced imprisonment by age 55-59 (1.47%).  Similarly, African-American New Yorkers are

more likely to experience imprisonment by their late teens and early 20s (3.81%) than whites are to experience it by their late 50s (1.47%).  Ex. 27 (Wildeman Report) at 10, and 15.

210.    Dr. Wildeman additionally concludes that because nearly half of the population of New York State resides in New York City, these estimates may properly be thought of as applying not only to New York State but also New York City. The disparities would need to be dramatically different in New York City and elsewhere in the state for the disparities referenced in paragraphs 206-09 to not also apply to New York City, and there is no reason to expect racial disparities in New York City and other parts of the state to differ.  Ex. 27 (Wildeman Report) at 11.

211.    Dr. Wildeman concludes that the racial disparities in conviction and incarceration risk are substantial across a range of offense types—including, but not limited to, disorderly conduct, burglary, theft, robbery, aggravated assault, murder, and drug crimes.  Ex. 27 (Wildeman Report) at 3; Ex. 13 (Wildeman Dep.) at 33:21-34:14; Ex. 21 (Wildeman Dec.) at ¶ 14.  Accordingly, "removing one or more offense types from [his] estimates would not have affected the racial disparities that [he] found in any discernable way."  Ex. 13 (Wildeman Dep.) at 34:7-14.

212.    Dr. Wildeman further notes that "racial disparities in incarceration for various offenses are always in the same direction, with African American[s] and Hispanics experiencing higher rates of incarceration regardless of offense type" and that his racial disparity estimates applied equally to offenses that do not result in incarceration at all.  Ex. 13 (Wildeman Dep.) at 34:17-23; *see* Ex. 13 (Wildeman Dep.) at 53:4-25 ("[T]he estimates that I generated in my report could be thought of as standing in for prison convictions, jail convictions and also lower-level convictions that didn't lead to any prison or jail time."); Ex. 21 (Wildeman Dec.) at ¶ 14.

213.    Defendants' expert, Donald Welsch, does not dispute Dr. Wildeman's key finding that African Americans and Latinos are significantly more likely than whites to have criminal records regardless of geography or income, and offers no criticism as to any aspect of Dr. Wildeman's analysis. Ex. 12 (Deposition of Donald Welsch ("Welsch Dep.")) at 82:15-84:23, 86:2-88:4.

214.    Welsch does not dispute Dr. Wildeman's methodology, measurements, or data. Ex. 12 (Welsch Dep.) at 84:24-85:8, 86:14-17, 87:18-88:4.

215.    Welsch's expert reports devote only a single sentence to his conclusions regarding Dr. Wildeman's report; Welsch's sole conclusion is that it "contains no evidence or information concerning Sandcastle's application procedures or any issues regarding Sandcastle's operations." Ex. 25 at 2 (Expert Report of Donald Welsch (October 7, 2015) ("Welsch Report")); Ex. 26 (Supplemental Export Report of Donald Welsch (December 11, 2015) ("Welsch Supp. Report)). Ex. 12 (Welsch Dep.) at 57:2-18, 75:6-14, 130:6-14.

216.    Welsch testified that he is "not qualified" to assess racial disproportionalities in the cumulative risk of incarceration. Ex. 12 (Welsch Dep.) at 99:21-100:2.  Welsch testified that he lacks familiarity with the core concepts discussed in Dr. Wildeman's report, observing: "I don't have a professional understanding of incarceration, of recidivism, racial disproportionality. These are terms that were new to me in my initial reading."  Ex. 12 (Welsch Dep.) at 57:23-58:5, 80:9-23.

217.    Welsch has never studied racial disparities in the criminal justice system, is not familiar with studies or data concerning people with criminal convictions, and does not know about the relationship of race and criminal records.  Ex. 12 (Welsch Dep.) at 48:25-49:5, 54:14-16, 53:22-54:3, 54:25-55:3, 86:18-87:3.

218.     Welsch has no familiarity with several of the data sets expressly relied upon by Dr. Wildeman in his report, including the CDC Wonder and the 2004 Survey of Inmates in State and Federal Correctional Facilities.  Ex. 12 (Welsch Dep.) at 54:4-16, 81:15-82:7.

**B.      The Disparities Are Substantial and Statistically Significant in the Housing Market From Which The Sand Castle Draws Its Applicants**

219.     Plaintiff's expert Allan Parnell, Ph.D., is the Vice President of the Cedar Grove Institute for Sustainable Communities; President of McMillian and Moss Research, Inc.; and a Senior Fellow at the Kenan Institute on Private Enterprise, University of North Carolina at Chapel Hill.  Dr. Parnell's areas of expertise include demographic analysis, spatial disparities, and the effects of discrimination on housing markets.  Ex. 23 (Expert Report of Allan Parnell (June 29, 2015) ("Parnell Report")) at 1, Attachment A.

220.     Dr. Parnell examined a summary of data extracted from all available Sand Castle tenant files and applications since 2006.  Ex. 24 (Parnell Supp. Report) at 9.

221.     The Sand Castle does not routinely keep any information regarding rejected applications or applicants for the relevant period.  Exs. 35-37 (Defs' Interrogatory Responses) at ¶ 7; Ex. 12 (Welsch Dep.) at 109:24-110:2.

