**EXHIBIT**

**22**

Expert Report
Lila Kazemian, Ph.D.
John Jay College of Criminal Justice, City University of New York

Civil Action No. 1:14-cv-6410

THE FORTUNE SOCIETY, INC.

v.

SANDCASTLE TOWERS HOUSING DEVELOPMENT FUND CORP., SARASOTA
GOLD LLC, E & M ASSOCIATES LLC, and WEISSMAN REALTY GROUP LLC

This report presents evidence from social science research to assess the public safety risk posed by individuals with criminal histories. The relevant empirical literature demonstrates in three fundamental ways that blanket policies banning all individuals with a criminal record from access to affordable housing are not justified by public safety concerns and may actually increase the risk of reoffending by creating significant barriers to a successful reintegration into the community.

1.  **Given American criminal justice trends over the course of the past decades, it cannot be assumed that individuals with a criminal record pose a significant threat to the community.**

The United States is the world leader in incarceration with approximately 2.2 million people incarcerated in the nation's state and federal prisons and jails; these figures reflect a nearly 500% increase in the incarceration rate during the past three decades (National Research Council, 2014). It has been estimated that one in every 31 adults in the United States is under correctional control; this rate is much higher among African Americans (one in every 11 African American is under correctional control; The Pew Center on the States, 2009).

The dramatic increases in the number of individuals incarcerated, the length of imposed sentences and the average time served by prisoners in the United States since the mid-1970s is a result of tough-on-crime policies (i.e., Three-Strikes legislation, "truth-in-sentencing" policies, and a reduced or delayed recourse to parole; The Pew Center on the States, 2012). These laws disproportionately affected racial minorities, especially the poorest, and led to racially disparate sentencing practices, resulting in the notable over-representation of African American and Hispanic individuals in the criminal justice system (Blumstein, 2004; National Research Council, 2014).

It is important to highlight that incarceration rates continued to increase in the United States despite declining crime rates during the last two decades, a decline that was particularly noteworthy in New York City (Rosenfeld, Terry and Chauhan, 2014; Zimring, 2012). Drawing on data from the FBI and the NYPD over approximately 20 years from 1985 onwards, Zimring (2012) reported that the crime rate per 100,000 population in New York declined by 82% for homicide, 77% for rape, 84% for robbery, and 67% for assault. The increasingly punitive trend observed in New York and in other states, illustrated by higher incarceration rates despite falling crime rates, suggests that the historically unprecedented number of individuals with a criminal record is not a result of a rise in crime or violence rates. In other words, a criminal record does not necessarily imply persistent or violent offending (see the conclusions set forth in paragraphs 81 and 88 of the amended complaint in this matter).

Recidivism statistics are often cited to make the argument that most individuals who are released from prison eventually reoffend and thus pose a significant threat to public safety. While official statistics released by the New York State Department of Corrections and Community Supervision (DOCCS) show that 41.5% of inmates released in 2010 returned to custody within three years, 78% of these returns occurred as a result of a violation of the rules of parole (Kim, 2014), otherwise known as "technical violations", which include breaking curfew, changing residence without permission, or missing an appointment with a parole officer. Similar trends were observed for the

aggregated release cohort between 1985 and 2010 (41.4% of released inmates returned to custody, with nearly two-thirds, or 64%, occurring as a result of parole violations). With the exception of some fluctuations in the late 1980s, the total return-to-custody rate has remained relatively stable in New York State at about 40% over the course of the past 30 years. However, since 1990, the return-to-custody rates for a new felony conviction have been on the decline, and the return rates for parole violations have generally been on the rise (Kim, 2014: Figure 2).

A study published by the Bureau of Justice Statistics, drawing on the population of prisoners released in 2005 in 30 states, found similar results regarding arrest trends over a 5-year follow-up period (Durose et al., 2014). Less than one third (28.6%) of prisoners released in 2005 were arrested for a violent offense. "Public order offenses" (such as technical violations or driving under the influence) were by far the most frequent post-release arrest charge, with 58% of all released prisoners who were arrested for such offenses. Approximately 1 in 4 (25.3%) released prisoners were arrested for a violation of the conditions of post-release parole supervision or community supervision. Another 39.9% were arrested for "other public order offenses," such as the failure to appear or obstruction of justice, "which in some jurisdictions may be the legal response to probation or parole violations" (Durose et al., 2014, p. 9).

Overall, these figures suggest that among individuals who are released from prison and subsequently arrested, few engage in violent crime and a significant portion are arrested for merely technical violations that do not impact public safety.

The racial disparities in the criminal justice system have been noted by many analysts and scholars (National Research Council, 2014). Racial minorities (particularly African American and Hispanic males) are more likely to be arrested than White males, more likely to be convicted when arrested, and more likely to face harsh sentences when convicted (Nellis, 2013). The source of these disparities may not be explicit, but rather linked to the distinct criminal justice experiences of poor and minority defendants, which may lead to discriminatory outcomes. For instance, Wooldredge et al. (2015) found that the higher pretrial detention rate of African American defendants (especially young males) indirectly led to less desirable sentencing outcomes, suggesting disproportionate cumulative disadvantage for this group throughout the various stages of the criminal justice process.

Importantly, while racial differences in arrests corresponded with racial disparities in incarceration in the 1980s and 1990s, at least for serious violent crimes, this has no longer been the case in the 2000s. A systematic review conducted by a panel of prominent experts concluded that "relative to arrest patterns, racial disparities in imprisonment became much worse in the twenty-first century" when compared to previous decades (National Research Council, 2014, p. 96). This observation suggests that the higher rate of incarceration of minorities is not a result of increased offending (measured through arrests) by individuals belonging to these groups.

These conclusions are consistent with the statistics and conclusions set forth in paragraphs 75 through 90 of the amended complaint in this matter. I have reviewed these paragraphs and the material cited in support of the arguments. In my opinion, these paragraphs are both accurate and based on sound and credible official statistics and research in my field of expertise. A copy of these paragraphs is attached as Exhibit 1.

To summarize, sentencing policies adopted in the United States in recent decades have resulted in a greater number of African American and Hispanic males with a criminal record, who may have otherwise avoided such records if they were not part of a minority group. Banning individuals with a criminal record from securing safe and affordable housing has a disproportionately adverse effect on African American and Latinos males.

**2.  Not all criminal records are equal. Criminal histories have a diminished ability to accurately predict offending behavior over time.**

Researchers have explored the impact of various features of criminal histories on subsequent offending outcomes. Two points are noteworthy.

First, given the ubiquitous decline in offending that occurs as individuals get older (Farrington, 1986; Hirschi and Gottfredson, 1983; Sampson and Laub, 1993), the impact of age on future risks of offending cannot be overstated. Bushway and Piehl (2007) argued that assessments of risk based on the number of past offenses must take into account the age of individuals. Because older individuals have more time to commit more offenses, it is unsurprising that they are more likely to have an extensive criminal history when compared to their younger counterparts. For instance, Bushway and Piehl argued that two individuals, one who is 25 years old and the other who is 35 years old, with identical current offenses and criminal histories, may not pose the same level of risk or blameworthiness. The younger individual has committed the same number of offenses within a shorter time frame, thus offending at a higher rate. These observations prompted Bushway and Piehl (2007, p. 156) to conclude that "two people of different ages with the same criminal history are not in fact equal".

