# EXHIBIT

# 24

Supplemental Expert Report
Allan McMillan Parnell, Ph.D.
Cedar Grove Institute for Sustainable Communities

Civil Action No. 1:14-cv-6410

THE FORTUNE SOCIETY, INC.

v.

SANDCASTLE TOWERS HOUSING DEVELOPMENT FUND CORP., SARASOTA GOLD LLC, E & M ASSOCIATES LLC, and WEISSMAN REALTY GROUP LLC

I.  QUALIFICATIONS

My name is Allan McMillan Parnell.  A copy of my curriculum vitae accompanies this report as Attachment A.

I am Vice-President and Research Director of the Cedar Grove Institute for Sustainable Communities, a not-for-profit research organization that specializes in using Geographic Information Systems (GIS) in demographic and policy analyses, focusing on community development, discrimination in housing policies, and issues of social equity, including analysis of disparities in access to public infrastructure.  I am also Senior Fellow at the Frank Hawkins Kenan Institute on Private Enterprise at the University of North Carolina at Chapel Hill and President of McMillan and Moss Research, Inc.

I received a Ph.D. in sociology with a specialization in demography from the University of North Carolina at Chapel Hill in 1987.  During my career, I have conducted and published research on a range of issues, taught at the graduate and undergraduate levels, consulted on demographic analysis, and worked as an expert in cases on housing discrimination and spatial disparities.  I have been a Research Associate in the Committee on Population at the National Academy of Sciences, on the faculty in the Sociology Department at Duke University, a Senior Fellow at the Duke Center for Demographic Studies, and a Research Associate at the Carolina Population Center at the University of North Carolina at Chapel Hill.  I have been the Principal Investigator on peer-reviewed grants from the National Institute of Child Health and Human Development (NICHD) and the National Institute on Aging (NIA).

## II. PREVIOUS EXPERIENCE AS AN EXPERT WITNESS

I have testified as an expert in several federal housing or civil rights cases. I testified in *Jerry R. Kennedy, et al., v. The City of Zanesville, et al.*, Case No. 2:03-CV-1047 (S.D. Ohio), *Anderson Group, LLC v. City of Saratoga Springs* Case No. 05-cv-1369 GLS/DRH (N.D.N.Y.), *The Inclusive Communities Project, Inc. v. the Town of Flower Mound, Texas*, Case No. 4:08-CV-433 (E.D. Tex.), *The Inclusive Communities Project, Inc. v. The Texas Department of Housing and Community Affairs, et al.* Civil Action No. 3:08-CV-0546-D (N.D. Tex.), and *Everett et. al. v. Pitt County Bd. of Education*, No. 6:-69-CV-702-H (ED. N.C.). I was deposed for *Antonia Manuel et al v. City of Lake Worth*, Case No. 06-81143 (S.D. Fl.) and *BBC Baymeadows, LLC v. City of Ridgeland*, Case No. 14-CV-676 (S.D. Mississippi).

## III. COMPENSATION FOR SERVICES

My fee for work in this case is $200 per hour and $300 per hour for deposition testimony. No portion of these fees is dependent on the nature of my findings or on the outcome of the case.

## IV. SCOPE OF THE ISSUE FOR THIS REPORT

In my initial report, I found that differences in the cumulative risk of incarceration for Whites[1], African Americans and Latinos disproportionately disadvantages African Americans and Latinos relative to Whites in their ability to rent at Sandcastle Apartments. I found this for the Queens housing market, the New York City housing market, and the New York, N.Y. HUD Metro housing market.

This supplemental report examines the tenant information provided by the Defendants and ABBA Realty ("ABBA"), one of Sandcastle Apartment's real estate brokers, that was not

---

[1] Throughout this report, White refers to non-Hispanic White.

