UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE FORTUNE SOCIETY, INC.<br><br>Plaintiff,<br><br>v.<br><br>SANDCASTLE TOWERS HOUSING DEVELOPMENT FUND CORP., SARASOTA GOLD LLC, E & M ASSOCIATES LLC, WEISSMAN REALTY GROUP LLC,<br><br>Defendants. | Civil Action No.: 1:14-cv-6410<br><br>Magistrate Judge Vera M. Scanlon |

**BRIEF IN SUPPORT OF DEFENDANTS MOTION FOR SUMMARY JUDGMENT, TO PRECLUDE THE EXPERT REPORTS AND TESTIMONY OF DR. ALAN PARNELL AND TO STRIKE PORTIONS OF THE AMENDED COMPLAINT**

Dated: New York, New York
      July 15, 2016

Thomas D. Shanahan (TS-3330)
Thomas D. Shanahan, P.C.
551 Fifth Avenue, Suite 616
New York, New York 10176
(212) 867-1100, x11
tom@shanahanalaw.com

### TABLE OF CONTENTS

ARGUMENT.................................................................................................................................1

The Expert Reports of Dr. Parnell are Properly Precluded.............................................1

*Dr. Parnell's First Report*.........................................................................................................3

*The Supplemental Report
of Dr. Parnell*.............................................................................................................................5

*Dr. Parnell's Incredible Testimony
Regarding the Sandcastle Tenants with Convictions*...........................................................6

*Dr. Parnell's Incredible Testimony That
Building Demographics are Irrelevant*.....................................................................................7

*The Declaration of Dr. Parnell Attempted
To Lower the Standard From "Blanket Ban" to
"Screening Out"*.........................................................................................................................7

Standard for Summary Judgment..........................................................................................12

Summary Judgment is Appropriate as Discovery Confirms
the Sandcastle Does Not Maintain A Blanket Ban As
Alleged in the Amended Complaint........................................................................................12

*HUD Guidance Defines Blanket Ban*....................................................................................15

*Sandcastle Tenants with Conviction Records*.....................................................................15

*The Purported Applicant Pool for Sandcastle
As Alleged by Dr. Parnell Should be Rejected
by This Court*.............................................................................................................................17

The Case-by-Case Analysis Utilized by the Sandcastle
in Regard to Applicants with Criminal Convictions Does
Not Have a Discriminatory Impact Based Upon Race.........................................................19

*The Actual Process Followed by
the Sandcastle*..........................................................................................................................20

Summary Judgment is Appropriate as Local Statistical
Evidence Confirms the Sandcastle's Demographics
are Consistent with the Surrounding Community................................................................23

*Local Data Was Available to Plaintiff*..............................................................................**23**

*Plaintiff Cannot Establish Nexus*..................................................................................**24**

It is Impossible for Plaintiff to Prove Disparate Impact.............................................**26**

*Phone Call Between Fortune and Sruly Tress*...............................................................**28**

*A Few Ads or Emails are Insufficient to*
*Demonstrate Disparate Treatment*.................................................................................**29**

Summary Judgment is Appropriate as The
Fortune Society Has Failed to Prove Disparate
Impact Based Upon Race, Resulting From the
Background Check Criteria Utilized by the Sandcastle...............................................**29**

The Sandcastle's Application Process Has a
Discriminatory Impact Based on Race, the Policy is
Necessary to Protect the Health, Safety and Welfare
of Residents Who Already Reside in the Sandcastle.....................................................**32**

The Case-by-Case Analysis Utilized by the
Sandcastle is Narrowly Tailored to Balance
the Safety of Existing Tenants with the Level
of Risk of Lack Thereof Presented by the Applicant
with a Criminal Conviction and There is
No Less Discriminatory Alternative................................................................................**32**

The Plaintiff Has Failed to Demonstrate
Intentional Discrimination Based Upon Race...............................................................**32**

Substantial Portions of the Amended Complaint Should Be Stricken.......................**33**

The Claims Under the NYSHRL and NYCHRL.............................................................**35**

Conclusion.........................................................................................................................**35**

## TABLE OF AUTHORITIES

**CASES**                                                                           Page(s)

*2922 Sherman Ave. Tenants Ass'n v. District of Columbia,*
        444 F.3d 673 (Dist. of Col, Cir. 2006)..................................................18, 25, 26

*Allen v. Muriello,*
        217 F.3d 517 (7th Cir. 2000)..........................................................................33

*Anderson v. Liberty Lobby, Inc.,*
        477 U.S. 242, 248 (1986)................................................................................12

*Carnegie-Mellon Univ. v. Cohill,*
        484 U.S. 343 (1988).......................................................................................35

*Charleston Housing Authority  v. United States Department of Agriculture,*
        419 F.3d  729, 741 (8th Cir. 2005)................................................................18

*City of Ladue v. Gilleco,*
        512 U.S. 43 (1994).........................................................................................13

*Danley v. Bayer,*
        2016 U.S. LEXIS 29752 (S.D.N.Y. 2016).....................................................1, 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
        509 U.S. 579, 113 S.Ct. 2786 (1993).............................................................9, 10

*Dothard v. Rawlinson,*
        433 U.S. 321, 330 (1977)...............................................................................23

*EEOC v. Freeman,*
        961 F.Supp.2d 783 (D. Md. 2013), *af'd sub nom. EEOC v. Freeman,*
        778 F.3d 463, 466 (4th Cir. 2015)............................................................10, 11, 12

*Evans v. UDR, Inc.,*
        692 F. Supp. 2d 675 (E.D.N.C. 2009)...........................................16, 26, 27, 29

*Green v. Missouri Pacific Railroad,*
        523 F.2d 1290, 1293 (8th Cir. 1975).........................................13, 14, 17, 32

*Griggs v. Duke Power Co.,*
        401 U.S. 424, 430, (1971)...........................................................................14, 24

*Huntington Branch NAACP v. Town of Huntington,*
        844 F.2d 926 (2nd Cir 1988)......................................................................18, 25, 30

*Kumho Tire Company v. Carmichael,*
  526 U.S. 137, 119 S.Ct. 1167 (1999) ............................................................................ 11

*Linsey v. Yates,*
  578 F.3d 407, 415 (6th Cir. 2009) ................................................................................. 33

*Lipsky v. Commonwealth United Corp.,*
  551 F.2d 887, 893 (2nd Cir. 1976) ................................................................................ 34

*Loeffler v. Staten Island Univ. Hosp.,*
  582 F.3d 268 (2nd Cir. 2009) ........................................................................................ 35

*Madsen v. Women's Health Center, Inc.,*
  512 U.S. 753, 773 (1994) .............................................................................................. 13

*Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly,*
  658 F.3d 375 (3rd Cir. 2011) ................................................................................... 18, 25

*Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.,*
  56 F.3d 1243, 1253 (10th Cir. 1995) ............................................................................. 23

*Nimely v. City of New York,*
  414 F.3d 381, 396 (2nd Cir. 2005) ................................................................................ 10

*Rodriguez v. City of New York,*
  2016 U.S. Dist. LEXIS 76882 (E.D.N.Y. 2016) ............................................................ 34

*Smith v. Clarkton,*
  682 F.2d 1055 (C.A.4 1982) ......................................................................................... 24

*Stagl v. Delta Air Lines, Inc.,*
  117 F.3d 76, 81 (2nd Cir. 1997) .................................................................................... 10

*Texas Department of Housing and Community Affairs v. Inclusive Communities,*
  135 S.Ct. 2507, 192 L.Ed. 2d 514 (2015) .................................. 15, 18, 24, 26, 29, 30, 31

*Thompson v. Gjivoje,*
  896 F.2d 716 (2nd Cir. 1990) ....................................................................................... 12

*United States v. Diebold, Inc.,*
  369 U.S. 654 (1962) ...................................................................................................... 12

*United States v. Playboy Entertainment Group, Inc.,*
  529 U.S. 803 (2000) ...................................................................................................... 13

*Valencia ex. rel. Franco v. Fee,*
 316 F.3d 299 (2nd Cir. 2003)..........................................................................35

*Watson v. Fort Worth Bank and Trust,*
 487 U.S. 977, 992, 999, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)................................10

**STATUTES**

24 C.F.R.
 §100.500 ( c )(1)........................................................................................19

42 U.S.C.
 §3607(b)(4)............................................................................................16

Fair Housing Act
 § 807(b)(4)............................................................................................16

Federal Rules of Civil Procedure
 Rule 12(f)..............................................................................................12

Federal Rules of Evidence
 Rule 702............................................................................................1, 10

United States Controlled Substances Act
 21 U.S.C. 802.........................................................................................16

## ARGUMENT

### The Expert Reports of Dr. Parnell are Properly Precluded

The Federal Rules of Evidence ("FRE") 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: is (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.   Expert testimony and reports are also properly excluded under FRE 403 if the subject matter therein has no relevance to the issues in dispute. See Danley v. Bayer, 2016 U.S. LEXIS 29752 (S.D.N.Y. 2016).  It is respectfully submitted that even under the liberal standards in the Second Circuit, Plaintiff's disparate impact expert, Dr. Parnell, has failed to satisfy even the most basic requirements of FRE 403 & 702.  Accordingly, both of his expert reports and any future testimony must be precluded.

