UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
THE FORTUNE SOCIETY,             :
             :
        Plaintiff,    :      **MEMORANDUM & ORDER**
             :
   -against-      :      14 Civ. 6410 (VMS)
             :
SANDCASTLE TOWERS HOUSING    :
DEVELOPMENT FUND CORP., SARASOTA  :
GOLD LLC, WEISSMAN REALTY GROUP  :
LLC, E & M ASSOCIATES LLC,    :
             :
        Defendants.
--------------------------------------------------------- X

**Vera M. Scanlon, United States Magistrate Judge:**

Plaintiff The Fortune Society ("Plaintiff" or "Fortune") brings this action against

Sandcastle Towers Housing Development Fund Corp., Sarasota Gold, LLC, E & M Associates,

LLC and Weissman Realty Group, LLC (collectively, "Defendants") for injunctive, monetary

and declarative relief.  Am. Compl. ¶ 1, ECF No. 30.  Plaintiff alleges that, in violation of the

Fair Housing Act, Defendants' housing policy has the purpose or effect of discriminating against

African-American and Latino persons, including Fortune's clients.  Id.  Before the Court is

Plaintiff's partial motion for summary judgment,[1] ECF No. 94, and Defendants' motion for

summary judgment, ECF No. 97, both brought pursuant to Federal Rule of Civil Procedure

("Rule") 56.  Defendants also move to dismiss for lack of standing pursuant to Rule 12.  ECF

No. 115.  Each side moves to exclude the other side's expert testimony.  ECF Nos. 94-1 at 32-33;

---

[1] Plaintiff does not move for summary judgment with respect to Defendant Weissman Realty
Group, LLC.  Pl.'s Mot., ECF No. 94-1 at 7 n.1.  This exclusion does not change the Court's
analysis.  Plaintiff also does not move for summary judgment with respect to its disparate
treatment claim.

97-1 at 7-18; 98 at 35-38.[2]  For the reasons stated herein, the Court:  (i) denies Plaintiff's partial motion for summary judgment; (ii) denies in part and grants in part Defendants' cross motion for summary judgment; (iii) denies Defendants' motion to dismiss for lack of standing; (iv) denies Defendants' motion to exclude the expert testimony of Dr. Allan McMillan Parnell; and (v) denies as moot Plaintiff's motion to exclude the expert testimony of Donald Welsch, with leave to renew in a pretrial motion.

## I.    BACKGROUND

### a.    Procedural History

Plaintiff commenced this action by filing a complaint alleging that Defendants have a housing policy of automatically excluding any person with a record of a criminal conviction from renting or living[3] in an apartment at the Sand Castle apartment complex in Queens, New York (the "Sand Castle"), and that this policy has the purpose or effect of discriminating against African-American and Latino persons, including Fortune's clients, in violation of the Fair Housing Act ("FHA") and New York State and City law.  Compl. ¶ 1, ECF No. 1.  Plaintiff alleges that the policy resulted in the denial of housing at the Sand Castle for twenty of Fortune's clients and cost Plaintiff $65,000 in additional rent, as well as an unspecified additional amount in brokers' fees.  ECF No. 116 at 7.  The Parties consented to this Court's jurisdiction in accordance with 28 U.S.C. § 636(c) and Rule 73.  ECF No. 26.  Plaintiff submitted an amended complaint, ECF No. 30, to add Defendant E & M Associates, LLC, and to add perfecting

---

[2] For ease of reference, all citations use ECF pagination.

[3] The evidence discussed herein focuses on the primary tenants and leaseholders (or any individual whose income is considered to meet the Sand Castle's income requirements, Ex. 60, ECF No. 94-15 at 6), but not on family or friends who may also reside in an apartment.  The only issue raised as to "living" in an apartment, as distinct from renting, is raised when a corporate entity rented or sought to rent an apartment on behalf of an individual.

citations, ECF No. 27.  Defendants filed an amended answer.  ECF No. 37.  The Parties

subsequently cross-moved for summary judgment, ECF Nos. 94, 97, which was followed by

supplemental motion practice relating to standing, ECF Nos. 115-17, 119, 122, 125, and

submission of supplemental authority, ECF Nos. 126, 129.

### b.      Relevant Facts

After reviewing both Plaintiff's and Defendants' Rule 56.1 statements and the responses

thereto, together with the exhibits and submissions of both sides, the Court finds that the

following relevant facts are undisputed, unless otherwise indicated.

### i.   The Sand Castle, Acquisition And Staffing

The Sand Castle is a four-building apartment complex with 917 rental units located at 7-

11 Seagirt Avenue in Far Rockaway, Queens.  Pl.'s 56.1 Stmt. ¶ 11, ECF No. 94-2; Defs.' Resp.

to Pl.'s 56.1 Stmt. ¶ 11, ECF No. 131.  In 2006, Defendant Sarasota Gold LLC ("Sarasota

Gold"), a New York corporation, acquired the Sand Castle buildings and has since held all

equitable interest in the property.  Pl.'s 56.1 Stmt. ¶ 12, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1

Stmt. ¶ 12, ECF No. 131.  Sarasota Gold is owned by, among others, Aryeh Ginzberg and Irving

Langer, with Mr. Ginzberg as both the corporation's largest shareowner and its managing

member.  Pl.'s 56.1 Stmt. ¶ 13, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 13, ECF No.

131.  Prior to its acquisition by Sarasota Gold, the Sand Castle predominantly provided senior

housing.  Defs.' 56.1 Stmt. ¶ 12, ECF No. 97-2; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 12, ECF No.

98-2.  Sarasota Gold, however, made renovations to the building, and, as apartments became

available, began to accept residents who paid their rent in whole or in part with governmental

rent subsidies, such as Hurricane Sandy victims with FEMA funding.  Pl.'s 56.1 Stmt. ¶¶ 14-15,

ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 14-15, ECF No. 131.

3

Shortly after acquiring the Sand Castle, Sarasota Gold entered an agreement with Defendant E & M Associates LLC ("E&M") to serve as the Sand Castle's management company, and E&M has since directed and controlled the complex's staff.  Pl.'s 56.1 Stmt. ¶¶ 23-24, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 23-24, ECF No. 131.  E&M is owned by Mr. Langer, and Mr. Ginzberg is Senior Vice President (each is an owner of Sarasota Gold).  Pl.'s 56.1 Stmt. ¶ 25, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 25, ECF No. 131. Since 2009, Defendant Weissman Realty Group, LLC ("Weissman") provided brokerage services for the Sand Castle, and two of Weissman's employees, Melissa Gursky and Heidi Hershkowitz, worked on-site (from 2009-2012 and 2013-present, respectively).  Pl.'s 56.1 Stmt. ¶¶ 26-27, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 26-27, ECF No. 131.  These on-site employees were under the direction and control of Sarasota Gold and E&M, and later Defendant Sandcastle Towers Housing Development Fund Corporation ("Sandcastle Towers").  Pl.'s 56.1 Stmt. ¶ 29, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 29, ECF No. 131.

The Parties agree that Sarasota Gold's and E&M's senior leadership have minimal-to-no involvement in the day-to-day operations of the Sand Castle.  Pl.'s 56.1 Stmt. ¶ 30, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 30, ECF No. 131.  Three members of E&M – Phil Goldstein, Meyer Brecher and Sruly Tress – helped manage the Sand Castle during the period relevant to this litigation.  Pl.'s 56.1 Stmt. ¶¶ 36-37, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 36-37, ECF No. 131.  Mr. Tress has managed the Sand Castle since January 2014, is under the direction and control of E&M, and is on-site once per-week.  Pl.'s 56.1 Stmt. ¶¶ 45-46, 48, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 45-46, 48, ECF No. 131.

### ii.   The Regulatory Agreement

In 2013, Sarasota Gold entered into an agreement with the New York City Housing

Development Corporation to become a provider of affordable housing (the "Regulatory

Agreement").  Pl.'s 56.1 Stmt. ¶ 16, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 16, ECF

No. 131.  The Regulatory Agreement requires that 90% of Sand Castle residents earn no more

than 125% of the Area Median Income and that 10% of residents earn no more than 135% of the

Area Median Income.  Pl.'s 56.1 Stmt. ¶ 90, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 90,

ECF No. 131.  As applied by the Sand Castle staff, this typically means that applicants cannot

earn more than $70,000 annually.  Pl.'s 56.1 Stmt. ¶ 91, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1

Stmt. ¶ 91, ECF No. 131.  For the sole purpose of facilitating the Regulatory Agreement, the

members of Sarasota Gold created Sandcastle Towers, with Mr. Ginzberg as president.  Pl.'s

56.1 Stmt. ¶¶ 17-18, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 17-18, ECF No. 131.

### iii.   Racial Makeup Of The Sand Castle And Surrounding Areas

The Parties dispute the current relevant racial makeup of the Sand Castle and its

surrounding area.[4]  Defendants assert that based on the United States Census Bureau, 2010-2014

American Community Survey, the area around the Sand Castle is approximately "50% Black."

Defs.' 56.1 Stmt. ¶ 13, ECF No. 97-2.  Relying on a tenant roster on which Defendants'

employees Rose Campbell and Sonia Forrest assigned a race to each tenant based largely on their

own personal assessment (the "Tenant Roster"), Defendants allege that 70% of the Sand Castle's

tenants are "Black" – significantly more than the 50% Defendants assign to the surrounding

area.[5]  Defs.' 56.1 Stmt. ¶ 14, ECF No. 97-2; Tenant Roster, Ex. E, ECF No. 97-8; Campbell

---

[4] The Parties also disagree as to what is the relevant area to be considered for FHA purposes.

[5] The Tenant Roster lacks the requisite degree of trustworthiness essential to be considered as
evidence.  See Romano v. Howarth, 998 F.2d 101, 108 (2d Cir. 1993) (excluding business

Decl., Ex. Y, ECF No. 97-29; Forrest Decl., Ex. Z, ECF No. 97-30.  Plaintiff controverts these numbers by citing to the same Census Survey, which reports that the area surrounding the Sand Castle is 44.3% Black or African-American, 28.3% Hispanic or Latino and 22.1% White, while the Census Block made up entirely of the Sand Castle is 37.4% Black or African-American, 14.9% Hispanic or Latino and 42.6% White.  Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 13, ECF No. 98-2; Ex. D, ECF No. 97-7 at 1-2; Ex. 8, ECF No. 94-5 at 340-42, 347.  Neither side provided any information about the current or historical rate of tenant turnover in the Sand Castle, the Census Block or the Census Survey.

### iv.   The Sand Castle Rental Application Process

Since 2006, the year of acquisition, Sarasota Gold employees Ms. Silvera and Ms. Campbell have been primarily responsible for reviewing Sand Castle rental applications.  Pl.'s

---

records that lacked "the requisite degree of trustworthiness essential to the business record exception").  Defendants' employees assigned a race to each tenant in part based on their best guesses regarding the race of each tenant.  Campbell Decl., Ex. Y, ECF No. 97-29; Forrest Decl., Ex. Z, ECF No. 97-30.  They do not report that they had any input from the individuals whose race they described in the annotated Tenant Roster.  The Tenant Roster, as well as any portion of expert testimony based on the Tenant Roster, is inadmissible and will not be considered on these motions.  See Romano, 998 F.2d at 108.