222.     Of the 1,277 applications available for review, only 116 were rejected applications.  Ex. 18 (Cole Dec.) at Ex. 1, Column A.

223.     The total number of missing rejected applications from 2006-2015 is unknown, and correspondingly, there is no way to determine comprehensively the number or identity of applicants rejected because of their criminal records.  This is because, as Dr. Parnell notes, "[w]ithout information on the unknown number of rejected applications, there is no sufficiently complete and representative pool of applicants to examine."  Ex. 24 (Parnell Supp. Report) at 5; Ex. 26 (Supplemental Expert Report of Donald Welsch (December 11, 2015) ("Welsch Supp.

41

Report")) at 3; Ex. 12 (Welsch Dep.) at 110:23-111:22; Ex. 8 (Deposition Transcript of Allan

Parnell ("Parnell Dep.")) at 39:24-40:11, 59:2-60:5.

224.     As a result of the missing rejected applicant data, The Sand Castle's tenant files

do "not aid in reaching any conclusions concerning effects of the criminal records policy"

implemented by the complex and "[i]t is not possible to use the application information provided

. . . to determine whether African Americans and Latinos are disproportionately disadvantaged

relative to Whites in their ability to rent" at The Sand Castle.  Ex. 24 (Parnell Supp. Report) at 5;

Ex. 26 (Welsch Supp. Report) at 2.

225.     Dr. Parnell explains that analysis of the housing markets affected by The Sand

Castle's restrictive criminal records practices is, accordingly, the only way to measure the

resulting or probable disparate impact of those practices.  Ex. 8 (Parnell Dep.) at 291:7-293:23.

226.     Further, given that the policy under scrutiny is a restriction on admission to the

building affecting the whole market, Dr. Parnell also explained that a housing market analysis is

more probative than an analysis of actual applicants.  Ex. 8 (Parnell Dep.) at 291:7-293:23.

227.     To assess the full effect of the policy, Dr. Parnell had to examine the "whole pool

of the potential renters who could apply," not just actual applicants.  Ex. 8 (Parnell Dep.) at

290:14-290:24; 293:5-23; 297:10-18.  This is because, while a policy affecting only those living

in the building affects only current tenants, restrictions on who can rent a unit affect any person

in the market who applies or might have applied absent the policy.  Ex. 8 (Parnell Dep.) at 287:6-

288:22, 290:14-24.

228.     Examining accepted applicants only conveys which "people . . . were accepted at

a certain time" but does not provide information on "the full pool of those rejected" or

individuals who were "discouraged from ever applying."  It is therefore not the "appropriate type

of data to conduct a disparate analysis on a policy that would limit certain people from renting a dwelling."  Ex. 8 (Parnell Dep. at 142:19-144:4).

229.    Dr. Parnell performed two sets of analyses concerning the applicant pool and rental housing markets from which The Sand Castle draws qualified applicants.  These analyses are presented in two separate reports, both of which conclude that African Americans and Latinos in the relevant applicant pool are disproportionately affected by a practice excluding people with criminal records from tenancy at The Sand Castle, and that the results are statistically significant.  Ex. 23 (Parnell Report) at 7-10; Ex. 24 (Parnell Supp. Report.) at 8; Ex. 51 (Declaration of Allan Parnell ("Parnell Dec.") at ¶¶ 9-17.

230.    Before an analysis of a policy's impact can be conducted, the population affected and the geography of the relevant housing market must be empirically determined.  Ex. 8 (Parnell Dep.) at 284:8-285:10, 285:19-286:6; 292:17-293:23, 290:14-24.

231.    Dr. Parnell determines, based on its location, that The Sand Castle primarily draws applicants from the New York HUD Metro Fair Market Rent Area (which includes Bronx, Kings, Putnam, Queens, New York, Richmond, Rockland, and Westchester Counties) and Nassau County.  Over the past decade, 92.4% of applicants with available zip code information have come from these combined areas, thus confirming that the entire area comprises the potential applicant pool.  Ex. 23 (Parnell Report) at 4; Ex. 24 (Parnell Supp. Report) at 6-7; Ex. 18 (Cole Dec.) at Ex. 1, Column E.

232.    Dr. Parnell also considers three alternative ways to define the applicant pool geographically: Queens alone, New York City alone, the New York HUD-designated rental area alone.  Ex. 23 (Parnell Report) at 4; Ex. 24 (Parnell Supp. Report) at 6.

233.   When applicants apply to The Sand Castle, most include their then-current address on the application form.  E.g., Ex. 45 at DEF000001; Ex. 54.

234.   Dr. Parnell supports his geographic determinations regarding the rental housing markets relevant to The Sand Castle applicant pool by using zip code information extracted from the 1,277 applications to The Sand Castle made available to Plaintiff for the period of 2006 to 2015.  Ex. 24 (Parnell Supp. Report) at 6; Ex. 18 (Cole Dec.) at Ex. 1, Column E.

235.   Dr. Parnell determined that 920 of the 1,277 entries included valid applicant zip codes.  Ex. 24 (Parnell Supp. Report) at 6; Ex. 18 (Cole Dec.) at Ex. 1, Column E.