In a later study, Bushway et al. (2011, p. 52) argued that "most offenders eventually resemble nonoffenders in terms of their conviction risk", although the amount of time required for these two groups to become indistinguishable varies with the age at the time of conviction and the number of prior convictions. For older offenders and those with less extensive criminal histories, criminal records are less predictive of future crime. This point highlights the meaningful role of age and consequently, past offending *rates* (as opposed to the number of past offenses), in assessments of risk based on criminal history.

Second, and relatedly, the amount of time elapsed since the last offense is an important feature of criminal histories. There is no compelling empirical evidence to suggest that old criminal records are predictive of future offending.

Kurlychek et al. (2006; 2007) estimated that the future arrest risk of individuals who remain arrest-free for approximately 7 years becomes nearly indistinguishable from that of nonoffenders. While this specific figure should not be used as a guideline for policy, namely because exact estimates vary across different studies and samples, other studies that have explored this issue have reached a similar conclusion. Blumstein and Nakamura (2009) also concluded that the risk of reoffending, and thus the threat to public safety, declined with time 'clean'. Using longitudinal conviction data up to age 40, Kazemian and Farrington (2006) found a negative association between the number

3

of future offenses and the time lag since the last offense. <u>All of these results suggest that as the criminal record grows more 'stale', the risk of future offending declines</u>.

In short, one consistent finding emerges from this body of research: <u>it is important to consider the recency of past crimes in order to determine whether an individual with a criminal record poses a threat to public safety. The risk of a new crime declines significantly as the amount of time since the last offense increases</u>, and "a recent criminal record seems to be far more predictive of short-term future behavior than older criminal records from many years ago" (Kurlychek et al., 2007, p. 80).

In a similar vein, <u>the risk of reoffending is highest shortly after release from prison and gradually declines thereafter</u>. The BJS data on prisoners released in 30 states in 2005 clearly show that "the longer released prisoners went without being arrested, the less likely they were to be arrested within the 5-year period" (Durose et al., 2014, p. 7). Similar trends have been observed in the return-to-custody rates of New York State inmates released in 2010 (Kim, 2014). <u>The inability to secure housing and employment, as well as the absence of a support network in the community, are important factors contributing to the higher risks of offending immediately upon release</u>.

<u>It should also be noted that the severity of prior convictions is a poor indicator of future risk</u>. For instance, in a national sample including 30 states, it was found that individuals convicted of person offenses tend to have lower arrest rates upon release when compared to those convicted of property offenses (Durose et al., 2014). Similar trends emerged in analyses of return-to-custody rates in New York (Kim, 2014).

<u>To summarize, the extant empirical research has demonstrated that blanket bans indiscriminatingly targeting all individuals with a criminal record cannot be justified on the basis of public safety concerns. Age, the number of past crimes, and the time since the last offense are variables that must be jointly considered in order to determine whether a criminal record is predictive of future offending and whether the individual is likely to pose a threat to the community.</u>

### 3. The inability to secure safe and affordable housing constitutes a major barrier to prisoner reentry and increases the risk of reoffending.

<u>Formerly incarcerated individuals face significant challenges upon their return to the community, and housing is one of the most crucial barriers to a successful reintegration</u>. Stable housing is widely recognized as an integral component of personal and family well-being (Bratt, 2001; Lee, Tyler, and Wright 2010; Visher and Courtney, 2007). <u>The ability to secure housing after release has been associated with lower rates of recidivism</u> (Makarios, Steiner, and Travis, 2010; Petersilia, 2009). As a result of local, state, and federal policies, returning offenders face multiple barriers in seeking housing (Geller and Curtis 2011). Incarceration can lead to the dissolution of social networks, which may in turn result in homelessness after release (Gowan, 2002). Geller and Curtis (2011) found that individuals with a history of incarceration were twice as likely to face housing insecurity, and this was particularly true for individuals who had been recently incarcerated.

<u>Access to housing also impacts other barriers to a successful reintegration into the community after prison</u>. Housing security is a key factor in both securing and maintaining employment (Bradley et

4

al. 2001). Housing provides an environment where the individual can reconnect with his/her family after a prison sentence. One of the major challenges facing formerly incarcerated individuals is the attempt to reconnect with family members upon release, especially after lengthy periods of incarceration (Hairston, 2003; Richie, 2001). Returning prisoners who report a strong social network and more positive family relationships have been found to be less likely to reoffend (Hairston, 2003; Sullivan, Mino, Nelson, & Pope, 2002; Visher & Courtney, 2007).

The impact of a criminal record on reintegration efforts appears to be much more substantial for African Americans. Pager (2003) found that the likelihood of securing employment was lower among black males *without* a criminal record (14%) than among white males *with* a criminal record (17%). White males without a criminal record were most likely to be called back by employers (30% of cases), whereas black males with a criminal record were least likely to be called back (5% of cases). These findings suggest the existence of heavier barriers to community reintegration for racial minorities after release from prison when compared to their non-minority counterparts.

The stigmatizing impact of a criminal record, as well as its negative effects on offending behavior, has been well documented. The stigma of a criminal history persists despite the nature, intensity, or recency of past offenses. It blocks access to adequate employment opportunities, thus increasing the odds of reoffending (National Research Council, 2014). Blanket policies banning access to safe and affordable housing for individuals with a criminal record have damaging effects on efforts to reintegrate into the community after release from prison. This type of policy is a prime example of 'stigmatizing shaming', a practice that does not support reintegration efforts and that has been found to promote offending behavior rather than deter it (Braithwaite, 1989).


**CONCLUSION: There is no empirical basis to justify the recourse to blanket bans against all individuals with a criminal record. This type of policy is not only failing to promote public safety, it is actually detrimental to it and increases the likelihood of reoffending among formerly incarcerated individuals by creating substantial barriers to a successful community reintegration.**

Not all criminal records are equal. The existence of a criminal record alone is not sufficient to predict the level of risk posed by an individual's to the community. A host of factors need to be considered to determine whether a criminal record constitutes an adequate predictor of the level of threat posed to the community. The most salient factors emerging from criminological research include age, time elapsed since the last conviction, the number of prior convictions, and the strength of the support network upon release. Kurlychek et al. (2007, p. 80) concluded that it is unlikely that "blanket decision rules based exclusively on whether someone has a criminal record will provide useful information for behavioral predictions".

Given the substantial obstacles faced by formerly incarcerated individuals upon release from prison, and the pivotal role of housing in this transition, the type of blanket ban adopted at the Sand Castle is detrimental to public safety. By blocking access to housing for formerly incarcerated individuals, this type of policy increases the likelihood of reoffending and further harm to the community. Moreover, these policies disproportionately and adversely impact African Americans and Latinos.

in various peer-reviewed journals, including the Journal of Quantitative Criminology, the Journal of Research in Crime and Delinquency, Punishment & Society, and the European Journal of Criminology.

My *curriculum vitae* is attached as Exhibit 2. It identifies all publications that I have authored in the past 10 years.