2

available when I wrote my initial report, and Defendants' responses to the Plaintiff's first interrogatories.  In this supplemental report, I:  1) determine if the information provided by Defendants and ABBA is useful in reaching conclusions on whether the Defendants' criminal records policy has racially disparate effects; 2) assess whether Queens; New York City; and the New York, N.Y. HUD Metro Fair Market Rent Area, the HUD-specified rental market for New York City[2] are the appropriate housing markets for Sandcastle Apartments using available zip codes from the applicant information provided; 3) assess the limited credit score information in light of the stated policies of Sandcastle Apartments to determine if these policies are applied consistently; and 4) consider whether prior landlord/tenant proceedings histories are likely to change the results of my analysis and my opinions.

## V. INFORMATION REVIEWED

1. Excel file with information on applications to Sandcastle Apartments from 2006-2015.

2. Sarasota Gold LLC's Responses to Plaintiff's First Set of Interrogatories.

3. American Community Survey 2009-2013 Housing Income Data for Nassau County, New York. www.census.com

4. Expert Report by Dr. Allan M. Parnell, June, 2015.

5. The report prepared by Dr. Christopher Wildeman on the cumulative risks of criminal conviction based on cumulative risk of incarceration, by race for different income levels.

6. http://www.unitedstateszipcodes.org/

---

[2] The New York, N.Y. HUD Metro Fair Market Rent Area includes Bronx County, Kings County, Putnam County, Queens County, New York County, Richmond County, Rockland County, and Westchester County http://www.huduser.org/portal/datasets/il/il2015/2015summary.odn

## VI. ASSESSMENT

*Information Regarding Applicants for Sandcastle Apartments*

The new information I assess is from an excel file containing information produced by Defendants and ABBA on 1,277 applications to rent apartments at Sandcastle Apartments. These applications are from around 2006 to 2015.

The data fields in this file are:

- Rejected?
- Applicant Last Name
- Applicant First/Middle Name
- Apt #
- Credit Score Available?
- Credit Score
- Subsidy Program
- Co-Applicant Last Name
- Co-Applicant First/Middle Name
- Credit Score Available?
- Credit Score

### Representativeness of Sandcastle Apartments Applicant File

Information for most rejected applications was not retained by the Defendants. In their responses to the Plaintiff's first interrogatories, the Defendants reported that, "Sarasota does not normally retain rejected applications." Significantly, I have been informed that no rejected tenant applications from prior to 2014 have been provided to the Plaintiff, so no information on rejected applications exists from 2006-2013. We do not know how many applicants were

4

rejected and not recorded in the Sandcastle Apartments' records, and we have limited information about the rejected applicants. For most of the relevant time period, I cannot determine who was rejected or the reasons for the rejection. Therefore, the tenant information provided does not aid in reaching any conclusions concerning effects of the criminal records policy at Sandcastle Apartments. Without information on the unknown number of rejected applications, there is no sufficiently complete and representative pool of applicants to examine.

Of the 1,277 applications on the file, 1,145 (89.7%) were not rejected, 16 are recorded as "Not Clear," and 116 (9.1%) are marked as rejected.

It is not possible to use the application information provided by the Defendants and ABBA to determine whether African Americans and Latinos are disproportionately disadvantaged relative to Whites in their ability to rent at Sandcastle Apartments. The problem is that the information provided does not represent all applicants to Sandcastle Apartments and we do not know how many applications are missing, and that the missing applicant information is largely (if not completely) missing for those with rejected applications. In statistical terms, the missing cases are non-random, that is they are concentrated in one category (rejected applications). No statistical adjustments or corrections can be made for non-random missing data.

The lack of information on most of the rejected applications confirms that the best method for assessing effects of the criminal records policy at Sandcastle Apartments is the method used in my prior report on this matter.

*Sandcastle Apartments Market Area*

Because I had no information on applicants when I wrote my first report, I assumed that most applicants came from the New York City area. I assumed: 1) many would come from Queens, where Sandcastle Apartments is located; 2) most would come from the other boroughs of New York City; and 3) the housing market specified by the U. S Department of Housing and Urban Development (HUD) New York City, which includes Putnam, Rockland, and Westchester Counties as well as New York City, is an appropriate housing market to consider.