Plaintiff retained the services of three experts in this matter.

Dr. Kazemian was retained to provide an expert assessment on "the necessity and value of blanket bans against individuals with criminal records for public safety and other legitimate purposes." See Declaration of Lila Kazemian dated May 12, 2016, Page 1, Exhibit H . Dr. Kazemian prepared and submitted one report in this matter. See Exhibit I.   None of the data in the report authored by Dr. Kazemian or in her declaration is specific to the Sandcastle.   The conclusion of Dr. Kazemian was that "blanket bans may actually be detrimental to public safety." See Declaration at 3.

1

Dr. Wildeman was retained to provide an expert opinion on the proportion of people by race that have a criminal record in the United States and New York.  See Declaration of Wildeman dated May 5, 2016, Page 1, Exhibit J.  Dr. Wildeman prepared one expert report annexed as Exhibit K  It is undisputed Dr. Wildeman incorporated no data specific to the Sandcastle in his expert report.  Id.  None of the data sets specifically referenced in the Complaint ¶¶ 60-90 and 95-100 are incorporated into Dr. Wildeman's report or any of his conclusions.  It is undisputed that Dr. Wildeman never spoke to either of the other experts retained by Plaintiff in this matter.  Dr. Wildeman utilized *incarceration* data instead of *conviction* data in both his national and New York based calculations. See Exhibit K, page 11.

Unlike the other two experts retained by Plaintiff, Dr. Allen Parnell's role is not exactly clear.  Actually, his role is quite flexible.  This case is the seventh case involving housing discrimination in which Plaintiff's counsel has retained Dr. Parnell.  See Exhibit P, pages 99, 100.  The relationship between the attorneys at Relman, Dane & Colfax, PLLC (hereinafter "Relman") and Dr. Parnell is so close, Dr. Parnell advertises Relman as a client on his website.  Id.,   .  Dr. Parnell has never been retained by, or worked with, a *defendant* in *any* housing case in his career.  Id., 104.  Dr. Parnell has only testified in cases brought against state actors regarding purported discriminatory zoning or other state action.  This is the first case involving a private landlord and alleged discrimination based upon criminal conviction record for which Dr. Parnell provides an expert opinion.  Id., 104-106.  He relied on Dr. Wildeman's report for his background information on criminal incarceration (which is over-inclusive as it does not focus solely on conviction, which is the issue here) and he

did not independently confirm any of the data sets utilized by Dr. Wildeman. Id., 14, 15, 16, 106.

Dr. Parnell prepared two (2) expert reports and also submitted a Declaration dated May 10, 2016.  In his initial report dated Dr. Parnell described the scope of work as: "Assess[ing] if a history of criminal conviction disproportionately affects the ability of African Americans and Latinos relative to Whites to qualify to rent at Sandcastle Apartments." See Exhibit O, Page 2.  However, by the time he executed his Declaration in May 2016, his self-described role and scope of his work had changed dramatically.  In his Declaration, Dr. Parnell described his scope of work: "To provide expert opinions on what housing markets define the applicant pool for the Sand Castle...[and] to assess how a policy *screening out* applicants with criminal records would affect the applicant pool." (Emphasis added).

Defendants respectfully submit that the radical change in Dr. Parnell's purported role, expertise and analysis, should raise red flags with this Court and preclude his reports and testimony.  When confronted with the discrepancies and his purported role at his deposition, Dr. Parnell testified, incredibly, as follows: "[It] means the same thing." See Deposition of Dr. Parnell, Exhibit P, page 179.  However, he admitted he failed to disclose in his initial report any mention of the fact that he was purportedly retained to provide expert opinion on what housing markets define the applicant pool for the Sandcastle. Id., 181.

### Dr. Parnell's First Report

To prepare his first report, Dr. Parnell relied on the Complaint and expert reports of Dr. Wildeman and Dr. Kazemian.  Dr. Parnell references the Sandcastle *fifteen (15) times*

throughout his expert report, giving the reader the impression that he was analyzing data specific to the Sandcastle. At his deposition, Dr. Parnell clarified that *none* of the data he relied on was specific to the Sandcastle. Id., 32-33. Rather, Dr. Parnell confirmed his conclusions related to the "housing market" generally, not the Sandcastle. Id., 33. As no data exists in the report that is case specific to the Sandcastle, Defendants respectfully submit that his initial report is properly stricken and precluded.

A second reason to preclude the report is that Dr. Parnell himself admits many of his basic assumptions were wrong. He admits that allegations in the Complaint, which he assumed as true, are not accurate. Id., 116. He admits that his prior testimony[1] regarding the automatic exclusion of applicants with conviction records was not accurate. Id. He admitted that he failed to distinguish between felonies and misdemeanors as he believed the alleged blanket ban automatically excluded all convictions. Id., 117, 224. At the continuation of his deposition, Dr. Parnell confirmed that he learned that many categories of information had *not* been provided to him by the attorneys for Plaintiff. Id., 126.

Most critically for purposes of this Court's analysis, Dr. Parnell admitted that his analysis in his initial report would apply to every residential building similarly situated and what made this case different was the alleged blanket ban. Dr. Parnell conceded that is if there is no blanket ban, both of his reports have "no relevance to the Sandcastle." Id., 201. He described the existence of the alleged blanket ban as "critical" to his analysis in both reports. Id., 121. The following is colloquy from Dr. Parnell's deposition:

---

[1]The deposition of Dr. Parnell was held on two days, the second day ordered by the Court after an improper instruction not to answer and disclosure of information previously withheld by Relman from Dr. Parnell and the Defendants.

Q. You need something at the – specific to the Sandcastle in addition to those generalized statistics that would support the conclusions you reached in your report?
A. No.
Q. So – you don't?
A. No.
Q. You don't need any specific conduct by the defendants in this case?
A. Well, we have the blanket ban on criminal convictions.
Q. So if there's no blanket ban on criminal convictions, the statistics you just cited to have no relevance to the Sandcastle, isn't that correct?
A: That's correct.

So the Plaintiff's lead expert concurs that *absent the existence of a blanket ban*, his initial report has no relevance whatsoever to any issue in dispute herein.

### *The Supplemental Report of Dr. Parnell*

The Supplemental Report of Dr. Parnell was based upon select information "cherry-picked" by the lawyers at Relman. Not surprisingly, the attorneys at Relman only provided him with the "cherry-picked" data they felt helped their case. The attorneys at Relman specifically chose to withhold relevant information, more specifically, a significant number of residents of the Sandcastle with conviction records. The inherent *bias* of the Supplemental Report based upon the misconduct of counsel for Plaintiff, is in and of itself grounds to preclude. In addition, Dr. Parnell analyzed credit scores and the effect of prior landlord-tenant actions on applicants to the Sandcastle even though he has never qualified as an expert in any court on these topics and admitted at his deposition that he has no training and/or experience on these topics. Id., 107-110.

Notable in his supplemental report is Dr. Parnell's conclusion that none of the evidence produced in discovery "is useful in reaching conclusions on whether the Defendant's criminal records policy has racially disparate effects". See Exhibit Q, Page 3. However, this Court should note that Dr. Parnell specifically does not address a "blanket

5

ban" anywhere in his Supplement report, but rather, he watered down his verbiage to review of the "Defendant's criminal records policy."  Id., Pages 2-3.

The process of the radical change in Dr. Parnell's scope of work begins to become clear there and Dr. Parnell continues to reinvent the reason he was retained.  Rather than focusing on the alleged blanket ban and demographics of the Sandcastle, Dr. Parnell embarks on an esoteric and convoluted analysis in an attempt to construct a hypothetical "applicant pool" which will become the focus of Plaintiff's disparate impact claim.

Dr. Parnell's Supplemental Report contains no data relating to the actual demographics of the Sandcastle or the surrounding community.  When asked at his deposition why he had not utilized Census data or other local demographic data, Dr. Parnell testified that it was not relevant.  See Exhibit P, pages 187, 194, 198, 205, 207.  He testified the Regulatory Agreement with the City that transitioned the Sandcastle from market rent to low-income housing was not relevant.  Id., 182.