On this point, Defendants' opposition does not directly respond to Plaintiff's claim that the key demographic is the potential pool of applicants, and not the actual accepted tenants.  The bottom-line number with respect to racial diversity is not a defense to allegations of disparate impact as to the applicant pool.  See Connecticut v. Teal, 457 U.S. 440, 455 (1982) ("It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group."); Dist. Council 37, Am. Fed'n of State, Cty. & Mun. Emp., AFL-CIO v. NYC Dep't of Parks & Recreation, 113 F.3d 347, 352 (2d Cir. 1997) (holding that a "nondiscriminatory bottom line was no defense" to a Title VII disparate impact claim); Waisome v. Port Authority of NY & NJ, 948 F.2d 1370, 1378 (2d Cir. 1991) ("An employer may not rely on a bottom-line defense, by that we mean that though parts of the employer's hiring or promotion procedures adversely affected members of a protected group, it may not successfully argue that a sufficient number of protected group members were nevertheless hired or promoted so as to refute proof of disparate impact."); see also Quad Enters. Co. v. Town of Southold, 369 F. App'x 202, 205-06 (2d Cir. 2010) (stating that claims for disparate impact under the FHA are analyzed under a modified version of the Title VII burden shifting analysis).

56.1 Stmt. ¶ 35, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 35, ECF No. 131.  Ms. Silvera's tenure ran from 2006 to early 2014, and in December 2013, Ms. Campbell succeeded her.  Pl.'s 56.1 Stmt. ¶¶ 38, 56-57, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 38, 56-57, ECF No. 131.  Both were under the direction and control of E&M.  Pl.'s 56.1 Stmt. ¶¶ 38, 58, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 38, 58, ECF No. 131.  Since January 2014, Ms. Campbell has reported to Mr. Tress.  Pl.'s 56.1 Stmt. ¶ 45, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 45, ECF No. 131.

Prospective applicants learn about the Sand Castle through, inter alia, online advertisements, broker advertising, housing agencies or by calling or walking into the office on-site.  Pl.'s 56.1 Stmt. ¶ 78, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 78, ECF No. 131. Applicants must submit to a review of their creditworthiness, criminal backgrounds and landlord-tenant litigation histories.  Pl.'s 56.1 Stmt. ¶ 80, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 80, ECF No. 131.  Since Sarasota Gold acquired the Sand Castle in 2006, Defendants have used Weimark Credit Information Services ("Weimark") to conduct background checks on prospective tenants.  Pl.'s 56.1 Stmt. ¶¶ 81-82, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 81-82, ECF No. 131.  The Weimark background checks list a person's criminal charges, including the nature, class, disposition and sentence.  Pl.'s 56.1 Stmt. ¶ 86, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 86, ECF No.131.  Neither Ms. Campbell nor Mr. Tress can determine from the Weimark reports when a crime or conviction occurred. Pl.'s 56.1 Stmt. ¶ 120, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 120, ECF No. 131.

Defendants do not maintain any written policies on the Sand Castle's rental application process.  Pl.'s 56.1 Stmt. ¶ 95, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 95, ECF No. 131.  The usual application process is for Ms. Campbell to field in-person, telephone and email

rental inquiries.  Pl.'s 56.1 Stmt. ¶ 42, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 42, ECF

No. 131.  She has the authority to explain the Sand Castle's applicant criteria to prospective

applicants, and she does so on a regular basis.  Pl.'s 56.1 Stmt. ¶ 44, ECF No. 94-2; Defs.' Resp.

to Pl.'s 56.1 Stmt. ¶ 44, ECF No. 131.  When applications are submitted to Ms. Campbell, she

determines whether the applicant satisfies the Sand Castle's rental criteria, and she has the

authority to reject an application without prior approval from anyone else at the Sand Castle.

Pl.'s 56.1 Stmt. ¶ 41, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 41, ECF No. 131.

Although the Parties disagree about the precise scope, both Plaintiff and Defendants agree that

Mr. Tress plays a more limited, supervisory role in the tenant application review than does Ms.

Campbell.  Pl.'s 56.1 Stmt. ¶ 52, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 52, ECF No.

131; compare Ex. 39, ECF No. 94-13 at 176 (Defendants' Supplemental Responses to Plaintiff's

First Set of Interrogatories, stating that Mr. Tress is involved in the decision-making process with

respect to accepting or rejecting tenants "if there is concern or question about the applications

which Rose Campbell doesn't know how to address or determine"); Ex. 2, ECF No. 94-4 at 292-

93; Ex. 10, ECF No. 94-5 at 640-43; Ex. 14, ECF No. 94-5 at 1262-63, with Ex. 10, ECF No. 94-

5 at 698-99 (Mr. Tress's testimony stating that Ms. Campbell would at times contact him for

approval if an applicant had a criminal history).

Ms. Campbell has full authority on her own to decide whether to forward an application

to the New York City Housing Development Corporation ("HDC") for approval.  Pl.'s 56.1

Stmt. ¶ 92, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 92, ECF No. 131.  Only those

applications passing Ms. Campbell's initial screening are sent to HDC; any application rejected

by Ms. Campbell is not forwarded.  Pl.'s 56.1 Stmt. ¶ 92, ECF No. 94-2; Defs.' Resp. to Pl.'s

56.1 Stmt. ¶ 92, ECF No. 131.  HDC and the Regulatory Agreement are exclusively concerned

with applicants' income, and income has been the only reason that HDC has rejected an applicant approved by the Sand Castle staff.  Pl.'s 56.1 Stmt. ¶¶ 93-94, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 93-94, ECF No. 131.  Other than the Regulatory Agreement's income requirements, Defendants assert (and Plaintiff agrees, with the exception of the criminal history criteria) that they provide their employees discretion as to each of the Sand Castle's eligibility requirements.  Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 164, ECF No. 131.

### v.  The Alleged Sand Castle Policy Regarding Criminal Records

Defendants do not maintain any written policies on the Sand Castle's applicant criteria, including with respect to treatment of applicants with criminal backgrounds.  Pl.'s 56.1 Stmt. ¶ 95, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 95, ECF No. 131.  The Parties present contravening facts regarding the existence or nonexistence of Defendants' alleged policy of excluding potential tenants with criminal convictions (other than traffic violations).  See Pl.'s 56.1 Stmt. ¶¶ 96-114, 124-147, ECF No. 94-2; see also Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 59, ECF No. 98-2 (noting that traffic-related convictions are not at issue).

### 1.  Written Communications Stating "No Criminal Background"

Plaintiff submits several communications in support of its assertion that the alleged policy exists, relying heavily on correspondence surrounding a Craigslist advertisement.  In January 2014, during the first month of his employment as the manager, Mr. Tress requested via email to a broker that a Craigslist advertisement be placed for the Sand Castle (the "Craigslist Email").  Pl.'s 56.1 Stmt. ¶ 96, ECF No. 94-2; Ex. 46, ECF No. 94-13 at 202-03.[6]  This email

---

[6] Defendants object to the consideration of this document – an email dated January 30, 2014, from Mr. Tress to the broker, Annette Strasser, regarding the posting of a Craigslist advertisement – (and several other correspondence from Defendants' employees or agents) they produced in discovery, arguing that the document is unauthenticated and hearsay.  Defs.' Resp.

request stated that the advertisement should include the criteria for residency as, "[a]ccept section 8 . . . good credit needed[;] no criminal history."  Id.  Ms. Campbell reposted or renewed the Craigslist advertisement for two to four months.  Pl.'s 56.1 Stmt. ¶ 102, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 102, ECF No. 131.  The Craigslist advertisement included Ms. Campbell's email address, and Ms. Campbell replied to email inquiries about rentals from at least March 2014 to October 2014 (the "Craigslist Response Emails").  Pl.'s 56.1 Stmt. ¶¶ 104-05, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 104-05, ECF No. 131.  The summary judgment record contains dozens of these Craigslist Response Emails reiterating the statement "no criminal background" (or variations thereof, such as "no criminal").  Pl.'s 56.1 Stmt. ¶ 105, ECF No. 94-2; Ex. 38, ECF No. 94-13 at 132-71.

Plaintiff also offers Sand Castle email exchanges with real estate agents and brokers expressing a similar restriction.  Ms. Campbell sent two emails to Program Rentals, a real estate agency that refers many applicants to the Sand Castle, stating in one that an "applicant cannot have [a] landlord/tenant record nor criminal background," and in the other, "no criminal."  Pl.'s 56.1 Stmt. ¶¶ 110-12, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 112, ECF No. 131; Exs.

---

to Pl.'s 56.1 Stmt. ¶ 96, ECF No. 131; see, e.g., id. ¶¶ 97, 113.  "The bar for authentication is not high" and, where as here, the documents are produced by the party challenging authentication, and there is no reason to question the authenticity of the document, the court may consider the document on summary judgment.  See AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc., 673 F. App'x 645, 649 n.7 (2d Cir. 2016); see also Fed. R. Evid. 901(a); United States v. Moayad, 545 F.3d 139, 162 (2d Cir. 2008) ("Rule 901 is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." (internal quotation marks & citation omitted)).  To the extent that the document (and others like it) contains party admissions, it is not barred by the hearsay rules.  See Innovative Biodefense, Inc. v. VSP Tech., Inc., 176 F. Supp. 3d 305, 323 n.10 (S.D.N.Y. 2016) (considering a party's employees' emails on summary judgment because they were likely to be admitted at trial as party admissions and "hearsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial" (internal quotation marks & citation omitted)).

48-49, ECF No. 94-13 at 209-12.  There is also an email from Weissman broker Ms.

Hershkowitz to Mr. Tress stating that she denied an applicant an interview because "he can

absolutely not live in the sandcastle with a criminal history."  Pl.'s 56.1 Stmt. ¶ 113, ECF No.

94-2; Ex. 50, ECF No. 94-13 at 214.

### 2.   Testimony Regarding The Written Communications

The Parties present contravening facts regarding whether the written "no criminal

background" statements contained in the above discussed communications reflect the actual

policy of the Sand Castle.  Pl.'s 56.1 Stmt. ¶¶ 105, 107, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1

Stmt. ¶¶ 105, 107, ECF No. 131.

Plaintiff directs the Court to Mr. Tress's statements that the language in the Craigslist

Email was "a standard form of renting an apartment," and that he had been informed of the

criteria therein through discussions of the review process with Ms. Silvera, Ms. Campbell and

Ms. Hershkowitz.  Ex. 10, ECF No. 94-5 at 725-31; Pl.'s 56.1 Stmt. ¶ 99, ECF No. 94-2; Defs.'

Resp. to Pl.'s 56.1 Stmt. ¶ 99, ECF No. 131.  Mr. Tress submitted the criteria set forth in the

Craigslist Email to Mr. Ginzberg, Mr. Brecher and Mr. Goldstein for review.  Pl.'s 56.1 Stmt.

¶ 97, ECF No. 94-2; Ex. 47, ECF No. 94-13 at 205.  Mr. Tress also stated in his deposition that

he would approve Ms. Campbell's Craigslist Response Emails if she submitted them to him

today.  Pl.'s 56.1 Stmt. ¶ 107, ECF No. 94-2; Ex. 10, ECF No. 94-5 at 711.  Ms. Campbell

testified at her deposition that the Craigslist Response Emails were her standard response for the

Craigslist inquiries.  Pl.'s 56.1 Stmt. ¶ 105, ECF No. 94-2; Ex. 2, ECF No. 94-4 at 319-20, 338-

40.

Defendants present contravening facts supporting their position that the written

statements do not reflect Defendants' actual policy.  Defendants direct the Court to Ms.

Campbell's deposition testimony wherein she states individuals can appeal rental application denials based on criminal history and that applications of potential tenants with certain criminal backgrounds are sent to Mr. Tress for review.  Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 105, ECF No. 131; Ex. 2, ECF No. 94-4 at 319-24.  She testified that the language in her Craigslist Response Emails was merely a way to avoid "get[ting] into the details as far as what kind of background is accepted or not."  Ex. 2, ECF No. 94-4 at 340.