236.   Using an online zip code database, Dr. Parnell determined that 84% of those 920 applicants lived in a zip code within the New York HUD Metro Fair Market Rent Area at the time they applied; 83% lived in a zip code within New York City at the time they applied; 39.6% resided in a zip code within Queens at the time they applied; 8.4% resided in a zip code within Nassau County.  Ex. 24 (Parnell Supp. Report) at 6-7.  Dr. Parnell ultimately found that applicants from these four nested geographic areas—Queens, New York City, the New York HUD Metro Fair Market Rent Area, and New York HUD Metro Fair Market Rent Area plus Nassau County—comprised 92.4% of The Sand Castle's applicants since 2006.  Ex. 24 (Parnell Supp. Report) at 6-7.  Accordingly, the New York HUD Metro Fair Market Rent Area plus Nassau County and its subsets constitute the relevant housing markets.

237.   Dr. Parnell's geographic determinations regarding the applicant pool are further supported by the observation of The Sand Castle's rental manager that most applicants "are coming from New York City."  Ex. 2 (Campbell Dep.) at 188:18-189:15.

238.   Dr. Parnell determined the number of white, African-American, and Latino households in each of the four housing markets studied:  Queens; New York City; New York

44

HUD Metro Fair Market Rent Area; and New York HUD Metro Fair Market Rent Area plus

Nassau County.  For each market, he did so using the seven different income scenarios

considered by Dr. Wildeman:  all incomes; $30,000 to $70,000; $40,000 to $70,000; $0 to

$70,000; $0 to 90,000; at least $30,000; and at least $40,000.  Ex. 23 (Parnell Report) at 4, 11;

Ex. 24 (Parnell Supp. Report) at 7, 14; Ex. 51 (Parnell Dec.) at ¶¶ 10-17.

239.    This wide range of income scenarios captures the population of potential

applicants eligible for tenancy at The Sand Castle according to Defendants' Regulatory

Agreement with HDC, i.e. those earning no more than 125% and 135% of Area Median Income

("AMI").  Ex. 31 at DEF000190-91; Ex. 8 (Parnell Dep.) at 132:17-134:5, 182:15-184:9.

240.    Dr. Parnell found the following, demonstrating that the applicant pool for The

Sand Castle is racially diverse:

| Income Scenario | White Population | African American Population | Latino Population |
| --- | --- | --- | --- |
| Queens Housing Market | | | |
| No Income Limit | 272,815 | 138,446 | 185,898 |
| $30,000 Minimum | 203,258 | 103,310 | 132,441 |
| $40,000 Minimum | 181,317 | 90,797 | 112,813 |
| $30,000-$70,000 | 79,580 | 45,366 | 67,875 |
| $40,000-$70,000 | 57,580 | 32,893 | 48,247 |
| $0-$70,000 | 149,078 | 80,505 | 121,332 |
| $0-$90,000 | 179,992 | 96,966 | 142,487 |
| New York City Housing Market | | | |
| No Income Limit | 1,228,022 | 736,836 | 752,521 |
| $30,000 Minimum | 944,782 | 459,594 | 424,841 |
| $40,000 Minimum | 863,001 | 383,037 | 350,715 |
| $30,000-$70,000 | 306,792 | 244,424 | 240,773 |
| $40,000-$70,000 | 225,001 | 167,867 | 163,647 |
| $0-$70,000 | 590,022 | 521,666 | 565,660 |
| $0-$90,000 | 713,249 | 590,609 | 627,537 |
| New York, N.Y. HUD Metro Fair Market Rent Area | | | |
| No Income Limit | 1,543,007 | 797,673 | 827,620 |
| $30,000 Minimum | 1,211,771 | 503,343 | 481,963 |
| $40,000 Minimum | 1,112,173 | 421,630 | 396,863 |
| $30,000-$70,000 | 373,769 | 263,098 | 266,476 |
| $40,000-$70,000 | 274,171 | 181,385 | 181,376 |

| | | | |
|---|---|---|---|
| $0-$70,000 | 704,962 | 557,403 | 565,867 |
| $0-$90,000 | 858,058 | 632,787 | 682,073 |
| New York, N.Y. HUD Metro Fair Market Rent Area and Nassau County | | | |
| No Income Limit | 1,861,248 | 840,810 | 875,984 |
| $30,000 Minimum | 1,489,130 | 537,574 | 521,427 |
| $40,000 Minimum | 1,372,437 | 453,598 | 432,676 |
| $30,000-$70,000 | 439,620 | 272,777 | 281,429 |
| $40,000-$70,000 | 321,908 | 188,285 | 192,184 |
| $0-$70,000 | 811,738 | 576,013 | 635,986 |
| $0-$90,000 | 996,238 | 656,322 | 711,481 |

Ex. 23 (Parnell Report) at 11-13; Ex. 24 (Parnell Supp. Report) at 14;[10] Ex. 51 (Parnell Dec.) at ¶¶ 12 and 14.

241.     Dr. Parnell then uses Dr. Wildeman's calculations of the proportional cumulative risk of incarceration for whites, African Americans, and Latinos by income scenario to determine if the racial disparities identified by Dr. Wildeman are statistically significant for populations of these sizes. Ex. 23 (Parnell Report) at 5-10; Ex. 51 (Parnell Dec.) at ¶¶ 11-17.