I have not testified as an expert at trial or by deposition in any other case in the previous 4 years.

## Compensation

I am being compensated at the rate of $65 per hour for my report and testimony in this case.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


_____

Signature

Lila Kazemian

June 30, 2015

# References

Blumstein, A. (2004). Restoring rationality in punishment policy. In M. Tonry (Ed.), *The future of imprisonment* (pp. 61-80). New York: Oxford University Press.

Blumstein, A. & Nakamura, K. (2009). Redemption in the presence of widespread criminal background checks. *Criminology*, *47*, 327–60.

Braithwaite, J. (1989). *Crime, shame and reintegration*. Cambridge, UK: Cambridge University Press.

Bratt, R.G. (2002). Housing and family well-being. *Housing Studies*, *17(1)*, 13–26.

Bushway, S. D., & Piehl, A. M. (2007). The inextricable link between age and criminal history in sentencing. *Crime and Delinquency, 53(1)*, 156-183.

Bushway, S.D., Nieuwbeerta, P. & Blokland, A. (2011). The predictive value of criminal background checks: Do age and criminal history affect time to redemption?" *Criminology*, *49(1)*, 27-60.

Durose, M. R., Cooper, A.D. & Snyder, H.N. (2014). *Recidivism of prisoners released in 30 states in 2005: Patterns from 2005 to 2010*. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics.

Farrington, D. P. (1986). Age and crime. In M. Tonry & N. Morris (Eds.), *Crime and justice: An annual review of research* (Vol. 7, pp. 189-250). Chicago: University of Chicago Press.

Geller, A. & Curtis, M.A. (2011). A sort of homecoming: Incarceration and the housing security of urban men. *Social Science Research*, *40(4)*, 1196–1213.

Gowan, T. (2002). The nexus: Homelessness and incarceration in two American cities. *Ethnography*, *3(4)*, 500–534.

Hairston, C.F. (1998). The forgotten parent: Understanding the forces that influence incarcerated fathers' relationships with their children. *Child Welfare, 77(5)*, 617-639.

Hirschi, T., & Gottfredson, M. R. (1983). Age and explanation of crime. *American Journal of Sociology, 89*, 552-584.

Kazemian, L., & Farrington, D. P. (2006). Exploring residual career length and residual number of offenses for two generations of repeat offenders. *Journal of Research in Crime and Delinquency, 43(1)*, 89-113.

Kim, R.H. (2014). *2010 inmate releases: Three year post release follow-up*. New York: State of New York Department of Corrections and Community Supervision.

Kurlychek, M.C., Brame, R. & Bushway, S.D. (2006). Scarlet letters and recidivism: Does an old criminal record predict future offending? *Criminology & Public Policy*, *5*, 483–522.

Kurlychek, M.C., Brame, R. & Bushway, S.D. (2007). Enduring risk: Old criminal records and prediction of future criminal involvement. *Crime and Delinquency*, *53*, 64–83.

Lee, B.A., Tyler, K.A. & Wright, J.D. (2010). The new homelessness revisited. *Annual Review of Sociology*, *36(1)*, 501–521.

Makarios, M., Steiner, B. & Travis, L.F. (2010). Examining the predictors of recidivism among men and women released From prison in Ohio. *Criminal Justice and Behavior*, *37(12)*, 1377-1391.

National Research Council (2014). *The growth of incarceration in the United States: Exploring causes and consequences*. Committee on causes and Consequences of High Rates of incarceration, Jeremy Travis, Bruce Western, and Steve Redburn, Editors. Committee on Law and Justice, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

Nellis, A. (2013). *Life goes on: The historic rise in life sentences in America*. Washington, DC: The Sentencing Project.

Pager, D. (2003). The mark of a criminal record. *American Journal of Sociology*, *108*, 937-975.

Petersilia, J. (2009). *When prisoners come home: Parole and prisoner reentry*. New York: Oxford University Press.

Richie, B. E. (2001). Challenges incarcerated women face as they return to their communities: Findings from life history interviews. *Crime and Delinquency, 47*(3), 368-389.

Rosenfeld, R., Terry, K.J. & Chauhan, P. (2014) New York's Crime Drop Puzzle: Introduction to the Special Issue. *Justice Quarterly*, *31(1)*, 1-4.

Sampson, R. J., & Laub, J. H. (1993). *Crime in the making: Pathways and turning points through life*. Cambridge, MA: Harvard University Press.

Sullivan, E., Mino, M., Nelson, K., & Pope, J. (2002). *Families as a resource in recovery from drug abuse: An evaluation of La Bodega de la Familia*. New York: Vera Institute of Justice.

The Pew Center on the States. (2012). *Time served: The high cost, low return of longer prison terms*. Washington, DC: The Pew Center on the States.

The Pew Center on the States. (2009). *One in 31: The long reach of American corrections*. Washington, D.C.: Pew Center on the States.

Visher, C. & Courtney, S.M.E. (2007). *One year out: Experiences of prisoners returning to Cleveland*. Washington, D.C.: The Urban Institute.

Wooldredge, J., Frank, J., Goulette, N. & Travis III, L. (in press). Is the impact of cumulative disadvantage on sentencing greater for Black defendants? *Criminology & Public Policy*.

Zimring, F.E. (2012). *The city that became safe: New York's lessons for urban crime and its control*. New York: Oxford University Press.

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE FORTUNE SOCIETY, INC.<br>29-76 Northern Blvd<br>Long Island City, NY 11101<br><br>       Plaintiff,<br><br>   v.<br><br>SANDCASTLE TOWERS HOUSING<br>DEVELOPMENT FUND CORP.<br>1465A Flatbush Ave.<br>Brooklyn, NY 11210<br><br>SARASOTA GOLD LLC<br>1407 48th Street<br>Brooklyn, NY 11219<br><br>E & M ASSOCIATES LLC<br>1465A Flatbush Ave.<br>Brooklyn, NY 11210<br><br>    and<br><br>WEISSMAN REALTY GROUP LLC<br>45 Broadway, 12th Floor<br>New York, NY 10006<br><br>       Defendants. | Civil Action No. 1:14-cv-6410<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY DEMAND** |

## <u>NATURE OF THE ACTION</u>

1.     The Fortune Society ("Fortune") brings this suit pursuant to the Fair Housing Act

of 1968, as amended, 42 U.S.C. §§ 3601 *et seq*., for injunctive, monetary and declarative relief

against Defendants Sandcastle Towers Housing Development Fund Corporation ("HDFC"),

Sarasota Gold LLC ("Sarasota Gold"), E & M Associates LLC ("E & M"), and Weissman Realty

at which whites are disqualified.  By implementing and maintaining their blanket ban at The

Sand Castle, Defendants have been and continue to be engaged in intentional discrimination.

Defendants' ban is consistent with a policy of limiting the number of new minority tenants in the

building.

74.     Defendants have also made concerted efforts to change The Sand Castle's image

and to present it as more "upscale," including through its print and online advertising, which

prominently feature young, white men and women.  These efforts are consistent with a policy of

purposefully attracting white tenants and dissuading others from applying.