As shown above, the application information provided is not representative since most rejected applications are not available. However, there is no reason to think that zip codes or missing zip codes vary between applications that were accepted and those that were rejected, so the representativeness of missing rejected applications is significantly less relevant for a confirmatory analysis. The zip codes on applications—where provided—do show that most applicants to Sandcastle Apartments are local. This supports the that assumption that Queens, New York City, and the New York HUD-designated rental market are the correct housing markets for Sandcastle Apartments. Therefore, income information from these markets is appropriate in this assessment.

I examined the file containing the zip code for 1,277 applicants for Sandcastle Apartments. Of these, four applicants had invalid zip codes, one appears to be a foreign postal code and 352 others (27.6%) are missing or not recorded. I identified the location of 920 (72%) valid zip codes in the file using the online application at http://www.unitedstateszipcodes.org/. 364 (39.6%) of the applications were from Queens, the largest number from any borough or other single area. 764 (83%) of the applications were from New York City. 773 (84%) of the

applications were from the New York, N.Y. HUD Metro Fair Market Rent Area.  This pattern of zip codes largely confirms the housing markets used in my initial report.

Nassau County, which borders New York City, is the next largest location of applicants (77 or 8.4%), and it may be part of the housing market for Sandcastle Apartments.  To see if adding Nassau County to the New York, N.Y. HUD Metro Fair Market Rent Area housing market for Sandcastle Apartments has any appreciable effect, I conducted the same analysis as in my first report, adding housing income data from Nassau County to the household income data for the New York, N.Y. HUD Metro Fair Market Rent Area.  Together, these account for almost 93% of zip codes of the available applicants.

In his report, Dr. Wildeman calculated the cumulative risk of incarceration for Whites, African Americans and Latinos for the entire racial/ethnic groups and for Whites, African Americans and Latinos with specific incomes.[3]  These income categories correspond to rent requirements at Sandcastle Apartments.  Dr. Wildeman calculated the cumulative risk of incarceration for Whites, African Americans and Latinos with incomes above $40,000; for Whites, African Americans and Latinos with incomes above $30,000 and less than $70,000, and for Whites, African Americans and Latinos with incomes above $40,000 and less than $70,000.  These are the income categories I used in my initial report and the categories I use in this supplemental analysis

In every income scenario, Dr. Wildeman found that Whites have lower cumulative risk of incarceration than African Americans and Latinos.  Dr. Wildeman's calculations of the cumulative risk of incarceration for Whites, African Americans and Latinos are the proportions of each group that have ever been incarcerated.  I use these proportions within the specified

---

[3] Dr. Wildeman used cumulative or lifetime risk of incarceration as a proxy for cumulative or lifetime risk of criminal convictions because the highest-quality data measure incarceration rather than criminal convictions.

7

housing markets to determine if these differences between Whites and African Americans and these differences between Whites and Latinos are statistically significant (that is, to determine if the calculated differences are substantial, meaningful and not due to random variation).

Table S1 shows the results of the analysis when Nassau County is included. In every case, African Americans and Latinos have higher proportions than Whites (who have ever been incarcerated and are therefore ineligible to rent at Sandcastle Apartments under their current policy). In every case, the differences in the White and African American proportions and the Whites and Latinos proportions not able to rent at Sandcastle Apartments are significantly different. For example, where there are no income limits, the cumulative percentage of Whites who have ever been incarcerated is 2.39%, and the proportion of African Americans who have ever been incarcerated is 10.61%. The Z-score of -288.46 confirms that the cumulative risk of incarceration for Whites and African Americans is significantly different at the .01 level. That is, there is less than one chance in 100 that these differences are due to random variation. All of the Z-scores for each paired comparison shown in Table S1 are statistically significant at the .01 level. The higher proportions of African Americans and Latinos relative to Whites not able to rent at Sandcastle Apartments are substantial, meaningful and highly unlikely to be due to random variation (less than1 in 100).

In addition to applications from Nassau County and the New York HUD-designated rental market, there were 40 applicants from counties in upstate New York, Suffolk County on Long Island, New Jersey and Connecticut. The remaining 30 applicants were from scattered locations across the county. These applications are too few in number and too scattered in locations to affect my conclusion that the housing market for Sandcastle Apartments have been accurately identified.