***Dr. Parnell's Incredible Testimony***
***Regarding the Sandcastle Tenants with Convictions***

At his continued deposition, Dr. Parnell testified that after this Court directed his deposition to continue, he reviewed the spreadsheet previously withheld by Relman and found only four (4) people in the Sandcastle with criminal convictions.  Id., 122,136.  Dr. Parnell was incorrect as the spreadsheet contains twenty (although it was incorrectly stated that the number was only eighteen at the deposition by Defendants' counsel).  Id., 146-166.  The twenty (20) range from misdemeanor traffic violations to serious felonies. Dr. Parnell was asked, for example, if the presence of someone convicted of felony sex

6

offense, grand larceny or assault and battery was relevant:  His answer was always no.[2]  Id.,

146-166.  The following colloquy took place:

> Q:  Do you believe the fact that 18 – at least 18 people with criminal convictions
> reside in the building is relevant to your disparate impact analysis?
> A: No.

**_Dr. Parnell's Incredible Testimony That_**
**_Building Demographics are Irrelevant_**

Dr. Parnell's Supplemental Report contains no data relating to the actual

demographics of the Sandcastle or the surrounding community.  When asked at his

deposition why he had not utilized census data or other local demographic data, Dr. Parnell

testified that it was not relevant.   Id., 187, 194, 198, 205, 207.  He testified the Regulatory

Agreement with the City that transitioned the Sandcastle from market rent to low-income

housing was not relevant.  Id., 182.  Dr. Parnell also gave no weight to the tenant roster,

reviewed by two employees of the Sandcastle (one of whom has been employed there since

prior to 2006), which confirms the Sandcastle's demographics to be approximately 70%

minority.  Id., 196-199, 206, 208, 210.  When questioned why, Dr. Parnell incredulously

testified the building demographics are not relevant for a disparate impact analysis. Id.,

208.

**_The Declaration of Dr. Parnell Attempted_**
**_To Lower the Standard From "Blanket Ban" to_**
**_"Screening Out"_**

---

[2] Dr. Parnell also was mistaken in his testimony that all the tenants in the spreadsheet
moved in after 2014.  See Deposition of Parnell, Exhibit P, page 175.  If he had actually
bothered to review the actual tenant files he would have known that the period the tenants
resided at the Sandcastle varied from 2007 to 2015.   Of the twenty total, seven moved in
prior to 2014.  Permitting Dr. Parnell to testify and make mistake after mistake as he did
not review any of the underlying data will confuse a trier-of-fact and constitute unfair
prejudice to the Defendants.

By the time the attorneys at Relman drafted the Declaration of Dr. Parnell which he executed on May 10, 2016, gone was any reference to the "blanket ban" mentioned repeatedly in the Complaint and the purported policy upon which both of Dr. Parnell's reports were based. See Exhibit F., ¶¶1, 9, 11, 12, 14, 15, 16, 18, 19, 20, 53, 66, 67, 68, 72, 73, 75, 76, 91, 92, 93, 94, 101, 102, 103, 105, 107, 109, 112, 113, 114, 116, 117 and 125. Surprisingly, given the "blanket ban" was the focus of the Complaint and both of his reports, Dr. Parnell's Declaration does not mention "blanket ban" once.  Rather, Dr. Parnell attempts to introduce a new term for the policy: "screening out applicants with criminal records."  See Exhibit N, page 2, see also, Deposition of Dr. Parnell, Exhibit P, pages  239, 240.  Further, the Declaration goes on at length regarding the purported "expert opinion on what housing markets define the applicant pool" for Sandcastle when that issue was never a major issue in dispute in the pleadings filed in this action.  Id., page 1.

Even Dr. Parnell's attempts to construct an applicant pool for the Sandcastle are flawed.  He utilized the HUD Metro New York Fair Market Rent Area database for *market rent* units.  See Parnell Declaration, Exhibit N, pages 2, 3, 4.  Dr. Parnell admitted that he has no prior experience with the New York City metropolitan housing market.  See Parnell Deposition, Exhibit M, pages 12,   This analysis does not give weight to the Regulatory Agreement and income limitations on applicants nor does it account for the fact that almost every tenant in the building is a participant in Section 8 or some other governmental program that provides rent subsidies.  Id., 17 18, 25., 28, 30, 42, 55.  He was not aware that a governmental entity had to approve all tenants for residence after the Sandcastle conducted initial screening and did not take this into consideration during his analysis. Id., 69.

Moreover, given his lack of familiarity with the New York City metropolitan area, he failed to take into account the very wealthy, non-minority neighborhoods included in the HUD Metro New York Fair Market Rent Area.  That database includes the Upper East and West Sides of Manhattan and affluent areas in Rockland and Westchester Counties.  See Declaration of Welsch, Exhibit T.   Had Dr. Parnell been familiar with the market, he would have known that substantial numbers of individuals included in the HUD Metro New York Fair Market Rent Area database simply would not qualify at the Sandcastle based on income alone.  Id.

It is well-settled that the Court may, in its discretion, admit expert testimony upon the proper showing of the factors enunciated in FRE 702 as interpreted by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993).  It is Defendants' position that Plaintiff has not made such a proper showing as required by Daubert and its progeny.

All precedent interpreting Daubert requires that the expert not only review the underlying data upon which the expert's testimony is based, but also use reliable and consistent methods, generally accepted in the expert community of which the expert is a part.  Dr. Parnell failed to review the underlying data upon which his two reports are based.  Even more egregious is that data specifically relevant, but which tended to contradict Plaintiff's claims, was secreted from Dr. Parnell by Relman.  Even after disclosure of this data that contradicts the basic assumptions underlying Dr. Parnell's reports, he continued to argue that his reports are accurate and reliable, while unilaterally changing the scope of his retention from the "blanket ban" at Sandcastle to some esoteric, purported applicant pool he created, which has zero relevance to the issues in dispute.

Although the Second Circuit employs a liberal rule regarding admissibility of expert reports, that rule is not liberal enough to permit in hearsay, speculation or conjecture. The Second Circuit has held that when an "expert opinion is based upon data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Nimely v. City of New York, 414 F.3d 381, 396 (2nd Cir. 2005). See, also Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81 (2nd Cir. 1997), Danley v. Bayer, supra.

A case almost directly on point is Equal Employment Opportunity Commission v. Freeman, 961 F.Supp.2d 783 (D. Md. 2013), affirmed sub nom. Equal Employment Opportunity Commission v. Freeman, 778 F.3d 463, 466 (4th Cir. 2015).   In Freeman, the Fourth Circuit upheld the preclusion of expert reports and testimony on behalf of the EEOC. The Court held that proof of disparate impact requires reliable and accurate statistical analysis performed by a qualified expert. As the Supreme Court has noted, "the inevitable focus on statistics in disparate impact cases" results in a very "high standard] of proof" that can be difficult for plaintiffs to meet. Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 992, 999, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Merely pointing to "statistical disparities in the employer's work force" is not sufficient; the plaintiff must provide "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Id. at 994, 108 S.Ct. 2777.

Plaintiff has failed to set forth any proof of disparate impact at the subject premises and, instead, relies upon a faulty and hypothetical applicant pool utilizing the least specific and least applicable data based upon the low-income status of the Sandcastle, the actual

10

demographics of the building and immediately surrounding area.  Moreover, and most troubling, is that Plaintiff's expert deems the inclusion of at least twenty (20) residents with known criminal backgrounds as irrelevant to Plaintiff's claim that a blanket ban exists.

Defendants respectfully submit the decision in Freeman is persuasive and supports Defendants' application.   The Court in Freeman found the data upon which the expert relied to be inadequate, and the report to be "riddled with fundamental errors, mistakes, and misrepresentations".  Id., at 464.  The Fourth Circuit held that the "sheer number of mistakes and omissions in the [E.E.O.C.'s expert's] analysis renders it outside the range where experts might reasonably differ."  Id., citing Kumho Tire Company v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167 (1999).  The Fourth Circuit also recognized that the expert had "cherry-picked" data for inclusion in his report.  Freeman, supra.  The Court admonished the E.E.O.C., holding that "'cherry-picking'" data is essentially the converse of omitting it; just as omitting data might distort the result by overlooking unfavorable data, cherry-picking data produces a misleadingly favorable result by looking only to 'good' outcomes." Id., 794-796.

The facts and analysis in Freeman are analogous to the issues on this motion.  Dr. Parnell concedes that he did not review the underlying data utilized to create the spreadsheet upon which his Supplemental Report is based or the underlying data used in Dr. Wildeman's report.   Dr. Parnell testified the spreadsheet was created by Plaintiff's lawyers and then provided to him.  See Deposition of Parnell, Exhibit M, pages 48-50, Exhibit P, pages 170-175.  Dr. Parnell cannot explain why certain information was included and other information left out.   In essence, the spreadsheet created by Relman, contains "cherry-picked" data similar to the facts in Freeman.  Dr. Parnell similarly could not explain

why the information that was then provided regarding the known criminal history of at

least twenty (20) tenants was irrelevant when it goes directly to the allegations in this case.