Mr. Tress stated in his deposition that the language in the Craigslist Email and the Craigslist Response Emails are not reflective of Defendants' policy.  Rather the language simply provides "the most basic information you could write."  Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 107, ECF No. 131; Ex. 10, ECF No. 94-5 at 710-11.  He testified that this language was intended only to inform potential applicants about the information Defendants would consider and alert them that "[t]heir criminal background shouldn't be a bad criminal background."  Ex. 10, ECF No. 94-5 at 731.  He further testified that a criminal record did not result in an applicant's automatic rejection, and applications would be reviewed case-by-case, noting that a number of current tenants have criminal backgrounds.  Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 107, ECF No. 131; Ex. 10, ECF No. 94-5 at 710-11.

### 3.  Felony Convictions

The Parties also present contravening facts regarding whether Defendants applied a more limited scope ban, rejecting applicants with felony convictions.  (The alleged felony ban is a revision of Plaintiff's original theory.)

Plaintiff points to Ms. Campbell's statement during her deposition that the landlord criteria denied applicants with felony convictions.  Pl.'s 56.1 Stmt. ¶ 105, ECF No. 94-2; Ex. 2, ECF No. 94-4 at 319-20, 338-40.  However, in at least one instance, Ms. Campbell stated that

she would escalate an application with a robbery conviction (a felony) to Mr. Tress for review. See Ex. 2, ECF No. 94-4 at 262, 323, 328.[7]  Plaintiff also relies on Weissman broker Ms. Gursky's deposition testimony that Mr. Brecher told her the Sand Castle "does not want people with criminal backgrounds."  Pl.'s 56.1 Stmt. ¶ 114, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 114, ECF No. 131.  Based on her understanding of the Sand Castle policy, Ms. Gursky did not in the past, and would not today, knowingly refer a person with a felony conviction.  Pl.'s 56.1 Stmt. ¶ 131, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 131, ECF No. 131. Defendants deny that this assertion accurately reflects Defendants' policy, noting that there are Sand Castle tenants with felony convictions.  Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 124-27, ECF No. 94-2; Ex. 2, ECF No. 94-4 at 260-63, 325-30;[8] Defs.' 56.1 Stmt. ¶ 32, ECF No. 97-2; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 32, ECF No. 98-2.

### vi.  The Sand Castle's Rental Applicant Files

Defendants did not regularly retain rejected rental applications, so comprehensive data on rejected applicants are not available.  Pl.'s 56.1 Stmt. ¶ 134, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 134, ECF No. 131.  Nonetheless, discovery revealed 1,277 applicant/tenant files, including 1,145 accepted applications, 116 rejected applications and 16 applications of unknown status.  Pl.'s 56.1 Stmt. ¶ 135, ECF No. 94-2; ECF No. 94-6 at 24-76.[9]  Plaintiff's expert opined

---

[7] It is unclear whether Ms. Campbell believes robbery to be a misdemeanor or knows that it is a felony.  See N.Y. Penal Law §§ 160.05-.15.

[8] Although Defendants rely on Ms. Campbell's testimony to rebut the assertion that Defendants' policy prohibited individuals with felony convictions, the testimony referenced addresses misdemeanors.

[9] Defendants object to the consideration of this data because it relies on a spreadsheet created by Plaintiff's counsel based on files obtained from the Sand Castle.  The spreadsheet is attached to a declaration detailing how the document was compiled and from where each piece of information originated.  Under Rule 1006, a party may use a summary or chart "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Fed. R. Civ. P. 1006.  Given that Defendants were free to present their own analysis of the files

that this incomplete data does not provide a reliable depiction of the rejected applicants as it is unclear how many applications are missing.  Supplemental Parnell Report, Ex. 24, ECF No. 94-10 at 7.  The Court considers this data with respect to rejected applications, but recognizes the weight it may be given may be limited based on its seeming lack of completeness.  It is also unclear on the present record how incomplete the accepted applicant files are as there are more accepted applications than apartments.  Without historical data about turnover or stability, it is not evident how many accepted applications are missing from Defendants' files.

Of the accepted application files that included a Weimark background check, two reflect a felonious criminal history and eight indicate misdemeanor criminal histories.  Pl.'s 56.1 Stmt. ¶¶ 136, 143, ECF No. 94-2.  Of the eight misdemeanors, five were traffic offenses.  Id. ¶ 144.  Of the three non-traffic offenses, one was part of an application file for someone who was potentially a tenant before initiation of this litigation in 2014.  Id.  Ten other applications reflect criminal arrest histories, but the history files are incomplete and fail to indicate, inter alia, whether a conviction was obtained, the charge class or the offense level.  Id. ¶ 145.

### vii.   Fortune's Attempts To Rent Apartments

#### 1.   Fortune's Mission

Plaintiff Fortune Society is a New York not-for-profit organization that provides reentry and reintegration services to formerly incarcerated individuals in New York City.  Pl.'s 56.1 Stmt. ¶ 1, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 1, ECF No. 131.  One of Fortune's services is to secure housing for its clients and their families.  Pl.'s 56.1 Stmt. ¶ 5, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 5, ECF No. 131.  In Fortune's scattered-site programs, Fortune

---

and they did not identify any serious errors, there is no prejudice to Defendants in the Court considering the summary presentation of the evidence.

often leases apartments and pays the rent on its clients' behalf.  Pl.'s 56.1 Stmt. ¶ 8, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 8, ECF No. 131.  According to Fortune President and CEO JoAnne Page, of Fortune's 350 active housing program participants, ninety percent are Black and/or Latino.  Ex. 20, ECF No. 94-7 at 10.

In 2013, New York State awarded Fortune a grant providing funds to rent twenty-five residential units to be located in Queens.  Pl.'s 56.1 Stmt. ¶ 278, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 278, ECF No. 131.  In May 2013, Fortune contacted the Sand Castle and leased four units in its own name through a broker.  Pl.'s 56.1 Stmt. ¶¶ 280-81, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 280-81, ECF No. 131.  The Sand Castle did not know or ask for the identities of Fortune's clients who moved into the complex, and it did not conduct criminal background checks on these individuals.  Pl.'s 56.1 Stmt. ¶ 282, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 282, ECF No. 131.

One month after this initial placement, in or around June 2013, Fortune attempted to rent additional apartments from the Sand Castle for twenty of its clients under Fortune's grant (the "Twenty Clients").  Pl.'s 56.1 Stmt. ¶¶ 290-300, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 290-300, ECF No. 131.  In furtherance of this effort, Fortune employees engaged in three telephone conversations with Defendants' employees.

## 2.  Telephone Communications Between Fortune And Defendants

In or around June 2013, Fortune's employee Camille Morrison contacted Ms. Gursky (Weissman), to inquire about rentals.  Pl.'s 56.1 Stmt. ¶ 290, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 290, ECF No. 131; Ex. 19, ECF No. 94-7 at 3-4.  Plaintiff submits Ms. Morrison's declaration in which she states that, following a description of Fortune's clientele, Ms. Gursky "emphatically" explained that the Sand Castle does not rent to ex-offenders.  Pl.'s 56.1 Stmt.

¶ 291, ECF No. 94-2; Ex. 19, ECF No. 94-7 at 3-4.  According to a declaration by Fortune's housing specialist, Kevin Carter, one month later, Mr. Carter again inquired about renting additional rooms.  Pl.'s 56.1 Stmt. ¶ 292, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 292, ECF No. 131; Ex. 17, ECF No. 94-5 at 1706-07.  Mr. Carter states in his declaration that he too gave a description of Fortune's clientele, after which the individual with whom he spoke responded that the Sand Castle did not rent to "ex-offenders."  Pl.'s 56.1 Stmt. ¶ 293, ECF No. 94-2; Ex. 17, ECF No. 94-5 at 1706-07.  He further states that he told the person with whom he spoke that excluding individuals with felony convictions appeared discriminatory, to which the person repeated that the Sand Castle did not accept individuals with felony convictions as residents.  Pl.'s 56.1 Stmt. ¶ 294, ECF No. 94-2; Ex. 17, ECF No. 94-5 at 1707.

Defendants deny these facts, referring the Court to the transcript of a recording of a July 2014 telephone call among Ms. Page, Mr. Carter and Mr. Tress, in which Fortune's employees ask about renting additional apartments (the "2014 Phone Call").  Pl.'s 56.1 Stmt. ¶¶ 295-300, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 290-300, ECF No. 131; Ex. W, ECF No. 97-27.  The transcript reflects that Ms. Page and Mr. Carter explained to Mr. Tress that all of Fortune's clients were formerly incarcerated.  Pl.'s 56.1 Stmt. ¶ 296, ECF No. 94-2; Ex. W, ECF No. 97-27 at 8.  Mr. Tress responded, "that scares us a little," but he went on to point out that none of Fortune's current Sand Castle residents had caused any issues.  Pl.'s 56.1 Stmt. ¶ 297, ECF No. 94-2; Ex. W, ECF 97-27 at 8-9.  Mr. Tress stated, "we try" with applicants with "a criminal history," but that it is "a red flag."  Pl.'s 56.1 Stmt. ¶ 297, ECF No. 94-2; Ex. W, ECF No. 97-27 at 11.  Mr. Tress stated, "due to the fact you have 5 people in here obviously then (inaudible) maybe trusted you."  Ex. W, ECF No. 97-27 at 12.  Towards the end of the

conversation, Mr. Tress stated that he would need to speak with Mr. Goldstein, whom he identified as "his boss."  Pl.'s 56.1 Stmt. ¶ 298, ECF No. 94-2; Ex. W, ECF No. 97-27 at 10.

Upon calling Mr. Carter back, Mr. Tress stated his boss was not interested in renting to Fortune.  Pl.'s 56.1 Stmt. ¶ 299, ECF No. 94-2; Ex. W, ECF No. 97-27 at 14.  The transcript reflects Mr. Tress's statements as "you know were [sic] not (inaudible) any vacancies or anything like that," and "he'd rather leave some open and something like that."  Pl.'s 56.1 Stmt. ¶ 300, ECF No. 94-2; Ex. W, ECF No. 97-27 at 14.  After Mr. Carter expressed some concern about renewing the apartments Fortune already leased, Mr. Tress stated he did not believe renewing would be a problem.  Ex. W, ECF No. 97-27 at 15.

### 3.  Fortune's Expenditures

Following Fortune's conversations with Defendants, Fortune asserts that its employees expended substantial additional time and money to locate alternative housing for the Twenty Clients.[10]  Pl.'s 56.1 Stmt. ¶ 312, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 312, ECF No. 131.  Fortune alleges that its housing specialist, Mr. Carter, spent nearly fifty hours per month for

---

[10] Defendants deny that Fortune expended substantial additional time and money locating alternative housing, arguing that the affidavits supporting this assertion are hearsay and that Plaintiff failed to provide evidence of this expenditure. Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 312, ECF No. 131.  As a preliminary matter, the affidavits are admissible evidence to the extent they provide the affiant's personal knowledge and set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4).  The evidence submitted by Plaintiff on this issue is sufficient to survive summary judgment.  It is for the fact-finder to determine what weight to give to the testimony of Fortune's employees regarding the time they allegedly expended in connection with Defendants' policy.  See Helena Assocs., LLC v. EFCO Corp., No. 06 Civ. 0861 (PKL), 2008 WL 2117621, at *6 (S.D.N.Y. May 15, 2008) (finding that the trier of fact is to determine the weight of lay witness testimony, so long as the testimony is based on first-hand knowledge).  Moreover, Plaintiff provides additional evidence with respect to some of its expenditures, including the brokers' fees for subsequent housing placements of the Twenty Clients, Ex. 97, ECF No. 116-8, and documentation of salary and expenses for an employee hired by Fortune to find housing for the Twenty Clients.  Ex. 98, ECF No. 116-9.

more than one year to find housing for the Twenty Clients who Fortune would otherwise have placed at the Sand Castle.  Pl.'s 56.1 Stmt. ¶ 312, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 312, ECF No. 131.  Fortune's CEO, Ms. Page, alleges that she personally spent multiple hours discussing the Sand Castle's refusal to accept the Twenty Clients with her staff, Pl.'s 56.1 Stmt. ¶ 314, ECF No. 94-2, and Fortune hired an additional staff member for the specific purpose of finding housing for those clients, Id. ¶ 312.  Upon finding housing for the Twenty Clients, Fortune asserts that it expended rent in excess of what would have been paid at the Sand Castle and incurred otherwise avoidable brokers' fees.  Id.