242.     Dr. Parnell performs "Z-tests" of two proportions to assess whether the disparities are statistically significant. Ex. 23 (Parnell Report) at 6; Ex. 51 (Parnell Dec.) at ¶¶ 13-16; Ex. 8 (Parnell Dep.) at 266:2-18. He performs 56 Z-tests to account for all four housing markets under all seven income scenarios. All 56 Z-tests show that the disparities are statistically significant at a 99% confidence level (p-value < 0.01). Ex. 23 (Parnell Report) at 6-13; Ex. 24 (Parnell Supp. Report) at 7-8, 14; Ex. 51 (Parnell Dec.) at ¶¶ 7-17.

243.     Dr. Parnell concludes that due to racial differences among those likely to have a criminal record, a policy of banning applicants with criminal records disproportionately disadvantages African Americans and Latinos relative to whites. Ex. 23 (Parnell Report) at 8,11; Ex. 51 (Parnell Dec.) at ¶¶ 7-17. He finds that the disproportionality and statistical significance

---

[10] The table included with Dr. Parnell's Supplemental Report is the corrected version, produced to Defendants on March 8, 2016. The corrections were minimal and rectified a scrivener's error.

persist regardless of which of the four applicant pools and seven income scenarios are considered.  Ex. 23 (Parnell Report) at 10-13; Ex. 24 (Parnell Supp. Report) at 8 and 14; Ex. 51 (Parnell Dec.) at ¶¶ 11-17.

244.    In addition, as Dr. Parnell noted in his deposition, documents subpoenaed by Defendants from the New York City Department of City Planning show that a single Census Block is made up exclusively of Sand Castle tenants (Block 2002, Census Tract 1010.02).  Ex. 55 at Dept of Planning 0002; Ex. 8 (Parnell Dep.) at 334:17-335:17; Ex. 71 (Defs' Letter Motion for Discovery, Dkt. 75), at 9 n.2.

245.    The Sand Castle's Census Block contains 1,111 people: 473 whites (42.6%); 415 (37.6%) African Americans; and 165 (14.9%) Latinos.  Ex. 55 at Dept of Planning 0002; Ex. 8 (Parnell Dep.) at 336:22-338:21.

246.    The 11691 zip code, which is where The Sand Castle is located, contains 62,577 people: 13,849 (22.1%) whites; 27,741 (44.3%) African Americans; and 17,701 (28.2%) Latinos. Ex. 55 at Dept of Planning 0003.

247.    The Sand Castle's white population is nearly double that of the immediate surrounding area.  Ex. 8 (Parnell Dep.) at 204:10-16; 344:16-20.

248.    The methodology used by Dr. Parnell to measure statistical significance in the proportions at issue is "widely used" in the field.  Ex. 8 (Parnell Dep.) at 266:2-18.

249.    Defendants' expert, Welsch, does not dispute any of Dr. Parnell's substantive findings or methodology. Ex. 12 (Welsch Dep.) at 93:15- 94:11, 96:24-97:15, 98:16-18, 99:4-24; 108:10-23; 111:11-22, 115:25-116:3, 116:14-117:10. Welsch does not dispute the validity of Dr. Parnell's housing market analysis; does not dispute whether Dr. Parnell correctly measured racial disparities in the market through use of the Z-Tests; and did not conduct any analysis of his own

or present alternative conclusions concerning either issue. Ex. 12 (Welsch Dep.) at 93:15-24, 94:8-11, 96:24-97:15, 98:16-18, 99:4-24; 107:20-22, 115:25-116:3, 116:14-117:10.

250.    Welsch "[could not] say" one way or the other whether a criminal records ban in the New York housing market would disproportionately affect minorities as compared to whites and had no opinion about racial differences in the risk of having a criminal record. Ex. 12 (Welsch Dep.) at 100:3-101:9.  On their face, Welsch's expert reports do not speak to any of these issues and contain no analysis rebutting Dr. Parnell's conclusions about the racial effects of a blanket criminal records ban. Ex. 25 (Welsch Report); Ex. 26 (Welsch Supp. Report).

251.    Welsch's primary conclusion as to Dr. Parnell is that his reports "contain[] no evidence that 'differences in cumulative incarceration rates . . . disproportionately disadvantage African Americans and Latinos relative to whites in their ability to rent at Sandcastle Apartments.'" Ex. 25 (Welsch Report) at 2.

252.    Welsch declared in his deposition that he was not "an expert in the area of disparate impact in housing;" has no experience with housing discrimination; and has never conducted an analysis assessing the effects of a neutral policy on a specified group of people. Ex. 12 (Welsch Dep.) at 32:11-13, 39:12-41:10, 43:5-13.

253.    He has no education, training, or credentials pertaining to housing issues. Ex. 12 (Welsch Dep.) at 13:7-14:13, 16:2-17:8. Welsch did not recognize that disparate impact cases require the examination of a facially neutral policy or practice and its effects. Ex. 12 (Welsch Dep.)  at 39:12-40:9, 40:22-41:10, 43:2-4.