A.     **Blanket Bans in General Disproportionately and Severely Impact African Americans and Latinos at the National, State, and City Levels**

75.     Seven-hundred thousand inmates are released from confinement each year and

become new targets of blanket bans.[7]  They are disproportionately African-American and Latino

because the inmate population as a whole is disproportionately African-American and Latino,

and 95% of inmates are eventually released.[8]

76.     In New York State, more than 50% of the 25,060 inmates released in 2009 were

African-American and over 25% were Latino.[9]  Yet the State's general population is only 15.9%

African-American and 17.6% Latino.  Of the nearly 600,000 inmates released by the New York

---

[7] Ann E. Carson, and William J. Sobel, U.S. Dept. of Justice, *Prisoners in 2011*, BJS Bulletin 1 (Dec. 2012), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCMQFjAA&url=http%3A%2F%2Fwww.bjs.gov%2Fcontent%2Fpub%2Fpdf%2Fp11.pdf&ei=uUNRVOy7GpHisATtwYHQAg&usg=AFQjCNF1I0Yzt_-U9B6qCTGgbdSaYZKWvQ&sig2=RBCZAeieGV1zf4VvBijxnQ&bvm=bv.78597519,d.cWc.

[8] Devah Pager, *The Mark of a Criminal Record*, 108.5 Am. J. of Sociology 937, 957-960 (2003).

[9] *See* State of New York Dept. of Correction and Comm. Supervision, *2009 Inmate Releases: Three Year Post Follow-up* 17 (2013), http://www.doccs ny.gov/Research/Reports/2013/2009_releases_3yr_out.pdf.

22

State Department of Correction from 1985 to 2009, over half were African-American and nearly one-third were Latino.[10]

77.     Most of those released from New York State prisons – nearly two-thirds since 1985 – go to New York City to live.[11]  In 2011, New York City's own Department of Correction released 88,000 people from its disproportionately African-American and Latino inmate population.[12]  The reentering population in New York City is therefore very large as well as disproportionately minority.

78.     Unlike African Americans and Latinos, whites are incarcerated, and therefore released from jails and prisons, at rates significantly lower than their representation in the general population at the national, New York State, and New York City levels.

79.     In addition to the large number of prisoners already being released, more than 46,000 additional federal prisoners are expected to become eligible for early release over the next several years.  In April 2014, the United States Sentencing Commission voted unanimously to retroactively apply lower sentencing ranges for certain drug offenses.  This will permit prisoners currently serving under these offenses to apply for early release.  Approximately 75% of the prisoners eligible to apply are African-American or Latino.[13]

---

[10] *Id.*

[11] *Id.*

[12] New York City Dept. of Correction, *2nd Quarter Fiscal Year 2012, Oct.-Dec. Report* 2 (2012), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCAQFjAA&url=http%3A%2F% 2Fwww.nyc.gov%2Fhtml%2Fdoc%2Fdownloads%2Fpdf%2Fdoc_at_a_glance.pdf&ei=_TRRVLsxp9qwBMnjgjg& usg=AFQjCNH34hX9wdSCxjAlRM1pqa72P6EWRg&sig2=cDD3q9NfHnhJ9kjSgD-8rg&bvm=bv.78597519,d.cWc.

[13] *See* supra note 6.

80.     The sheer number of people released from prison every year has skyrocketed largely because the incarcerated population in the United States has grown from 300,000 in 1980 to more than 2.3 million today.  Approximately 10 million misdemeanor cases are filed every year.[14]  An additional 12 million people across the country have at least one felony conviction.[15] At the same time, it has become much easier and common for housing providers to identify and ban people with criminal records because of the growth of companies that provide inexpensive background checks via the Internet.

81.     The dramatic increase in the number of incarcerated people over these years is due largely to the widespread policy of pursuing non-violent drug offenders.  Non-violent drug offenses alone account for two-thirds of the rise in the federal inmate population and more than half of the rise in state prisoners between 1985 and 2000.

82.     The national prison population is now comprised overwhelmingly of individuals convicted of non-violent crimes.  As of 2010, less than 10% of the federal prison population had been convicted of a violent crime.[16]

83.     The massive increase in incarceration and in the number of people with criminal convictions has hit African Americans and Latinos especially hard.  They are incarcerated at rates significantly disproportionate to their numbers in the United States general population.

---

[14] Alexandra Natapoff, *Misdemeanors*, 85 S. CAL. L. REV. 1313 (2012).

[15] *See* supra note 8 at 938.

[16] Paul Guerino, Paige M. Harrison, and William J. Sabol, U.S. Dept. of Justice, *Prisoners in 2010*, BJS Bulletin 1 (Dec. 2011), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCMQFjAA&url=http%3A%2F%2Fwww.bjs.gov%2Fcontent%2Fpub%2Fpdf%2Fp10.pdf&ei=sjZRVPOEK-_8sASRg4GACA&usg=AFQjCNEPKwaNRy9ORMlSwxCPr3ax_dIvGA&sig2=NCZDIUCD69T-y-2raD44NA&bvm=bv.78597519,d.cWc

Together, African Americans and Latinos comprise approximately 58% of all prisoners.[17]
However, they only make up 30% of the U.S. population.[18]

84.     Men overwhelmingly comprise the nation's inmate population and the disparities
by race are especially stark among the male population.  African Americans represent 13% of the
United States male population but over 40% of the more than two million men currently
incarcerated.  Based on national incarceration data, the U.S. Department of Justice estimates that
1 in 3 African-American men will go to prison at some point in their lifetime.  For Latino men,
the rate of expected incarceration is 1 in 6.  For white men, the figure is only 1 in 17.[19]  That is,
African-American men are six times more likely to be incarcerated than white men, and Latino
men are almost three times more likely to be incarcerated than white men.[20]

85.     The above-referenced disparities persist across categories of crime, such as drug
possession.

86.     New York State and New York City race and incarceration statistics mirror the
national data.  Of the 54,235 inmates under State custody on January 1, 2013, 49.5% were

---

[17] *See generally* NAACP, *Criminal Justice Factsheet* (2009), http://www.naacp.org/pages/criminal-justice-fact-sheet.

[18] *See* U.S. Census Bureau, *Statistical Abstract of the United States: 2012*, Table 6 (2012), http://www.census.gov/compendia/statab/2012edition html.

[19] The Sentencing Project, *Report of the Sentencing Project to the United Nations Human Rights Committee*: *Regarding Racial Disparities in the United States Criminal Justice System* 1 (Aug. 2013), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCMQFjAA&url=http%3A%2F%2Fsentencingproject.org%2Fdoc%2Fpublications%2Frd_ICCPR%2520Race%2520and%2520Justice%2520Shadow%2520Report.pdf&ei=3zdRVLmII-nasATY64AI&v6u=https%3A%2F%2Fs-v6exp1-ds.metric.gstatic.com%2Fgen_204%3Fip%3D50.242.218.113%26ts%3D1414608864553895%26auth%3Dfg6dk3vitleto2x3z4zvhqfeu6bstw25%26rndm%3D0.46951305062984383&v6s=2&v6t=2831&usg=AFQjCNH3mh3wqJlc32hwhRKt75FxmCBWrg&sig2=X1vmoYBfe_jMR-AbtEozqA&bvm=bv.78597519,d.cWc

[20] *Id.*

25

African-American and 24% were Latino.[21]  Yet the State's general population is just 15.9%

African-American and 17.6% Latino.