8

Table S2 shows the number and percentage of Whites, African Americans and Latinos from New York City and the five zip code areas with the largest number of applicants. There are at least 20 applications from these five zip code areas, with 146 applications from zip code area 11691 (Queens). New York City and four of the five zips codes are very diverse. The zip code area for 10016 (Manhattan) is less diverse, but 30% of the residents in this area are minority.

*Credit Score Information*

Defendant Sarasota Gold's response to the Plaintiff's first set of interrogatories states that, "Applicants with a credit score of less than 620 are generally not accepted unless they are receiving a lawful guarantied (*sic*) income or some governmental subsidy or assistance and, in that case, a lower credit score will be considered."

Figure 1 shows this distribution of available credit score information. Of the 1,227 applications for which we have information, credit scores are reported on 337 (26.4%), 216 (16.9%) are recorded as "no score, and 724 (56.7%) are noted as "no report."

**Figure 1: Applications to Sandcastle Apartments, Credit Score Availability**

| Category | Count |
|---|---|
| Credit Score | 337 |
| No Credit Score | 216 |
| No Credit Report | 724 |



Figure 2: Applications to Sandcastle Apartments Not Reject and With Credit Scores or No Score

Of all of the applications with a credit score recorded, 323 are applications that were not rejected (see Figure 2). Of the applications not rejected with credit scores recorded, 139 have scores below 620 and 124 have credit scores below 600. In addition, 193 applicants that were not rejected have no credit score.

For the applicants who were not rejected and had credit scores below 620, 78 (56.1%) applicants have no apparent subsidy source. For the applicants who were not rejected and had credit scores below 600, 61 (48.8%) have no apparent subsidy source (see Figure 3).

10



Figure 3: Applications to Sandcastle Apartments Accepted and With Credit Scores

The credit score information on this file is largely incomplete. Even if credit scores are recorded, the standard asserted by Sarasota Gold (minimums of 620 or 600 unless there is a governmental subsidy) is not followed in over half of the accepted applications. There appears to be no consistent policy on credit scores in deciding whether an applicant can rent at Sandcastle Apartments.

***Prior Landlord-Tenant Proceedings***

In Defendant Sarasota Gold's responses to the Plaintiff's first set of interrogatories, they write, "Applicants who have been involved in landlord-tenant proceedings with a prior landlord (nonpayment proceedings or nuisance or chronic nonpayment of rent holdover proceedings) are generally not accepted."

There would have to be a large racial differential in applicants rejected due to prior landlord-tenant proceedings to offset the results in my initial report and in this supplement. I know from Dr. Wildeman's analysis that with no income limit, the cumulative risk of incarceration for African Americans of 10.61% is more than four times the cumulative risk of

incarceration or Whites of 2.39%.  Thus, African American applicants to Sandcastle Apartments would have to have more than four times as many prior landlord-tenant proceedings than White applicants to offset the significant cumulative risk of incarceration differential if there were no prior landlord-tenant proceedings for Whites.  No data has been produced in this litigation that shows any racial differential for prior landlord-tenant proceedings among applicants to Sandcastle Apartments.  I am aware of no data from other sources that shows racial differential in prior landlord-tenant proceedings sufficient to offset the significant cumulative risk of incarceration differential.  This conclusion holds for each of the comparison of cumulative risks of incarceration for both Whites and African Americans and for Whites and Latinos in my initial report and in this supplemental report.

**VII. Conclusion**

1)  The application information provided by the Defendants and ABBA does not aid in determining whether African Americans and Latinos are disproportionately disadvantaged relative to Whites in their ability to rent at Sandcastle Apartments.  The problem is the information does not represent all applicants to Sandcastle Apartments, and the missing applicant information is largely (if not completely) for those with rejected applications.  The methodology and data used in my prior report are the best available information for my analysis that documents that the criminal record policy disproportionately disadvantages African Americans and Latinos relative to Whites in their ability to rent at Sandcastle Apartments.