      As in <u>Freeman</u>, the "cherry-picking" in this case is egregious.  Given the egregious

conduct andfailure of Dr. Parnell to analyze and review actual demographics for the

Sandcastle and surrounding community, together with his continually evolving role which

confirms, it is respectfully submitted, the utter lack of any professional standard in regard

to his conduct and behavior, both of his reports and his testimony are properly precluded.

<h3 align="center"><u>Standard for Summary Judgment</u></h3>

      Pursuant to F.R.C.P. 56, summary judgment is appropriate where the evidence

demonstrates that "there is no issue of any material fact and the moving party in entitled to

judgment as a matter of law." <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986), <u>Thompson v. Gjivoje</u>, 896 F.2d 716 (2nd Cir. 1990).  In light of this burden, any

inferences to be drawn from the facts must be viewed in the light most favorable to the

non-moving party.  <u>See</u> <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962).  For the reasons

that follow, Defendants respectfully submit that summary judgment is properly granted in

favor of the Defendants.

<h3 align="center"><b>Summary Judgment is Appropriate as Discovery Confirms the Sandcastle Does Not<br>Maintain A Blanket Ban As Alleged in the Amended Complaint</b></h3>

      This action is predicated upon the allegation, made repeatedly in the Complaint, and

the assumption underlying all of Plaintiff's expert reports, that the Sandcastle has a blanket

ban against renting to any person with any history of criminal convictions. <u>See</u> <u>Exhibit F</u>,

¶¶1, 9, 11, 12, 14, 15, 16, 18, 19, 20, 53, 66, 67, 68, 72, 73, 75, 76, 91, 92, 93, 94, 101, 102,

103, 105, 107, 109, 112, 113, 114, 116, 117 and 125.   The Complaint does *not* distinguish

between misdemeanors and felonies. <u>Id</u>.  It is undisputed that the expert reports of both

12

Dr. Parnell and Dr. Wildeman do *not* distinguish between misdemeanors and felonies. Accordingly, absent a further major amendment to the Complaint, the allegations as pled are that the Sandcastle maintains a blanket ban against renting to anyone with a misdemeanor or felony conviction.[3]

Case law cited by the Plaintiff in the Complaint itself, <u>Green v. Missouri Pacific Railroad</u>, 523 F.2d 1290, 1293 (8th Cir. 1975), defines blanket ban as *all* applicants. <u>See</u> <u>also</u> <u>Madsen v. Women's Health Center, Inc.</u>, 512 U.S. 753, 773 (1994), <u>City of Ladue v. Gilleco</u>, 512 U.S. 43 (1994), <u>United States v. Playboy Entertainment Group, Inc.</u>, 529 U.S. 803 (2000).   In <u>Green</u>, the Court held that in the context of employment, a policy *automatically* rejecting all applicants for employment at the defendant railroad with convictions for offenses other than minor traffic infractions, resulted in a disparate impact based upon race, and could not be justified by business necessity. <u>Id.</u>, at 1298 (emphasis added).   The Eighth Circuit found disparate impact after measuring the effects of defendant's policies on the "general population in the area from which employees were drawn (metropolitan St.

---

[3] As was referenced earlier in the "<u>Daubert</u>" section, the theory of Plaintiff's case and core allegations are constantly evolving to fit evidence as it was turned over in discovery.  For example, once the Plaintiff became aware that the building demographics are contrary to their claim, they then alleged the actual group damaged by the Sandcastle's application review policy was a hypothetical applicant pool from the entire New York metropolitan region.  When the Plaintiff learned of individuals in the Sandcastle with misdemeanor convictions, they then modified their argument to argue the alleged policy disparately impacts felons only.  When they learned of numerous individuals residing in the Sandcastle with felonies, the theory of their case shifted and their expert Dr. Parnell testified the building demographics are irrelevant.   Plaintiff then once again shifted the theory of their case back to the hypothetical applicant pool.  The constantly shifting theory of Plaintiff's case along with the "cherry picking" of information provided to Dr. Parnell, should lead to a negative inference.  Moreover, this Court should recall its Decision dated April 25, 2016 wherein the Court held one of the attorneys for Plaintiff improperly instructed a witness not to answer a relevant question and another improperly failed to disclose a spreadsheet containing evidence contrary to the allegations in their Complaint.  As a result, the Court reopened the deposition of Dr. Parnell.

Louis) and the effect on white and black applicants for employment with [defendant]". Id., at 1295.

The disparate impact analysis in Green, based upon the actual, rather than hypothetical, applicant pool and the differential between the number of similarly situated black and white applicants accepted, was found to violate the provisions of Title VII, as it constituted discrimination based upon race. Id. The Eighth Circuit, citing to the United States Supreme Court, held that the "employment criterion must be examined for its operation on a racially exclusionary basis – thus the effect must be measured upon blacks separately and upon whites separately." Id., citing Griggs v. Duke Power Co., 401 U.S. 424, 430, (1971).

None of the analysis found in Green was conducted in this action; Green relied on actual data and the Plaintiff seeks to ignore almost all actual data, instead relying on hypothetical groups created by its paid experts.[4] Unlike Green, Plaintiff's statistical analysis involves *hypothetical*, rather than actual, tenants or applicants.   It is undisput4ed that at the deposition of Dr. Wildeman and Dr. Parnell, both conceded that their initial reports had *no* data sets or other information specifically relating to the Sandcastle. In other words, unlike Green, wherein data sets specific to the employer of both applicants and employees were utilized to demonstrate disparate treatment, almost none of the data utilized by Plaintiff's experts in this case is specific to the Sandcastle.

The attempt to cover up the lack of any meaning to the reports as they relate to the Sandcastle is best demonstrated by the initial report of Dr. Parnell.  Although Dr. Parnell

---

[4] This court should note that Dr. Parnell has been retained by Plaintiff's counsel in seven cases that he can "recall".  See Exhibit P, page 97.  Dr. Parnell also lists Plaintiff's firm on his website as one of this clients.  See Exhibit M, page 76.

repeatedly referenced the Sandcastle in his first report, when questioned at his deposition

he conceded that *no* data related to the Sandcastle was actually reviewed by him.  <u>See</u>

<u>Exhibit M</u>, pages 32, 33.  There are over 15 misleading references to the Sandcastle

throughout Dr. Parnell's report while none of the data relates to the building.

**HUD Guidance Defines Blanket Ban**

On April 4, 2016, the United States Department of Housing and Urban Development

("HUD") issued *Guidance on Application of Fair Housing Act Standards to the Use of Criminal*

*Records by Providers of Housing and Real Estate-Related Transactions* (hereinafter "HUD

Guidance").  <u>See</u> <u>Exhibit GG</u>.  The HUD Guidance specifically incorporates the holding of the

United States Supreme Court in <u>Texas Department of Housing and Community Affairs v.</u>

<u>Inclusive Communities</u>, 135 S.Ct. 2507, 192 L.Ed. 2d 514 (2015) and <u>Green</u>, into its legal

analysis in cases involving claims of race based discrimination in housing involving

individuals with a record of one or more criminal convictions.  HUD's General Counsel

stated:

> "A housing provider that imposes a blanket prohibition on any person with
> any conviction record – no matter when the conviction occurred, what the
> underlying conduct entailed, or what the convicted person has done since then –
> will be unable to meet" the burden of proving that a policy or practice is "necessary
> to achieve a substantial, legitimate, nondiscriminatory interest."  <u>See</u> <u>Exhibit GG</u>,
> Page 6, subsection 2.

Clearly, the standard annunciated and adopted in the HUD Guidance is identical to

the definition given to the term "blanket ban" by the Complaint and in <u>Green</u>: *all*

*convictions.*

**Sandcastle Tenants with Conviction Records**

In discovery, a review of the tenant files of the Sandcastle by Plaintiff's counsel led

to the disclosure of *at least* twenty (20) tenants with some known history of a criminal

conviction.   A review of the spreadsheet created by Plaintiff's counsel, that includes these

twenty (20) tenants with convictions, confirms that the convictions run the gamete from

misdemeanor traffic infractions to violent felonies.   See Exhibit S.   Irrespective, the fact that

at least twenty (20) tenants have some record of conviction belies the allegation that a

blanket ban exists, or has ever existed, at the Sandcastle[5].   The number of individuals with

conviction records does not include the Fortune Society tenants residing in the building, as

their convictions were not disclosed at the time the Fortune Society rented these units

(these leases are in the name of the Fortune Society and not the individual residing

therein), nor tenants for whom the criminal background check was not found in the tenant

file[6].