## II.  STANDING

The threshold question in every federal case, which determines the power of the court to entertain the suit, is "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art[icle] III."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy.  The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

"The Art[icle] III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."  Warth, 422 U.S. at 499.  Thus, a federal court's jurisdiction can be invoked only when the plaintiff itself has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ."  Linda R.S. v. Richard D., 410 U.S. 614, 617 (1973).  The Supreme Court has established that the "irreducible constitutional minimum" of standing consists of three elements.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  "The

18

plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

Spokeo, 136 S. Ct. at 1547.  The plaintiff, as the party invoking federal jurisdiction, bears the

burden of establishing these elements and, on summary judgment, "must set forth by affidavit or

other evidence specific facts which for purposes of the summary judgment motion will be taken

as true."  Lujan, 504 U.S. at 561 (internal quotation marks & citation omitted).

Although the Supreme Court has also articulated "prudential" requirements for

standing,[11] "'Congress intended standing under . . . [the Fair Housing Act, 42 U.S.C. § 3601 et

seq.] to extend to the full limits of Art[icle] III' and . . . courts accordingly lack the authority to

create prudential barriers to standing in suits brought under that section."  Havens Realty Corp.

v. Coleman, 455 U.S. 363, 372 (1982) (quoting Gladstone, Realtors v. Vill. of Bellwood, 441

U.S. 91, 103 n.9 (1979)); see Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 44

(2d Cir. 2015) ("Th[e] FHA definition of 'aggrieved person' extends as broadly as permitted by

Article III of the Constitution.  As such, there are no prudential barriers to plaintiff's standing

under the FHA.").  Thus, the only requirement for standing to sue under the FHA "is the

Art[icle] III minima of injury in fact:  that the plaintiff allege that as a result of the defendant's

actions he has suffered 'a distinct and palpable injury.'"  Havens, 455 U.S. at 372 (quoting

Warth, 422 U.S. at 501).

---

[11] Prudential requirements for standing include "the general prohibition on a litigant's raising
another person's legal rights, the rule barring adjudication of generalized grievances more
appropriately addressed in the representative branches, and the requirement that a plaintiff's
complaint fall within the zone of interests protected by the law invoked."  NYCLU v. NYC
Transit Auth., 675 F. Supp. 2d 411, 424 (S.D.N.Y. 2009) ("NYCLU I"), aff'd, 652 F.3d 247 (2d
Cir. 2011), opinion amended & superseded, 684 F.3d 286 (2d Cir. 2012) (internal quotation
marks & citation omitted).

### a.   Organizational Vs. Associational Standing

"[I]t is well established that the limitation on raising the rights of a third party does not preclude an organization from establishing standing.  Specifically, an organization may establish standing in two ways" – by demonstrating a harm to the organization itself ("organizational standing") or to its members ("associational standing").  <u>NYCLU I</u>, 675 F. Supp. 2d at 425 (citing <u>Irish Lesbian & Gay Org. v. Giuliani</u>, 143 F.3d 638, 649 (2d Cir. 1998)).

Organizational and associational standing are separate bases on which an organization may assert standing, each having distinct requirements.  Although only organizational standing is asserted in this case, the Parties' briefing demonstrates some confusion over the distinct requirements.  Accordingly, the Court briefly addresses the differences between the two types of standing.[12]

With respect to organizational standing – at issue here – "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever

---

[12] Defendants argue that to assert standing in a disparate impact case, the plaintiff must itself be an organization whose mission it is to represent members of a protected class.  Defendants have not cited any authority supporting this proposition, and there is authority to the contrary.  For example, in <u>National Community Reinvestment Coalition v. Accredited Home Lenders Holding Co.</u>, 573 F. Supp. 2d 70, 73, 75 (D.D.C. 2008), a national nonprofit organization whose mission was to "increase fair and equal access to credit, capital and banking services and products for all Americans, regardless of race," and whose members included community development corporations, civil rights groups, community reinvestment advocates, local and state government agencies and churches, had standing to sue under the FHA for disparate impact.  <u>See, e.g.</u>, <u>LuxuryBeachfrontGetaway.com, Inc. v. Town of Riverhead, New York</u>, No. 17 Civ. 4783 (SJF) (SIL), 2018 WL 4635736, at *5 (June 25, 2018) (finding a short-term rental business had standing under the FHA where it alleged economic harm as a result of an ordinance that allegedly disparately impacted its ability to rent to families with children), <u>R & R adopted in relevant part</u>, 2018 WL 3617947 (E.D.N.Y. July 27, 2018).  Further, Fortune is a not-for-profit whose mission is to help formerly incarcerated individuals reintegrate into society through, <u>inter alia</u>, housing placement services.  Page Decl. ¶ 13, Ex. 20, ECF No. 94-7 at 10.  Although Fortune's mission is not specifically to help Black and/or Latino individuals find housing, because ninety percent of Fortune's 350 clients are Black and/or Latino, the effect is substantially the same.  <u>Id.</u>

rights and immunities the association itself may enjoy." Warth, 422 U.S. at 511.  Under the "organizational" standing rubric, the organization "must meet the same standing test that applies to individuals by showing actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." Irish Lesbian & Gay Org., 143 F.3d at 649 (alterations, citations, & internal quotation marks omitted).  In an organizational standing case, the plaintiff need not identify the individuals allegedly injured by the defendant's actions because the organization itself is seeking to vindicate whatever rights and immunities it may enjoy.  See NYCLU v. NYC Transit Auth., 684 F.3d 286, 295 (2d Cir. 2012) ("NYCLU II").  "Accordingly, the question becomes whether Plaintiff, as an organization, has met its burden of demonstrating an 'injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" NYCLU I, 675 F. Supp. 2d at 425 (citing Lujan, 504 U.S. at 560).

"[A]n organization may also assert 'associational' standing, that is, standing to bring suit on behalf of its members." NYCLU I, 675 F. Supp. 2d at 425 (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342-43 (1977)).  To bring a claim by way of "associational" standing, a plaintiff must show that:  "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt, 432 U.S. at 343.  It is in the context of associational standing, as opposed to organizational standing, that an "argument that the persons allegedly injured must be identified by name might have some validity . . . at the summary judgment stage." Bldg. & Const. Trades Council of Buffalo, NY & Vicinity v. Downtown Dev., Inc., 448 F.3d 138, 144-45 (2d Cir. 2006).

b.      Analysis[13]

i.  **Plaintiff Has Alleged Injury Sufficient To Establish Standing To Bring Its FHA Claims**

Plaintiff asserts that Defendants' alleged policy of prohibiting tenants with certain criminal convictions has a disparate impact on racial minorities and caused Fortune, as an organization, concrete and particularized injury.  Under the FHA, the "only injury which need be shown to confer standing . . . is deflection of the [organization's] time and money from counseling to legal efforts directed against discrimination."  Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir. 1993) (holding that where "the Defendants' advertising practices detracted the attention of [the housing organization's] staff members from their regular tasks at the [organization]," the organization had standing to sue under the FHA because there need only be a "perceptible impairment" of an organization's activities and resources for there to be an "injury in fact"); see Mhany Mgmt., Inc. v. Cty. of Nassau, 819 F.3d 581, 600 (2d Cir. 2016) ("Standing under the [FHA] is as broad as Article III permits."); Nnebe v. Daus, 644 F.3d 147, 157 (2d Cir. 2011) (holding that even "if only a few suspended drivers are counseled by [the plaintiff organization] in a year, there is some perceptible opportunity cost expended by the [organization], because the expenditure of resources that could be spent on other activities 'constitutes far more than simply a setback to [the organization's] abstract social interests'" (quoting Havens, 455 U.S. at 379)).  "Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes

---

[13] The Court's analysis focuses on the federal law claims as the state and city laws are similar and at least as protective of prospective or potential applicants to the Sand Castle such that the disparate impact claims will proceed to trial for the reasons discussed below.  Defendants' motion for summary judgment on Plaintiff's state and city disparate treatment claims is granted for the reasons discussed in Section VI below.  See infra Section VI.

far more than simply a setback to the organization's abstract social interests."  Havens, 455 U.S. at 379; see also Nat'l Cmty. Reinvestment Coal., 573 F. Supp. 2d at 75 ("[P]laintiff's statement [that] they have expended resources on counteracting defendants' policies are [sic] sufficient to state an injury in fact caused by defendant's conduct.").

In Havens, the Supreme Court found organizational standing to sue under the FHA existed where an apartment owner's racial steering practices impaired the organization's ability to provide counseling and referral services for low-and-moderate-income home seekers, resulting in the organization suffering an injury in fact.  455 U.S. at 379.  "Furthermore, the Supreme Court has stated that so long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging [a particular policy preference].'"  Nnebe, 644 F.3d at 157 (alternations in original) (quoting Havens, 455 U.S. at 379 n.20).  Thus, an alleged drain on or diversion of an organization's resources alone may suffice to constitute an injury in fact.

Plaintiff alleges an economic loss and drain on its resources specifically resulting from its inability to place the Twenty Clients in the Sand Castle and creates an issue of material fact as to whether it suffered a loss attributable to Defendants' conduct.[14]  Specifically, Plaintiff demonstrates that, in addition to its employee, Mr. Carter, expending substantial time trying to find alternative housing for the Twenty Clients, Plaintiff hired a new employee, Joseph

---

[14] Of the Twenty Clients who Plaintiff claims were harmed by Defendants' policy, five were identified by first name:  Andrew, Sam, Wilfredo, Eric and Kevin.  Carter Supp. Decl. ¶¶ 16-17, Ex. 92, ECF No. 116-3.  After being rejected by the Sand Castle, Kevin moved twice for which Plaintiff incurred $400 in moving expenses.  Id. ¶ 16.  Andrew, Sam and Wilfredo moved into apartments that rented for $1,215 per month and Eric moved into an apartment that rented for $1,300 per month, all more than the rent Plaintiff was expected to pay to rent apartments for its clients at the Sand Castle.  Id. ¶ 17.