254.    Welsch testified that his opinions were not guided by any methodology. Ex. 12 (Welsch Dep.) at 126:1-3, 8-12.

255.    Welsch did not conduct any independent data or housing market analysis. Ex. 12 (Welsch Dep.) at 92:7-25, 97:2-12, 99:7-10, 99:21-24, 115:25-116:3, 125:22-25.  Nor did he attempt to replicate, or seriously review, the data analysis of any expert. Ex. 12 (Welsch Dep.) at 85:6-8, 86:18-23, 87:4-88:4, 92:18-19, 99:4-6.

256.    Welsch did not review the sources, references, data, or other materials relied upon by Plaintiff's' experts. Ex. 25 (Welsch Report); Ex. 26 (Welsch Supp. Report); Ex. 12 (Welsch Dep.) at 56:20-57:1, 57:23-58:5, 74:5-7, 78:3-8, 78:22-79:3, 87:18-88:4, 92:3-19, 99:4-10, 97:10-12, 107:20-22, 113:1-9, 122:18-123:4, 128:23-129:5.

257.    Welsch has no professional or academic background in demography, geography, recidivism, criminal desistance, criminology, sociology, criminal justice, or social statistics, and specifically disclaimed expertise in any fields beyond labor economics and econometrics. Ex. 12 (Welsch Dep.) at 14:17-15:22, 45:9-12, 46:5-8, 16-18, 47:19-24, 48:9-24.

258.    Matters outside of personal injury, employment discrimination, medical malpractice, and wrongful death are "beyond [his] comfort zone." Ex. 12 (Welsch Dep.) at 18:16-19:2, 20:6-14.

## VII.    THERE IS NO LEGITIMATE BUSINESS JUSTIFICATION FOR THE SAND CASTLE'S CRIMINAL RECORDS POLICIES

259.    Beyond articulating the need to find "good" tenants, Defendants and their agents have not offered a rationale for communicating to members of the public that The Sand Castle does not accept people with criminal records or for the practice of denying applicants with felonies or misdemeanors. Ex. 1 (Brecher Dep.) at 84:20-85:3.

260.    Dr. Kazemian notes that recidivism statistics are often cited by those contending that most individuals who are released from prison eventually reoffend and thus pose a significant threat to public safety, but that barely a quarter of releasees were arrested for a violent

offense and that "[p]ublic order offenses" (e.g., technical violations, driving under the influence, failure to appear and obstruction of justice) constituted 58% of post-release arrest charges.  Ex. 22 (Kazemian Report) at 2.

261.    Dr. Kazemian concludes that among individuals who are released from prison and subsequently arrested, few engage in violent crime and a significant portion are arrested for merely technical violations that do not impact public safety.  Ex. 22 (Kazemian Report) at 2.

262.    Dr. Kazemian notes that for older offenders and those with less extensive criminal histories, criminal records are less predictive of future crime. Age of the offender and past offending rates are therefore an important factor in assessing the safety risk posed by a person with a criminal record.  Ex. 22 (Kazemian Report) at 3.

263.    Dr. Kazemian observes that "most offenders eventually resemble nonoffenders in terms of conviction risk" and sets forth the scientific studies showing that after approximately seven years, the future risk of offending for individuals who remain arrest-free within that period is "nearly indistinguishable from that of nonoffenders."  Ex. 22 (Kazemian Report) at 3.

264.    Dr. Kazemian further concludes that the amount of time elapsed since the last offense is an important feature of criminal histories because there is no compelling empirical evidence to suggest that old criminal records are predictive of future offending.  Ex. 22 (Kazemian Report) at 3.  There is a negative association between the number of future offenses and the time lag since the last offense. Dr. Kazemian finds that as the criminal record grows more "stale", the risk of future offending declines, and that the risk of a new crime declines significantly as the amount of time since the last offense increases.  Ex. 22 (Kazemian Report) at 4.

265.     Dr. Kazemian finds that age, the number of past crimes, and the time since the last offense are variables that must be jointly considered in order to determine whether a criminal record is predictive of future offending and whether the individual is likely to pose a threat to the community.  Ex. 22 (Kazemian Report) at 4.

266.     Dr. Kazemian determines that it is therefore unlikely that blanket decision rules based exclusively on whether someone has a criminal record will provide useful information for behavioral predictions and ultimately concludes that blanket bans indiscriminatingly targeting all individuals with a criminal record cannot be empirically justified on the basis of public safety concerns.  Ex. 22 (Kazemian Report) at 4-5.

267.     Dr. Kazemian concludes that blanket criminal record bans in housing are actually counter-productive.  She observes that this type of policy is a prime example of "stigmatizing shaming", a practice that does not support reintegration efforts and that has been found to promote offending behavior rather than deter it.  Ex. 22 (Kazemian Report) at 5.

268.     Defendants' expert, Welsch, does not dispute any of Dr. Kazemian's substantive findings. Ex. 12 (Welsch Dep.) at 64:20-66:21, 67:11, 68:7-10, 69:13-71:7, 74:8-11. Welsch does not dispute her conclusions about the relationship between public safety and criminal records bans, nor does he dispute any aspect of Dr. Kazemian's analysis, including her findings concerning the lower risk of recidivism over time. Ex. 12 (Welsch Dep.) at 64:20-66:19, 67:7-68:10, 69:13-71:7, 74:8-11.