87.     Of the 12,386 City inmates in custody on December 31, 2012, 57% were African-

American and 33% were Latino.[22]  The City's general population, however, is only 25.5%

African-American and 28.6% Latino.

88.     Much of the disparity in New York is due to the fact that African Americans are

significantly more likely than whites to be arrested for drug-possession.[23]  For example, African

Americans are four times as likely as whites to be arrested for marijuana possession despite

research showing equivalent marijuana use; such arrests increased substantially in recent years in

New York City due to stop and frisk police tactics.

89.     The bottom line is clear: more people have criminal records than ever before, and

those people are disproportionately African-American and Latino.  In New York City, New York

State, and the country as a whole, African Americans and Latinos are far more likely than whites

to have a criminal record.

90.     This means both that African Americans and Latinos are much likelier than

whites to be barred from housing by automatic exclusions of people with records and that the

absolute number of African Americans and Latinos affected is very large.

---

[21] State of New York Dept. of Correction and Comm. Supervision, *Under Custody Report: Profile of Inmate Population Under Custody on January 1, 2013* ii (Jan. 2013), http://www.doccs.ny.gov/Research/ Reports/2013/UnderCustody_Report_2013.pdf.

[22] *See* supra note 12.

[23] Ryan S. King, The Sentencing Project, *Disparity By Geography: The War on Drugs in America's Cities* 15 (May 2008), http://www.sentencingproject.org/doc/publications/dp_drugarrestreport.pdf.

# EXHIBIT 2

*Updated April 2015*

**Lila Kazemian**
John Jay College of Criminal Justice
Department of Sociology
524 West 59th Street, North Hall Room 2127
New York, NY 10019
(212) 484-1301
e-mail: **lkazemian@jjay.cuny.edu**

## Education

2002-2005    Ph.D., Criminology
University of Cambridge, Institute of Criminology, Cambridge, England
Dissertation: *A Comparative Analysis of the Duration of Criminal Careers and Desistance from Crime*

2001-2002    M.Sc., Criminology
Université de Montréal, Canada
Thesis: *Le passage à l'acte criminel: étude des caractéristiques et trajectoires de modus operandi entre l'adolescence et l'âge adulte* [*Characteristics and Trajectories of Modus Operandi between Adolescence and Adulthood*]

1998-2001    B.Sc., Criminology
Université de Montréal, Canada

## Academic Appointments

2011 –    Associate Professor, Department of Sociology
John Jay College of Criminal Justice, City University of New York

2007 –    Faculty Member, Doctoral Program in Criminal Justice
Graduate Center, City University of New York

2006-10    Assistant Professor, Department of Sociology
John Jay College of Criminal Justice, City University of New York

2005-06    Postdoctoral Fellow
University of Cambridge, Institute of Criminology
Funded by the Economic and Social Research Council (ESRC)

## Awards and Distinctions

2014    Faculty Mid-Career Research Support Program, John Jay College of Criminal Justice

2013    Visiting scholar, École normale supérieure, Centre Maurice Halbwachs, Paris

2012        Faculty Scholarly Excellence Award, John Jay College of Criminal Justice
2007

2011        Collaborative Research Award, John Jay College of Criminal Justice

2008        Donald E.J. MacNamara Award for Outstanding Research by a Junior Faculty,
            John Jay College of Criminal Justice

## Research Interests

Life-course and criminal career research; desistance from crime; offender reentry; comparative research.

## Publications

### Edited volumes

Morizot, J. & Kazemian, L. (2015, Eds.). *The Development of Criminal and Antisocial Behavior: Theory, Research and Practical Applications*. New York: Springer.

Kazemian, L. & Farrington, D.P. (2007, Eds.). Special issue on desistance from crime. *Journal of Contemporary Criminal Justice*, 23 (1).

### Peer-reviewed articles

Kazemian, L. & Travis, J. (2015). Forgotten prisoners: Imperative for inclusion of long termers and lifers in research and policy. Forthcoming in *Criminology & Public Policy*.

Kazemian, L. (2015). Conducting prison research in a foreign setting. *International Journal for Crime, Justice and Social Democracy*, *4(1)*, 113-127.

Kazemian, L., McCoy, C. & Sacks, M. (2013). Does law matter? An old bail law confronts the New Penology. *Punishment & Society*, 15(1), 43-70.

Piquero, A.R., Carriaga, M., Diamond, B., Kazemian, L. & Farrington, D.P. (2012). Stability in aggression revisited. *Aggression and Violent Behavior*, 17, 365-372.

Kazemian, L., Pease, K., & Farrington, D.P. (2011). DNA retention policies: The potential contribution of criminal career research. *European Journal of Criminology*, 8(1), 48-64.

Kazemian, L., Widom, C.S. & Farrington, D.P. (2011). A prospective examination of the relationship between childhood neglect and juvenile delinquency in the Cambridge Study in Delinquent Development. *International Journal of Child, Youth and Family Studies*, 2(1-2), 65-82.

Kazemian, L., Cusson, M., & Le Blanc, M. (2011). Des jeunes délinquants devenus meurtriers: Une étude des carrières criminelles des délinquants homicidaires. *Revue internationale de criminologie et de police technique et scientifique*, *LXIV (4)*, 413-430.

Kazemian, L., Farrington, D.P., & Le Blanc, M. (2009). Can we make accurate long-term predictions about patterns of de-escalation in offending behavior? *Journal of Youth and Adolescence*, 38(3), 384-400.

Eisner, M., Ribeaud, D., Murray, J., Kazemian, L., & Topcuoglu, T. (2009). The event history calendar as an instrument for longitudinal criminological research. *Monatsschrift für Kriminologie und Strafrechtsreform,* 92(2/3), 137-159.

Kazemian, L. (2007). Desistance from crime: Theoretical, empirical, methodological, and policy considerations. *Journal of Contemporary Criminal Justice*, 23(1), 5-27.

Kazemian, L. & Le Blanc, M. (2007). Successful criminal careers: Random occurrences or distinctive characteristics? *Crime and Delinquency,* 53(1), 38-63.

Kazemian, L., Le Blanc, M., Farrington, D.P., & Pease, K. (2007). Patterns of residual criminal careers among a sample of adjudicated French-Canadian males. *Canadian Journal of Criminology and Criminal Justice*, 49(3), 307-340.

Kazemian, L. & Farrington, D.P. (2006). Exploring residual career length and residual number of offenses for two generations of repeat offenders. *Journal of Research in Crime and Delinquency*, 43(1), 89-113.

Kazemian, L. & Farrington, D.P. (2005). Comparing the validity of prospective, retrospective, and official onset for different offending categories. *Journal of Quantitative Criminology*, 21(2), 127-147.

Kazemian, L. & Le Blanc, M. (2004). Exploring patterns of perpetration of crime across the life course: Offense and offender-based viewpoints. *Journal of Contemporary Criminal Justice*, 20(4), 393-415.