2)  Based on available zip codes from applications, Queens (39.6%), New York City (82%), and the HUD-defined New York City Rental Market (83%) are the appropriate housing markets to

consider for Sandcastle Apartments. Moreover, 8.4% of available zip codes are from Nassau County, which border Queens. When household income from Nassau County is added to the income data from for the HUD-defined New York City Rental Market, the comparisons (shown in Table S1) are consistent with and support the results in my initial report.

3) While the information on credit scores for applicants to Sandcastle Apartments is limited, it does not support the Defendants' assertion that "generally" applicants with credit scores below 620 or 600 without a government subsidy are not accepted at Sandcastle Apartments.

4) Regarding the stated criteria of prior landlord-tenant proceedings, no information showing racial differences was provided or is otherwise available. If the necessary data were available by race, the size of the racial differential needed to offset the statistically significant differences would have to be very large. In my opinion, prior landlord-tenant proceedings cannot offset the statistically significant differentials due the criminal records policy.

**Table S1: Z-Test Result for Differences in Qualifying for Renting at Sandcastle Apartments, New York, N.Y. HUD Metro Fair Market Rent Area and Nassau County**

| Income Limit | White | African American | Latino |
|---|---|---|---|
| **No Income Limit** | | | |
| Cumulative Risk | 2.39 | 10.61 | 5.99 |
| N | 1,861,248 | 840,810 | 875,984 |
| Z Score | | -288.46 | -150.31 |
| Level of Significance | | P<0.01 | P<0.01 |
| | | | |
| **$30,000 Minimum** | | | |
| Cumulative Risk | 0.91 | 4.44 | 2.23 |
| N | 1,489,130 | 537,574 | 521,427 |
| Z Score | | -164.80 | -73.77 |
| Level of Significance | | P<0.01 | P<0.01 |
| | | | |
| **$40,000 Minimum** | | | |
| Cumulative Risk | 0.80 | 3.05 | 2.15 |
| N | 1,372,437 | 453,598 | 432,676 |
| Z Score | | -113.47 | -73.46 |
| Level of Significance | | P<0.01 | P<0.01 |
| | | | |
| **$30,000-$70,000** | | | |
| Cumulative Risk | 1.37 | 4.76 | 3.00 |
| N | 439,620 | 272,777 | 281,429 |
| Z Score | | -86.31 | -48.16 |
| Level of Significance | | P<0.01 | P<0.01 |
| | | | |
| **$40,000-$70,000** | | | |
| Cumulative Risk | 1.36 | 2.79 | 3.20 |
| N | 321,908 | 188,285 | 192,184 |
| Z Score | | -36.22 | -45.07 |
| Level of Significance | | P<0.01 | P<0.01 |

Sources: Cumulative Risk of Incarceration estimates are by Dr. Christopher Wildeman's report for this case. Household income data are from the 2009-2013 American Community Survey, www.census.gov

Table S2: Racial and Populations in New York City and the Five Zip Code Areas with the Largest Number of Applications to Sandcastle Apartments, Census 2010

|  | New York City | 10016 | 11207 | 11208 | 11221 | 11691 |
|---|---|---|---|---|---|---|
| **Total** | 8,175,133 | 54,183 | 93,386 | 94,469 | 78,895 | 60,035 |
|  |  |  |  |  |  |  |
| **White** | 2,722,904 | 37,601 | 1,567 | 1,973 | 3,721 | 12,455 |
|  | 33.3% | 69.4% | 1.7% | 2.1% | 4.7% | 22.4% |
|  |  |  |  |  |  |  |
| **Black** | 1,861,295 | 1,981 | 56,381 | 39,761 | 40,934 | 28,279 |
|  | 22.8% | 3.7% | 60.4% | 42.1% | 51.9% | 47.1% |
|  |  |  |  |  |  |  |
| **Latino** | 2,336,076 | 4,394 | 32,323 | 40,645 | 31,166 | 15,134 |
|  | 28.6% | 8.1% | 34.6% | 43.0% | 39.5% | 25.2% |

Respectfully submitted,

_____  November 23, 2015

Allan M. Parnell, Ph.D.