Rather than concede that the number of Sandcastle residents with convictions

fatally flaws the allegations in the Complaint, Plaintiff simply chooses to ignore them.   In

fact, Dr. Parnell takes the position that the convictions are "irrelevant".   See Exhibit P, pages

118, 125, 136, 165.   At his reopened deposition, testified that the spreadsheet contained

"four" people with convictions.   He testified that the presence of these "four" was

---

[5] In fact, the Sandcastle houses tenants with convictions that are excluded from the Fair Housing
Act's provisions.  For example F.H.A. §807(b)(4) contains statutory exemptions for individuals
convicted of certain crimes, namely the illegal manufacture or distribution of a controlled substance
as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802).  See 42 U.S.C.
§3607(b)(4).

The HUD Guidelines incorporate this exemption and state as relevant:

"Section 807(b)(4) only applies to disparate impact claims based on the denial of housing due to the
person's conviction for drug manufacturing or distribution; it does not provide a defense to
disparate impact claims alleging that a policy or practice denies housing because of the person's
arrest for such offenses." The fact is that the Sandcastle has rented units for years to individuals
with criminal convictions, including in categories exempted under the F.H.A.  Dr. Parnell testified at
this deposition that he did not know if the F.H.A. exempted these categories.  See Parnell Dep.,
Exhibit P, page 148-152.
[6] The fact that Fortune has units rented at the building is relevant to this court's analysis.  See Evans
v. UDR, Inc., 692 F. Supp. 2d 675 (E.D.N.C. 2009)

"irrelevant". Id., pages 122, 140.   The spreadsheet actually contains twenty (20) individuals with convictions.  When confronted with his mistake of this critical fact, Dr. Parnell deemed all tenants with convictions living in the Sandcastle "irrelevant".   Id., page 165.   Defendants respectfully disagree and submit that the presence alone of a substantial number of tenants residing in the Sandcastle with known criminal convictions should, in and of itself, result in summary judgment in favor of the Defendants.[7]

**The Purported Applicant Pool for Sandcastle**
**As Alleged by Dr. Parnell Should be Rejected**
**by This Court**

The Sandcastle demographics demonstrate racial diversity, rather than racial discrimination.  The demographics of the building and the presence of at least twenty (20) individuals with known criminal convictions, make proving the allegations in the Complaint impossible.   Realizing this fact, Plaintiff's counsel, along with Dr. Parnell, shifted the theory of their case away from the Sandcastle and instead, towards a hypothetical applicant pool with no basis in fact or law.   This was confirmed at Dr. Parnell's deposition where he admitted that the scope of work when he was retained was **not** to provide expert opinions on what housing markets define the applicant pool for the Sandcastle. Id., 181.

In Green, the applicant pool for employment at the defendant railroad was based upon the actual individuals whose applications were rejected by the defendant.  Further, the applicant pool was clearly delineated as metropolitan Saint Louis.  Herein, there are minimal rejected applications to review, as it was the Sandcastle's policy to disregard

---

[7] There are a large number of tenant files that do not contain any proof of a criminal background check.  This indicates that a criminal background check was not a necessity in granting apartments to all residents, and that there may be more tenants residing in the Sandcastle with criminal convictions than accounted for by Plaintiff.  Similarly, there may be residents in the Sandcastle who have been convicted of crimes after the date they moved into the premises and continue to reside therein.

rejected applications prior to 2014.  The policy changed in 2014 as a result of personnel changes and preferences, and not as a result of any specific policy change.   Using what rejected applications remained, Dr. Parnell attempted to estimate the potential zip codes and/or communities from which the Sandcastle drew applicants in his initial and supplemental reports.  See Parnell Report, Exhibit O; Supp. Parnell Report.  Exhibit P. However, Dr. Parnell's analysis fails for a number of reasons.

First, Plaintiff's counsel did not disclose to Dr. Parnell the existence of the Regulatory Agreement and that the Sandcastle is a low-income housing development.  See Exhibit P, page 55. Rather, Dr. Parnell conducted an analysis utilizing data applicable to "market rent buildings" and failed to consider the restrictive income requirements along with the demographics of low-income housing, generally, in New York City and other major metropolitan areas in the Northeast.   Id.

Second, Dr. Parnell chose to ignore the available Census data along with the local data included in the Complaint and instead focused on regional data for fair market housing.  *Every case* cited in the HUD Guidance, Second Circuit and United States Supreme Court involving disparate impact claims include detailed analysis of the Census data specific to the location where it is alleged the disparate impact has taken place. See Texas Dept. of Hsg. and Comm Affairs v. Inclusive Communities *supra*; Huntington Branch NAACP v. Town of Huntington, 844 F.2d 926 (2nd Cir 1988), Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly, 658 F.3d 375 (3rd Cir. 2011), Charleston Hous. Auth. v. USDA, 419 F.3d 729 (8th Cir. 2005), 2922 Sherman Ave. Tenants Ass'n v. District of Columbia, 444 F.3d 673 (Dist. of Col, Cir. 2006).

Should the Plaintiff prevail, this case would be the **very first** case involving alleged disparate impact that ignored **actual** Census data available for the building at issue and instead found disparate impact based upon a hypothetical applicant pool with **no connection** whatsoever to the location at issue.  As Defendants' expert points out repeatedly in his Declaration submitted in support of this motion, the analysis of Dr. Parnell, which excludes building demographics, is fundamentally and fatally flawed.  See Declaration of Welsch, Exhibit T.

Lastly, Dr. Parnell's reliance on the HUD Metro market is erroneous as he failed to take into consideration that the market figures include neighborhoods and zip codes of great wealth and minimal minority demographics, such as the Upper East and West Sides of Manhattan, Riverdale in the Bronx and parts of Westchester County.  See Welsch Declaration, ¶¶53, 54.  Given the "cherry picked" information provided to Dr. Parnell by Plaintiff's counsel (to wit, the failure to reveal that the Sandcastle is a low-income housing development), it was an impossibility for him to conduct an accurate analysis to construct an applicant poof for prospective tenants at the Sandcastle.   Moreover, **even after** disclosure of the Regulatory Agreement and income range for prospective tenants, Dr. Parnell did not conduct further analysis to re-evaluate his conclusions.  See Exhibit P.

### The Case-by-Case Analysis Utilized by the Sandcastle in Regard to Applicants with Criminal Convictions Does Not Have a Discriminatory Impact Based Upon Race

Both statute and case law have affirmatively declared blanket bans to be *per se* discriminatory under the Fair Housing Act.  See 24 C.F.R. §100.500 ( c )(1); Texas Dept. of Hsg. and Comm Affairs v. Inclusive Communities *supra; see also* U.S. HUD. Guidance, Exhibit GG.  Rather than a blanket ban, the Sandcastle has an informal policy of subjectively evaluating prospective tenants taking into account the factors identified in the HUD

Guidance, Exhibit GG,  and Expert Report of Dr. Kazemian, Exhibit I .  This subjective, case-

by-case evaluation was in place at the Sandcastle long before the HUD Guidance was

released in April 2016.

**The Actual Process Followed by
the Sandcastle**

Rose Campbell, an African-American, who oversees applications for the Sandcastle,

confirms the subjective nature of the Sandcastle's policy regarding conviction records.  See

Exhibit U .  For example, Ms. Campbell testified:

> Q: I want to return to the issue of what kinds of applicant decisions you take to Mr.
> Tress. Can you describe for the criminal background issue, are there any
> applications that you ask Mr. Tress if you can approve even though the person has a
> criminal background hit?
> A:  Yes.  You want examples?
> Q:  Yes.
> A:  Sometimes there may be something for substance abuse or drugs, in that sense in
> that nature, yes, I would give it to Srully (sic) to review.  Something like assault
> robbery, those things, like that.
> Q: Assault and robbery, would – would- what's the –
>
> A: It could be something maybe a little towards the violent side but it's not charged
> as a felony.  It's a misdemeanor and I would still just let them – I can't – I don't – I
> didn't – you know, follow directions.  So, I will let them review it to make the
> decision because maybe the applicant is pleading, that, oh well, you know.   It could
> have happened so many years ago, then they likely haven't been in no trouble since
> then.   So then, I would then make, it – the upper management make the decision.
> Q:  And how would the applicant give more information about their criminal
> background to you?
> A:  Only if I state – if I tend to tell them that they would read the  -- let's say if I have
> to tell them they will be denied or if there's something on their report that might
> need to be a little – verified a little bit, then they would intrigue to go on and give a
> little information.
> Id., pages 74-76.
>
> Another example of Ms. Campbell's testimony regarding the actual policy follows:
>
> Q:  So, for drug possession that's a misdemeanor, do you consider that to be violent
> or non-violent?
> A:  Drug possession is non-violent but it depends also on the person's – if it's a
> misdemeanor, you also have a felony that can have a drug possession, as well

instead of a felony (sic).  So, it depends on the person's rap sheet.  A person can have just that one little minor thing versus a person with a misdemeanor and have 10 pages of a rap sheet.  That person could be a – could be a – considered a little more fluent in getting, you know, involved in things.