Blumberg, specifically to assist with placing the Twenty Clients.  Page Supp. Decl. ¶ 7, Ex. 91, ECF No. 116-2; Carter Decl. ¶¶ 7, 11-15, Ex. 92, ECF No. 116-3; Page Decl. ¶ 12, Ex. 20, ECF No. 94-7 at 10; Ex. 98, ECF No. 116-9.  Plaintiff also shows through affidavits and other supporting documentation, that placing the Twenty Clients elsewhere required additional expenditures for brokers' fees and higher rents – costing Plaintiff an additional $65,000 in rent alone.  Page Supp. Decl. ¶ 8, Ex. 91, ECF No. 116-2; Carter Supp. Decl. ¶¶ 16-18, Ex. 92, ECF No. 116-3; Ex. 97, ECF No. 116-8.  This is the type of economic injury held to be sufficient by the Supreme Court in Havens and by the Second Circuit in Ragin to demonstrate the injury element of organizational standing.  See Fair Hous. Justice Coop., Inc. v. Edgewater Park Owners Co-op., No. 10 Civ. 912 (RPP), 2012 WL 762323, at *5 (S.D.N.Y. Mar. 9, 2012); NYCLU I, 675 F. Supp. 2d at 425 (citing Lujan, 504 U.S. at 560) ("[T]he paradigmatic injury pertains to a financial or property interest.").[15]

---

[15] Plaintiff has offered evidence through affidavits of a reallocation of its resources to educate about and combat the alleged discriminatory practices at the Sand Castle.  Plaintiff has shown that it redirected staff efforts and resource to increase its advocacy efforts relating to criminal records discrimination in housing as a result of its experience with the Sand Castle.  Plaintiff's CEO and President stated that "[a]s a result of the discrimination [Fortune] encountered at Sand Castle, Fortune stepped up its advocacy efforts on criminal records discrimination in housing." Page Supp. Decl. ¶ 16, Ex. 91, ECF No. 116-2.  Ms. Page stated that she herself spent at least fifty hours "on anti-discrimination advocacy efforts, including participating in a criminal records working group with other non-profit leaders; educating other advocates through public-speaking engagements at conferences and convenings; and communicating with [her] staff about what to do when they encounter discrimination."  Id. ¶ 17.  These allegations are sufficient to demonstrate injury-in-fact to the organization itself.  See Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 110-11 (2d Cir. 2017) ("[Plaintiff organization] offered unrebutted testimony that it has already had to devote attention, time, and personnel to prepare its response to the [alleged discriminatory] Ordinance.  And where an organization diverts it resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing."); Ragin, 6 F.3d at 905 (finding organization's provision of information at community seminars about how to fight housing discrimination and devotion of time "to investigating and attempting to remedy the defendant's [alleged discriminatory] advertisements" sufficient to establish standing); LC v. LeFrak Org., 987 F. Supp. 2d 391, 397 (S.D.N.Y. 2013) (finding organization's assertion that it

A plaintiff's economic injury must also be "fairly traceable to the challenged conduct." Nat'l Cmty. Reinvestment Coal., 573 F. Supp. 2d at 75. In order to meet this requirement with respect to injuries relating to placement of the Twenty Clients, Plaintiff must demonstrate that the Twenty Clients were otherwise qualified applicants. If the Twenty Clients were not otherwise qualified applicants, Defendants' alleged policy could not have caused the alleged economic injury.[16] Plaintiff has demonstrated that the Twenty Clients were otherwise qualified by showing through affidavit testimony that they met the Sand Castle's income requirements under the Regulatory Agreement. Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 91, ECF No. 131; Carter Decl. ¶ 9, Ex. 92, ECF No. 116-3. Accordingly, Plaintiff has met this burden and adequately created an issue of material fact that it expended staff time and resources in finding alternative housing for its otherwise qualified members who were deterred from submitting applications to the Sand Castle housing complex because of Defendants' alleged policy.

Defendants' argument that Plaintiff has failed to demonstrate that any of its members (including, as is relevant here, the Twenty Clients) met the Sand Castle's other criteria relating to credit score or landlord tenant litigation history is unavailing. Defendants' have "den[ied] the

_____

"expended staff time and other resources to investigate and respond to Defendants' discriminatory rental practices, which diverted resources away from other [organization] activities" sufficient to plead injury-in-fact). Ms. Page also stated that she spent at least fifteen hours investigating Defendants' alleged conduct prior to the litigation and assisting with the litigation after it commenced. Page Supp. Decl. ¶ 18, Ex. 91, ECF No. 116-2; see also Page Decl. ¶ 12, Ex. 20, ECF No. 94-7 at 10.

[16] Plaintiff is not required for the purposes of standing to show that its members would have ultimately been selected as tenants. See Winfield v. City of New York, No. 15 Civ. 5236 (LTS) (DCF), 2016 WL 6208564, at *4 (S.D.N.Y. Oct. 24, 2016) ("Plaintiffs' claimed injury relates to denial of the opportunity to compete on an equal footing for fair housing in their desired neighborhoods, rather than from the failure to achieve a successful result."); Huntington Branch, N.A.A.C.P. v. Town of Huntington, 689 F.2d 391, 394 (2d Cir. 1982) (stating that because of the uncertainties inherent in the housing market, housing discrimination plaintiffs have been permitted to proceed based on "a realistic opportunity to proceed with construction").

Sand Castle 'enforces' strict 'cut-off[s]' for applicant criteria, as evidence demonstrates all tenant applications are considered on a case-by-case basis."  Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 148, 150, 161, 172, ECF No. 131; Defs.' Jurisdictional Mot., ECF No. 115 at 17-18; see also Ex. 2, ECF No. 94-4 at 294-96 (criteria regarding landlord-tenant history flexible), 346 (criteria regarding credit score flexible).  Rather, Defendants assert that the only criteria for which they do not exercise discretion is an applicant's maximum income and Plaintiff has adequately shown that the Twenty Clients met the income requirements.  Pl.'s 56.1 Stmt. ¶ 91, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 91 (income requirement under the Regulatory Agreement was approximately $70,000 per year or less), ECF No. 131; Carter Decl. ¶ 9, Ex. 92, ECF No. 116-3 (each of the Twenty Clients earned less than $40,000 per year); see also Ex. 2, ECF No. 94-4 at 256-57.

There are material issues of fact as to Defendants' defense that, under the Regulatory Agreement, the Sand Castle could not accept tenants with an organization.  First, there is a fact question as to whether the Regulatory Agreement prohibited contracting with organizations (provided the underlying tenant met the income requirements set forth under the Regulatory Agreement), as the Sand Castle was able to renew organizational contracts and, in fact, entered into a new organizational contract while a party to the Regulatory Agreement.[17]  Second, Plaintiff has offered evidence that, if believed, shows that had the Sand Castle declined to enter into a lease with Plaintiff due to its organizational status, Plaintiff could and would have had its clients sign leases in their own names, backed by Plaintiff's financial support.  Carter Decl. ¶ 10,

---

[17] Defendants' counsel Loretta Gastwirth submits a declaration asserting that this new organizational contract was entered into in error.  Gastwirth Reply Decl. ¶ 7, ECF 117-1.  Ms. Gastwirth's statement is the only evidence offered that the contract was entered into mistakenly. Whether credible testimony can be offered on this issue is to be seen at trial and is a question for the fact-finder, not the Court on summary judgment.

Ex. 92, ECF No. 116-3.  Plaintiff has adequately created a material issue of fact as to whether an injury in fact was caused by Defendants' alleged policy.  Defendants' motion to dismiss for lack of standing is denied.

### III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Kwong v. Bloomberg, 723 F.3d 160, 164-65 (2d Cir. 2013); Redd v. NY Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012). The role of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  The "mere existence of a scintilla of evidence" is not enough to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [non-moving party]."  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted); see Anderson, 477 U.S. at 252.  The Court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party. . . ."  Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000).

After examining the voluminous record, the Court finds that as to the merits, the Parties have raised genuine issues of material fact as to:  (i) whether the Sand Castle had a ban on applicants with criminal histories, and, if so, what were the contours of that ban; and (ii) what weight should be given to Plaintiff's expert testimony and whether that testimony proves that any criminal record ban, as applied at the Sand Castle, disparately impacts a protected class.

## IV.   **DAUBERT** MOTIONS

In connection with Defendants' motion for summary judgment, Defendants moved to preclude the testimony and reports of Plaintiff's expert, Dr. Allan McMillan Parnell, Ph.D.  See ECF No. 97.  In connection with Plaintiff's motion for partial summary judgment, Plaintiff moved to preclude the testimony and reports of Defendants' expert, Donald Welsch.  See ECF No. 94.  For the reasons stated herein, Defendants' motion to preclude the testimony of Dr. Parnell is denied.  Given the Court's decision on the summary judgment motions, which would be the same with or without the testimony of Mr. Welsch, Plaintiff's motion to preclude the testimony of Mr. Welsch is moot but may be renewed without prejudice in pre-trial motions.

### a.  Legal Standards

A "party seeking to introduce expert testimony 'bears the burden of establishing its admissibility by a preponderance of the evidence.'"  Qube Films Ltd. v. Padell, No. 13 Civ. 8405 (AJN), 2016 WL 888791, at *1 (S.D.N.Y. Mar. 1, 2016) (quoting Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003)).  Federal Rule of Evidence ("Evidence Rule") 702 sets forth two prerequisites that must be satisfied before a witness is allowed to provide expert testimony.  "First, the witness must be properly qualified as an expert to testify on scientific, technical, or specialized matters."  Ramos v. SimplexGrinnell LP, 796 F. Supp. 2d 346, 372 (E.D.N.Y. 2011) (citing Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81-82 (2d Cir. 1997)).  "Second, the court must determine whether the expert testimony is both relevant and reliable."  Id. (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  The

28

Supreme Court further explained, that the objective of the "gatekeeping" requirement of Daubert

and Evidence Rule 702 is "to make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire,

526 U.S. at 152. "[T]he trial judge's gatekeeping obligation applies not only to testimony based

on 'scientific' knowledge, as in Daubert, but also to testimony based on 'technical' or 'other

specialized' knowledge." Zaremba v. GMC, 360 F.3d 355, 358 (2d Cir. 2004) (quoting Kumho

Tire, 526 U.S. at 141). The trial court ultimately has "broad discretion" in determining the

admissibility of expert testimony. Brown v. Mermaid Plaza Assocs., LLC, No. 13 Civ. 760

(AMD) (CLP), 2016 WL 5802779, at *6 (July 20, 2016), R & R adopted, 2016 WL 5716414

(E.D.N.Y. Sept. 30, 2016).

 In order to assess whether expert testimony is sufficiently reliable, the court engages in a

flexible inquiry under which it may consider the following factors: (i) whether a theory or

technique can be or has been tested; (ii) whether the theory or technique has been subjected to

peer review; (iii) the known or potential rate of error and the existence of standards controlling

the technique's operation; and (iv) whether the theory or technique has gained general

acceptance in the relevant scientific community. See Daubert, 509 U.S. at 593-94; see Zaremba,

360 F.3d at 358. "A district court should consider the Daubert factors 'where they are reasonable

measures of the reliability of expert testimony,' [but] the list of factors 'neither necessarily nor

exclusively applies to all experts or in every case.'" Zaremba, 360 F.3d at 358 (quoting Kumho

Tire, 526 U.S. at 141, 152); Qube Films, 2016 WL 888791, at *1 (explaining that the Daubert

factors "do not constitute a definitive checklist or test" (citing Kumho Tire, 526 U.S. at 150)).

Indeed, the trial court enjoys "the same kind of latitude in deciding how to test an expert's

29

reliability . . . as it enjoys when it decides whether or not that expert's relevant testimony is reliable." Kumho Tire, 526 U.S. at 152 (emphasis omitted).

### b. Dr. Parnell

In order to prove its claim that the Sand Castle employs a policy that disparately impacts racial minorities, Plaintiff seeks to offer the testimony of demographer Dr. Parnell. Dr. Parnell submitted an expert report summarizing his analysis and conclusions. See Parnell Report, Ex. 23, ECF No. 94-9. Dr. Parnell later submitted a supplemental report in which he examined "the tenant information provided by the Defendants and . . . one of Sandcastle Apartment's real estate brokers" that was not available when Dr. Parnell prepared his initial report, and incorporated Defendants' responses to Plaintiff's first interrogatories into his analysis. See Supplemental Parnell Report, Ex. 24, ECF No. 94-10 (together with the Parnell Report, the "Parnell Reports") at 3-4. In connection with Defendants' motion for summary judgment, Defendants move to preclude the expert testimony of Dr. Parnell. See ECF No. 97.

### i. Qualifications

Attached to Dr. Parnell's report is his curriculum vitae, which lists his qualifications to serve as an expert in this case. Parnell Report, Ex. 23, ECF No. 94-9 at 17-24. In addition, Dr. Parnell testified regarding his qualifications at his deposition. See, e.g., ECF No. 97-19 at 20-24, 95-96.