269.     Welsch's expert reports devote only a single sentence to his conclusions regarding Dr. Kazemian's report; Welsch's sole conclusion is that it "contains no evidence that 'the type of blanket ban adopted at Sandcastle is detrimental to public safety.'" Ex. 25 (Welsch Report) at 2; Ex. 26 (Welsch Supp. Report); Ex. 12 (Welsch Dep.) at 57:2-18, 59:7-60:3.

51

270.     Welsch testified that Dr. Kazemian's report was "in a field beyond [his] expertise" and acknowledged that he is "not qualified" to opine about criminal records policies or the relationship between recidivism and public safety. Ex. 12 (Welsch Dep.) at 66:18-67:18, 126:17-127:10.

271.     Individualized consideration of applicants with criminal records is a less discriminatory alternative that also would allow The Sand Castle to maintain the safety of building residents and property.  Ex. 22 (Kazemian Report) at 4; Ex. 20 (Page Dec.) at ¶¶ 5-7, 17.

272.     A substantial proportion of African-American and Latino applicants with criminal records can survive, and have survived, a landlord's individualized review and ultimately obtained housing in the greater New York City area.  Ex. 20 (Page Dec.) at ¶ 15.

273.     In her capacity as Fortune Society President and CEO, JoAnne Page has observed hundreds of current and former Fortune employees—almost exclusively black and/or Latino— who, despite their felony records, have become successful tenants and homeowners.  These are individuals who would have otherwise been denied housing under a blanket ban policy.  Ex. 20 (Page Dec.) at ¶ 15.

274.     There are many Fortune clients with positive track records and receiving holistic services who could pass an individualized review that took into account mitigating circumstances.  Fortune has placed hundreds of clients into private apartment buildings throughout the City and the vast majority have remained in their housing without incident, including four individuals placed at The Sand Castle in May 2013 in Fortune-leased units.  Ex. 20 (Page Dec.) at ¶¶ 15-18; Ex. 70 at DEF018267-85.

275. Fortune's employees who have found housing on the private market are contributing members of society. Ex. 20 (Page Dec.) at ¶¶ 17.

276. These clients and Fortune employees have not posed a safety risk or a financial risk to their landlords. Ex. 20 (Page Dec.) at ¶¶ 17-18.

277. Page has increasingly observed states and municipalities treating individualized review as a best practice in the housing industry, including in New York. Ex. 20 (Page Dec. at ¶ 6).

## VIII.   DEFENDANTS REFUSED TO RENT APARTMENTS TO THE FORTUNE SOCIETY BECAUSE OF THEIR CRIMINAL RECORDS POLICIES

278. In 2013, Fortune received a housing assistance grant from New York State providing funding for 25 residential units to be specifically located in Queens. Ex. 17 (Declaration of Kevin Carter ("Carter Dec.")) at ¶ 3.

279. In the course of attempting to place clients using this funding, Fortune reached out to The Sand Castle. Ex. 17 (Carter Dec.) at ¶¶ 3-4; Ex. 56.

280. Fortune leased four units in The Sand Castle in May 2013, in its own name. Ex. 70 at DEF018267-85.

281. Fortune obtained these units through a broker, Renee Bueller, who was owner and chairman of the L.E.S. Group, Inc. Ex. 17 (Carter Dec.) at ¶ 4; Ex. 56 at PL000844-47 Ex. 64; Ex. 65 at PL000892-94; Ex. 66 ; Ex. 68 at PL000909-11; Ex. 69 at PL000913-14; Ex. 70 at DEF0018267, DEF0018271, DEF018278, and DEF018282.

282. The Sand Castle did not know or ask for the identities of Fortune's clients who moved into the complex, and thus, did not conduct criminal background checks on these individuals. Ex. 70 at DEF0018267, DEF0018271, DEF018278, and DEF018282; Ex. 58 (Declaration of Jeffrey Schroeder ("Schroeder Dec.") at Ex. 1 (Recording of Calls Between

Fortune Society and Sruly Tress ("Call Transcript")) 3:12-13; Ex. 63; Ex. 10 (Tress Dep.) at
179:20-23; Ex. 5 (Goldstein Dep.) at 74:5-12; Ex. 3 (Forrest Dep.) at 111:12-16.

283.    The Sand Castle had accepted non-Fortune tenants sent by Bueller and L.E.S. on
previous occasions.  Ex. 4 (Ginzberg Dep.) at 116:18-117:18; Ex. 5 (Goldstein Dep.) at 67:12-
24, 68:8-69:1.  Sand Castle staff understood that applicants referred by Bueller were supported
by non-profit programs and regarded such applicants as a "good source of income."  Ex. 5
(Goldstein Dep.) at 68:23-69:21.

284.    While Sand Castle staff were aware that those referred by Bueller were program
participants, they did not know the nature of the client populations served by the programs.  Ex.
5 (Goldstein Dep.) at 68:17-69:19, 76:3-21.  Bueller represented to Defendants that the
applicants she referred were either from a FEMA-funded program or from programs for the
homeless.  Ex. 4 (Ginzberg Dep.) at 119:23-120:16; Ex. 59 at DEF000235-36.  Sand Castle
personnel understood that applicants and potential applicants referred by Bueller were from such
programs.  Ex. 4 (Ginzberg Dep.) at 118:13-119:22.