Morselli, C. & Kazemian, L. (2004). Scrutinizing RICO. *Critical Criminology*, 12(3), 351-369.

Kazemian, L. & Le Blanc, M. (2003). Le passage à l'acte criminel de l'adolescence à l'âge adulte: Analyse des formes et des trajectoires de *modus operandi. Revue internationale de criminologie et de police scientifique*, LVI(4), 417-450.

### Book chapters

Kazemian, L. (2015). Desistance from crime and antisocial behavior. In Morizot, J. & Kazemian, L. (Eds.), *The Development of Criminal and Antisocial Behavior: Theory, Research and Practical Applications* (pp. 295-312). New York: Springer.

Morizot, J. & Kazemian, L. (2015). Introduction. In Morizot, J. & Kazemian, L. (Eds.), *The Development of Criminal and Antisocial Behavior: Theory, Research and Practical Applications* (pp. 1-16). New York: Springer.

Kazemian, L. and Farrington, D. P. (2014). The developmental evidence base: Desistance. In Towl, G. & Crighton, D. (Eds.) *Forensic Psychology (2nd ed.)*. Oxford: Blackwell.

Kazemian, L. (2012). Pushing back the frontiers of knowledge on desistance from crime: Current and future directions. In R. Loeber & B. Welsh (Eds.), *The Future of Criminology* (pp. 134-140). New York: Oxford University Press.

Piquero, A., Hawkins, J.D. & Kazemian, L. (2012). Criminal career patterns. In R. Loeber & D.P. Farrington (Eds.), *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention* (pp. 14-46). New York: Oxford University Press.

Kazemian, L. & LeBel, T. (2012). Réinsertion et sorties de délinquance. In M. Mohammed (Ed.), *Les sorties de délinquance: Théories, méthodes, enquêtes [Desistance and offender reintegration]* (pp. 229-254). Paris: La Découverte.

Kazemian, L. & Farrington, D.P. (2012). Recherches sur les sorties de délinquance: Quelques limites et questions non résolues. In M. Mohammed (Ed.), *Les sorties de délinquance: Théories, méthodes, enquêtes [Limitations and unresolved issues in desistance research]* (pp. 61-86)*.* Paris: La Découverte.

Kazemian, L. & Maruna, S. (2009). Desistance from crime. In M. Krohn, A.J. Lizotte, & G.P. Hall (Eds.), *Handbook on Crime and Deviance* (pp. 277-295). New York: Springer.

von Hirsch, A. & Kazemian, L. (2009). Predictive sentencing and selective incapacitation. In A. von Hirsch, A. Ashworth, & J. Roberts (Eds.), *Principled Sentencing: Readings on Theory and Policy, 3rd edition* (pp. 95-101). Oxford, England: Hart.

Kazemian, L. & Piquero, A. (2009). David P. Farrington. In K. Hayward, S. Maruna, & J. Mooney (Eds.), *Fifty Key Thinkers in Criminology* (pp. 267-272). New York: Routledge.

Martin López, M.T., Le Blanc, M., Espuny, F.D., Curto Fortuno, R., & Kazemian, L. (2004). Medidas de adaptación social y personal para adolescentes españoles: Análisis de su coherencia interna, fiabilidad y validez. In F. Pérez Álvarez (Ed.), *Serta: In Memoriam Alexandri Baratta [*Methods of social and personal adjustment among Spanish adolescents: Analysis of consistency, reliability, and validity*]* (pp. 465-488). Salamanca: Acquilafuente.

### *Other publications*

Kazemian, L. & Andersson, C. (2012). *The French prison system: Comparative insights for policy and practice in New York and the United States*. New York, NY: Research and Evaluation Center, John Jay College of Criminal Justice, City University of New York.

Kazemian, L. (2009). Desistance. In R. Rosenfeld (Ed.), *Oxford Bibliography Online*. Oxford University Press.

Kazemian, L. (2009). Criminal Career Research. In R. Rosenfeld (Ed.), *Oxford Bibliography Online*. Oxford University Press.

Kazemian, L. (2009). Developmental and Life-Course Criminology. In R. Rosenfeld (Ed.), *Oxford Bibliography Online*. Oxford University Press.

Kazemian, L. (2009). Contributions to the Sage Glossary of the Social and Behavioral Sciences, edited by Larry E. Sullivan. Thousand Oaks, CA: Sage Publications.

Kazemian, L. (2008). The criminal career paradigm. In L. Kontos & D.C. Brotherton (Eds.), *Encyclopedia of Gangs* (pp. 34-38). New York: Routledge.

## Funding

| | |
|---|---|
| 2013 | *A comparative study of French and American correctional systems*. Principal Investigator, City of Paris Research Fellowship, France; €18,000. |
| 2013 | *Understanding desistance from crime in adult sex offenders: A prospective longitudinal study* Co-Principal Investigator, Social Sciences and Humanities Research Council of Canada; $79,000. |
| 2010 | *Le devenir des adolescents: Trajectoires de comportement antisocial, d'adaptation sociale et de personnalité jusqu'à la cinquantaine* [*Trajectories of antisocial behavior, social adjustment and personality up to age 50*]. Research Collaborator, Social Sciences and Humanities Research Council of Canada; $101,910. |
| 2010 | *The relationship between social integration and victimization among immigrant groups*. Principal Investigator, PSC-CUNY, City University of New York; $1,330. |
| 2009 | *Testing the accuracy of offender typologies in self-reports and official records*. Principal Investigator, PSC-CUNY, City University of New York; $4,390. |
| 2007 | *Linking up qualitative accounts and quantitative measures of desistance*. Principal Investigator, PSC-CUNY, City University of New York; $5,100. |
| 2005 | *Desistance from crime*. Co-Principal Investigator with David Farrington, National Consortium on Violence Research, NSF, Washington, DC; $15,000. |
| 2003 | Doctoral research grant. *Fonds de recherche sur la société et la culture* (Quebec, Canada); $46,600. |
| | Doctoral research grant. Overseas Research Student Award; £10,000 GBP. |
| | Doctoral research grant. Wakefield Scholarship; £10,000 GBP. |
| 2002 | Doctoral research grant. Cambridge Commonwealth Trust; £4,500 GBP. |

5

## Data Collection

2013            *Quality of Life, Desistance and Reentry in Parisian Correctional Facilities*
                Paris, France

2006-07         *Collaborative Family Initiative* (CFI) Program
                John Jay Research and Evaluation Centre & Department of Juvenile Justice

2005-06         *Zurich Project on the Social Development of Children*
                University of Cambridge, Institute of Criminology

2003            *Peterborough Youth Study* (PYS)
                University of Cambridge, Institute of Criminology

2001-02         Research project on applications of anti-racketeering legislation
                Université de Montréal, School of Criminology

2000            Program evaluation of a high-school dropout prevention program among high-
                risk adolescents.
                Université de Montréal, School of Criminology

1999-2002       *Montreal Two Samples Longitudinal Study*
                Université de Montréal, School of Criminology

## Invited Presentations

Kazemian, L. (2014, September). *Les perceptions de la qualité de vie en détention et les obstacles au désistement : résultats d'une recherche menée à la maison centrale de Poissy* [*Perceived quality of life in prison and obstacles to desistance : Results from a research conducted in a French prison*]. Paper presented at Université Paris 1, Panthéon-Sorbonne, Paris, France.