I don't know.  That's something that has to be decided by the manager, not me, because someone like that, if you – if—I would have to look and see that -- if that they have, for example, it could be a 20-page.  If – somewhere in there, then I would have to be, like, yeah, the manager has to look at that.  I can't really make that decision.

Q.  Right.  I'm just trying to understand your testimony that for non-violent misdemeanors you can make the decision.  So, if someone only has a misdemeanor drug possession, is that something that you would approve yourself or is that something Mr. Tress approves?

A:  In some cases, yes, because there's people that go – I guess get there life together and is no longer, you know, substance users or whatever.  I mean, I don't get into the nature of that.  I look at the rap sheet, in general.  It could be just that one thing and nothing ever, and then they also might have, like, letters of something or references to show – you know, because some – 9 times out of 10 – a client knows their self.  They know their background.  They already know what they are involved in.  And if they're looking for housing, they already know a lot of the landlord criteria's.

So to be honest, a person could have had a substance abuse problem and got their self together.  They might voluntarily even state that, if – well you – I have to still tell them, well, a misdemeanor did come up on their report.

And if they volunteer that information, I'm looking at them, they're trustworthy, they have other things, then yeah, I can most likely consider that myself.  But like other things like robbery, assault, more – seem more to the violent part, now I would let the manager do it.

Q:  So, for the non-violent misdemeanors that you're not sending to Mr. Tress –

A:  Misdemeanors, right? Um-hum.

Q:  For non-violent misdemeanors, do you communicate with the applicant about the fact that there was misdemeanor found in their record?

A:  Right. But they're not being denied.  It's never – we don't – it's not, I am not saying that they're being denied their application because they have the misdemeanor.  I'm just saying that it has come up, but it's – a little more violent compared to a non- - a person who has maybe traffic violations or is in family court for domestic violence or something like that, or domestic abuse or child or those things like that.

Q:  But is it your practice to have a conversation with anybody who has a misdemeanor come up in their background check?

A:  Well, I honestly give them the truth, as far as—I don't have to tell them, but if I'm sitting here and we're going over an application together, as – me as a person, I say "Okay, your background check was okay expert you do have a little minor misdemeanor thing.  But we're -- everything else seems to be okay, there's nothing

to panic about, you're not going to get denied." You know, this probably still have to go over review if I – if it looks like it's something that could be a problem. Or even – of that nature. Other than that, those – I've rent to misdemeanor applicants. Id., Pages 138-143.

Sruly Tress, Property Manager at the Sandcastle, confirmed the substance of Ms.

Campbell's testimony. Mr. Tress testified: "Some [applications] get approved, some get

denied. And some of them have a criminal history, and the person will come in and say,

Yes, I was 18, I got arrested for drugs. I'm 55 or I'm anything, my life has turned around."

See Exhibit V, pages 126-128.

In relation to felonies, Mr. Tress, testified as follows:

Q. Do you know how Ms. Campbell treats an application when she sees that the applicant has a felony?

A: I believe it's case by case, like we are all supposed to treat them.
Q: Do you know that it's case by case?
A: I know that we've have people with a criminal history living in the building, so that has never deterred us. If someone has a criminal history, it's just depends, like I said, case by case what the rest of the situation is.
Id., at 132, 133, see also pages 134-140.

Given the subjective criteria as described above, Defendants respectfully submit that

the Sandcastle's policy, albeit informal and not in writing, complies with the factors to be

considered in the HUD Guidance, in the report of Plaintiff's expert Dr. Kazemian, and

precedent regarding the balancing test to be applied in employment and/or housing to

individuals with conviction records. We respectfully submit that the uncontroverted

testimony of Ms. Campbell and Mr. Tress, confirmed by the presence of at least twenty (20)

residents with known conviction records, supports the Court granting summary judgment

in favor of Defendants.

**Summary Judgment is Appropriate as Local Statistical Evidence Confirms the Sandcastle's Demographics are Consistent with the Surrounding Community**

To ascertain whether a specific policy has a disparate impact it is necessary to look to the specific demographics of the location in question and then utilize statistical evidence to demonstrate some anomaly that has a nexus to the challenged policy.  See Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev., 56 F.3d 1243, 1253 (10th Cir. 1995).  Only in rare cases, where demographic information is not available for the specific site or community at issue, is it proper to substitute national statistics.  Id.  In those rare cases, reliance on general demographic information is not misplaced if the party relying on the data can establish no meaningful difference in the national and local demographics.  See Dothard v. Rawlinson, 433 U.S. 321, 330 (1977).

***Local Data Was Available to Plaintiff***

Throughout the Complaint, the Plaintiff relies heavily on New York State and City demographic statistics relating to individuals presently incarcerated and for the formerly incarcerated.  See Complaint, Exhibit F, ¶¶60-90, 95-101.  The Plaintiff avers as follows:

> "95.  Using data from the United States Census Bureau, Bureau of Justice Statistics, Bureau of Labor Statistics, the likely racial composition of City residents who have criminal records and annual incomes near or above $30,000 can be and has been ascertained through an independent analysis. "
> "96.  The analysis shows that 12.2% of African-American men who live in New York City and 18% of Latino men who live in the City, satisfy The Sand Castle's income threshold but are nonetheless disqualified from living at The Sandcastle because of the Defendant's blanket ban."
> "97.  The analysis further shows that only 4.1% of white men who live in the City satisfy the income threshold but are disqualified by the blanket ban." Id.

Although referenced in the Complaint, the local data that clearly exists and which is relevant was *not* evaluated by the Plaintiff's experts and/or contained in any of the Plaintiff's expert reports.  Rather, Dr. Wildeman, one of Plaintiff's experts, utilized national

23

data for incarceration, *rather than conviction*, in his report.  See Exhibit K.  Dr. Parnell then

incorporated the national statistics in Dr. Wildeman's report into both of his reports along

with data from the HUD website, including large areas outside of New York City, where the

Sandcastle is located.[8]  This, even though the Complaint clearly states that the applicant

pool for the Sandcastle is New York City.

Given that Plaintiff cites to local demographic data in the Complaint, and then fails to

analyze any of the local data in its experts' reports, this Court should draw a negative

inference.  Clearly, as the local data exists, this case is not among the rare cases where it is

appropriate to substitute national data in the place of local data.  Perhaps the only

explanation for the decision to exclude the relevant Census data from any of the expert

reports submitted on behalf of the Plaintiff is that the Census data disproved the allegations

of disparate treatment given the majority of African-Americans and Latinos/Hispanics in

the Sandcastle.

### *Plaintiff Cannot Establish a Nexus*

Similarly, the Plaintiff cannot establish a nexus given the failure to properly assess

and analyze the subjective nature of the Sandcastle's policy.   A party *must* establish a nexus

between the statistical disparity and the policy at issue –  in this case, the purported

blanket ban.  See Texas Dept. of Hsg. and Comm Affairs v. Inclusive Communities *supra*,

citing to Griggs v. Duke Power Co., *supra*, and Smith v. Clarkton, 682 F.2d 1055 (C.A.4

1982). The Supreme Court held: "A disparate impact claim relying on a statistical disparity

must fail if the plaintiff cannot point to a defendant's policy or policies causing that

disparity.  A robust causality requirement is important in ensuring that defendants do not

---

[8] Dr. Parnell did not review or confirm the underlying data in Dr. Wildeman's report, upon which Dr. Parnell relied in part.

resort to the use of racial quotas." See also Huntington Branch, NAACP, *supra* (Census tract data relevant to the neighborhood at issue demonstrated the Town of Huntington's zoning ordinance perpetuated segregated housing); Mt. Holly Gardens Citizens in Action, Inc., v. Township of Mount Holly, *supra*(Relying heavily on Census tract data, the Third Circuit reversed the District Court holding that the plaintiff had demonstrated a *prima facie* case of discrimination by a showing of gross statistical disparities in the relevant Census tract), Charleston Housing Authority v. United States Department of Agriculture, *supra*(Plaintiff demonstrated a *prima facie* case of disparate impact upon minority class members by analysis of the relevant waiting list population, the income-eligible population and the actual Charleston Apartment Tenants).