Defendants do not challenge Dr. Parnell's expertise in demography or housing discrimination generally. To the extent Defendants suggest that Dr. Parnell lacks qualifications to provide expert testimony with respect to the New York City metropolitan area housing market, ECF No. 97-1 at 14, the Court disagrees. A court may rely on expert testimony based on demographic data without reference to the expert's personal knowledge of the geographic area to

which the data relates. See, e.g., Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly, 658 F.3d 375, 382-83, 386-87 (3d Cir. 2011).

### ii. Reliability/Relevance

The stated purpose of the Parnell Report is to "assess[] if a history of criminal conviction disproportionately affects the ability of African-Americans and Latinos relative to Whites to qualify to rent at Sandcastle Apartment." Parnell Report, Ex. 23, ECF No. 94-9 at 4. To accomplish this task, Dr. Parnell evaluates whether the "exclusion[18] of those who have been incarcerated from the opportunity to rent at Sandcastle Apartments disproportionately affects African Americans and Latinos relative to Whites in the New York City housing market." Id. at 6. He relies in part on the Report prepared by Dr. Christopher Wildeman regarding risks of conviction based on risks of incarceration for different races at different income levels. Id. Dr. Parnell looks to three geographic areas in the Parnell Report – (i) Queens; (ii) New York City; and (iii) New York, N.Y. HUD Metro Fair Market Rent Area (which includes Bronx County, Kings County, Putnam County, Queens County, New York County, Richmond County, Rockland County and Westchester County), the HUD-specified rental market for New York

---

[18] Defendants argue that Dr. Parnell's "role, expertise, and analysis" radically changed between the Parnell Reports and his declaration in support of those reports, including a change from referencing a "blanket ban" on criminal background to a "screening out" of applicants with criminal records. Defs.' Mot., ECF No. 97-1 at 9, 14. First, the Parnell Reports do not use the term "blanket ban." See generally, Parnell Report, Ex. 23, ECF No. 94-9; Supplemental Parnell Report, Ex. 24, ECF No. 94-10. Rather, Dr. Parnell describes his analysis as relating to the "exclusion" of individuals with criminal backgrounds. Parnell Report, Ex. 23, ECF No. 94-9 at 6. Dr. Parnell's declaration describes the policy as "screening out" applicants with criminal records. Parnell Decl., ECF No. 94-13 at 217. Although the Court does not consider this change in language to require the rejection of Dr. Parnell's testimony, Defendants may use it on cross-examination before a fact-finder. See R.F.M.A.S., Inc. v. So, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010) ("Minor flaws in an expert's analysis . . . can be probed through cross-examination and generally go to the weight to be accorded to the expert's testimony rather than admissibility.").

City.  Id. at 6.  Dr. Parnell states in his supplemental report that he confirmed that these housing

markets are the appropriate selection by looking at the zip codes for over 1,000 Sand Castle

applicant files.[19]  Supplemental Parnell Report, Ex. 24, ECF No. 94-10 at 6, 8.  Dr. Parnell also

found that there were enough applicants from Nassau County to warrant consideration and added

Nassau County to the New York, N.Y. HUD Metro Fair Market Rent Area as a fourth housing

market for consideration.  Id. at 9.  He examines these areas with respect to four income levels:

(i) incomes of $30,000 or more; (ii) incomes of $40,000 or more; (iii) incomes between $30,000

and $70,000; and (iv) incomes between $40,000 and $70,000.  Parnell Report, Ex. 23, ECF No.

94-9 at 6.  Relying on Dr. Wildeman's findings, which provided proportions of cumulative risk

of incarceration for Whites, African-Americans and Latinos, Dr. Parnell used a "Z test" to assess

whether, within the above-referenced housing markets, the differences in incarceration rates

among each racial group are statistically significant – in other words, whether the differences are

meaningful and not due to random chance.  Id. at 7-8.  The Z test calculation is based on the

proportions of the two populations' lifetime risk of incarceration – based on Dr. Wildeman's

findings – and the size of the two populations in the relevant housing market – determined from

the 2009-2013 American Community Survey measures of household income, which was

designed and collected by the U.S. Census Bureau.  Id. at 8.  Defendants do not challenge the use

of the Z test.  Each of Dr. Parnell's Z tests comparing Whites and African-Americans and Whites

and Latinos in each selected housing market and each selected income range were statistically

---

[19] Mr. Welsch opines that "the partial zip code data was statistically insufficient to support the
conclusion that the available data was sufficient to determine the applicant pool of prospective
Sandcastle tenants."  Welsch Decl. ¶ 14, Ex. T, ECF No. 97-23.  Should the Court ultimately
find the Welsch Declaration admissible, this would be a question for the fact-finder.  The Court
does not consider this assertion on the Parties' motions for summary judgment, however,
because it does not change the outcome of the motions.

significant.  Id. at 12-15; Supplemental Parnell Report, Ex. 24, ECF No. 94-10 at 10, 16.

The Court finds Dr. Parnell's analysis sufficiently relevant, reliable and reasoned to be admissible as evidence of a possible disparate impact.  Defendants' primary challenges are that: (i) Dr. Parnell does not address data specific to the Sand Castle, and, in fact, stated that the Sand Castle's demographics were not relevant for a disparate impact analysis, Defs.' Mot., ECF No. 97-1 at 10, 12-13; (ii) Dr. Parnell used an improper applicant pool in his analysis – using market rent units without giving weight to income limitations posed by the Regulatory Agreement; including wealthy New York City neighborhoods in his applicant pool; and disregarding the fact that the Sand Castle participates in Section 8 and other government programs providing rent subsidies, id. at 14-15; and (iii) Dr. Parnell's analysis is based on inadequate or unreliable data, id. at 8, 11, 15, 17.   These are questions regarding the weight that should be afforded Dr. Parnell's testimony, if any, rather than its admissibility.  For the reasons set forth below, none of these arguments is sufficient to warrant preclusion of Dr. Parnell's testimony.

First, with respect to Dr. Parnell's decision to look at a pool of potential applicants, rather than data specific to the Sand Castle, the Court finds that this decision was reasoned and the results relevant to this litigation.  The Second Circuit has recognized that statistics considering the potential applicant pool, rather than the actual applicant pool are often appropriate where "the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory."  E.E.O.C. v. Joint Apprenticeship Comm. of the Joint Industry Bd. of the Electrical Indus., 164 F.3d 89, 97 (2d Cir. 1998).  Where, as here, a defendant is alleged to have informed the potential applicant pool – here through advertising and external communications with brokers and potential tenants – of the policy, an expert may properly account for potential

33

applicants that may have been discouraged from applying due to an awareness of the policy in question.  Id.; see Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination . . . his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."); Malave v. Potter, 320 F.3d 321, 327 n.4 (2d Cir. 2003) (finding that the application process might not adequately reflect the actual potential applicant pool); Anderson v. Douglas & Lomason Co., 26 F.3d 1277, 1305 (5th Cir. 1994) ("[P]ractices which deter qualified minorities from applying for jobs impermissibly taint[] any analysis which employs the use of actual applicant-flow data."). Further, Dr. Parnell provides a plausible rationale for relying on the potential applicant pool rather than the actual applications, noting that the information available relating to actual applicants was inadequate to conduct a reliable statistical analysis because Defendants did not retain rejected rental applications.  Supplemental Parnell Report, Ex. 24, ECF No. 94-10 at 7.

Second, Defendants' argument that Dr. Parnell fails to give weight to income limitations of the Regulatory Agreement is incorrect.  Dr. Parnell analyzed data sets for a variety of income ranges, including an income restriction of $70,000, which Defendants indicated was the approximate cap under the Regulatory Agreement.  See Pl.'s 56.1 Stmt. ¶ 91, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 91, ECF No. 131.

Third, none of Dr. Parnell's opinions proffered or methodology used falls "outside the range where experts might reasonably differ . . . ."  Kumho Tire, 526 U.S. at 153.  Defendants' argument that Dr. Parnell relies on "cherry picked" data provided by Plaintiff's counsel (specifically, that Plaintiff did not provide Dr. Parnell with information regarding tenants with criminal records) confuses Dr. Parnell's role and suggests that he is opining on the existence of a criminal record ban.  Although the language in the Parnell Reports could be clearer on this point,

34

the tests Dr. Parnell conducted (which are unrelated to the determination of whether a ban exists) make clear that his role is to assess the impact, not the existence, of such a ban if it exists.[20]  See generally, Parnell Report, Ex. 23, ECF No. 94-9.  Accordingly, whether he was aware of information that suggests there is or is not a criminal record ban does not bear on the reliability of his disparate impact analysis.[21]  Further, the Court will not preclude Dr. Parnell's testimony based on Defendants' arguments that Dr. Parnell did not independently review the data underlying the other expert report (by Dr. Wildeman) on which his reports relied, or because the underlying report uses inferential data (including incarceration data rather than conviction data, and certain national data rather than New York City specific data).[22]  Defs.' Mot., ECF No. 97-1 at 8, 11, 15, 17.  It is entirely appropriate for an expert to base his or her assumptions on facts provided by other experts.  See Verizon Directories Corp. v. Yellow Book USA, Inc., 331 F. Supp. 2d 134, 136 (E.D.N.Y. 2004).  Defendants' concerns regarding the inferences drawn in Plaintiff's experts' reports go to the weight of Dr. Parnell's analysis, not its admissibility.  See

---

[20] Defendants also argue that Dr. Parnell's testimony should be excluded because Dr. Parnell mistakenly believed there was a ban excluding tenants with criminal convictions – both felonies and misdemeanors.  Defs.' Mot., ECF No. 97-1 at 10-11.  Experts may rely on factual assumptions as they prepare their reports.  See Lee Valley Tools, Ltd. v. Indus. Blade Co., 288 F.R.D. 254, 267 (W.D.N.Y. 2013) (finding that an "expert opinion is not per se unreliable" even if it "relies upon some unverified or inaccurate information provided by the expert's client").  One party's belief that one of these assumptions is incorrect, when that assumption is a key undecided fact in the litigation, is not a basis to preclude expert testimony.  At trial, Defendants may cross-examine Dr. Parnell in light of evidence that may undermine his assumption.

[21] To the extent Dr. Parnell seeks to opine on the existence of a criminal record ban at the Sand Castle, that factual testimony would likely be precluded as unrelated to Dr. Parnell's expertise.

[22] Defendants do not expressly move to exclude Dr. Wildeman's testimony, but, through their challenge of Dr. Parnell discussed above, Defendants raise certain concerns about the data on which Dr. Wildeman relies – namely, his use of incarceration data as a proxy for conviction and his use of national data.  To the extent Defendants intended to move to exclude Dr. Wildeman's testimony, such motion is denied for the same reasons Defendants' challenges to Dr. Parnell's testimony are rejected.  Again, at trial, Defendants may cross-examine the experts as to those evidentiary assumptions.

Anderson Grp., 805 F.3d at 50 (stating that contentions that an expert's assumptions are unfounded go to weight, not admissibility); Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.), 169 F. Supp. 3d 396, 432 n.23 (S.D.N.Y. 2016) ("Extrapolation from studies to support an expert's conclusions . . . may at times go to the weight and not the admissibility of expert testimony.").

For the foregoing reasons, Defendants' motion to exclude Dr. Parnell's testimony is denied.

### c.  Mr. Welsch

Defendants seek to offer the testimony of Donald Welsch, a labor economist with forty years' experience in economic analysis and econometric and financial modeling.  Welsch Report, Ex. 25, ECF No. 94-11 at 6.  Mr. Welsch submitted two reports – the first (the "Welsch Report") and the second (the "Supplemental Welsch Report," collectively the "Welsch Reports") – and a supporting declaration (the "Welsch Declaration").  Decision on the admissibility of the Welsch Reports and the Welsch Declaration is not necessary at this time as consideration of these reports would not change the outcome of the Parties' respective summary judgment motions.