285.    An agent or employee of Defendants stated that Bueller misrepresented Fortune's
mission and purpose to The Sand Castle.  Specifically, Bueller told Defendants that Fortune was
an organization that assisted Hurricane Sandy victims.  Ex. 17 (Carter Dec.) at ¶ 5.

286.    In the summer of 2013 and again in March 2014, Fortune tried to rent additional
apartments for its clients at The Sand Castle under one of its scattered-site programs that
required that apartments be located in Queens. Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at
¶ 5; Ex. 17 (Carter Dec.) at ¶¶ 6-10.

287.     Fortune identified The Sand Castle as an ideal choice for its clients because of its location in Queens, accessibility to public transportation, and the complex's many amenities. Ex. 17 (Carter Dec.) at ¶ 3.

288.     Formerly senior housing, The Sand Castle features a doorman and is equipped with medical facilities, a grocery store, beach access, and a Jewish community center; it is also convenient to public transportation relied upon by Fortune's clients.  Ex. 29 (Defs' Answer to Am. Compl., Dkt. 37) at ¶ 25; Ex. 10 (Tress Dep. at 60:12-61:8; Ex. 6 (Gursky Dep.) at 112:1-11; Ex. 77 at DEF000209-10; Ex. 17 (Carter Dec.) at ¶ 3.

289.     The Sand Castle's units are within Fortune's price range, with studios starting at $950.  Ex. 60 at DEF013234; Ex. 10 (Tress Dep.) at 119:19-120:2; Ex. 17 (Carter Dec.) at ¶ 3.

290.     In or around June 2013, Fortune employee Camille Morrison called The Sand Castle to inquire about housing for Fortune's clients and spoke to Melissa Gurksy.  Ex. 19 (Declaration of Camille Morrison ("Morrison Dec.")) at ¶¶ 3-4; Ex. 34 (Def. Weissman Realty's Interrogatory Responses) at ¶ 14; Ex. 19 (Morrison Dec.) at ¶ 4.

291.     Morrison explained to Gursky that Fortune sought housing at The Sand Castle for its clients, who were all formerly incarcerated persons.  Gursky told Morrison that The Sand Castle does not rent to ex-offenders.  Ex. 19 (Morrison Dec.) at ¶ 4.

292.     In July 2013, Fortune's housing specialist, Kevin Carter, visited the Sand Castle and inquired about renting apartments for Fortune clients.  The Sand Castle agent or employee with whom Carter spoke told him that he had to make his request to another person associated with The Sand Castle and gave him a telephone number to call for that purpose.  Ex. 17 (Carter Dec.) at ¶ 6.

293.     Carter later called the phone number and spoke to an employee or agent of Defendants.  In the conversation with this person, Carter explained Fortune's reentry mission and the fact that all of its clients had criminal records.  Defendants' employee or agent responded that The Sand Castle did not allow "ex-offenders" to rent at the property.  Ex. 17 (Carter Dec.) at ¶ 7.

294.     After Carter stated that such a practice appeared to be discriminatory, the Sand Castle employee repeated that the building does not accept formerly incarcerated individuals as residents.  Ex. 17 (Carter Dec.) at ¶ 8.

295.     On March 24, 2014, Carter and Fortune's president, JoAnne Page, called The Sand Castle together to inquire about the possibility of Fortune renting apartments.  Carter and Page spoke to Tress, the complex manager.  Ex. 58 (Schroeder Dec.) at Ex. 1 (Call Transcript) 1:2-3, 2:18-6:29; Ex. 63.

296.     Page explained Fortune's mission to Tress and that Fortune served people who were formerly incarcerated.  Tress asked: "most people coming from you . . . have criminal records, do you mean?"  Page responded: "all of the people who come to us because that's what we do, but as I said, we screen people very carefully before sending them."  Ex. 58 (Schroeder Dec.) at Ex. 1 (Call Transcript) 4:21-23; Ex. 63.

297.     Tress stated that "criminal history, or something like that, does scare us," and that it is a "red flag."  Ex. 58 (Schroeder Dec.) at Ex. 1 (Call Transcript) 5:30-31; Ex. 17 (Carter Dec.) at ¶¶ 9-10; Ex. 63.

298.     After this phone call, Tress conferred with someone who he referred to as his "boss" at The Sand Castle about Fortune's request to rent additional apartments.  Ex. 10 (Tress Dep.) at 220:14-20, 223:5-13; Ex. 63; Ex. 58 (Schroeder Dec.) at Ex. 1 (Call Transcript) 7:4.

299.     Tress later called Carter back and told him that The Sand Castle could not rent to Fortune. Ex. 58 (Schroeder Dec.) at Ex. 1 (Call Transcript) 7:4-11; Ex. 17 (Carter Dec.) at ¶ 10; Ex. 63.

300.     Tress stated to Carter that The Sand Castle was "not dealing with that many vacancies or anything like that" and that renting to Fortune was "not something that we'd be interested in right now."  Ex. 58 (Schroeder Dec.) at Ex. 1 (Call Transcript) 7:4-6.  Carter responded: "well I'm confused -- if we . . . give it support, and -- our rent is paid, and our clients aren't giving problems, I'm trying to understand your boss so that I can try to satisfy him."  Ex. 58 (Schroeder Dec.) at Ex. 1 (Call Transcript) 7:7-8. To which Tress responded: "I don't think it's anything like that. It's just like right now, he says, you know, he'd rather leave some open, or something like that, you know, cause at this moment, he's not, uh, interested."  Ex. 58 (Schroeder Dec.) at Ex. 1 (Call Transcript) 7:9-11; Ex. 63.