Kazemian, L. (2014, September). *La recherche en milieu carcéral* [*Prison research*]. Paper presented at l'Observatoire international des prisons, Paris, France.

Kazemian, L. (2014, September). *La prison, le désistement et la réinsertion* [*Prison, desistance and reentry*]. Paper presented at Direction de l'administration pénitentiaire, Ministère de la justice (Correctional administration, Ministry of Justice).

Kazemian, L. (2014, September). *Le climat carcéral : Impact sur le personnel pénitentiaire et les détenus [Prison climate : Impact on staff and inmates*]. Paper presented to prison staff at maison centrale de Poissy.

Kazemian, L. (2014, September). *Le rôle de la prison dans la préparation à la sortie [The role of prison in reentry planning*]. Paper presented to prisoners at maison centrale de Poissy.

Kazemian, L. (2014, March). *The French prison system*. Beyond the bars: Breaking through. Columbia University, New York.

Kazemian, L. (2013, June). *La réinsertion sociale et le désistement : Le rôle des services d'insertion et de probation* [*Reentry and desistance : The role of probation staff and services*]. Angers, France.

Kazemian, L. (2013, June). *Les enjeux de la recherche sur les carrières criminelles pour le travail des praticiens dans les champs judiciaire et pénitentiaire* [*Practical implications of criminal career research for practitioners in the judicial and correctional fields*]. Event organized by associations of judges, probation and attorneys (*Tribunal de grande instance de Pontoise, le Service pénitentiaire d'insertion et de probation du Val d'Oise et l'Ordre des avocats de Pontoise*), Maison de l'avocat, Pontoise, France.

Kazemian, L. (2013, April). *Probation, contrainte pénale communautaire, désistement* [*Probation, community sanctions, desistance*]. L'Institut national des hautes études de la sécurité et de la justice, Paris, France.

Kazemian, L. (2013, February). *Que sait-on des facteurs qui préconisent la récidive* [*What do we know about factors that promote recidivism?*]. Invited expert at a conference organized by the French Ministry of Justice (*Conférence de consensus sur la prévention de la récidive*), Paris, France.

Kazemian, L. (2013, February). *À propos des études sur la désistance (ou désistement)* [*Issues in desistance research*]. Paper presented at Université Paris 1, Panthéon-Sorbonne, Paris, France.

Kazemian, L. (2012, May). *État des lieux de la recherche empirique sur le désistement* [*Empirical research on desistance: Current state of knowledge*]. Plenary presentation at the meeting of the Association internationale des criminologues de langue française (AICLF, International Association of French-Speaking Criminologists), Montreal, Canada.

Kazemian, L. (2011, December). *Le rôle de l'état dans l'administration pénitentiaire : L'exemple des États-Unis* [*The role of the state in correctional administration : The example of the United States*]. Paper presented at l'*École nationale d'administration pénitentiaire*, Agen, France.

Kazemian, L. (2011, July). *Le système pénitentiaire américain* [*The American correctional system*]. Paper presented at l'*École nationale d'administration pénitentiaire*, Agen, France.

Kazemian, L. (2011, July). *Désistement et réinsertion sociale aux États-Unis* [*Desistance and social reintegration in the United States*]. Paper presented at l'*École nationale d'administration pénitentiaire*, Agen, France.

Kazemian, L. (2009, April). *Assessing the impact of a recidivist sentencing premium on crime & recidivism rates*. Paper presented at a meeting on sentencing policy, University of Oxford, England.

Kazemian, L. (2009, March). *Desistance from crime and the prevention of recidivism: A review of empirical findings, police practices, and offender reintegration initiatives.* Paper presented *in absentia*. National Conference on the Prevention of Crime, Tehran, Iran.

Kazemian, L. (2008, April). *Crime prevention and criminal history*. Paper presented at a meeting on sentencing practices for repeat offenders, University of Cambridge, England.

Kazemian, L. & Farrington, D.P.   (2006, June). *Final report on desistance workshop.* NCOVR workshop, La Romana, Dominican Republic.
Kazemian, L. (2006, May). *Desistance from crime: Theoretical, empirical, methodological, and policy issues.* NCOVR-funded workshop on desistance from crime, Washington, DC.

Kazemian, L. (2005, November). *Desistance from crime: Some recent findings.* School of Criminal Justice, State University of New York, Albany.

Kazemian, L. (2005, October). *Event history analysis using the Zurich Study Data.* Meeting for the Zurich study on the social development of children, Switzerland.

Kazemian, L. (2005, June).   *Chronic and persistent offending: Causes and solutions*. Institute of Criminology, University of Cambridge, England.

Kazemian, L. (2005, March). *Assessing the importance of residual criminal career estimates*. Workshop on criminal career research and sentencing policy, Washington, DC.

Kazemian, L. (2003, March). Delegate in a roundtable on Canadian development aid policies, London, England.


## Conference Presentations

Kazemian, L. & Travis, J. (2014, November). *The forgotten prisoners: The imperative for inclusion of long termers and lifers in research and policy*. American Society of Criminology Annual Meeting, San Francisco, CA.

Andersson, C. & Kazemian, L. (2014, November). *A cross-national and multilevel investigation of homicide rates using strain and frustration-aggression frameworks*. American Society of Criminology Annual Meeting, San Francisco, CA.

Andersson, C. & Kazemian, L. (2013, November). *A cross-national investigation of the stream analogy model of violence.* American Society of Criminology Annual Meeting, Atlanta, Georgia.

Kazemian, L. (2013, June). *Pushing back the frontiers of knowledge on desistance from crime: Current and future directions*. Stockholm Criminology Symposium, Stockholm, Sweden.

Andersson, C. & Kazemian, L. (2012, November). *The operationalization of anomie in a cross-national comparison of homicide rates.* American Society of Criminology Annual Meeting, Chicago, Illinois.

Lee, D. & Kazemian, L. (2012, November). *Is Canada adopting the U.S.' tough-on-crime approach?: Testing a harbinger of mass incarceration.* American Society of Criminology Annual Meeting, Chicago, Illinois.

Kazemian, L., Widom, C.S. & Farrington, D.P. (2011, November). *Childhood neglect & adult life outcomes: Findings from the Cambridge Study in Delinquent Development*. American Society of Criminology Annual Meeting, Washington, DC.

Andersson, C. & Kazemian, L. (2011, November). *The association between crime and other indicators of social malaise: A cross-national comparison*. American Society of Criminology Annual Meeting, Washington, DC.

Kazemian, L., Cusson, M. & Le Blanc, M. (2010, November). *Criminal careers of homicide offenders*. American Society of Criminology Annual Meeting, San Francisco, CA.

Kazemian, L. (2010, June). *Pitfalls of enhanced sentences for repeat offenders*. John Jay College International Conference, Marrakech, Morocco.