In 2922 Sherman Ave. Tenants Ass'n v. District of Columbia, *supra*, the Court held: "To prevail on a disparate impact claim, a plaintiff must offer sufficient evidence to support a finding that the challenged policy *actually* disproportionately affected a protected class." In that case, a tenant group challenged a plan to demolish certain buildings, arguing that the buildings to be demolished were comprised primarily of Hispanic tenants, constituting discrimination.   The D.C. Circuit found for the defendants, holding:

> "The tenants provided no evidence that the specific buildings on the Hot Properties List were disproportionately Hispanic.   Instead, their statistical expert merely described the ethnic composition of all District neighborhoods, leaving it to the jury to infer the ethnic composition of their respective neighborhoods." Id., at 681.

The Court continued: "Absent evidence of the actual ethnic composition of the building on the Hot Property List, no jury could reasonably conclude that the initiative had a disproportionate impact on Hispanics." Id. 681, 682.

Summary judgment is appropriate herein as the record is lacking any nexus between the actual policy of the Sandcastle which is a subjective consideration of each applicant, and the failure of the Plaintiff to address the actual Census data of the Sandcastle that was indisputably available and necessary in order to conduct an appropriate disparate impact analysis.   We respectfully submit that should a nexus be determined to exist based upon hypothetical applicant pools from a regional database in place of actual statistics relating to the Sandcastle, this case will <u>expand</u> existing precedent well-beyond the permissible limits established by the Supreme Court in <u>Texas Dept. of Hsg. and Comm Affairs v. Inclusive Communities</u>.

### It is Impossible for Plaintiff to Prove Disparate Impact

In <u>Evans v. UDR, Inc.</u>, *supra*, similar to this case, the Court granted summary judgment to a housing provider, dismissing the complaint of an advocacy organization that represents clients with drug addictions in need of housing.   The advocacy organization claimed the housing provider's refusal to rent to a specific client based upon her drug history and associated criminal record, constituted disability based discrimination.   In support of the plaintiff's claim, a number of emails between the parties regarding the plaintiff's drug history were submitted.  The Court found the limited number of emails submitted insufficient as a matter of law.  The Court held that more is required than a few emails, constituting a "scintilla of evidence" to establish liability. <u>Id.</u>, at 682.

The Court in <u>Evans</u> also found as persuasive that the defendant had rented numerous apartments to other clients of the plaintiff.  The Court held: "UDR's criminal history policy is neutral on its face and is applied equally to all applicants, regardless of disability.   Defendants rent a number of their apartments to other SEARISE participants,

26

undercutting any notion that they discriminate again individuals with the same disability suffered by Evans on the basis of such disability *per se*."   Id., 692.

Similarly, the Sandcastle has five (5) existing tenants that are clients of the Fortune Society.   The Fortune Society clients are not included in the spreadsheet below that includes an additional twenty Sandcastle tenants with known conviction records:

| Tenant's Name | Unit# | Move In Date | | Move Out Date |
|---|---|---|---|---|
| Green, Steven | A3A | 04/01/15 | | |
| Cathey, David | A3E | 10/01/14 | | |
| Rosa, Patrick | A4E | 07/01/14 | | |
| McCauley, Fidel | A7C | 02/23/12 | | |
| Smith, Joshua | A/15F | 02/15/15 | | |
| Rozier, Turan | A/21E | 04/14/15 | | |
| Cabassa, Ricardo | A18K | 04/01/15 | | |
| Marsh, Kevin | C8C | 08/15/14 | | |
| Serrano, Edwin | C8L | 12/15/14 | | |
| Querisma Jr, Gabriel | D8M | 12/15/14 | | |
| Smith, John | D/13G | 04/15/13 | | |
| **Past tenants** | | | | |
| Ruiz, Ruperto | A9F | 10/01/07 | - | 10/31/08 |
| Taylor, Patricia | A11L | 10/01/07 | - | 04/30/11 |
| Lebron, Michael | A20C | 05/01/11 | - | 04/30/15 |
| Amit, Merchant | A23C | 07/01/09 | - | 05/31/11 |
| Akinmola, Abidemi | B19M | 11/1/12 | - | 11/30/13 |
| Walters, Lourdes | C4B | 02/01/08 | - | 05/31/09 |
| Fletcher, Lisa | C3B | 09/01/14 | - | 10/31/15 |
| Nuniz, Edith | D13J | 05/01/13 | - | 02/28/15 |
| Brill, Keith | D9G | 08/01/11 | - | 7/31/12 |

Further, the transcript of the phone conversation between representatives of the Sandcastle and the Fortune Society does not *explicitly* include any denial of housing as alleged in the Complaint.   See Transcript Exhibit W and compare to Complaint ¶¶68, 69, 70, 71.   In fact, the actual transcript of the conversation does not support the exaggerated allegations as pled in the Complaint.

***Phone Call Between Fortune and Sruly Tress***

Mr. Tress stated in response to repeated requests to house more Fortune Society

tenants:

> "Every single tenant that comes in there, we do a background check.  They're
> going to sign a waiver that we can do a background check.  And (inaudible) most
> people that do have a criminal history, we try – I mean we try – the building has had
> all types of problems, you know, like problem tenants and therefore, like a criminal
> history or something like that does scare us.  It's not – not that it's a no, nothing is a
> no, you know, but it's a red flag."  See Exhibit W, Page 11.

> "So due to the fact that you have five people in here obviously then
> (inaudible) maybe trusted you.  They do a screening and as much as they were
> incarcerated in the past, you know, they're normal people and people can go
> through a rough times and they're back in society.   But for the future, let me – let me
> take your information.  I'll call him and I'll – and I'll call you back with an answer."
> See Exhibit W, Page 12.

Mr. Tress indicated to the agents of Fortune that he would speak to his supervisor

and then get back to Mr. Carter of the Fortune Society.  In keeping with his commitment, he

again spoke to Mr. Carter after speaking to his supervisor.    The following colloquy is the

full follow-up conversation between Mr. Tress and Mr. Carter.

> Mr. Tress: "My boss said that at this moment, you know were not (inaudible) any
> vacancies or anything like that.  It's not something that we would be interested in
> right now, but in the future hopefully it's something that we could go back to.
> Mr. Carter: Okay. Well I'm confused.  If our clients, and we – if we're giving support
> and our rent is paid aren't giving problems, I'm trying to understand your boss so
> that I can try to satisfy him, you know.
> Mr. Tress:  I – I don't think it's anything like that.   I just – just right now he says you
> know, he'd rather leave some open and something like that, you know.  He said at
> this moment he's not interested...
> Mr. Carter:  We've got – we've got some apartments that are up for renewal.  Are
> those leases going to be renewed without a problem?
> Mr. Tress:  I believe so."  See Exhibit W, Page 14-15.

As the transcript demonstrates, no unlawful or disparaging discriminatory

statements were made and there was never any explicit denial of housing to *any* person or

individual.  In fact, any individual client of the Fortune Society could have applied for

housing at the Sandcastle and undergone the background check process.  The record

contains no actual clients of the Fortune Society or testers that actually applied and were rejected due to the purported blanket ban.

***A Few Ads or Emails are Insufficient to
Demonstrate Disparate Treatment***

The only evidence proffered by the Plaintiff after reviewing tens of thousands of documents made available in discovery are a few emails, purportedly sent by agents of the Sandcastle, that incorrectly generalize that the Sandcastle does not rent to individuals with criminal convictions.   Given the size of the complex, four buildings and over nine hundred units, the small numbers of emails or advertisements are a mere "scintilla of evidence".  See Evans, at 682.  Moreover, it is unclear who may have created the emails or advertisements containing the incorrect data as numerous outside brokers were advertising the building and may have communicated the misinformation.

**Summary Judgment is Appropriate as The Fortune Society Has Failed to Prove Disparate Impact Based Upon Race, Resulting From the Background Check Criteria Utilized by the Sandcastle**

As addressed at length herein, the Sandcastle implements a subjective analysis, on a case-by-case basis, to balance the need for housing by individuals with past criminal records against the need to protect and secure residents in the Sandcastle's nine-hundred plus units of housing.  We anticipate the Plaintiff will rely heavily on Texas Dept. of Hsg. and Comm Affairs v. Inclusive Communities in support of its claim.  However, we respectfully submit that Inclusive Communities is distinguishable from the facts of the dispute herein, and does not support the Plaintiff's allegations.  Rather, the dicta in the Inclusive Communities decision, as it relates to the potential for abuse of disparate impact claims, is of great import and particularly apropos in the instant case.