The Court notes that Plaintiff has raised serious concerns about the utility of the Welsch Reports and their admissibility pursuant to Evidence Rule 702 and Daubert.  See Brown, 2016 WL 5802779, at *5 ("The standards governing the admissibility of expert testimony are set forth in Rule 702 of the Federal Rules of Evidence, and are further clarified in Daubert v. Merrell Dow Pharmaceutical Inc. . . . .").  The Welsch Reports provide conclusions with limited-to-no analysis, and Mr. Welsch indicates that he did not look at the documents relied on by Plaintiff's experts despite opining on the reliability of Plaintiff's experts' analyses.  See Welsch Reports, Exs. 25 & 26, ECF No. 94-11.  See Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d

461, 473 n.2 (S.D.N.Y. 2005) ("[A]n expert basing his opinion solely on experience must do more than aver conclusorily that his experience led to his opinion . . . ."). The Welsch Declaration has greater indicia of reliability, but it is insufficient to sustain Defendants' motion for summary judgment and relies in part on at least one significant piece of inadmissible evidence (the Tenant Roster, see supra note 5).

## V.      DISPARATE IMPACT ANALYSIS

"A disparate impact analysis examines a facially-neutral policy or practice . . . for its differential impact or effect on a particular group." Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 933 (2d Cir. 1988). Claims of disparate impact under the FHA are analyzed "under a modified version of the burden-shifting analysis usually applied to employment discrimination cases under Title VII of the Civil Rights Act of 1964." Quad Enters., 369 F. App'x at 205-06; see McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In order make out a prima facie case of disparate impact, Plaintiff must show:  "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Rivera v. Inc. Vill. of Farmingdale, 784 F. Supp. 2d 133, 142 (E.D.N.Y. 2011) (citations omitted). Plaintiff "need not show [Defendants'] action was based on any discriminatory intent," but Plaintiff must "prove that the [challenged] practice 'actually or predictably results in . . . discrimination.'" Id. at 142 (quoting Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 90 (2d Cir. 2000)). Plaintiff must also "show a causal connection between the facially neutral policy and the alleged discriminatory effect." Id. (citations omitted). If Plaintiff successfully makes this showing, the burden shifts to Defendants to prove that the policy furthered a legitimate, bona fide and nondiscriminatory interest. Mhany Mgmt., 819 F.3d

at 617.  If Defendants meet their burden, the burden shifts back to Plaintiff to show that the legitimate, bona fide and nondiscriminatory interest "supporting the challenged practice could be served by another practice that has a less discriminatory effect."  Id. at 617-18.

### a. There Is A Question Of Fact Whether Defendants Applied A Criminal Record Ban

The Court finds that, at the outset, there is a threshold issue of fact as to whether Defendants applied a blanket ban against individuals with criminal convictions.

Plaintiff presents sufficient evidence that Defendants exclude tenants with criminal records to defeat Defendants' motion for summary judgment on this issue.  Plaintiff provides testimony regarding and transcripts of conversations between Fortune's employees and Defendants' employees in which Defendants' employees indicated that the Sand Castle would not rent to ex-offenders, and that a criminal record was a red flag.  See, e.g., Ex. 17, ECF No. 94-5 at 1706-07; Ex. 19, ECF No. 94-7 at 3-4; Ex. 58, ECF No. 94-14 at 11, 13.  Plaintiff also points to the Craigslist Email, the Craigslist Response Emails and other correspondence with brokers and real estate agents that state some variation of "no criminal record" as a tenant criterion.  See, e.g., Ex. 38, ECF No. 94-13 at 133-71; Ex. 47, ECF No. 94-13 at 205; Ex. 48, ECF No. 94-13 at 209; Ex. 49, ECF No. 94-13 at 212; Ex. 50, ECF No. 94-13 at 214.  The testimony of some of Defendants' agents further supports the assertion that such criteria exists.  See, e.g., Ex. 2, ECF No. 94-4 at 319-20; Ex. 6, ECF No. 94-4 at 936-38; Pl.'s 56.1 Stmt. ¶ 114, ECF No. 94-2; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 114, ECF No. 131.

On the other hand, Defendants present sufficient evidence to avoid a finding as a matter of law that such a ban exists, or, if it does, to dispute the scope of that ban.  First, there are

multiple tenants with criminal backgrounds currently living in the Sand Castle.[23]  Defs.' 56.1

Stmt. ¶ 32, ECF No. 97-2; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 32, ECF No. 98-2.  Second, prior to

this litigation, Fortune placed at least four of its clients at the Sand Castle without issue and

without background checks.  Pl.'s Opp'n 56.1 Stmt. ¶¶ 295-297, ECF No. 98-1.  Although

Defendants admit that background checks are standard, this deviation from that practice and

admission of four tenants with criminal history undercuts Plaintiff's argument that a ban exists.

Defendants' employees also testified that Defendants do not bar individuals with criminal history

and instead conduct a case-by-case analysis.[24]  Ex. 2, ECF No. 94-4 at 260-63, 330; Ex. 10, ECF

No. 94-5 at 701.

---

[23] Although Plaintiff discounts these individuals from its analysis by excluding individuals with
traffic offenses from its argument and stating that certain of these individuals were admitted in
error or admitted after this litigation began, even Plaintiff acknowledges that some number of
individuals remain after its exclusions.  Pl.'s Opp'n 56.1 Stmt. ¶¶ 113, 121-226, ECF No. 98-1.

[24] Plaintiff offers stronger evidence of a felony ban than a ban encompassing felonies and
misdemeanors, but the Court finds there still remains a question of fact on this narrower issue.
Despite her testimony regarding the existence of a felony ban, Ms. Campbell also testified that
she would escalate an applicant's file if the applicant had a record of robbery (a felony) for her
manager's consideration.  Ex. 2, ECF No. 94-4 at 262-63, 319-20, 323, 328.  Her supervisor, Mr.
Tress testified that a felony conviction did not result in an applicant's automatic rejection and
that the application would be reviewed case-by-case.  Ex. 10, ECF No. 94-5 at 698; see also id.
at 701.  It is undisputed that there are Sand Castle tenants who have felony convictions.  Defs.'
56.1 Stmt. ¶ 32, ECF No. 97-2; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 32, ECF No. 98-2.  Regardless,
as discussed below in Section V(b), the Court does not find Plaintiff's expert testimony
conclusive enough to sustain a finding of a disparate impact on summary judgment – particularly
with respect to a more limited felony-only ban on which Plaintiff's experts do not specifically
opine.  See Wildeman Report, Ex. 27, ECF No. 94-12 at 4 (noting that disparities in conviction
and incarceration are substantial across a range of offense types and "it is incredibly unlikely that
removing only a handful of specific offense types from the analysis, which is not possible with
the data at hand for a number of reasons, would change the conclusion of [the] report in any
substantial way"); Parnell Report, Ex. 23, ECF No. 94-9 at 7 (relying on Dr. Wildeman's
cumulative proportions).  Accordingly, the Court need not parse whether there is a more limited
scope ban as that determination would not alter its conclusions with respect to summary
judgment and the scope of any ban is a determination better left to the fact-finders.

With respect to the written statements and advertisements stating "no criminal background," Ms. Campbell stated during her deposition that this language was merely a "broad prospective [sic]" and a way to avoid "get[ting] into the details as far as what kind of background is accepted or not." Ex. 2, ECF No. 94-4 at 340. Mr. Tress stated during his deposition that the language in the advertisement was a way of letting potential applicants know what information Defendants would be looking at and that "[t]heir criminal background shouldn't be a bad criminal background." Ex. 10, ECF No. 94-5 at 731. Mr. Tress also stated in his deposition that this language was not an accurate reflection of the Sand Castle's requirements, noting that not all tenants met the credit score, landlord tenant or criminal background criteria set forth in the communications. Ex. 10, ECF No. 94-5 at 710-11. Notably, these same written communications also state that an applicant must have a credit score of 600+ and no landlord tenant court record, Ex. 38, ECF No. 94-13 at 133-71, but both sides agree that these "criteria" were flexible and not strictly enforced. Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 172, ECF No. 131; Pl.'s 56.1 Stmt. ¶¶ 159-78, ECF No. 94-2.

For the foregoing reasons, a question of fact remains as to whether Defendants implemented a criminal record ban and, if so, the scope of such ban. Accordingly, summary judgment for Plaintiff is denied as Plaintiff cannot meet its burden without this initial showing that a ban exists.

### b. There Is Conflicting Expert Testimony Regarding The Impact Of Any Blanket Ban

In addition to the material question of fact regarding whether Defendants implemented a criminal record ban and, if so, the scope of that ban, there also remains a question of material fact regarding the impact of any such ban. "The basis for a successful disparate impact claim involves a comparison between two groups–those affected and those unaffected by the facially

neutral policy." Rivera, 784 F. Supp. 2d at 142-43 (citations omitted).  "This comparison must reveal that although neutral, the policy in question imposes a 'significantly adverse or disproportionate impact' on a protected group of individuals."  Id. (citations omitted).  "Often[], disproportionate impact is demonstrated through the use of statistics."  Valdez v. Town of Brookhaven, No. 05 Civ. 4323 (JS), 2005 WL 3454708, at *13 (E.D.N.Y. Dec. 15, 2005).

Plaintiff relies on the expert testimony of Dr. Parnell and Dr. Wildeman[25] to provide a statistical analysis establishing the alleged disparate impact of the alleged criminal record ban.[26] Dr. Wildeman estimates "the degree of racial disparity in the lifetime risk of being convicted of a crime."  Wildeman Report, Ex. 27, ECF No. 94-12 at 3.  In doing so, Dr. Wildeman relies on certain inferences, including relying on incarceration data as a proxy for conviction data and using national and state data rather than New York City-specific data.  Id. at 3, 13-14.  Dr. Parnell relies on Dr. Wildeman's findings based on national data to, as described in more detail in Section IV(b) above, assess the statistical significance of any impact a policy excluding individuals with criminal backgrounds from the Sand Castle would have on individuals of different races in specified housing markets.  See supra Section IV(b).  Dr. Parnell looks to the

---

[25] Defendants object to Plaintiff's experts' reports as hearsay because they are purportedly unsworn.  Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ 179, 192, 219, 260, ECF No. 131.  This objection lacks merit as each of Plaintiff's experts provided a sworn declaration in support of their reports (with the exception of Dr. Kazemian, whose report was sworn).  Ex. 21, ECF No. 94-7; Ex. 51, ECF No. 94-13; Ex. 22, ECF No. 94-8 at 8.

[26] The Supreme Court recently made clear that disparate impact in the context of the FHA is not to be interpreted too broadly, stating that the "FHA is not an instrument to force housing authorities to reorder their priorities," and a "robust causality requirement is important."  Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc. ("ICP"), 135 S. Ct. 2507, 2512, 2522 (2015).  This area of law is evolving as the circuit courts interpret this new language, with circuit courts conflicting in their understanding and the future of disparate impact law under the FHA uncertain.  Compare Inclusive Communities Project, Inc. v. Lincoln Prop. Co., 920 F.3d 890 (5th Cir. 2019), with Reyes v. Waples Mobile Home Park Ltd., 903 F.3d 415 (4th Cir. 2018).

potential applicant pool for the Sand Castle by considering a variety of surrounding housing markets and analyzing several potential income ranges.  Parnell Report, Ex. 23, ECF No. 94-9; Supplemental Parnell Report, Ex. 24, ECF No. 94-10.  He concludes that for each income range and each housing market considered, the higher proportions of African-American and Latino individuals compared to White individuals that would be adversely affected by a criminal record ban is statistically significant.  Parnell Report, Ex. 23, ECF No. 94-9 at 12; Supplemental Parnell Report, Ex. 24, ECF No. 94-10 at 10.  In other words, Dr. Parnell opines that the disparity between those who would be impacted by such a ban who are African-American or Latino compared to those who are White is not due to random chance.  Dr. Parnell does not analyze data specific to the Sand Castle.