## IX.   VACANCIES AT THE SAND CASTLE

301.     As of February 28, 2014, The Sand Castle had a total of 72 vacancies.  Ex. 1 (Brecher Dep.) at 111:24-112:25; Ex. 61 at DEF000354.

302.     As of March 31, 2014, The Sand Castle had a total of 76 vacancies.  Ex. 61 at DEF000350; Ex. 10 (Tress Dep.) at 226:20-25.

303.     As of April 30, 2014, The Sand Castle had a total of 75 vacancies. Ex. 61 at DEF000346; Ex. 10 (Tress Dep.) at 226:11-19.

304.     There was no period in 2014 when The Sand Castle did not have vacancies.  Ex. 4 (Ginzberg Dep.) at 98:12-99:1; Ex. 2 (Campbell Dep.) at 96:15-18; Ex. 14 (Campbell *Marcano* Dep.) at 40:23-41:5, 42:23-43:2.

305.    Since at least 2010, the Sand Castle has consistently had vacancies and the complex has never been at 100% occupancy.  Ex. 4 (Ginzberg Dep.) at 98:12-99:1; Ex. 10 (Tress Dep.) at 114:5-9; Ex. 2 (Campbell Dep.) at 96:15-18.

306.    The average rate of vacancy throughout 2013 was 60 units per month.  Ex. 10 (Tress Dep.) at 113:14-114:4.

307.    Management acknowledges that under ideal circumstances The Sand Castle would be fully occupied.  Ex. 10 (Tress. Dep.) at 115:13-116:1; Ex. 4 (Ginzberg Dep.) at 99:15-20.

308.    One of Ginzberg's priorities has been to lower the number of vacancies at The Sand Castle.  Ex. 10 (Tress Dep.) at 115:8-12.  Sand Castle staff are constantly trying to fill more units with tenants.  Ex. 10 (Tress Dep.) at 113:11-13; Ex. 3 (Forrest Dep.) at 68:4-12; Ex. 2 (Campbell Dep.) at 96:1-4.

309.    The goal of filling units is a constant feature of the job in the complex's front office and ownership has reminded staff of the need to bring in and retain tenants.  Ex. 10 (Tress Dep.) at 113:11-13, 115:8-12; Ex. 3 (Forrest Dep.) at 66:24-67:13, 68:4-12.

310.    The majority, specifically 56%, of The Sand Castle's 917 units are studios, and most of the vacancies are studios.  Ex. 11 (Weissman Dep.) at 35:21-23; Ex. 10 (Tress Dep.) at 114:17-20; Ex. 2 (Campbell Dep.) at 95:5-12; Ginzberg Dep. at 32:16-22.

311.    Fortune was primarily, if not exclusively, interested in studio apartments for any clients at The Sand Castle.  Ex. 17 (Carter Dec.) at ¶ 4.

312.    After The Sand Castle refused further units to Fortune, Fortune and its staff expended substantial additional time and money to locate alternative housing, time and resources that otherwise would have been spent pursuing other organizational objectives.  Carter spent

58

nearly 50 hours per month for more than a year to find housing for 20 clients who otherwise would have been placed at the complex and Fortune hired an additional staff member for the specific purpose of locating housing for those specific clients.  Ex. 17 (Carter Dec.) at ¶ 11.

313.    Fortune was prepared to place at the complex at least 20 clients for approximately $1000 per month per unit.  Ex. 56 at PL000844-47; Ex. 65.  Upon Defendants' refusal to rent, these clients were placed in alternative housing at greater monthly cost to Fortune; Fortune also incurred brokers' fees for these units that it would not have had to pay otherwise.  Ex. 17 (Carter Dec.) at ¶ 11.

314.    Page also spent multiple hours of her own time addressing issues related to The Sand Castle's refusal to rent.  Ex. 20 (Page Dec.) at ¶ 12.

315.    Fortune has an ongoing need for more units and continues to incur costs as a result of not being able to place clients at The Sand Castle.  Ex. 17 (Carter Dec.) at ¶ 11; *see* paragraphs 9-10.

Dated: August 12, 2016                        Respectfully submitted,

                                              /s/ Ryan C. Downer
                                              Ryan C. Downer (RD3249)
                                              Margaret Burgess, admitted *pro hac vice*
                                              John P. Relman, admitted *pro hac vice*
                                              Glenn Schlactus, admitted *pro hac vice*
                                              Jia Cobb, admitted *pro hac vice*
                                              RELMAN, DANE & COLFAX, PLLC
                                              1225 19th St., NW, Suite 600
                                              Washington, D.C. 20036-2456
                                              Tel: 202-728-1888
                                              Fax: 202-728-0848
                                              E-mail: rdowner@relmanlaw.com
                                              mburgess@relmanlaw.com
                                              jrelman@relmanlaw.com
                                              gschlactus@relmanlaw.com
                                              jcobb@relmanlaw.com

                                              *Attorneys for Plaintiff*