Kazemian, L. (2010, May). *Influence de la nouvelle pénologie dans les décisions portant sur la libération sous caution* [*The role of the New Penology in bail decisions*]. Meeting of the Association internationale des criminologues de langue française (AICLF, International Association of French-Speaking Criminologists), Fribourg, Switzerland.

Kazemian, L., Curtis, R. & Bribiesca, M. (2009, November). *A study of victimization among a sample of immigrants in Hempstead, NY*. American Society of Criminology Annual Meeting, Philadelphia, PA.

Edwards, C. & Kazemian, L. (2009, November). *The challenges of successful reintegration: Identifying the needs of formerly incarcerated individuals after their release from prison*. American Society of Criminology Annual Meeting, Philadelphia, PA.

Sacks, M., Kazemian, L. & McCoy, C. (2009, November). *Does law matter? Bail as danger control*. American Society of Criminology Annual Meeting, Philadelphia, PA.

Kazemian, L. & Le Blanc, M. (2009, September). *Revisiting the relationship between substance use and desistance*. European Society of Criminology Annual Meeting, Ljubljana, Slovenia.

Kazemian, L. & Le Blanc, M. (2008, November). *Linking up qualitative accounts and quantitative measures of desistance*. American Society of Criminology Annual Meeting, St. Louis, MO.

Kazemian, L. (2008, May). *Une évaluation critique de l'état des connaissances sur le désistement* [*A critical assessment of the state of knowledge on desistance*]. Association internationale des criminologues de langue française (AICLF, International Association of French-Speaking Criminologists), Rabat, Morocco.

Kazemian, L. (2007, November). *Author-meets-critic session: Wikstrom & Butterworth (2006). Adolescent crime: Individual differences and lifestyles*. American Society of Criminology Annual Meeting, Atlanta, GA.

Kazemian, L., Farrington, D.P. & Le Blanc, M. (2007, July). *A comparison of the profiles of desisters, persisters, and non-offenders in self-reports and official records*. Law and Society Annual Meeting, Berlin, Germany.

Kazemian, L. & Le Blanc, M. (2006, November). *Differential cost avoidance and successful criminal careers: Random or rational?* American Society of Criminology Annual Meeting, Los Angeles, CA.

Kazemian, L., Farrington, D.P. & Le Blanc, M. (2005, November). *Predicting termination and desistance from crime: A comparative analysis.* American Society of Criminology Annual Meeting, Toronto, Canada.

Kazemian, L. & Farrington, D.P. (2004, November). *Exploring residual career length and residual number of offenses for two generations of repeat offenders.* American Society of Criminology Annual Meeting, Nashville, Tennessee.

Kazemian, L. & Farrington, D.P. (2003, November). *Age of onset of offending: Exploring the validity of self-reports across time.* American Society of Criminology Annual Meeting, Denver, Colorado.

Kazemian, L. & Le Blanc, M. (2002, November). *Adjudicated males' modus operandi trajectories from ages 15 to 30.* American Society of Criminology Annual Meeting, Chicago, Illinois.

## Teaching

*Undergraduate Courses*
> Principles and Methods of Statistics
> Advanced Social Statistics

*MA Courses*
> Sociology of Crime
> Issues in Criminal Justice
> Computer Applications for Social Sciences

*Doctoral Seminars*
> Criminological Theory
> Life-Course Criminology and Criminal Career Research
> Quantitative Methods in Criminal Justice

*Dissertation Committees*
> Allyson Franklin (chair, current)
> Catrin Andersson (chair, current)
> William Parkin (member, completed in summer 2012)
> Brenda Vollman (member, completed in summer 2010)
> Meghan Sacks (member, completed in fall 2010)
> Frédéric Ouellet (member, completed in fall 2010)

*MA Thesis Committees*
> Cavwell Edwards (chair, completed in spring 2009)

## Academic Service

### International Service

2010 -        *Prix Fernand Boulan*, International committee assessing the most distinguished doctoral dissertation (*AICLF*, International Association of French-Speaking Criminologists)

### National Service

2012-         American Society of Criminology, Developmental and life-course Awards Committee

2014          American Society of Criminology Program Committee
2009
2007

2012          Sellin-Glueck Committee, American Society of Criminology

2010          Academy of Criminal Justice Sciences Program Committee

### Manuscript reviews

*Canadian Journal of Criminology and Criminal Justice*
*Child Abuse & Neglect*
*Crime and Delinquency*
*Criminal Justice and Behavior*
*Criminal Justice Review*
*Criminology*
*International Journal of Offender Therapy and Comparative Criminology*
*Journal of Contemporary Criminal Justice*
*Journal of Quantitative Criminology*
*Journal of Research in Crime and Delinquency*
*Justice Quarterly*
*National Institute of Justice*
*Psychology, Crime and Law*
*Punishment and Society*
*Revue canadienne de criminologie et de justice pénale*
*Social Problems*
*Social Science Research*
*Social Sciences and Humanities Research Council of Canada*

### Other Professional Service

2014 –        Editorial Board, *Journal of Developmental and Life-Course Criminology*

| | |
|---|---|
| 2010 – | Invited collaborator-member of the *International Centre for Comparative Criminology* (ICCC) |
| 2009 – | Editorial Board, Oxford Bibliographies Online Series in Criminology |
| 2011-2014 | Editorial Board, *Journal of Quantitative Criminology* |

### *University Service*

| | |
|---|---|
| 2014-2015 | Grades appeal committee |
| 2014-2015 | Research Advisory Committee |
| 2014-2015 | Search committee member, Research compliance/senior analyst position |
| 2014-2015<br>2013-2014<br>2010-2011<br>2009-2010<br>2007-2008 | Admissions committee, Criminal Justice Doctoral Program |
| 2014-2015<br>2012-2013<br>2008-2009 | Executive committee, Criminal Justice Doctoral Program |
| 2013-2014<br>2012-2013<br>2011-2012 | Membership committee, Criminal Justice Doctoral Program |
| 2013-2014 | Search committee member, Associate Dean of Graduate Studies position |
| 2012-2013 | College-wide Faculty and Personnel Committee |
| 2014<br>2012 | Dissertation award committee |
| 2012 | Webmaster, Department of Sociology |
| 2011-2012 | Faculty advisor, *Redefining Juvenile Justice* student club |
| 2011-2012 | Faculty advisor, *Khalas* student club |
| 2007-2011 | Institutional Review Board (IRB) committee |
| 2008-2009 | Curriculum committee, Criminal Justice Doctoral Program |
| 2006-2007 | College-wide academic standards committee |
| 2003-2005 | Ph.D. class representative (Cambridge University, Institute of Criminology) |

### Service to the Community

2014 –            Program facilitator, *Network in Prisons* program

2011-2012        Volunteer work with City Harvest's food rescue and distribution program

2007-2008        Volunteer work with *Episcopal Social Services*, a New York-based organization assisting with the reentry needs of incarcerated and formerly incarcerated individuals

### Professional Affiliations

American Society of Criminology
*Association internationale des criminologues de langue française* (AICLF, "International Association of French-Speaking Criminologists")
European Society of Criminology

## Languages
English (fluent), French (fluent), Farsi (fluent), Spanish