29

In Inclusive Communities, the United States Supreme Court clarified that the Fair Housing Act permitted a party allegedly subjected to housing discrimination, based upon a disparate impact theory, to bring a FHA claim.  In so holding, the Supreme Court held: "Suits targeting unlawful zoning laws and other housing restrictions that unfairly exclude minorities from certain neighborhoods without sufficient justification are the heartland of disparate-impact liability." Id., at 17, citing Huntington, supra.

In Inclusive Communities, the plaintiff alleged that a facially neutral housing policy violated the Fair Housing Act as it perpetuated historical patterns of segregation.  The Supreme Court found the facially neutral policy in application did, in fact, perpetuate segregation by awarding housing subsidies to developers to construct housing in existing minority neighborhoods.  The plaintiff's case relied upon local demographics, more specifically, Census block and tract statistics for the specific neighborhoods at issue, to prove their case. Id., at 4.  The plaintiff then demonstrated a nexus between the disparities in the census data and the State's application of the development/zoning laws.

However, the Court included cautionary language, recognizing the potential for the abuse of process.  The Court noted: "It would be paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing in the Nation's cities." Id., at 19.  The Court continued: "The limitations on disparate-impact liability discussed here are also necessary to protect potential defendants against abusive disparate-impact claims.   If the specter of disparate-impact litigation causes private developers to not construct or renovate housing units for low-income individuals, then the FHA would have undermined its own purpose as well as the free-market system." Id., at 21. Lastly, again recognizing the potential for abuse, the Supreme Court cautioned: "Courts

should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." Id, at 21.

It is undisputed that the Sandcastle is a private low-income housing development. It is further undisputed that the Sandcastle entered into a Regulatory Agreement with the City of New York in June 2013 to restrict access to the four buildings comprising the Sandcastle based upon income criteria.   The goal of entering into the Regulatory Agreement was to revitalize the Sandcastle, which had a large number of vacancies and provide quality housing to low-income New Yorkers.  A majority of the tenants in the Sandcastle are members of minority groups.  At the very least, 52% of the building is comprised on tenants who identify as African-American or Latino/Hispanic, according to the 2010 Census data for the tract including the Sandcastle.  See NYC Planning Documents, Exhibit X , Declaration of Welsch. According to a recent tenant survey conducted by two employees of the Sandcastle based upon their personal knowledge of the tenants residing in the building, Defendants estimate that the actual percentage of minorities residing in the Sandcastle is closer to 70%[9].  See Declaration of Campbell , Exhibit Y , Declaration of Forrest, Exhibit  Z, Tenant Roster, Exhibit E.

Given that the Census tract data and the actual demographics of the building confirm that the Sandcastle is consistent demographically with its neighborhood and county, the disparate impact claim must fail and summary judgment be granted to the Defendants.

**The Sandcastle's Application Process Has a Discriminatory Impact Based on Race, the Policy is Necessary to Protect the Health, Safety and Welfare of Residents Who Already Reside in the Sandcastle**

---

[9] The demographics of the Sandcastle are addressed at length in the Statement of Facts and in earlier sections of this brief.

In its answer, Defendant Sarasota Gold pled the following affirmative defenses as relevant on this motion: "The use of criminal records searches as part of the overall tenant screening process used at Sand Castle serves valid business and security functions of protecting tenants and the property from former convicted criminals." See Answer, Exhibit G. Should this Court disagree, Defendants respectfully submit that this is an issue of fact, properly decided by a trier-of-fact.

**The Case-by-Case Analysis Utilized by the Sandcastle is Narrowly Tailored to Balance the Safety of Existing Tenants with the Level of Risk of Lack Thereof Presented by the Applicant with a Criminal Conviction and There is No Less Discriminatory Alternative**

There is no less discriminatory manner to screen potential tenants than the system currently in place at the Sandcastle, which considers each applicant's history on a case-by-case basis. Defendants concede that a blanket ban would not be narrowly tailored to balance the safety of the building and other tenants with the rights of a potential applicant. See Green, *supra*. (Holding that a blanket ban justified by a fear of theft and safety-related justifications were "not empirically validated"). Should this Court disagree, Defendants respectfully submit that this is an issue of fact, properly decided by a trier-of-fact.

**The Plaintiff Has Failed to Demonstrate Intentional Discrimination Based Upon Race**

Assuming, *arguendo*, that the allegations in the Complaint are deemed to include intentional discrimination by the Sandcastle or its agents, Defendants respectfully submit that the Plaintiff has failed to establish a *prima facie* case. A plaintiff alleging intentional discrimination must make the following four part showing: (1) the plaintiff is a member of a protected class; (2) applied for a dwelling from the housing provider; (3) the housing provider rejected the plaintiff; and (4) the housing provider offered housing to a similarly

32

situated applicant not of the plaintiff's protected class, but with a comparable criminal record. See Allen v. Muriello, 217 F.3d 517, 522 (7th Cir. 2000) (holding that Plaintiff's allegations that his application for federal housing assistance and the alleged existence of a potentially disqualifying prior criminal record was handled differently than those of two similarly situated white applicants presented a *prima facie* case that he was discriminated against because of race, in violation of the Fair Housing Act). See also Linsey v. Yates, 578 F.3d 407, 415 (6th Cir. 2009).

After substantial discovery, Defendants respectfully submit that the Plaintiff cannot establish any act of overt or intentional discrimination by any agent of the Sandcastle. No individual has asserted such a claim, the transcript of the recorded conversation between Kevin Carter and Sruly Tress does not contain an explicit rejection of tenants based upon criminal conviction as asserted in the Complaint and no "testers" or other outside parties similarly situated with the exception of race, were treated disparately. Accordingly, any allegation of intentional discrimination to the extent pled in the Complaint is properly dismissed.

### Substantial Portions of the Amended Complaint Should Be Stricken

Defendants move, pursuant to Rule 12(f) of the F.R.C.P. to strike substantial portions of the Amended Complaint. In the Second Circuit, to strike allegations from a pleading, the moving party must demonstrate: (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no baring on the issues in the case; and, (3) that to permit the allegations to stand would result in prejudice to the movant. See Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2nd Cir. 1976) see also Rodriguez v. City of New York, 2016 U.S. Dist. LEXIS 76882 (E.D.N.Y. 2016). Even with the heightened

33

standard in the Second Circuit, we respectfully submit substantial portions of the

Complaint must be stricken.

The Complaint includes lengthy statements of social policy and advocacy relating to

the formerly incarcerated population that has zero relevance to what did, or did not,

transpire at the Sandcastle.   Not only are these allegations irrelevant to the Sandcastle, but

also highly prejudicial.   Defendants avoid detailed analysis of each and every point that

Defendants believe is properly stricken given the court's familiarity with this case.  Suffice

to say that permitting the Fortune Society to allege in a pleading that the Defendants herein

are responsible for: the fact that disproportionate numbers of minorities are imprisoned;

the highest per capita imprisonment ratio in the world; the failure of our corrections

system to provide adequate training and other remedial services in the prison system; the

lack of jobs available to formerly incarcerated individuals; the lack of housing available to

formerly incarcerated individuals; and, the lack of support for inmates once released,

would make it impossible for the Defendants to adequately defend their rights and also

obscure the real issue before this court regarding the purported (but non-existent)

"blanket ban". Defendants respectfully submit that the following paragraphs from the

Complaint should be stricken:  4, 5, 6, 7, 11, 13, 17, 20, 35, 37, 38, 39, 40-47, 52, 74, 75-92,

108-124.  See Amended Complaint, Exhibit F.

### The Claims Under the NYSHRL and NYCHRL

Should the federal claims be dismissed, Defendants respectfully submit that this

Court should decline to exercise jurisdiction over the pendent state claims.  See Valencia ex.

rel. Franco v. Fee, 316 F.3d 299 (2nd Cir. 2003), Loeffler v. Staten Island Univ. Hosp., 582

F.3d 268 (2nd Cir. 2009).   As the Second Circuit directed, the factors to be considered under

34

the pendent jurisdiction doctrine – "judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction."  Id., 305, Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343 (1988).

     More important, if the federal claims fall, so too must the state law claims since they are substantially mirror images of each other and are equally without merit.

## Conclusion

     For all the reasons stated herein, we respectfully submit that the Amended Verified Complaint is properly dismissed and request and an Order and Judgment dismissing this action and such other, different and further relief as is deemed just, equitable and proper.

Dated: New York, New York
      July 15, 2016

                                 Thomas D. Shanahan
                                 Thomas D. Shanahan, P.C.
                                 551 Fifth Avenue, Suite 616
                                 New York, New York 10176
                                 (212) 867-1100, x11
                                 Bar Id: TS-3330

On the brief:  Richard T. Walsh, Esq.
               Jann S. Brent, Esq.