Although a reasonable fact-finder could credit Plaintiff's experts' testimony and other evidence to find Plaintiff proved a ban creates a disparate impact, Defendants raise sufficient challenges regarding the underlying methodology and conclusions to make summary judgment inappropriate on this issue.  See Brown v. Cty. of Nassau, 736 F. Supp. 2d 602, 620 (E.D.N.Y. 2010) (finding that where defendant challenged the methodology and conclusions of plaintiff's unopposed expert, defendant was entitled to have the fact-finder evaluate the testimony and credibility of the plaintiff's expert); see also Penree v. City of Utica, No. 13 Civ. 1323 (MAD), 2016 WL 915252, at *23 (N.D.N.Y. Mar. 4, 2016) (finding that a "jury is free to refuse to credit an expert's opinion even when there is no expert rebuttal").  Although the decisions of Plaintiff's experts to rely on a broader potential applicant pool outside of the actual pool of Sand Castle applicants is reasoned, adequately based in law and sufficient for the Court to find the testimony admissible, the more tangential nature of the analysis may diminish the weight a fact-finder would afford the conclusions.  See Deutsch v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 433-

34 (E.D.N.Y. 2011) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."); see also In re Mirena, 169 F. Supp. 3d at 432 n.23.  In the same vein, the experts' decisions to rely on incarceration data as a proxy for conviction, and the application of national statistics to the New York housing market, are appropriate decisions within the scope of an expert's discretion, but they could decrease the weight a fact-finder would afford the experts' conclusions as applied to the Sand Castle. "[W]hile the threshold issue of whether a particular witness qualifies as an expert is one for the judge to determine, it is for the jury to decide what weight should be given to the testimony." Hilaire v. DeWalt Indus. Tool Co., 54 F. Supp. 3d 223, 235 (E.D.N.Y. 2014); see Brown, 736 F. Supp. at 620 ("Courts have recognized that the grant of a motion for summary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony." (internal quotation marks omitted)).  Thus, even assuming the Sand Castle implements some type of criminal record ban – a question of fact that remains open – Plaintiff has not demonstrated as a matter of law that such a ban has a disparate impact on African-American and Latino persons, and Plaintiff's motion for partial summary judgment on this issue is denied.

### c.  The Record Is Underdeveloped Regarding Remaining Issues

For the reasons discussed above, the Court finds a question of fact remains as to the first prong of the burden-shifting framework – whether the Sand Castle has the policy in question and, if so, whether that policy has a disparate impact on African-American and Latino persons.  In light of that determination, the Court cannot grant summary judgment on the disparate impact claim in Plaintiff's favor.  Although this finding does not prohibit the Court from finding summary judgment in Defendants' favor on this claim should the Court find for

Defendants on the second prong of the burden-shifting test, such a finding would be inappropriate at this stage because the record with respect to the second prong is underdeveloped.

In order to find summary judgment for Defendants on Plaintiff's disparate impact claim, the Court would have to assume there was a ban, but find that Defendants had carried their burden on the second prong, showing a legitimate business reason for the ban.  Defendants have not argued that they have a legitimate business reason for a criminal record ban and, in fact, they "concede that a blanket ban would not be narrowly tailored to balance the safety of the building and other tenants with the rights of a potential applicant."  Defs.' Mot., ECF No. 97-1 at 38; see id. at 25; HUD Guidance, ECF No. 97-35 at 6 ("A housing provider that imposes a blanket prohibition on any person with any conviction record – no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then – will be unable to meet this burden [of showing the policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest].").  Defendants instead argue that they have a legitimate business reason for using the case-by-case review of applicants with criminal convictions they claim to use.  Defs.' Mot., ECF No. 97-1 at 38.  Because the Court has not determined as a matter of law that the type of review on which Defendants' argument is based is applied, it cannot grant Defendants' motion for summary judgment with respect to Plaintiff's disparate impact claim.  There must first be a factual determination of whether a ban exists and the scope of any such ban.

The Court notes that the record is similarly underdeveloped with respect to the third prong of the burden-shifting framework.  The Supreme Court stated that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical

44

business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system.  And before rejecting a business justification . . . a court must determine that a plaintiff has shown that there is an available alternative practice that has a less disparate impact and serves the entity's legitimate needs."  ICP, 135 S. Ct. at 2518 (alterations omitted).  Although Plaintiff argues that the Sand Castle could do a case-by-case assessment of each applicant's criminal history, it has not addressed the practicalities of its proposal in the context of the real estate industry.  Plaintiff itself notes that Mr. Tress did not know the difference between a misdemeanor and a felony conviction, and neither Mr. Tress nor Ms. Campbell know how to determine the age of an applicant's conviction or sentence.  Pl.'s 56.1 Stmt. ¶¶ 120, 130, ECF No. 94-2.  Yet it expects these same employees to make informed and thoughtful case-by-case assessments of an individual's likelihood of recidivism and danger to the community.  Plaintiff does not explain where Defendants should obtain adequate information to conduct this in-depth analysis or how Defendants should train their employees (or the costs and resources necessary for such trainings), such that their employees could make considered and appropriate, rather than arbitrary, determinations based on an applicant's criminal background.

For all of the reasons set forth above, summary judgment is denied for both Plaintiff and Defendants as to the disparate impact claim.

## VI.   DISPARATE TREATMENT DISCUSSION

"A plaintiff can establish a prima facie case of disparate treatment by showing that animus against the protected group was a significant factor in the position taken by the . . . decision-makers themselves or by those to whom the decision-makers were knowingly responsive."  Mhany Mgmt., 819 F.3d at 606 (internal quotation marks omitted).  "[A] district court facing a question of discriminatory intent must make 'a sensitive inquiry into such

circumstantial and direct evidence of intent as may be available. The impact of the official action whether it bears more heavily on one race than another may provide an important starting point.'" Id. (quoting Arlington Heights, 429 U.S. 252, 267 (1977)). "[U]nless a clear pattern, unexplainable on grounds other than race, emerges, impact alone is not determinative and the Court must look to other evidence." Id. (internal quotation marks & citation omitted). This other evidence includes whether the historical background of the policy reveals a series of actions taken for invidious purposes, departures from normal procedure and contemporary statements or information (the "Arlington factors"). Id. Here, Plaintiff has not offered evidence to suggest discriminatory intent.

Plaintiff's assertion that Defendants' building renovations and improvements demonstrate that Defendants sought to attract higher income tenants, likely to skew white, Pl.'s Opp'n Mot., ECF No. 98 at 41, is contradicted by the Regulatory Agreement, which restricts the complex to primarily low-income tenants, Defs.' 56.1 Stmt. ¶¶ 4-8, ECF No. 97-2; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 4-8, ECF No. 98-2. The only other evidence Plaintiff offers in support of its allegations of intentional discrimination is its "strong evidence of disparate impact." Pl.'s Opp'n Mot., ECF No. 98 at 41. Whether the impact of an action bears more heavily on one race than another is a relevant factor in assessing discriminatory intent, but any such impact standing alone is insufficient to sustain a disparate treatment claim.[27] Mhany Mgmt., 819 F.3d at 606 (stating that

_____

[27] Plaintiff relies on Teamsters, 431 U.S. at 335 n.15, for the proposition that it need only show a statistical disparity to support a disparate treatment claim. "Outside the class context, however, private plaintiffs may not invoke the Teamsters method of proof as an independent and distinct method of establishing liability." Chin v. Port Auth. of NY & NJ, 685 F.3d 135, 150 (2d Cir. 2012).

"impact alone is not determinative" of intent and "the Court must look to other evidence"

(internal quotation marks & citations omitted)); see Arlington Heights, 429 U.S. at 265

("[D]isproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious

racial discrimination.  Proof of racially discriminatory intent or purpose is required to show a

violation of the Equal Protection Clause." (internal quotation marks & citation omitted)).  The

Court must consider the totality of the circumstances, and may look to the Arlington factors for

guidance.  Rivera, 784 F. Supp. 2d at 147.

Plaintiff offers and the Court sees no evidence that any of the other Arlington factors

suggests discriminatory intent.  Plaintiff provides no evidence that the alleged decision by

Defendants to exclude individuals with criminal histories was unusual or a departure from

normal procedure, nor does it offer any statements by Defendants or their agents suggesting

discriminatory animus toward African-American or Latino persons.  Considering the totality of

circumstances in light of the Arlington factors, no reasonable fact-finder could find on the record

before the Court that Defendants acted with discriminatory intent.  Accordingly, Defendants'

motion for summary judgment with respect to Plaintiff's claim of disparate treatment under the

FHA, ECF No. 97-1 at 38-39, is granted.

Defendants' motion for summary judgment with respect to Plaintiff's state and city

claims for disparate treatment (NYSHRL, NY Executive Code § 296(5) & NYCHRL,

Administrative Code of City of NY § 8-107(5)) is also granted.  "NYSHRL, and NYCHRL

housing discrimination claims are analyzed under the same standard as claims made under the

FHA" because they contain language that is substantively identical to that of the FHA, differing

in that the NYSHRL and NYCHRL cover a broader range of protected classes.  Haber v. ASN

47

50th St. LLC, 847 F. Supp. 2d 578, 588 & n.5 (S.D.N.Y. 2012).[28]  "Because Plaintiff's claims of alleged discriminatory treatment under the FHA fail for lack of discriminatory animus, a requisite element under the McDonnell Douglas test, Plaintiff's state [and city] law discriminatory treatment claims also fail."  Favourite v. 55 Halley St., Inc., No. 16 Civ. 4285 (NSR), 2019 WL 2226762, at *12 (S.D.N.Y. May 23, 2019); see Haber, 847 F. Supp. 2d at 588 & n.5.

---

[28] For the same reason, Plaintiff's state and city law claims based on alleged disparate impact survive summary judgment.  See id.; Jackson v. Tryon Park Apartments, Inc., No. 18 Civ. 6238 (EAW), 2019 WL 331635, at *5 (W.D.N.Y. Jan. 25, 2019) ("We have consistently held that the standards for recovery under the New York Human Rights Law are in nearly all instances identical to federal law." (internal quotation marks, citations, & alterations omitted)); Williams v. NYCHA, 879 F. Supp. 2d 328 (E.D.N.Y. 2012) (dismissing state and city disparate impact claims because they were "analogs" of the FHA disparate impact claim, which had been dismissed).

## VII.   CONCLUSION

For the reasons stated above, Plaintiff's motion for partial summary judgment is denied; Defendants' cross-motion for summary judgment is denied with respect to Plaintiff's disparate impact claim and granted with respect to Plaintiff's disparate treatment claim; Defendants' motion for dismissal based on lack of standing is denied.  Defendants' motion to exclude the testimony of Dr. Parnell is denied, and Plaintiff's motion to exclude the testimony of Mr. Welsch is denied as moot, but may be renewed without prejudice for pre-trial motions.

At the upcoming Status Conference, the Parties should be prepared to discuss the underdeveloped areas referenced above, a timeline for submission of a joint pre-trial order, trial scheduling and any potential for settlement.  The Parties are to read and consider the Court's alternative dispute resolution program information available on the Court's website and discuss whether they wish the Court to provide a referral.  The program information is available at: https://www.nyed.uscourts.gov/alternative-dispute-resolution.


Dated:  Brooklyn, New York
        July 3, 2019


*Vera M. Scanlon*
_____
        VERA M. SCANLON
        United States Magistrate Judge